**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

*Counsel for Lead Plaintiffs*
*Universal and ACATIS, and*
*Lead Counsel for the Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Illumina, Inc. Securities Litigation* | Case No. 3:23-cv-02082-LL-BJC<br><br>CLASS ACTION<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Courtroom: 6D<br>Judge:  Hon. Linda Lopez |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ...................................................................................................... xii

I.  INTRODUCTION ..................................................................................... 1

II.  STATEMENT OF FACTS ......................................................................... 7

   A.  Illumina Forms GRAIL ................................................................... 7

   B.  Illumina Creates the Appearance that It Cedes Control Over Grail .......................................................................................... 8

   C.  Illumina Reacquires GRAIL and Antitrust Regulators Intervene ......................................................................................... 8

   D.  Illumina Defies Its Antitrust Regulators and Closes the GRAIL Transaction, Claiming Doing so Was Necessary to "Save Lives" ................................................................................. 9

   E.  Defendants Continue to Misrepresent GRAIL ............................... 9

      1.  Defendants' Inflated GRAIL Valuations ............................. 10

      2.  Illumina Could Not "Accelerate" Galleri ........................... 10

      3.  Galleri's Deficient Clinical Data and Impossible Timeline. ............................................................................. 11

   F.  Illumina Reacquired GRAIL So That Insiders Could Profit ............................................................................................. 13

   G.  Defendants Close the Deal in Order to Cash Out .......................... 14

   H.  The Acquisition Enriches Defendants and Injures Investors ........................................................................................ 15

III.  ARGUMENT ......................................................................................... 16

   A.  Defendants Made False and Misleading Statements ...................... 16

      1.  GRAIL's False Financial Valuations Are Actionable And Illumina Had a Duty to Disclose Its Own Contrary Forecasts ................................................. 17

      2.  Defendants' Statements About Illumina's Ability to "Accelerate" Adoption And "Save Lives" Are Actionable ........................................................................... 22

      3.  Defendants' Statements About Galleri's Clinical Data And Timeline For FDA Approval Were False And Misleading .................................................................. 28

4.    Illumina's Denials Of Conflicts Were False and Misleading ............................................................. 35

5.    Illumina Made False And Misleading Statements Concerning Its Accounting For GRAIL ................... 38

B.    Defendants Acted With Scienter .................................................. 40

1.    The Complaint Pleads A Strong Inference of Scienter ............................................................ 41

2.    Defendants' Scienter Arguments Are Meritless ...................... 49

3.    The Remaining Allegations Support Scienter ......................... 55

4.    A Holistic Analysis Supports A Strong Inference of Scienter ............................................................ 56

C.    The Complaint Adequately Pleads Loss Causation ....................... 58

1.    The Complaint Alleges Loss Causation With Particularity ........................................................ 58

2.    Defendants' Arguments Fail ...................................................... 61

D.    The Complaint Adequately Pleads Scheme Liability .......................... 64

IV.    CONCLUSION .................................................................................. 65

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*In re Aetna, Inc. Sec. Litig.*,
    34 F. Supp. 2d 935 (E.D. Pa. 2002) .................................................................27

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ...........................................................................42

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ........................................................48, 54

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .........................................................................16, 64

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .....................................................................................61

*Anderson v. McGrath*,
    2013 WL 1249154 (D. Ariz. Mar. 26, 2013) .....................................................58

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .....................................................40

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) ......................................................31, 35

*In re ArthroCare Corp. Sec. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................54

*Azar v. Blount Int'l, Inc.*,
    2017 WL 1055966 (D. Or. Mar. 20, 2017) ...................................................18, 20

*Bajjuri v. Raytheon Techs. Corp.*,
    641 F. Supp. 3d 735 (D. Ariz. 2022) ...............................................................56

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................*passim*

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..........................................28, 29, 43

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) .............................................................34

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ........................................................59, 62

*Bond v. Clover Health Invs., Corp.*,
   587 F. Supp. 3d 641 (M.D. Tenn. 2022) .....................................39, 40

*Chew v. MoneyGram Int'l, Inc.*,
   2024 WL 4346522 (N.D. Ill. Sept. 30, 2024).....................................24

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........................................44, 53

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
   Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..............................................................26

*City of Roseville Employees' Retirement System v. Horizon Lines,
   Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010)....................................................31

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser
   Grp PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022) ..................................................25

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   527 F. Supp. 3d 1151 (N.D. Cal. 2021)..........................................30, 31

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ............................................................28

*In re CV Therapeutics, Inc.*,
   2004 WL 1753251 (N.D. Cal. 2004) ..................................................29

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...............................................31, 39, 65

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ................................................33

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) .........................................................43, 47

*Farhar v. Ontrak, Inc.*,
   714 F. Supp. 3d 1198 (C.D. Cal. 2024) ..............................................34

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ...................................................................25, 26

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................51

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ................................................45, 65

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ..........................................................58, 61

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ................................................2, 16, 25, 33

*Glazer v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................49

*Gregory v. ProNAi Therps. Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................25

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ......................................33

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ......................................24

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ...........................24, 26, 27, 32

*In re Hot Topic, Inc. Sec. Litig.*,
  2014 WL 7499375 (C.D. Cal. May 2, 2014) ........................................18

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...............................................................19

*Huang v. Higgins*,
  2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ......................................63

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014)...........................................24, 25, 34

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  998 F.3d 397 (9th Cir. 2021) .................................................................58

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016).......................................................57, 60

*Jaeger v. Zillow Grp., Inc.*,
    644 F. Supp. 3d 857 (W.D. Wash. 2022) ..............................................................33

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)............................................................................................19

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017)......................................................35

*Karinski v. Stamps.com*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ........................................................61

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .......................................................................*passim*

*Kipling v. Flex Ltd.*,
    2020 WL 2793463 (N.D. Cal. May 29, 2020)......................................................31

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
    242 F. Supp. 3d 950 (C.D. Cal. 2017) .................................................................38

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sept. 27, 2012).....................................................34

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    639 F. Supp. 3d 350 (E.D.N.Y. 2022) .................................................................25

*Laborers Dist. Council Constr. Indus. Pension Fund v. Sea Ltd.*,
    2024 WL 3708800 (D. Ariz. Aug. 7, 2024) ........................................................21

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................................................51

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .......................................................................60, 63

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ..............................................................................63

*Lorenzo v. Sec. & Exch. Comm'n*,
    587 U.S. 71 (2019)..............................................................................................64

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024)................................................................*passim*

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2012) ...................................43, 47, 62

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)....................................................32, 41, 49

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021)..............................60, 63

*Mauss v. NuVasive, Inc.*,
    2016 WL 3681831 (S.D. Cal. July 12, 2016) ....................................60

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
    2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ....................................55

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)......................................49, 52

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................63

*Miller v. Inv. Tr. v. Morgan Stanley & Co., LLC*,
    308 F. Supp. 3d 411 (D. Mass. 2018)........................................40

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .............................................16

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ........................................*passim*

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015).....................................39, 49

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020).....................................20, 21

*In re Mullen Auto. Sec. Litig.*,
    2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ...................................22

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014).................................*passim*

vii
    CASE NO. 3:23-CV-02082-LL-BJC
    PLAINTIFFS' OMNIBUS OPP. TO DEFS.' MTD

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ...................................................31, 41

*In re Mylan N.V. Sec. Litig.*,
    2023 WL 3539371 (W.D. Pa. May 18, 2023) ....................................................65

*In re Myriad Genetics, Inc.*,
    2021 WL 977770 (D. Utah Mar. 16, 2021) .......................................................48

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013) ..........................................................50

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................................38

*In re Nature's Sunshine Prods. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ..............................................................46

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
    2017 WL 4453561 (D. Or. Oct. 3, 2017) ..........................................................18

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ............................................................................30

*In re Nevsun Res. Ltd.*,
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ............................................46, 51

*Ng v. Berkeley Lights*,
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ....................................................30

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...........................................................................31

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................43, 47

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................................44

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ....................................................................46, 51

*Okla. Firefighters Pension & Ret. Sys. v. SNAP Inc.*,
    No. 23-3932 (9th Cir. Dec. 20, 2024), ECF No. 54.1 .......................................47

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018) ....................................................23, 37

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................26, 32, 40

*Palm Harbor v. First Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023) ...........................................62

*Pampena v. Musk*,
    705 F. Supp. 3d 1018 (N.D. Cal. 2023) ...................................................54

*Pittleman v. Impac Mortg. Holdings, Inc.*,
    2009 WL 648983 (C.D. Cal. Mar. 9, 2009)..............................................56

*Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*,
    2023 WL 4418886 (N.D. Cal. May 24, 2023)..........................................65

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ................................................................61

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .........................................48

*In re Quality Systems, Inc. Securities Litigation*,
    865 F.3d 1130 (9th Cir. 2017) ........................................................*passim*

*In re QuantumScape Sec. Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022).............................21, 28, 34, 62

*In re Regulus Therapeutics Inc. Securities Litigation*,
    406 F. Supp. 3d 845 (S.D. Cal. 2019)......................................................56

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020).........................................55

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
    2024 WL 4354809 (S.D.N.Y. Sept. 30, 2024) ......................................19

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) .....................................................................47

*Rudolph v. UTSTarcom*,
    2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) .......................................60

*In re Salix Pharm., Ltd.,*
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..................................................48

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.,*
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) .................................................48, 55

*Schueneman v. Arena Pharms., Inc.,*
    840 F.3d 698 (9th Cir. 2016) ...........................................................*passim*

*SEC v. Daifotis,*
    2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ......................................................19

*SEC v. Richman,*
    2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ......................................................65

*Seeks v. Boeing Co.,*
    2024 WL 4367846 (N.D. Ill. Sept. 30, 2024) ....................................................25

*In re Silvercorp Metals, Inc. Sec. Litig.,*
    26 F. Supp. 3d 266 (S.D.N.Y. 2014) .............................................................50, 54

*In re SLM Corp. Sec. Litig.,*
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ...........................................................46, 50

*Smilovits v. First Solar Inc.,*
    119 F. Supp. 3d 978 (D. Ariz. 2015) ..............................................................62

*In re Smith Barney Transfer Agent Litig.,*
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) ..............................................................19

*Smith v. NetApp, Inc.,*
    2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ......................................................24

*In re Splash Tech. Holdings, Inc. Sec. Litig.,*
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ...................................................53

*Steinberg v. Schmidt Industries*, Inc.
    2024 WL 1007879 (D. Or. Feb. 2, 2024) ..........................................................54

*Stocke v. Shuffle Master, Inc.,*
    615 F. Supp. 2d 1180 (D. Nev. 2009).............................................................51

*Strezsak v. Ardelyx, Inc.,*
    2024 WL 1160900 (N.D. Cal. Mar. 18, 2024) ....................................................34

*In re Surebeam Corp. Sec. Litig.*,
  2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ......................................24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)............................................................*passim*

*United States v. Chang*,
  2024 WL 2817494 (E.D.N.Y. Mar. 31, 2024)..................................19

*Utesch v. Lannett Co., Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019) ..........................................44

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)...........................................55

*In re Vaxart, Inc. Sec. Litig.*,
  2023 WL 3637093 (N.D. Cal. May 25, 2023)..........................64, 65

*In re VeriFone Holdings, Inc., Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .......................................................40

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) .............................................18

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).................................................................21

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ....................................................*passim*

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023)...........................................35

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ......................................................28

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
  2024 WL 1327247 (N.D. Cal. Mar. 27, 2024) ...............................59

*Zak v. Chelsea Theraps. Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) .......................................................28

*Zucco Partners, LLC v. Digimarc Corporation*,
  552 F.3d 981,1002 (9th Cir. 2009) ..............................................56

# GLOSSARY

| Term | Definition |
|------|-----------|
| ALJ | Chief Administrative Law Judge D. Michael Chappell, who presided over *In the Matter of Illumina Inc., and GRAIL, Inc.*, Docket No. 9401. |
| App'x A | Appendix A, Plaintiffs' Response to Defendants' Chart of Challenged Statements (ECF No. 62-4), filed herewith. |
| App'x B | Appendix B, Plaintiffs' Response to Defendants' Chart of Former Employee & Confidential Witness Allegations (ECF No. 62-5), filed herewith. |
| Aravanis | Alexander M. Aravanis, M.D., Ph.D. ¶36. |
| Bishop | Hans Bishop. ¶41. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class Period | September 21, 2020 to November 9, 2023, inclusive. |
| CMO | Chief Medical Officer. |
| Complaint or ¶ | Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 54. |
| CTO | Chief Technology Officer. |
| Defendants | Illumina Defendants and GRAIL Defendants. |
| deSouza | Francis A. deSouza. ¶35. |
| EC | European Commission. |
| Ex. | Exhibits to Ill.RJN. |
| Executive Defendants | deSouza, Aravanis, Febbo, Samad, Thompson, Bishop, Ofman, and Klausner. |
| FE | Illumina and GRAIL former employees whose reports are discussed in the Complaint. |
| Febbo | Phillip G. Febbo, M.D. ¶37. |
| FTC | Federal Trade Commission. |
| Galleri | GRAIL's MCED test. ¶60. |
| Gr.Br. | ECF No. 68-1. |
| GRAIL | GRAIL, LLC (n/k/a GRAIL, Inc.). ¶34. |
| GRAIL Defendants | GRAIL, Bishop, Ofman, and Klausner. |
| Ill.Br. | ECF No. 62-1. |
| Ill.RJN | ECF No. 63. |
| Illumina | Illumina, Inc. ¶33. |
| Illumina Defendants | Illumina, deSouza, Aravanis, Febbo, Samad, and Thompson. |

| Term | Definition |
|---|---|
| Klausner | Richard D. Klausner, M.D. ¶43. |
| MCED | Multi-cancer early detection. ¶58. |
| Ofman | Joshua J. Ofman. ¶42. |
| Plaintiffs | Universal-Investment-Gesellschaft mbH, UI BVK Kapitalverwaltungsgesellschaft mbH, and ACATIS Investment Kapitalverwaltungsgesellschaft mbH. ¶¶31-32. |
| RJN Opp. | Plaintiffs' Omnibus Response to Defendants' Requests for Judicial Notice, filed herewith. |
| Ronaghi | Mostafa Ronaghi, Ph.D. ¶49. |
| Samad | Sam A. Samad. ¶38. |
| SEC | U.S. Securities and Exchange Commission. |
| Thompson | John W. Thompson. ¶39. |

Lead Plaintiffs submit this memorandum in opposition to the Illumina Defendants and GRAIL Defendants' Motions to Dismiss.[1]

## I.  INTRODUCTION

This case arises from Defendants' false and misleading statements concerning Illumina's $8 billion acquisition of GRAIL. Defendants told investors that, by acquiring GRAIL, Illumina would "accelerate" adoption of GRAIL's Galleri cancer test—a supposedly "proven technology" nearing FDA approval and broad commercialization—thereby "saving tens of thousands of lives" and quickly generating billions in revenue. After Illumina's stock price soared as a result of these false statements, Defendants closed the acquisition—despite ongoing antitrust reviews and a "standstill" obligation prohibiting closing—allowing the Executive Defendants to realize *hundreds of millions of dollars* in profits. Unfortunately for investors, Defendants' statements were false. In reality, Galleri was unproven and clinically useless, the FDA had rejected Galleri's planned clinical trials, and Illumina had no plan or ability to accelerate its adoption. Eventually, Illumina was forced to divest GRAIL at a *95% discount* to its purchase price, bringing an end to one of the "most disastrous attempted mergers in biotech history." Illumina's share price has crumbled as a result, inflicting massive losses on its investors, including Plaintiffs.

The Complaint provides uniquely detailed and compelling facts supporting a claim for securities fraud. These facts include the conclusions of a former Illumina director, based on internal information, that the Illumina Defendants committed fraud to benefit themselves, ¶¶232-36, 287-88; internal Illumina documents demonstrating that Defendants overstated GRAIL's valuation by billions, ¶¶100-08; Defendants' own testimony and admissions in trial proceedings, as well as judicial determinations following the trial and appeal, which confirm the falsity of several misstatements, ¶¶113-20, 151-52; and numerous well-placed witnesses who

---

[1] Unless otherwise noted, all internal citations and internal quotations are omitted and all emphasis is added.

reported facts showing that Defendants' misrepresentations concerning GRAIL and Galleri were false when made. ¶¶120, 147, 153-54.

These allegations state a claim for securities fraud under the Exchange Act. Defendants demand even more—effectively requiring irrefutable proof of wrongdoing at the pleading stage—but Ninth Circuit law holds otherwise. "Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one . . . . The PSLRA was designed to eliminate *frivolous or sham actions, but not actions of substance*," such as this one. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023).

The Ninth Circuit has well-established standards for pleading that a statement is misleading and actionable. Whether a statement is literally false or literally true is not the test; rather, a statement is misleading whenever it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Along these same lines, it is black-letter law that, once a defendant chooses to speak on a topic and touts positive information to the market, she must disclose "adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). The Complaint here alleges five principal categories of false and misleading statements.

*First*, Defendants hailed Galleri's "efficacy" and ability to "save lives." In reality, as the FTC concluded, Defendants' statements that Galleri was effective were "simply false" because there was "no clinical evidence" to support them. ¶¶121-47.

*Second*, Defendants published to investors financial projections for GRAIL valuing the company at $44 billion, making the $8 billion purchase price seem like a steal. In reality, the true projections that Defendants relied on—which they concealed—actually valued GRAIL at a fraction of that amount. ¶¶100-08.

***Third***, Defendants touted the cancer test's clinical trials, telling investors that these tests were robust enough to provide for imminent FDA approval and broad commercialization. ¶¶148-54. These statements were misleading for a host of reasons, including ***because the FDA told GRAIL that these trials were insufficient for approval*** because they did not even measure patient outcomes, let alone demonstrate positive outcomes. ¶¶136-54.

***Fourth***, Defendants repeatedly stated that Illumina would "accelerate" Galleri's adoption and that Defendants had a "very clear line of sight into how we can accelerate the plan." ¶¶109-20. In truth, as Defendants admitted in FTC proceedings, Illumina had no plan to accelerate Galleri's adoption, and lacked any relevant expertise, experience, or ability to do so.

***Fifth***, Defendants issued a series of misleading statements when confronted about their potential conflicts in pursuing the acquisition. For example, Illumina told investors that Defendant Aravanis—who stood to personally reap millions of dollars from the deal—was "recused" from any decision to sign and close the acquisition. ¶¶184, 178-93. In truth, Aravanis served as the lead "co-sponsor" for the transaction, presented the deal to Illumina's Board, and led the negotiations over its terms. ¶¶157-62. Similarly, when questioned about an insurance policy Illumina obtained for the deal, Defendants represented it was "standard" and commonplace. But when the Delaware Chancery court reviewed the policy—which had a $100 million premium that was 25 times greater than what Illumina paid the year before—the court found it so unusual that it provided a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law." ¶¶167-72, 275-81.

Ignoring the controlling law cited above and the Complaint's detailed allegations, Defendants seek dismissal by manufacturing a sideshow. Defendants' lead argument appears to be that the Complaint must be dismissed because, after Defendants showed Lead Counsel certain confidential, internal Illumina documents, Lead Counsel amended the complaint by removing one category of motive

allegations concerning Defendants' financial interest in the transaction. This argument fails for a host of reasons. To start, it is simply a diversionary tactic designed to distract the Court from the only thing that actually matters: whether the current Complaint states a claim based on the allegations inside its four corners. Second, the law is clear that a plaintiff is ***not*** required to plead a financial motive—or ***any*** motive—to state a claim for securities fraud. The fact that Plaintiffs removed one type of motive allegation ***that was never required in the first place*** is thus irrelevant. Third, although not required, the current Complaint nevertheless contains ample motive allegations, including the fact that the Executive Defendants combined ***reaped hundreds of millions of dollars in personal profits*** by misrepresenting the facts about GRAIL. ¶¶165, 284-85, 294. Klausner alone pocketed $125 million this way. ¶¶164-65. Aravanis—who secretly served as the "cosponsor" of the deal—sold every single share he received at the earliest possible moment he could precisely because he knew the truth, reaping $10 million for himself.  ¶¶159, 282, 294.

Defendants also assert that the Court must conclude as a matter of law at the pleading stage that they did not make a single misleading statement. Often, their arguments on this score rely on disputed and incomplete extrinsic evidence that—at the very best—raise disputed fact issues that cannot be decided in their favor now. Calling tactics such as these part of a larger "troubling trend" in securities cases, the Ninth Circuit has forcefully warned that the PSLRA does not permit Defendants to "present their own version of the facts at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). In one notable—but by no means unique—example, Defendants improperly and selectively introduce their own testimony before the FTC to contend they had a "good faith" belief Illumina would accelerate Galleri—***while withholding their nonpublic testimony on cross-examination by the FTC on that very topic***. This is plainly improper.

In another example, Defendants repeatedly argue that several of their challenged statements—including about Galleri's ability to "save lives," Illumina's

ability to "accelerate" Galleri's adoption, and statements concerning Galleri's clinical data—were mere "puffery."

But the law is clear that evaluating whether a statement is "puffery"—i.e., so obviously immaterial that no investor could have relied on it—entails "fact-intensive assessments that are more properly left to the jury." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Here, the "contextual" analysis that courts (or most likely juries) must undertake to assess materiality confirms that Defendants' statements were concrete and verifiable; concerned GRAIL's only product, ***which Illumina was purchasing for $8 billion in the most-important transaction in its corporate history***; were relied on by investors in valuing Illumina shares; and Defendants themselves told the market how important their own statements were, as they uttered them to allay investor concern and hold suspicious regulators at bay. These statements cannot be dismissed as "immaterial" as a matter of law now.

Defendants also repeatedly mischaracterize their own statements in an effort to whitewash them. For example, Defendants argue that their acceleration statements are not actionable because—Defendants now say—they never publicly claimed to have a concrete "plan" or "model" to do so. What nonsense. While Defendants are now forced to make this meritless argument because the evidence at the FTC trial established there was no "plan," their statements to investors during the Class Period conveyed the exact opposite. In dozens of investor calls, media appearances, and newspaper op-eds, Defendants told investors the very "reason" Illumina spent $8 billion to acquire GRAIL was to "accelerate" Galleri's adoption—and that they had a "very clear line of sight into how we can accelerate the plan." At best, Defendants' implausible rewriting of their statements creates a fact issue about how a reasonable investor understood the statement that cannot be decided now.

Along similar lines, Defendants now argue that their misleading statement that Aravanis was "recused from any decisions to sign and close the GRAIL acquisition" is not actionable because Aravanis was not a Board member and therefore could not

actually "vote" on the GRAIL deal in the first place. It is absurd to argue that Defendants' statement sought to convey only the tautological, self-evident fact that Defendant Aravanis did not serve on the Board. Rather, a reasonable investor would have understood the statement to mean that Aravanis did not meaningfully participate in the Board's decision-making. This representation created an "impression of a state of affairs that differs in a material way from the one that actually exists" because Aravanis actually served as lead "co-sponsor" of the deal, presented its merits to the Board, negotiated its terms, and led the acquisition efforts—and thus would have misled a reasonable investor under Ninth Circuit law. *Berson*, 527 F.3d at 985.

Defendants also incorrectly contend that the Complaint fails to plead facts giving rise to an inference of scienter. As the Supreme Court has explained, when considering scienter, the court must accept the plaintiffs' well-pled allegations as true, and assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, ***not*** whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007).  Critically, the inference of scienter need ***not*** be of the "smoking-gun genre," nor even "most plausible." A "tie" goes to the plaintiff. *Id.*

Here, the Complaint pleads a litany of facts supporting a strong inference of scienter, including that: (i) Defendants knew the projections they actually used to value GRAIL were radically worse than the ones they provided to investors; (ii) contemporaneous internal documents and Defendants' admissions at the FTC trial establish that their statements were knowingly or recklessly false, including that Illumina had no plan to accelerate Galleri, that an FDA submission was "years away," and that commercialization required FDA approval (which they could not obtain); (iii) the FDA directly informed GRAIL that its current and planned studies were ***not*** sufficient for approval; (iv) numerous statements were deliberately misleading, including that Defendant Aravanis was "recused" from deciding

whether to approve the deal when in fact he was the co-sponsor and Illumina's own lead negotiator; (iv) Defendants took out an insurance policy that covered them personally (but not Illumina), paid an extraordinary $100 million premium that was 25 times what Illumina paid the year before, and then told investors the policy was "standard"; (v) Defendant Aravanis engaged in highly suspicious insider trading and the Executive Defendants as a whole profited to the tune of hundreds of millions of dollars; (vi) the two lead "cosponsors" of the deal "resigned" the day before Illumina disclosed an SEC investigation, and every other single senior Illumina executive responsible for it has been replaced, in a nearly unprecedented corporate bloodletting. These allegations, considered collectively as they must be under *Tellabs*, amply plead the requisite strong inference of scienter.

Finally, Defendants assert that the Complaint fails to establish loss causation because, according to them, the disclosures must reveal the fraud and "correct" specific misstatements. The Ninth Circuit squarely rejected this very contention in *Mineworkers' Pension Scheme v. First Solar Inc.*, holding that there are an "infinite variety of causation theories," and that loss causation is pled "even if the market was unaware at the time that fraud" resulted in the stock decline. 881 F.3d 750, 753-54 (9th Cir. 2018). All that is required is that there be some "causal connection" between the alleged fraud and the stock price decline. *Id.* The "causal connection" is alleged here. Each of the loss-causing disclosures—the announcement of an SEC investigation, an earnings miss, the surprise resignation of key executives, and the revelation that Defendants had a "personal stake" in the transaction—are nearly identical to ones that have been upheld by the Ninth Circuit.

The motions should be denied.

## II.    STATEMENT OF FACTS

### A.    Illumina Forms GRAIL

Illumina makes and sells DNA sequencing platforms that are used in a variety of medical applications and controls approximately 80% of that market. ¶55. In

7

Case No. 3:23-cv-02082-LL-BJC
Plaintiffs' Omnibus Opp. to Defs.' MTD

September 2015, Illumina formed GRAIL to develop a multi-cancer-early-detection ("MCED") test, "Galleri," that sought to identify multiple types of cancer from a single blood draw. ¶58. In January 2016, Illumina spun out GRAIL and, with outside funding, reduced its ownership stake to 52%. ¶61.

### B.    Illumina Creates the Appearance that It Cedes Control Over Grail

In January 2017, GRAIL announced plans to raise approximately $1 billion to fund "large-scale clinical trials" including the "Circulating Cell-free Genome Atlas" study, or "CCGA." ¶63. GRAIL used a significant portion of that $1 billion to repurchase most of Illumina's stake in GRAIL—reducing Illumina's ownership to just under 20%, a significant threshold under the accounting rules. ¶¶64, 308.

Following additional fundraising rounds that brought GRAIL to a rumored market value of $4 billion, GRAIL began pursuing an IPO, purportedly to raise additional money to fund the launch and commercialization of Galleri. ¶66.

### C.    Illumina Reacquires GRAIL and Antitrust Regulators Intervene

On September 21, 2020, the first day of the Class Period, Illumina announced that it would reacquire GRAIL for over $8 billion in cash, stock, and contingent value rights. ¶68. Analysts immediately questioned several aspects of the deal, including its $8 billion price as compared to GRAIL's recent $4 billion valuation. For example, UBS asked: "Why buy GRAIL now, after starting GRAIL in 2016, spinning in 2017, and after the recent financings plus filing for the IPO?" ¶¶71-72.

Defendants immediately began making false and misleading statements designed to convince investors the GRAIL acquisition was a good investment and would deliver billions of dollars in revenue for Illumina shareholders. Specifically, Defendants misrepresented: (1) GRAIL's value; (2) Illumina's ability to "accelerate" Galleri's FDA approval and commercialization; and, (3) the clinical evidence purportedly supporting Galleri's "proven technology" and ability to "save lives." ¶69. Defendants made these statements specifically to address analyst concerns, and analysts credited them—assigning Illumina their highest ratings after

Defendants addressed their "lingering questions/concerns" about GRAIL. ¶79.

The deal also raised significant concerns in the eyes of U.S. and European competition authorities given Illumina's near-monopoly on the technology relied on by the MCED industry. ¶¶80-82. In March and April 2021, both the FTC and the EC sought to block the merger—and, under EC rules, the deal became subject to a "standstill" preventing it from closing without clearance. ¶84. The FTC, which had filed for an injunction, withdrew it in light of the EC standstill. ¶85.  Meanwhile, Defendants continued to tout the merits of the deal and Galleri's efficacy, causing Illumina's share price to nearly *double* from September 2020 to August 2021. ¶88.

## D.    Illumina Defies Its Antitrust Regulators and Closes the GRAIL Transaction, Claiming Doing so Was Necessary to "Save Lives"

On August 18, 2021, Illumina shocked investors by announcing that it had closed the acquisition despite the ongoing antitrust review and EC standstill, though it committed to keeping GRAIL "separate and independent" while the reviews continued. ¶89. That day, Defendants held a conference call to reassure investors about Illumina's brazen move, during which deSouza claimed there was a "moral obligation" to close the deal because "[w]ith Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S. . . . ." ¶92. Days later, the EC began investigating Defendants' breach of the standstill obligation. ¶95.

## E.    Defendants Continue to Misrepresent GRAIL

As explained directly below, in the face of ongoing investor concern and analyst questions that only intensified after Illumina defied its regulators, Defendants issued a series of misstatements touting GRAIL's value, Galleri's supposedly "proven" technology, and their ability to accelerate its approval. Unfortunately for investors, Defendants' statements were untrue: (1) Defendants' public financial projections for GRAIL were multiples greater than the projections Illumina and its Board relied on; (2) Illumina's acquisition could not—and was never designed to—"accelerate" Galleri's FDA approval or commercialization; and

(3) contrary to Defendants' statements calling Galleri's technology "proven," the FDA had informed Defendants prior to the Class Period that the evidence they were developing for Galleri would not suffice for FDA approval, let alone support the baseless statement that Galleri would "save lives."

### 1.    Defendants' Inflated GRAIL Valuations

To justify GRAIL's price tag, Defendants misrepresented its value. In November 2020, Illumina filed a Form S-4 containing two forecasts "prepared by GRAIL management." ¶77. The more conservative one assumed "that broad reimbursement for Galleri would be achieved in calendar 2025," while the more aggressive one assumed even wider adoption by then. *Id*. Using these forecasts, Morgan Stanley valued GRAIL at $11.15-43.95 billion—easily justifying GRAIL's $8 billion price and comforting analysts. ¶¶77-79, 101-03. But Illumina concealed its actual forecasts that ascribed a much lower value to GRAIL: both Illumina Board materials from April 2020 and Illumina's "deal model"—the model it actually relied on to value GRAIL—showed that GRAIL would generate roughly *half* the revenues in the more conservative S-4 forecast. ¶¶100-105. Later, Illumina's outside auditor concluded that GRAIL was worth roughly $4 billion—which "aligned with prior analysis" that Illumina had concealed. ¶107. And several facts showed that "broad reimbursement" would never happen by 2025. *See* Section II.E.2-3.

### 2.    Illumina Could Not "Accelerate" Galleri

Defendants also falsely stated that the acquisition would "accelerate" Galleri's commercialization and "save tens of thousands of lives." ¶¶109-10. For example, deSouza told investors that Illumina acquired GRAIL "because *we have very clear line of sight into how we can accelerate the plan* that they are on today" and that Illumina could dramatically accelerate adoption "*by many years*" because it had "teams that can work on reimbursement and regulatory approval." ¶¶109-10. Analysts credited these representations, relying on them in valuing Illumina. ¶111.

In truth, Defendants had no ability or plan to accelerate Galleri's adoption.

¶112. As confirmed by evidence from the FTC proceeding, the U.S. antitrust review that went to trial less than a week after Illumina closed the acquisition (¶¶85-86), neither Illumina nor GRAIL conducted *any* analysis to determine whether Illumina could "accelerate" Galleri's adoption or planned for that possibility. ¶113. GRAIL's CEO, Defendant Bishop, testified that he could not quantify how much sooner he expected GRAIL to receive FDA approval with Illumina versus without, and Illumina assumed *no acceleration would occur* at all. ¶¶113-14. Evidence from FTC proceeding establishes that Illumina did not perform any analysis to determine whether its operational or supply chain capabilities would lead to any efficiencies, as Defendants publicly claimed (¶117), and the Fifth Circuit found that the purported "efficiencies" were not backed by any "model" or "underlying assumptions"—only "the unsupported and vague assertions of management personnel." ¶¶116, 118. Based on this absence of evidence, the Fifth Circuit held Illumina had not shown that any acceleration was possible or achievable. ¶¶115, 119.

Illumina FEs confirmed these facts and reported that Defendant deSouza privately admitted his public claims about Galleri were baseless. In 2023, deSouza directed an effort to identify an independent backer to legitimize his statements that Illumina would "accelerate" Galleri's adoption and "save lives"—but failed to find anyone to take the job despite weeks of outreach, enraging him. ¶120.

### 3. Galleri's Deficient Clinical Data and Impossible Timeline.

Defendants also misrepresented the clinical data purportedly supporting Galleri's "efficacy." ¶¶331-35, 347-48, 387-90, 393-96, 404-05. For example, on Bloomberg TV, deSouza described GRAIL as a "proven technology" supported by "large studies that show [its] efficacy"; he told investors in a CNBC interview that Galleri "really works"; and he repeatedly highlighted Galleri's clinical data, including the U.K. NHS-Galleri trial, as supporting Galleri's effectiveness. ¶¶122, 393, 404. deSouza also told investors in 2021 that the clinical evidence backing Galleri was so compelling that "we don't think that any studies are essential from a

performance perspective but also from a launch perspective." ¶150. Analysts credited these statements, citing Defendants' assurances that the PATHFINDER, STRIVE, SUMMIT and NHS studies supported near-term FDA approval. ¶138.

In truth, however, Defendants had been privately informed by the FDA, in meetings and formal written feedback in 2019 and 2020, that the studies GRAIL was conducting on Galleri were insufficient to demonstrate "effectiveness"—that it "really works," as deSouza claimed—or to obtain FDA approval. As the FDA told GRAIL, the STRIVE study was insufficient because it did not "assess how the test results impacted patient treatment decisions" and because it did not study the intended patient population (¶140)—a defect Defendants Ofman and Bishop would admit infected all of GRAIL's clinical trials. ¶141. And since none of the studies measured Galleri's impact on patient outcomes or treatment decisions for the intended patient population (¶123), they could not show Galleri's effectiveness. ¶132. Former employees confirmed that there was "no way" GRAIL would obtain FDA approval based on its existing and planned clinical studies (¶¶142-44) and that it was "common knowledge" at GRAIL that the FDA had said that none of Galleri's clinical data was sufficient for approval. ¶147. Defendants' statements about the NHS trial were also misleading because the FDA told GRAIL that a U.K. study would not support FDA approval given differences in medical practices between the U.S. and the U.K., a fact confirmed by former employees, an industry expert, and later GRAIL itself—which began issuing warnings after the Class Period that the NHS-Galleri Trial might not support an FDA submission for this very reason. ¶143.

As a result, Defendants had no basis to claim Galleri was effective or would "save tens of thousands of lives." ¶¶132-35. Significantly, the FTC reached the same conclusion, finding that Defendants' representation about Galleri's effectiveness was "simply false" because there was "no clinical evidence" to support it. ¶146. Former employees and other witnesses said the same thing: that "GRAIL was not at that stage to determine if it could save lives." ¶134. And Galleri's "real world" track

record underscored the need for the kind of actual clinical evidence the FDA requires, as the test's results were abysmal. For example, the San Francisco Firefighters Cancer Prevention Foundation reported that they had been sold a "bill of goods" when they paid over $1 million for Galleri tests that identified only five cancers, two of which were already known and all of which were too "late stage" to make any difference (¶¶125-26), while missing at least six cases of actual cancer. ¶¶127-28. At minimum, Defendants' statements were reckless: as an MCED competitor's CEO testified during the FTC trial, as a "company that is regulated by the FDA, one thing we don't do is talk about saving lives as it relates to a specific test . . . . we don't make claims that we save lives." ¶135.

For similar reasons, Defendants' misrepresentations that "broad reimbursement" for Galleri would be obtained by 2025 were false and misleading when made. ¶¶136, 148. When the acquisition was announced in late 2020, Defendants represented that Galleri would be submitted for FDA approval in 2023, obtain approval in 2024, and achieve broad reimbursement in 2025. ¶148. Defendants substantiated these timelines by referencing their purportedly "productive" discussions with the FDA (¶149) and the clinical data backing Galleri. But as set forth above, Defendants knew that their studies were insufficient because the FDA required totally new and different studies. Indeed, in the FTC proceedings, Defendant Bishop admitted in May 2021 testimony that GRAIL was "still years away from seeking FDA approval" and ***Defendants' own expert concluded that it would take at least seven years to conduct the required studies***. And in the same proceedings, the Executive Defendants admitted that FDA approval was a necessary precursor to broad reimbursement and commercialization. ¶¶151-154.

## F. Illumina Reacquired GRAIL So That Insiders Could Profit

Contrary to Defendants' statements that acquiring GRAIL was a moral imperative and needed to "save lives," in reality, Defendants engineered the deal in order to profit. Shortly after GRAIL reported its CCGA results in 2019, insiders put

their plan into motion through a series of personnel changes. First, in mid-2019, Defendants Bishop and Ofman were installed at GRAIL to give its private equity investors a "fast" exit—*i.e.*, a quick liquidation of their shares. ¶¶156, 165. By April 2020, deSouza told Illumina's Board that Illumina should conduct "further due diligence into GRAIL as a potential acquisition target." A week later, Illumina hired Aravanis back from GRAIL to become Illumina's CTO while switching its then-CTO, Mostafa Ronaghi, to GRAIL's Board. ¶¶157-58.

Aravanis's first job at Illumina was to serve as the "co-sponsor" of the GRAIL acquisition. He convinced the Illumina Board of its merits, negotiated its terms, and participated in the Board's decision-making. ¶¶159-61. While serving in that critical role for Illumina, which was not disclosed to investors, Aravanis held 1.3 million GRAIL shares that were worth whatever he could convince Illumina to pay—and thus he was impossibly conflicted as to getting the best deal *for Illumina*. ¶159. Worse yet, just two days after Aravanis's return to Illumina was announced, Defendant Klausner—a GRAIL Board member who approved the personnel change and understood its significance—purchased $125 million worth of GRAIL stock while the merger talks were brewing. ¶163. With his inside information, Klausner *doubled his investment in four months* when the deal was announced. ¶164.

On September 1, 2020, Illumina management made their "best and final" offer to GRAIL, even though "formal diligence" *had not even been conducted*—again confirming the acquisition was not about the merits, but securing a "fast" exit for insiders. ¶¶160-61. Seven days later, Illumina's Board unanimously approved the acquisition that Aravanis pitched to them and negotiated for them. ¶161.

### G.    Defendants Close the Deal in Order to Cash Out

After securing Illumina's agreement to pay an inflated price for GRAIL, Defendants needed the acquisition to actually close in order to realize their profits. Accordingly, when the antitrust review threatened that payday, Defendants took steps to close in the face of the standstill. ¶167. Just two weeks before closing the

deal on August 18, 2021, Illumina's Board doubled its insurance coverage to $300 million, paying a staggering annual premium of *$100 million*—over 25 times the prior year's premium—specifically to insure Defendants' personal acquisition-related liability, while forgoing such coverage for Illumina entirely. ¶168. At the same time, Illumina and GRAIL entered into a highly material secret letter agreement where each side agreed to waive the merger agreement's provisions requiring regulatory approval, and had Illumina fully indemnify *both* companies' executives for proceeding with the deal. ¶¶166-170.

During the Class Period, however, Defendants did not breathe a word of Aravanis's conflicted role, Klausner's insider investment, Illumina's superficial "diligence," their extraordinary insurance, or this secret side agreement. To the contrary, as investors began questioning Defendants about any conflicts motivating the acquisition, Defendants lied. For example, when asked whether any insiders had personal motives for pursuing the deal, Defendants falsely stated that Aravanis had been "recused" from any decisions to sign and close the acquisition—when in truth he engineered it. ¶¶183-85, 320, 338. When questioned about the insurance policy, Defendants represented it was "standard" and commonplace—when in truth it was so unusual a Delaware court later held it indicated the Board committed "a knowing violation of positive law." ¶¶167-72, 275-81. Defendants further claimed the transaction was "arm's length," "consistent with good corporate governance practices," and that Defendants closed the deal to prevent the "clock from running out." But after gaining access to Illumina's privileged and confidential documents, a newly elected director quickly uncovered that Defendants' pursuit of the GRAIL deal was so conflicted and disloyal that deSouza and the Board breached their fiduciary duties and were "poisoned by their personal stake in the deal." ¶¶282-89.

## H.    The Acquisition Enriches Defendants and Injures Investors

Illumina and GRAIL insiders reaped hundreds of millions of dollars in profit through their misconduct. As quickly as possible, Aravanis sold every Illumina share

he obtained from the GRAIL transaction, netting at least $5 million (on top of the cash he received from his $10 million in GRAIL shares). ¶¶282, 294, 322. For their part, Bishop's GRAIL stake netted him over $100 million, while Ofman's exceeded $55 million. ¶165. deSouza was rewarded with over $67 million in compensation over 3 years—35 times more than the $1.9 million he earned in 2019. *Id.*

Investors, on the other hand, suffered devastating losses when the price of Illumina shares declined in response to disclosures causally connected to Defendants' fraud. Beginning in August 2021, investors were barraged by a series of partial disclosures, including when deSouza conceded that Galleri's FDA approval timeline was longer than previously represented (¶¶204-09); Illumina disclosed an SEC investigation into the GRAIL deal and the departures of Defendants Febbo and Aravanis, the deal's "cosponsors" (¶¶227-31); and a lawsuit backed by an Illumina Board member revealed that deSouza and Illumina's Board had been "poisoned by their personal stake" in the deal. ¶¶232-37. In total, Illumina shares lost more than 80% of their value because of these fraud-related disclosures, causing catastrophic losses to investors for which this lawsuit seeks to recover.

## III.   ARGUMENT

To state a claim under Section 10(b) here, Plaintiffs must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; . . . and (6) loss causation." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). While the PSLRA imposes a heightened pleading standard, the Ninth Circuit has stressed that it is not intended to eliminate "actions of substance," but is satisfied "by stating with particularity the facts supporting each of their beliefs as to why the challenged statements were false or misleading." *Glazer*, 63 F.4th at 769.

### A.   Defendants Made False and Misleading Statements

Even "literally accurate" statements "can become, through their context and manner of presentation, devices which mislead." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). The Supreme Court very recently affirmed that "half-

truths" are actionable under the securities laws. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) ("Rule 10b–5(b) . . . prohibits omitting a material fact necessary to make the statements made not misleading" and thus "bars . . . half-truths"). In accord with this concept, it has long been a precept of Ninth Circuit law that a statement is misleading, even if literally accurate, if it omits important qualifying information or otherwise gives a reasonable investor "the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. Similarly, when a company touts positive information, it must "disclos[e] adverse information that cuts against [it]." *Arena*, 840 F.3d at 706. Whether a statement is misleading cannot be resolved at the pleading stage "unless the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja*, 899 F.3d at 1014.

Defendants made five categories of misleading statements, as set forth below.

### 1. GRAIL's False Financial Valuations Are Actionable And Illumina Had a Duty to Disclose Its Own Contrary Forecasts

Defendants misrepresented GRAIL's valuation when presenting investors with projections that showed that GRAIL would make up to $24 billion by 2030 and was worth up to $44 billion. In truth, the projections Illumina actually relied on— including Illumina's "Deal Model" that was ***actually used*** internally to value GRAIL—had figures that were approximately ***one-quarter to one-half*** of those Illumina publicly reported. ¶¶104-05. *See also* App'x A.

It was materially misleading for Defendants to publish the rosy projections while concealing the bleak ones they actually relied on. There is no doubt that the public figures, which contained revenue numbers and valuations two to four times greater than Illumina's internal ones, gave a "reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. Likewise, once Defendants touted the rosy projections, they were required to disclose the "adverse information that cut[] against" them. *Arena*,

840 F.3d at 706. Statements just like these are routinely sustained. *See Azar v. Blount Int'l, Inc.*, 2017 WL 1055966, at *5 (D. Or. Mar. 20, 2017) (omission of more accurate projection and inclusion of less accurate ones was misleading); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *6-7 (D. Or. Oct. 3, 2017) (statements attesting to accuracy of forecasts used for fairness opinion misleading when internal forecasts more accurate); *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *7 (C.D. Cal. May 2, 2014) (same).

Defendants' arguments to the contrary fail. ***First***, Defendants argue that Illumina was permitted to reveal whichever projections it thought best, so long as they were reasonable, as there is no *per se* rule requiring otherwise. Ill.Br. 14-15. But this is a strawman—nobody is arguing for a *per se* rule. Defendants ***chose*** to publish one set of projections and hold back another; no one forced them to say anything. Having made the choice to speak on the subject, it was misleading for Defendants to publish gleaming projections they did not rely on while withholding the far bleaker ones they did rely on. *See Macquarie*, 601 U.S. at 263 (Rule 10b5(b) bars "half-truths"); *Berson*, 527 F.3d at 985; *Arena,* 840 F.3d at 706. At best, Defendants' argument that withholding the actual projections they relied on would not mislead a reasonable investor raises a fact issue that cannot be decided now.

***Second***, the Complaint establishes that the projections disclosed in the S-4 ***were*** false and unreasonable because those projections assumed that "broad reimbursement would be achieved in calendar 2025"—an impossibility incompatible with Defendants' admissions in the FTC trial—and because the true projections that Illumina's Board relied upon resulted in a far lower valuation. ¶¶102, 104-07, 151-52. Defendants' hoary case is inapposite for this reason. *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1487 (N.D. Cal. 1992) (plaintiffs failed to "show why the [disclosed] projection lacked a reasonable basis").

Defendants also assert that these false projections somehow amount to "pure omissions," which are foreclosed by *Macquarie.* 601 U.S. at 266. Quite the opposite.

Plaintiffs allege that the published projections were ***affirmative misstatements that Defendants chose to make when they simply could have remained silent on the subject***; no one is arguing that Defendants had an independent duty to disclose the internal projections ***absent a statement on the subject***. *See United States v. Chang*, 2024 WL 2817494, at \*11 (E.D.N.Y. Mar. 31, 2024). The public projections are a classic, actionable "half-truth" under *Macquarie*. As the Supreme Court explained, a child telling his parents "he had dessert" is a half-truth when "the dessert was, in fact, a whole cake." 601 U.S. at 263; *Roofers Loc. No. 149 Pension Fund v. Amgen Inc*., 2024 WL 4354809, at \*12 (S.D.N.Y. Sept. 30, 2024) (disclosure of IRS dispute "without revealing its true scope calls to mind the Supreme Court's [cake analogy]"); ¶345.

Illumina tries to distance itself from its misstatements by suggesting that they were only GRAIL's—not Illumina's. Ill.Br. 14-15. But it is black letter law that the issuer (Illumina) of an SEC filing is responsible for its contents. *See Howard v. Everex Sys., Inc*., 228 F.3d 1057, 1061 (9th Cir. 2000). As are the signatories of the S-4, which include deSouza, Thompson, and Samad. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) (courts hold "signatories of misleading documents 'made' the statements in those documents"). For its part, GRAIL argues that it was not responsible for the projections either—contending that it did not "make" these statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), despite ***extensive*** disclosures concerning GRAIL's joint responsibility for these statements that Illumina identifies. *Cf.* Gr.Br. 12, *with* Ill.Br. 14-15. But Defendants cannot evade liability on a pleading motion by pointing fingers at one another and contending that ***no one*** is responsible for the statement because the other defendant is to blame. *See, e.g.*, *SEC v. Daifotis*, 2011 WL 3295139, at \*4 (N.D. Cal. Aug. 1, 2011) (fact issues under *Janus* should be resolved at summary judgment, not pleadings).

***Third***, Defendants argue the projections are protected by the PSLRA's safe

harbor. Ill.Br. 15-18. Not so. To start, as explained in *In re Quality Systems, Inc. Securities Litigation*, the safe harbor only protects issuers "when optimistic projections of growth in revenues and earnings are not borne out by events"—***not*** "when they knowingly make a materially false or misleading statement about current or past facts" or "combine that statement with a forward-looking statement." 865 F.3d 1130, 1142 (9th Cir. 2017). Thus, the safe harbor does not apply when statements "misrepresented or omitted material past or present facts." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1020-21 (N.D. Cal. 2020). That is exactly the case here: the public projections omitted the ***present*** fact of what the real projection actually was at the time—*i.e.*, the more accurate internal projections and valuations Illumina actually relied on when making its decision. *See* ¶¶345-46.

Defendants next argue that their undisclosed projections were not "contemporaneous" with the S-4 because they were created before Illumina had access to GRAIL's due diligence materials. Ill.Br. 16. But they ignore that the S-4 projections are ***also*** inconsistent with Illumina's Deal Model—the model Illumina used in valuing GRAIL, which incorporated those due diligence materials and was consistent with the April 2020 projections. ¶¶104-05. And contrary to Defendants' argument (Ill.Br. 17-18), Illumina's third-party auditor's later valuation also corroborates the falsity of the S-4 because it was "aligned with prior analysis" (¶107) ***and*** flatly inconsistent with the S-4 projections. At best, Defendants argument raise a fact issue. *Azar*, 2017 WL 1055966, at *6-7 & n.4 (argument that projections were "stale" is "inappropriate for resolution on a motion to dismiss").

Defendants also argue that FTC testimony from "unspecified" Illumina and GRAIL executives is "far too vague" to support an inference that Defendants knew the S-4 projections could not be achieved. Ill.Br. 16-17. But they ignore their specific ***admissions*** showing that they ***knew***, at the time of disclosure, that the S-4's revenue projections were implausible. *See* Section II.E.1-3; III.B.1; ¶141 (Ofman and Bishop testimony), ¶¶151-52 (Ofman, Bishop, deSouza, and Defendants' expert testimony).

Defendants further argue that FE2's account that GRAIL's commercial plan was "preposterous" and "based on dreams and magic" cannot support Defendants' knowledge that the S-4 projections were impossible because the Complaint does not allege that he "knew anything about the assumptions GRAIL used." Ill.Br. 17. This is wrong. FE2 was charged with implementing GRAIL's commercial plan to have health systems pay for Galleri pre-FDA approval, which was "preposterous" because those providers would not do so without approval. ¶¶134 & n.4, 153, 274. Other FE accounts also support the projections' falsity: FE3, who worked with Aravanis and Ofman, recounted how healthcare systems would "laugh[]" in meetings with Ofman because they would not pay for Galleri without reimbursement, and how this was regularly discussed with GRAIL senior management; and FE4 recounted that the "real-world studies" necessary for commercialization were not "completed" and the FDA *still* has not approved a study design. *See* ¶¶147 & n.6, 153-54 & n.7, 274.

Finally, Defendants' boilerplate warnings (Ill.Br. 15-16) are insufficient under controlling Ninth Circuit law. They are generic boilerplate applicable to all projections—***none*** comes close to disclosing that the public projections were multiples better than Illumina's own. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (warnings must be so clear "the risk of real deception drops to nil"); *In re QuantumScape Sec. Litig.*, 580 F. Supp. 3d 714, 738 (N.D. Cal. 2022) (risk warning of "generality about unspecified 'delays'" inadequate); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (similar). Here, nothing short of "an outright admission"—i.e., a disclosure that the FDA had rejected Galleri's clinical program and an FDA submission (let alone approval) was at least seven years away (¶151)—would have been "'sufficiently meaningful' to qualify the statement for the safe harbor." *Quality Sys.*, 865 F.3d at 1146-48; *see also Mulderrig*, 492 F. Supp. 3d at 1022-23 (similar); *Laborers Dist. Council Constr. Indus. Pension Fund v. Sea Ltd.*, 2024 WL 3708800, at *7 (D. Ariz. Aug. 7, 2024) (similar).

***Fourth***, Defendants argue that deSouza's statement that "owning GRAIL is

significantly value-accretive to Illumina shareholders" is puffery and insufficiently alleged as misleading. ¶336; Ill.Br. 18. This argument fails for the same reasons—the statement was material because it was made in response to an analyst question to justify GRAIL's $8 billion valuation and allay concerns about impacts on Illumina's existing business (¶336), and it was misleading because the true valuations were a fraction of what Defendants represented. *See infra* 24-25.

### 2. Defendants' Statements About Illumina's Ability to "Accelerate" Adoption And "Save Lives" Are Actionable

Defendants represented that the merger would "accelerate" Galleri's regulatory approval and reimbursement and enumerated the specific capabilities that supported those statements. *See, e.g.*, ¶109 ("we have very clear line of sight into how we can accelerate the plan that they are on today"), ¶110 (highlighting Illumina's "incredible" "commercial capability, support capability, regulatory capability and reimbursement experience" as supporting acceleration); Section II.E.2. In reality, and as Illumina and GRAIL executives—including the Illumina executive responsible for those efforts—***admitted***, Illumina had no plan, resources, or relevant expertise for accelerating Galleri. ¶¶113-15. The statements are misleading and actionable. *See Berson*, 527 F.3d at 985; *Arena*, 840 F.3d at 706; *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) (statements concerning ability to timely deliver products actionable when company could not do so); *Impax*, 36 F. Supp. 3d at 956-62 (statements attesting to ability to respond to FDA warning letter actionable where deficiencies could not be remedied).

Defendants also repeatedly represented that closing the acquisition would "save lives." *See, e.g.*, ¶76 (closing will "result in the savings of tens of thousands of lives that would not be saved if we didn't buy GRAIL"), ¶92; Section II.E.2. In addition to being false for implying that Illumina could accelerate Galleri, these statements are misleading because Defendants lacked any evidence to support them, they were privately told as much by the FDA, and failed to disclose the actual "real-world" evidence showing Galleri did not work and harmed patients. ¶¶123-24. Once

Defendants touted Galleri's ability to "save lives," they were obligated to disclose these adverse facts, which they failed to do. *See Arena,* 840 F.3d at 706; App'x A.

Each of Defendants' arguments to the contrary fails. ***First***, Defendants contend that statements about Illumina's ability to "accelerate" Galleri's adoption were not false because "Illumina never claimed to have a concrete plan or financial model for accelerating adoption." Ill.Br. 19. This argument fails for multiple reasons. To start, Defendants told investors the opposite: that "we have a very clear line of sight into how we can accelerate the ***plan***" (¶325); they had ***quantified*** the number of lives that would be saved under that plan (¶376) and ***modeled*** GRAIL's value in connection with Illumina's "acceleration" of Galleri (¶336); and Illumina had the "commercial capability, support capability, regulatory capability and reimbursement experience" to effectuate the plan (¶384). Defendants never once suggested that simple "common sense" was the sole basis of their "acceleration" claims, but instead conveyed to a reasonable investor that a plan was in place. *Berson*, 527 F.3d at 985. At best, Defendants' effort to rewrite their statements raises a fact issue as to what the market understood—again, something the Court cannot decide now. *Id*.

Last, Defendants' "acceleration" statements are actionable even under Defendants' implausible reading because, as the senior-most Illumina executive who would lead those efforts testified, Illumina did not have the underlying experience, resources, expertise or funding needed to "accelerate" Galleri's approval or adoption. ¶¶109-20, 386. Thus, the statements are actionable because touting that Illumina had "commercial capability, support capability," etc.—when in truth it did not—gave investors a misleading impression of the true facts, regardless of whether there was a formal "plan." *Berson*, 527 F.3d at 985.[2]

***Second***, Defendants ask the Court to disregard the evidence showing their acceleration statements were "pulled from a hat" by arguing that the Complaint relies

---

[2] *Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*, Ill.Br. 19, shows ***Defendants*** are "recasting." 300 F. Supp. 3d 551, 572 (S.D.N.Y. 2018).

on "hindsight" or the standard of review in the antitrust context. Ill.Br. 19; Gr.Br. 7. They are wrong. Any difference in pleading standards is irrelevant, as the contemporaneous **admissions**, **facts**, **evidence**, and **testimony** demonstrate that Defendants' "acceleration" statements were misleading **when made**. Courts routinely rely on evidence like this to find falsity. *See, e.g.*, *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *6 (E.D.N.Y. Sept. 27, 2019) (sustaining securities claims based in part on evidence in FTC complaint). If anything, the fact that Illumina bore the burden on its "acceleration" defense favors Plaintiffs—as it underscores the significance of Defendants' admission they could not substantiate any acceleration, "much less show[] how it would be achieved." ¶¶113-20.[3]

> **Third**, incredibly, Defendants argue that their acceleration and "saving lives" statements are "puffery." Ill.Br. 20-21. Not so. To start, determining whether a statement is puffery—*i.e.*, immaterial—"entail[s] fact-intensive assessments that are more properly left to the jury." *Impax*, 36 F. Supp. 3d at 966. That assessment requires an examination of "the entire statement and its circumstances" to determine whether it was so obviously immaterial that no investor would rely on it. *Id.* Almost by definition, statements that are objectively verifiable cannot be "puffery." Because statements concerning a medical product's efficacy (like its ability to "save lives") can be objectively assessed, courts routinely hold they are not puffery. ¶404; *see, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (efficacy statements "capable of objective verification" not puffery); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *16 (N.D. Cal. Feb. 23, 2023) (discussion of clinical benefit not puffery). Similarly, the ability to "accelerate" a

---

[3] The ALJ decision, which made no findings concerning "acceleration," does not help Defendants either. Defendants' cases are inapposite. *Cf. Chew v. MoneyGram Int'l, Inc.*, 2024 WL 4346522, at *12 (N.D. Ill. Sept. 30, 2024) (no evidence contradicting statements); *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *6 (N.D. Cal. Feb. 1, 2021) ("sole argument" was "close temporal proximity"); *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *19 (S.D. Cal. Jan. 3, 2005) (similar).

product's delivery to market is not puffery, as it is critical to a company's business. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "anticipates a continuation of its accelerated expansion schedule" not puffery); *Xoma*, 74 F.3d at 959 (statements about progress to FDA approval not puffery).

Importantly, Defendants' statements concerning Galleri's ability to "saves lives" and Illumina's ability to "accelerate" Galleri's adoption were relied on by investors and analysts—including as an explanation for why Defendants closed in defiance of the EC standstill—and thus were not "mere expressions of [immaterial] corporate optimism." *Intuitive*, 65 F. Supp. 3d at 834; *Glazer,* 63 F.4th at 770-71 (statements made in response to analysts are not puffery); *see, e.g.,* ¶92 (deSouza stating there was "moral obligation" to close because with "Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives"); ¶138 (Aravanis and Febbo making similar claim); ¶¶79, 94, 111 (analysts crediting statements). Further, Defendants repeated these statements with increasing intensity throughout the Class Period—with deSouza going so far as to publish an editorial in *The Wall Street Journal*. ¶¶110, 120. 365; *see also Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374-75 (E.D.N.Y. 2022) ("repeated emphasis" supports materiality); *Seeks v. Boeing Co.*, 2024 WL 4367846, at *15 (N.D. Ill. Sept. 30, 2024) (similar). And even if Defendants' statements could be seen as "general statements of optimism" (they were not), "in context," they were misleading because they were "contravened" by the true facts. *Glazer*, 63 F.4th at 770-71; *Xoma*, 74 F.3d at 959 (statement "everything was going fine" actionable when made to quell fears).

Unsurprisingly, Defendants cite no authority to support the notion that statements about a product's efficacy or ability to "save lives" are puffery.[4] In any

---

[4] Defendants' cases (Ill.Br. 20-21) are inapposite: *Sterling Heights* referenced "optimistic" "self-congratulations" and *ProNAi* touted its "leadership position"—puffing nothing like the statements here. *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp PLC,* 587 F. Supp. 3d 56, 92 (S.D.N.Y. 2022); *Gregory v. ProNAi Therps. Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018).

event, "determining whether a given statement is material entail[s] fact-intensive assessments that are more properly left to the jury." *Impax*, 36 F. Supp. 3d at 966.

**Fourth**, Defendants argue that their false statements are inactionable "opinions," pointing to their FTC trial testimony to argue that they "actually and reasonably believe[d] the merger would accelerate access to Galleri and save lives." Ill.Br. 21, Gr.Br. 10 (citing Defendants' FTC trial testimony). This argument is improper under controlling Ninth Circuit law. To start, the Court may not credit Defendants' self-serving testimony that is well outside the four corners of the Complaint. *Khoja*, 899 F.3d at 1002-03 (incorporation-by-reference cannot be used to "create[] a defense to the well-pled allegations"). In addition, much of it, including portions of the FTC's cross-examination, remains under seal. *See* RJN Opp. at 5-8.

Further, Defendants' "acceleration" statements are not protected "opinions," but factual false statements. *See Fecht*, 70 F.3d at 1083 ("positive statements about the expansion program" were verifiably false based on plaintiffs' allegations that "the new stores were losing money"). Even if they were deemed "opinions" (which they are not), they are actionable under controlling law because they did not "fairly align[]" with the information in Defendants' possession. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (opinion actionable if it "omits material facts [that] conflict with what a reasonable investor would take from the statement itself"). Here, Defendants' statements that Galleri would save "tens of thousands of lives" omitted the material facts that the FDA informed Defendants that its clinical program was insufficient to show the test worked. *See ChemoCentryx*, 2023 WL 3579440, at *14 (failure to disclose FDA concerns over trial misleading when touting study results). And the supposed "opinion" that Illumina would "accelerate" Galleri omitted that in reality, Illumina lacked the required experience, resources, and funding to do so.

¶¶324, 326, 350-51, 379, 384, 404; *ChemoCentryx*, 2023 WL 3579440, at *15.[5]

**Finally**, Defendants contend their "saving lives" and "acceleration" statements are protected as forward-looking. Ill.Br. 22; Gr.Br. 8-11. This is wrong, as the statements contain false assertions or misleading omissions of present fact. For example, Defendants' acceleration" statements falsely represented that Illumina **presently** had capabilities it did not have and omitted the **present** facts that Illumina's "acceleration" claims were not backed by any then-existing "plan" or "model," as Defendants now admit. *See* ¶¶112-20, 270-74, 384 ("we **have** incredible [] commercial capability, support capability, regulatory capability and reimbursement experience"), ¶324 (similar); ¶379 ("[w]e **have** the teams that can work on reimbursement and regulatory approval"); *Quality Sys.*, 865 F.3d at 1146-48. And statements that Galleri could "saves lives" omitted the then-existing facts that there was no basis to make that claim, and that the FDA told them as much. ¶¶331, 333, 350, 355, 362, 368, 371, 374, 376, 379, 381, 383, 404; *Quality Sys.*, 865 F.3d at 1141-43 (describing forward- versus non-forward-looking statements).

Even if the statements could be considered forward-looking (they cannot), they are **not** protected by the safe harbor. As Defendants concede, many of their statements were not accompanied by cautionary language (ECF No. 62-4 (Stmt. Nos. 16-18, 20, 26, 28-32)), while the rest were accompanied by mere boilerplate that fails as a matter of law. *Cf. e.g.*, Ill.RJN Ex. 12 ("anticipated synergies . . . may not be realized"), *with, e.g.*, ¶384 (enumerating existing capabilities Illumina did not have); *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 2002) (warning about "synergies" insufficient). And Defendants had "actual knowledge" that their "acceleration" and "saving lives" statements were misleading, given the admissions, testimony, and documents showing they lacked any basis to make them. Sections

---

[5] GRAIL Defendants' cases are inapposite, as none mention acceleration. Gr.Br. 7.

II.E.2-3 & III.B.1-2; *Quality Sys.*, 865 F.3d at 1144-46 (finding actual knowledge).[6]

### 3. Defendants' Statements About Galleri's Clinical Data And Timeline For FDA Approval Were False And Misleading

Defendants made false statements about Galleri's efficacy. For example, Defendant deSouza stated that GRAIL's "technology works" and pointed to "large studies that show [Galleri's] efficacy." ¶¶331, 333, 405. Defendants also touted the evidence supporting Galleri's FDA approval, with deSouza responding to an analyst question about FDA approval by saying that he did not believe "additional studies are necessary for Galleri to be successful." ¶347. *See also* App'x A.

These statements were misleading because there was no evidence GRAIL's "technology works" and no "large studies that show [Galleri's] efficacy." ¶¶331-33, 404. The FTC concluded as much, stating that such representations were "simply false" because there was "no clinical evidence" to support them—points that Ofman and Defendants' own expert have admitted. ¶146. Significantly, Defendants knew Galleri's studies would be insufficient for FDA approval because the FDA had informed GRAIL of that very fact. ¶¶123-30, 140-43. *See* Section II.E.3. Once Defendants touted the "large studies" supporting Galleri's efficacy, they were required to "disclos[e]" the "adverse information" they knew of, including that the FDA had informed them they were insufficient. *Arena*, 840 F.3d at 706; *Berson*, 527 F.3d at 985. Such statements are routinely sustained. *See, e.g.*, *Arena*, 840 F.3d at 708 (statements touting studies misleading for omitting FDA concerns about them); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *4, *12 (N.D. Cal. Jan. 6, 2022) ("clinical benefit" statements misleading due to FDA concerns); *QuantumScape*, 580 F. Supp. 3d at 732 (similar); *Zak v. Chelsea Theraps. Int'l, Ltd.*,

---

[6] Defendant Bishop's statements show the safe harbor does not apply; they concern then-existing capabilities. ¶326 (existing "international footprint and expertise"), ¶351 (current "experience and scale"), ¶375; *see also Quality Sys.*, 865 F.3d at 1141-43. Defendants' cases concern future goals and are inapposite. *E.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (single revenue projection); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190-91 (9th Cir. 2021) (production goal).

780 F.3d 597, 609 (4th Cir. 2015) ("strength" of data misleading due to FDA concerns).

Defendants also made false statements about how Galleri would swiftly earn FDA approval based on Galleri's clinical studies. For example, when the acquisition was announced, Defendants represented that they anticipated submitting Galleri for FDA approval in 2023, obtaining approval in 2024, and achieving broad reimbursement in 2025. ¶148. In truth, Defendants knew their public timelines for FDA approval were false because the FDA told them the studies were insufficient. ¶¶123-30, 140-43. Defendant Bishop admitted in his FTC testimony that GRAIL was "still years away from seeking FDA approval for its multi-cancer screening test," while Defendants' own experts concluded that it would take "seven to ten years at minimum" to generate study results for an FDA submission—at least five years longer than Defendants reported in their public approval timeline. ¶151.

Defendants were required to disclose these known adverse facts when touting the timelines presented to investors to avoid creating a misleading impression. *Berson*, 527 F.3d at 985; *Arena*, 840 F.3d at 706; *BioMarin*, 2022 WL 164299, at *12 ("If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue.").

Defendants' challenges to these statements fail.

***First***, Defendants contend that there is a "fundamental disconnect between the challenged statements and the reasons Plaintiffs allege they are false" because "Defendants never said GRAIL's then-existing clinical studies . . . were sufficient to obtain FDA approval." Ill.Br. 23. Not so. Defendants stated that they "don't believe additional studies are necessary for Galleri to be successful" either "from a performance" or "launch perspective," and they provided dates for FDA submissions and GRAIL revenues that could only be achieved absent further studies. ¶¶347, 389. This is the exact "connection" between false statements and reasons for falsity courts credit. *See Arena*, 840 F.3d at 708 (statements that company had "all of the data in

hand" false due to FDA "concerns" about studies); *In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *7 (N.D. Cal. 2004) (statement that "nothing" "made [defendant] believe that another study would be needed" false when FDA needed more data). Even if Defendants had not represented that their clinical program was sufficient for FDA approval, their positive statements about Galleri's "efficacy" and "proven technology" are actionable because they created a misleading impression they had clinical support (when the FDA said otherwise). *Berson*, 527 F.3d at 985-87.[7]

**Second**, Defendants contend that the "only particularized fact" suggesting that the Galleri studies would not suffice for FDA approval is the FDA's May 2019 communication about the STRIVE study, and assert that Plaintiffs merely extrapolate that the other studies "suffered the same flaws." Ill.Br. 24. This too is wrong. As the Complaint alleges, Defendants have largely conceded that **each** GRAIL study suffered flaws rendering it insufficient for FDA approval (¶¶141-43); GRAIL has acknowledged that U.K. study results will not support FDA approval (¶¶143-44); former employees recounted that it was "common knowledge" that the FDA had rejected Galleri's clinical program (¶147); and the FDA has **still** not approved a study design, a necessary prerequisite to an FDA submission here (¶147). *There is literally no sufficient study for FDA approval they point to—then or now*.

Defendants challenge the account of FE3 as lacking sufficient detail. Ill.Br. 24. FE3 worked with Defendants Aravanis and Ofman, participated in presentations with Ofman where executives demanded FDA approval and reimbursement before purchasing Galleri, and was thus in a position to know what he reported: it was common knowledge that the FDA had informed GRAIL that its studies were insufficient. ¶¶147, 154; *see City of Sunrise Firefighters' Pension Fund v. Oracle*

---

[7] Defendants' cases make this very point. *Cf. Ng v. Berkeley Lights*, 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024) (statements actionable where they "affirmatively led [investors] in the wrong direction"); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836 (9th Cir. 2022) (when "tout[ing] positive information" defendants must disclose "adverse information that cuts against" it).

*Corp.*, 527 F. Supp. 3d 1151, 1180 (N.D. Cal. 2021) (FE allegations require only "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). And FE3's account is corroborated by many allegations, including Bishop and Ofman's admissions, the FTC's findings, and the FDA's rejection of Galleri's data. *See* Section II.E.3.

**Third**, Defendants challenge the account of the former industry consultant who reported that the FDA told GRAIL there was "no way" that NHS data would support FDA approval, claiming the account lacks "necessary" facts and credibility. Ill.Br. 25-26. These arguments mischaracterize his account. He explained that he had relevant information about GRAIL's NHS trial, his discussions with the FDA made clear that NHS trial data would not support approval, and he understood this fact was conveyed to GRAIL by the FDA and had spoken to GRAIL management about their interactions with the agency—not that anyone shared "confidential" information with him. ¶¶142, 144. The additional details Defendants demand are not necessary. *See Oracle*, 527 F. Supp. 3d at 1180; *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (same). Moreover, his account is consistent with many other allegations (and FDA guidance), bolstering its reliability. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *14 (D. Or. June 27, 2017) ("*PCC*") ("corroborative nature"). At best, this argument raises fact issues for a later stage.[8]

**Fourth**, Defendants contend that certain of their clinical data statements were non-actionable opinions. Ill.Br. 26-27 (citing ¶¶331, 347, 405). But Defendants mischaracterize the statements and alleged reasons for their falsity. These statements

---

[8] Defendants' cases are inapposite. *See Kipling v. Flex Ltd.*, 2020 WL 2793463, at *16 (N.D. Cal. May 29, 2020) (title and roles sufficient); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) (no titles, roles, or basis of knowledge). Moreover, *Nguyen v. Endologix, Inc.* simply holds that plausibility matters, 962 F.3d 405, 415 (9th Cir. 2020), while in *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, the FE worked for a competitor and only had information about that competitor. 713 F. Supp. 2d 378, 397 (D. Del. 2010).

are actionable because the studies Defendants relied upon to support Galleri's purported "efficacy" was categorically insufficient because ***it did not measure the right outcomes in the right patients***—not because there is some difference of opinion as to how to interpret them. Ill.Br. 26-27. For example, deSouza's statements that Defendants "don't believe additional studies are necessary for Galleri to be successful" and "don't think any studies are essential from a performance perspective but also from a launch perspective" are misleading because Defendants studies were insufficient ***by design***. ¶¶347-48; ¶¶331-32 ("large-scale clinical studies have put to bed a lot of the questions that we had"); ¶405 ("large studies that show the efficacy of GRAIL"). These are ***factual*** statements about the adequacy of data that differed from reality. *Chemocentryx*, 2023 WL 3579440, at *13-14.

Regardless, even if these statements could be considered opinions, they are actionable because they omitted highly material facts that demonstrate Defendants "lacked the basis for making those statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at 188-89, 196. *Arena* is instructive. There, the defendant sought FDA approval but the FDA expressed concerns about the results of a single animal study. *Arena*, 840 F.3d at 701-03. The Ninth Circuit held that touting FDA approval prospects and that the drug's "long-term safety and efficacy" were "demonstrated" by studies were actionable given the FDA's undisclosed concerns. *Id*. at 702, 707-08; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (drug safety statement misleading for failing to disclose expert's concerns). Similarly, here, Defendants touted the sufficiency of Galleri's data and prospects for prompt approval and commercialization knowing that their clinical program was fundamentally insufficient—rendering their statements materially misleading.

***Fifth***, Defendants argue—based on cherry-picked snippets—that certain statements were mere "puffery." Ill.Br. 27 (citing ¶¶331, 387, 389). Materiality determinations should be "left to the jury," and the Court may not assess the statements "in a vacuum, plucking the statements out of their context to determine

whether the words, taken per se, are sufficiently vague so as to constitute puffery." *Impax*, 36 F. Supp. 3d at 966. Rather, the Court must assess the entire statement and its circumstances—an assessment that shows they are anything but immaterial here.

To start, many of Defendants statements were made in direct response to analyst questions on topics of critical importance to investors, including why Illumina had undertaken the most monumental transaction in its corporate history. This forecloses a finding of puffery. *Cf. In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (statements made in response to direct questions by analysts not puffery; "very strong and terrific relationship" not puffery) *with* ¶¶1, 331; Ex. 9 ("exceptional progress in developing the technology and clinical data required to launch [Galleri]" how "the results [GRAIL is] demonstrating from their large-scale clinical studies have put to bed a lot of the questions that we had," and how GRAIL's "value has been demonstrated"); ¶¶152, 387; Ex. 28 (response to an analyst question about the NHS-Galleri trial, which Aravanis said would be "evidence" for FDA approval, ¶387 (and thus would support commercialization)—even though the FDA had informed GRAIL that study would not support approval). *See also Glazer*, 63 F.4th at 770-71 (9th Cir. 2023) ("statements cannot be discounted as mere 'puffery'" where "most of the challenged statements were made in response to specific questions asked by financial analysts").

Defendants also drew connections between their optimistic statements and concrete and verifiable facts. *Compare Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872-73 (W.D. Wash. 2022) (statement that "draws a connection" between general phrase and concrete representations about, e.g., "strong customer demand," not puffery) *with* ¶331 ("the results [GRAIL is] demonstrating"); ¶389 ("momentum" from GRAIL's studies was "translat[ing] into an expected GRAIL revenue CAGR of 60% to 90% over the next five years"—connecting the studies directly to a critical financial result). In other words, the context here precludes a finding that Defendants' statements were immaterial. *See also Hefler v. Wells Fargo*

*& Co.*, 2018 WL 1070116, at *7 (N.D. Cal. Feb. 27, 2018) (statements "anchored in misrepresentations of existing facts" not puffery); *see, e.g.*, *Intuitive*, 65 F. Supp. 3d at 834 (efficacy statements "capable of objective verification" not puffery); *Xoma*, 74 F.3d at 959 (statements about progress to FDA approval not puffery).[9]

**Finally**, Defendants incorrectly contend that certain of these statements were forward-looking and protected by the PSLRA safe harbor. Ill.Br. 27-28 (citing ¶¶347, 359, 387, 389, 393). To start, a "statement [that] 'contains an express or implied concrete assertion concerning a specific current or past fact'" is not protected under the safe harbor, even if it contains some other forward-looking aspect. *QuantumScape*, 580 F. Supp. 3d at 737. Here, the statements in question are all challenged for misrepresenting a present fact—*i.e.*, the sufficiency of GRAIL's completed and planned studies. *See* ¶¶348, 360, 388, 390, 394. That the statements "have language that contemplates the future" does not mean that they are forward looking if they "simply describe the present." *QuantumScape*, 580 F. Supp. 3d at 737. Here, Defendants' statements that Galleri was a "proven technology" and that GRAIL's "studies have put to bed a lot of the questions that we had" about Galleri's efficacy "simply describe the present."

Even if the statements were forward-looking (they were not), they remain actionable because they were not accompanied by meaningful cautionary language and were made with knowledge that they would mislead. *See Quality Sys.*, 865 F.3d at 1148. To start, Defendants' boilerplate warnings about risks inherent in all FDA submissions are plainly inadequate, where Defendants' statements were misleading

---

[9] Defendants' cases only underscore materiality here. *Cf. Strezsak v. Ardelyx, Inc.*, 2024 WL 1160900, at *7 n.3 (N.D. Cal. Mar. 18, 2024) (statements were "highly subjective claims"); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *8 (N.D. Cal. Sept. 27, 2012) (statements not false where "adverse effects" well-known), *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) ("terrific momentum" inactionable where business was "moving in the right direction"); *Farhar v. Ontrak, Inc.*, 714 F. Supp. 3d 1198, 1206, 1209 (C.D. Cal. 2024) ("we made important progress" and pipeline will "proceed into new heights" inactionable).

for omitting present facts, and the warned-of risk (i.e., FDA disapproval) had transpired. *See id.* (where a forward-looking statement accompanied by a misrepresentation of present fact, "virtually no cautionary language short of an outright admission" is sufficient); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023) ("'risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition'" are not meaningful) (quoting *Alphabet*, 1 F.4th at 703); *Xoma*, 74 F.3d at 959 (disclaimer about "risks of failure involved in the FDA process" inadequate).

Further, a mountain of evidence shows that Defendants had actual knowledge that their statements were misleading. This includes materials from the FTC proceeding showing that the FDA had communicated to Defendants that GRAIL's studies were insufficient to support approval, Defendants' admissions that years were needed before GRAIL could make an FDA submission for Galleri, the FDA's written feedback, the findings of the FTC, and the account of FE4.[10] ¶¶123, 139-140, 151; *see* Section III.B.1-2.

### 4. Illumina's Denials Of Conflicts Were False and Misleading

Defendants misrepresented Illumina's justifications for purchasing GRAIL and closing the acquisition in defiance of regulators, and made other statements concealing the conflicted nature of the transaction. When analysts and investor Carl Icahn began questioning Defendants' motives, Defendants denied any conflicts or wrongdoing—with Defendant Thompson, for example, stating that Aravanis was "***recused*** from any decisions to sign and close the GRAIL acquisition." ¶183. In

---

[10] Contrary to Defendants' challenge (Ill.Br. 28) and unlike in their cases, FE4 had years of experience in oncology and regularly interacted with doctors (¶153 n.7), and would know the facts he recounted. *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *16 (N.D. Cal. Apr. 27, 2017) (witnesses "would [not] have been privy" to relevant information); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) (witness not "connected to" work at issue).

reality, however, rather than "recuse" Aravanis from decisions concerning GRAIL, Aravanis served as a lead "cosponsor" of the acquisition—presented the deal to the Board, "negotiated" its terms, and participated in the Board's decision-making. ¶¶159-61. Further, when Icahn questioned Illumina about its insurance (not knowing its premium or coverage), Illumina gave investors the misleading impression that the insurance was "standard" and "not uncommon." *Berson*, 527 F.3d at 985. In reality, the insurance was extraordinary: its $100 million annual premium was so unusual that a Delaware Chancery court concluded it demonstrated a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law." ¶281. And rather than follow "good corporate governance practices," after obtaining internal documents about the Board's decision to acquire GRAIL, a former Illumina director concluded that Defendants were impossibly conflicted and "poisoned by their personal stake in the deal." ¶287. At minimum, these statements gave investors an "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985; App'x A.

Defendants' challenges to the conflict-of-interest statements each fail. To start, Defendants attack a strawman by contending that Aravanis's ownership of GRAIL shares was disclosed to investors. Ill.Br. 30. Plaintiffs do not allege that the statements were misleading for failing to disclose that fact. Rather, they allege that the statements falsely asserted that Aravanis's equity was disclosed to the Illumina Board and that he was "***recused*** *from any decisions to sign or close the GRAIL acquisition*". *See* ¶¶413-14. As to ***that*** point, Defendants offer no serious argument. Defendants contend that Aravanis's role as the "cosponsor" of the deal was "not inconsistent" with their "recusal" statements because Aravanis was not a Board member with voting power. Ill.Br. 30; ¶¶411-12. This argument badly misapprehends the standard for pleading that a statement is misleading, which does ***not*** require a showing of pure, literal falsity. All that Plaintiffs must allege is that the statement was a misleading "half-truth," which this one obviously was. *See*

1  *Macquarie*, 601 U.S. at 263 (Rule 10b5(b) bars "half-truths").[11] Defendants'

2  statement gave investors the misleading impression that Aravanis did not play a

3  ***meaningful role*** in the decision-making process, which he clearly did and which

4  Defendants do not even dispute. *Berson*, 527 F.3d at 985. At bare minimum,

5  Defendants' implausible interpretation of this statement is a question of fact.[12]

6      As to their misleading statement about the blockbuster insurance policy,

7  Defendants argue that they previously disclosed Illumina's Insurance Matters

8  Agreement ("IMA") in November 2021, but they do not (and cannot) contend that

9  that disclosure included the highly material information the Complaint alleges was

10  misleadingly omitted—i.e., the extraordinary premium Defendants paid and the fact

11  that they eliminated all entity coverage. Indeed, Defendants concede that the IMA

12  did not even disclose that any insurance had been obtained at all. *See* Ill.Br. 29.

13  Defendants next contend that their false reassurances about Defendants' supposedly

14  "standard" policy are inactionable because the only policy they could have obtained

15  under Delaware law was a Side A policy. Ill.Br. 29. That argument is meritless:

16  Illumina ***had*** Side C entity coverage the prior year (like many Delaware corporations

17  do), so it is false to suggest that Side A coverage was all that was available or

18  appropriate. ¶168. At best, this only raises a fact question.

19      Defendants next contend that the undisclosed $100 million insurance

20  premium was immaterial. Seriously? The materiality of a ***$100 million*** premium is

21  so obvious that the Delaware Chancery court concluded it demonstrated a "credible

22  basis to infer" "knowing" misconduct. ¶409. And, when Illumina cut $100 million

23  in expenses, the disclosure prompted a statistically significant stock price decline.

24

25  ———————————

25  [11] *Xerox* is inapposite, as there was no dispute that the challenged statements were

26  accurate. 300 F. Supp. 3d at 572.

27  [12] Illumina contends that there are no well-pled facts establishing that Aravanis's

28  "economic interests" in GRAIL were hidden from the Board. Ill.Br. 30 n.14. Not so.

The Complaint explicitly alleges that Aravanis was required (but failed) to disclose

his significant GRAIL ownership on his Board disclosure form. ¶¶184, 188.

¶¶219-23. Regardless, courts routinely find facts that are probative of misconduct or a company's future prospects material, regardless of quantitative significance. *See, e.g.*, *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 972 (C.D. Cal. 2017) (quantitatively insignificant information may be material "for what it may signal about the future of the company"); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 974 (N.D. Cal. 2015) (improper reimbursements of $190,000 material).

With respect to Defendants' undisclosed interests in GRAIL, Defendants mischaracterize Plaintiffs' amendment. Plaintiffs amended their complaint to avoid burdening the Court and the parties with a dispute about one category of allegations; they have in no way conceded that the allegation that Illumina insiders had a personal financial stake in the acquisition has been "refuted"—let alone "conclusively"—as Defendants now argue. Ill.Br. 29. In fact, Plaintiffs allege—based on a ***verified*** complaint reflecting the knowledge of a former ***Illumina Board member based on his review of internal Illumina documents***—that Illumina's Board was conflicted because directors were "poisoned by their personal stake" in the GRAIL acquisition. *See, e.g.*, ¶¶232, 234, 236, 287, 414. This is anything but "vague innuendo," as Defendants suggest (Ill.Br. 29 n.13): it is a particularized and sworn fact given in a court proceeding by a then-current Illumina director. Such an allegation is exceedingly rare in securities litigation at the pleading stage. Moreover, Plaintiffs amply allege Defendants' personal financial stakes in the deal, including allegations beyond Illumina Board members' GRAIL equity. *See* Section III.B.1-2.

### 5. Illumina Made False And Misleading Statements Concerning Its Accounting For GRAIL

Defendants also misrepresented the accounting treatment for GRAIL. After Illumina reduced its GRAIL stake to just under 20% in 2017, Illumina publicly reported its interests in GRAIL using the "cost method" as opposed to the "equity method." ¶¶308-09. This was improper and violated GAAP. Among other things, this improper accounting treatment allowed Illumina to avoid scrutiny because it enabled Illumina to avoid reporting GRAIL as a related party, to (falsely) assert its

acquisition of GRAIL was "arm's length," and to conceal Aravanis's GRAIL ownership and role in the deal. ¶¶318-22. But the actual facts—including from FE accounts, internal documents, and numerous other sources—showed Illumina exerted "significant influence" over GRAIL, rendering the "cost method" treatment improper and in violation of GAAP.  Accounting allegations like these are routinely sustained. *See Daou*, 411 F.3d at 1020 (sustaining GAAP violations); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) (fact that defendant and another entity were related, and failure to disclose them as such, "made [the defendant's] SEC filings misleading"). *See also* App'x A.

Illumina's SEC filings up until closing were false and misleading because they improperly accounted for GRAIL under the cost method rather than the equity method, failed to identify highly relevant related party transactions, and attached false SOX certifications. ¶415. These failures led to further false and misleading statements in the S-4 and its subsequent amendments concerning purported "arm's length" negotiations. ¶338. Defendants' challenges to these allegations fail.

***First***, Defendants contend that Plaintiffs fail to specify which statements were alleged to be false. Ill.Br. 11. That is incorrect. The Complaint alleges that Defendants failed to identify transactions with GRAIL and GRAIL equity holders as related party transactions, falsely asserted that filings were prepared in compliance with GAAP, attached false SOX certifications, and falsely described the negotiations between Illumina and GRAIL. ¶¶338, 415-17. This is precisely the specificity that Defendants contend is lacking. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 674 (M.D. Tenn. 2022) (failure to disclose "related-party transactions" actionable and "assertions that [defendant] complied with GAAP" was additional false statement). To the extent Defendants contend that the failure to make related party disclosures is no longer actionable after *Macquarie*, that argument is wrong, as such an omission renders false an issuer's affirmative statement that it complied with GAAP (¶415), as well as any "half-truths" that may

be rendered misleading by that omission. *See, e.g.*, *Bond*, 587 F. Supp. 3d at 674.

*Second*, Defendants argue that their accounting treatment was an inactionable opinion. Ill.Br. 11-12. This argument fails. Among other things, the Complaint alleges that the cost method was employed, in violation of GAAP, specifically to conceal the conflicted nature of the acquisition—a highly material omitted fact that rendered any supposed "opinion" actionable. *See* ¶¶316-22; *Miller v. Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 429, 436 (D. Mass. 2018) (inadequate related-party transaction disclosure actionable under *Omnicare*).

*Third*, Defendants mischaracterize the Complaint to contend that their false statement that the deal was "arms' length" was not adequately alleged. Significantly, this argument disregards that Aravanis was Illumina's lead negotiator and the transaction was anything but "arms' length." ¶¶155-65. Defendants last argue the description of the background of the merger was accurate. But this ignores that the Complaint actually alleges that deSouza began outreach to GRAIL in April 2020, prior to the date disclosed in the S-4, and failed to disclose Defendants' severe conflicts. ¶¶156-57. These arguments are without merit.

## B.    Defendants Acted With Scienter

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *see also Arena*, 840 F.3d at 705 ("deliberate recklessness" suffices). The issue is "whether all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation," does. *Tellabs*, 551 U.S. at 322-23. In this inquiry, a court must "constantly assum[e] . . . plaintiff's allegations to be true." *Id.* at 326-27. The scienter inference "need not be irrefutable," a "smoking gun," or even the "most plausible of competing inferences"—a scienter inference that is merely as likely as any other suffices, because a "tie" goes to the plaintiff. *Id.* at 324. Importantly, no "specific theory of defendants' motives" is required to plead scienter, *In re Apple Inc. Sec. Litig.*, 2020

WL 6482014, at *12-13 (N.D. Cal. Nov. 4, 2020), and while supportive, no pecuniary or other motive is needed. *See Matrixx*, 563 U.S. at 48.

### 1.    The Complaint Pleads A Strong Inference of Scienter

Here, Plaintiffs allege with particularity numerous facts that give rise to a strong inference that Defendants knew or were reckless that their statements about GRAIL and Galleri were false and misleading when made. These include:

**Defendants' Testimony and Documents.**    Defendants' admissions in this case and the FTC proceeding, and the FTC's and Fifth Circuit's findings in the FTC proceeding, demonstrate their scienter with respect to their challenged statements.

As noted above, Defendants made several statements attesting that the merger would "accelerate" Galleri's adoption and commercialization, including Defendant deSouza's assertion that he and Illumina had a "very clear line of sight into how" they would go about it. ¶¶109-10. Yet Defendants now admit that they had no "concrete plan or model" for how they would do those things at all. Ill.Br. 19. Moreover, the senior-most executive at Illumina responsible for Galleri's regulatory and reimbursement strategy testified during the FTC proceeding that Illumina did not have the funding, experience, or resources to "accelerate" Galleri's FDA approval or its widespread adoption (¶115), and Defendants admitted in that proceeding that they were "unable to substantiate" any acceleration claim. ¶116. In fact, Defendant Febbo, Illumina's then-CMO, testified that Illumina did not include any acceleration in its financial model for the acquisition (a fact Illumina's own expert confirmed); GRAIL's CFO testified that there was no estimate for Galleri's "acceleration" due to the acquisition because neither Illumina nor GRAIL performed that analysis; and Defendant Bishop admitted that he could not quantify how much sooner Galleri would obtain FDA approval as a result of the acquisition. ¶¶113-15. These facts provide powerful evidence of scienter. *See PCC*, 2017 WL 3084274, at *16 (finding scienter where plaintiffs alleged that company "did not have any actual forecasts to support [their] representation").

Similarly, Defendants made numerous statements claiming that they had a robust collection of data demonstrating Galleri's efficacy that would support an FDA submission in the near-term. ¶¶150, 343. But Defendants have admitted several facts that show that these statements were false or misleading. For example, Bishop testified in May 2021 that GRAIL was "still years away from seeking FDA approval for its multi-cancer screening test" (¶151), and Defendants' expert testified it would take "seven to ten years at minimum"—at least five years longer than in Defendants' public timeline—to conduct the clinical study needed to demonstrate the effectiveness of a cancer screening test in an asymptomatic population—exactly the study needed for FDA approval. ¶¶151-52. Similarly, several Defendants conceded that FDA approval was a prerequisite to broad reimbursement and that Illumina's plans for Galleri turned on it. ¶¶123, 147, 152, 268-71, 298. These contemporaneous admissions cannot be squared with Defendants' public statements and are strong evidence of scienter. *See, e.g., Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82-83 (1st Cir. 2002) (admission that directly contradicted statement establishes scienter); *Quality Sys.*, 865 F.3d at 1145 (scienter when "executives themselves told investors they had real-time access to, and knowledge of, sales information").

The Complaint also alleges in detail that: Defendants were directly informed by the FDA, in meetings in 2019 and in formal written feedback in February 2020, that the studies being conducted on Galleri were wholly insufficient to support FDA approval (¶123); it was "common knowledge" at GRAIL that the FDA had informed Defendants Galleri's clinical program was insufficient (¶147); Illumina's senior executives had unrestricted access to GRAIL's FDA file and knew this fact too (¶298); and Galleri's actual real-world performance showed that Galleri was a disaster (¶¶124-35). Controlling Ninth Circuit law holds facts like these sufficient to plead scienter. *See, e.g., Arena*, 840 F.3d at 707-08 (scienter where defendants failed to "inform the market about the risk of non-approval or delayed approval based on the FDA's 'concerns'"); *Xoma*, 74 F.3d at 959 (scienter where defendants made

"misleading, optimistic public statements that the [] FDA-approval process was progressing positively" when it was not); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 808-09 (C.D. Cal. 2012) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity."); *BioMarin*, 2022 WL 164299, at \*13 (scienter for FDA timeline statements when "approval was riskier than they let on publicly" given "warning signs…and silence from the FDA").

And Defendants obviously knew, when issuing the Illumina S-4 that contained glowing projections, that Illumina's own internal valuations were a fraction of those numbers. Indeed, the concealed projections were provided to Illumina's Board, which included deSouza and Thompson. ¶345. Further, as detailed above, Defendants also knew that the assumption underlying the projections—broad reimbursement in 2025—was impossible, given their admissions about the FDA submission timeline and how it was a necessary predicate to commercialization. Courts routinely hold that the possession of information contradicting public statements establishes a strong inference of scienter. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) ("access and review of contemporaneous reports are the most direct way to prove scienter"); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941-43 (9th Cir. 2003) (scienter where executives aware of "maintenance and operational problems" when touting company's long-term prospects).

**Defendants' Unusual Insurance Policy and Related Misrepresentations.** Defendants' scienter is also supported by the extraordinary insurance they secured to indemnify Illumina's Board and senior management for their acquisition-related conduct, as well as the secret indemnification letter agreement Defendants negotiated to indemnify the companies' executives, which demonstrate they knew their positive statements about the deal were misleading. ¶¶275-81; Sections II.G; III.B.1. Notably, the $300 million policy had a ***$100 million annual premium***,

costing **25 times** what Illumina paid the year before (even as it eliminated the "entity" coverage Illumina could have used to pay for any "gun-jumping" fines) and it was so unusual that a Delaware Chancery court concluded it provided a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law." ¶¶168-71, 281. It also evinces Defendants' knowledge that their statements about the acquisition's closing being driven by a "moral imperative" to "save lives" and to prevent the "clock from running out" were misleading at best.

Notably, Defendants never voluntarily disclosed the extraordinary terms of this policy. When questioned about it by activist investor Carl Icahn two years later, they made up a series of blatantly misleading statements to suggest the insurance was somehow "standard," "appropriate," and consistent with the Board's fiduciary duties and "appropriate risk management and disclosure practices." ¶¶398, 400. These false explanations further establish a strong inference of scienter. *See Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000) ("no doubt" scienter pleaded when, "despite knowledge of the true reasons for rising inventory levels, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth"); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (denials made with "'certitude'—when viewed in the 'context' of such persistent and significant underlying questions, is suggestive" of scienter"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237-38 (S.D.N.Y. 2010) ("incongruity between word and deed establishes a strong inference of scienter").

**<u>Defendants' Concealment of Conflicts of Interest</u>**.  For similar reasons, the undisclosed conflicts of interest that drove the acquisition, which were obviously known by Defendants, demonstrate scienter as to several of Defendants' statements.

To start, in describing the background of the deal in Illumina's S-4 and elsewhere, Defendants omitted how the deal was laden with conflicts that, by their nature, would have been evident to Illumina's Board. These included that one of two

primary "co-sponsors" of the acquisition was Aravanis—the former CSO of GRAIL who was installed as Illumina's CTO by deSouza to orchestrate the acquisition, and who personally stood to make millions from the deal. ¶¶159-62.

When investor Carl Icahn began raising serious questions about conflicts of interest around the acquisition in April 2023 (¶195), rather than disclose the conflicts above, Defendants continued to conceal them and made further false and misleading statements. Specifically, Illumina and Defendant Thompson—who was Illumina's Board Chair at the time the deal was signed and closed, and undoubtedly knew the facts above—misleadingly stated that, "consistent with good corporate governance practices, [Aravanis was] recused from any decisions to sign and close the GRAIL acquisition." ¶¶183, 187. But Aravanis played a central role in the Board's decision-making process—and Defendants did not disclose his role or any of the other conflicts described above. Moreover, Illumina and Thompson further asserted that Aravanis's stake in GRAIL was "fully disclosed" to the Board, even though evidence shows that was not true (¶188)—another false statement that further evinces Defendants' culpable intent. And, after Icahn ousted Thompson and got his nominee, Andrew Teno, appointed to the Board in June 2023, Teno obtained confidential information about the acquisition and immediately concluded that deSouza and the Board were "poisoned by their personal stake in the deal." ¶287.

Courts have recognized that facts like these, indicating that Defendants had access to information directly contradicting their statements and engaged in a deliberate effort to cover up wrongdoing, provide powerful proof of scienter—especially where, as here, those facts were uncovered by a then-current Board director. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145 (finding that "particularized allegations"—including allegations based on former director's lawsuit—"that defendants had actual access to the disputed information raise a strong inference of scienter"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) ("alleged attempts to hide" and "cover up" misconduct "support a strong

inference of scienter"); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310-11 (D. Utah 2007) (similar).

**Defendants Had Powerful Financial Motives to Mislead**. The law is clear that motive is not required to plead scienter. Nevertheless, the Complaint alleges that Defendants had powerful motives to mislead investors. For example:

- Defendant Klausner used an opaque vehicle, Milky Way, to invest $125 million in GRAIL at the same time he knew Illumina was taking steps to reacquire it—doubling his investment in mere months. ¶¶163-64.

- Through the acquisition, Defendant Bishop's GRAIL stake netted him over $100 million, while Defendant Ofman pocketed over $55 million. ¶165.

- Defendant Aravanis—who was elevated to Illumina's CTO specifically in to serve as Illumina's "cosponsor" for the GRAIL acquisition—liquidated all of the stock he received through the GRAIL acquisition as quickly as possible, reaping well over $10 million in proceeds. ¶¶282, 294, 322.

- After Defendant deSouza orchestrated the GRAIL acquisition, Illumina's Board rewarded him with approximately $67 million over the next three years—a huge increase from the $1.9 million he earned in 2019. ¶165.

These extraordinary financial incentives weigh heavily in favor a finding of scienter, particularly in light of the numerous other allegations corroborating Defendants' knowledge of the true facts. *See, e.g.*, *Tellabs*, 551 U.S. at 310 ("personal financial gain may weigh heavily in favor of a scienter inference"); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (size, timing, and context of insider sales support scienter); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("possibility of reaping a windfall payout" through acquisition supports scienter); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) (scienter where defendants were allegedly motivated to overstate valuation in order to increase price paid in acquisition and "Defendants' stock sales took place shortly after the transaction").

**GRAIL's Significance and Defendants' Knowledge and Credibility**. The Ninth Circuit has explained at least four times now that "facts [that] were prominent enough that it would be 'absurd to suggest' that top management was unaware of

them" support an inference of scienter. *Berson*, 527 F.3d at 989 (quoting *Am. W.*, 320 F.3d at 943 n.21); *NVIDIA*, 81 F.4th at 946 (similar); ECF No. 54.1 at 5-6, *Okla. Firefighters Pension & Ret. Sys. v. SNAP Inc.*, No. 23-3932 (9th Cir. Dec. 20, 2024) ("absurdity" test independently established scienter). In *NVIDIA*, the Ninth Circuit found that it was "obvious" that a CEO would know about the source of approximately $1 billion in revenues. 81 F.4th at 946. In *Berson*, the Court found it "hard to believe" that senior executives would not have known about stop-work orders that allegedly halted tens of millions of dollars of work. 527 F.3d at 988. In *Am. W.*, it called the argument that a board would not have discussed millions in stock repurchases or an FAA investigation "patently incredible" and "absurd." 320 F.3d at 943 n.21. The facts here are in another league entirely.

Defendants' misstatements concerned the over $8 billion GRAIL acquisition, the single most important transaction in Illumina and GRAIL's corporate histories. The acquisition was the subject of a successful proxy contest that led to the ouster of Illumina's Board chair, a derivative lawsuit, and an FTC trial, FTC appeal, and appeal to the Fifth Circuit. These facts—and the fact that GRAIL **lost 95% of its value** shortly after being acquired—bolsters scienter. *See NVIDIA*, 81 F.4th at 946; *Berson*, 527 F.3d at 988; *Am. W.*, 320 F.3d at 943; *MannKind*, 835 F. Supp. 2d at 808-09 (given drug was most important product and defendants had access to FDA interactions "it would be absurd to suggest" management was without knowledge); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("remarkable" 84% write-off supported scienter). It would be "patently incredible" and "absurd" to suggest that Defendants did not know about many of the facts they misrepresented here, including whether Galleri's evidence base was sufficient for approval, whether they had plans or capabilities to accelerate Galleri, and whether the projections provided to investors conflicted with the ones they held back. *Am. W.*, 320 F.3d at 943 n.21.

Defendants' scienter is also supported by their own professed and demonstrated knowledge of GRAIL and Galleri—a central topic of every investor

call and numerous media appearances during the Class Period. *See, e.g.*, ¶¶295, 381, 393, 404-07. *See, e.g.*, *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (scienter supported by fact that defendants' statements were made in response to questions from analysts); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228-29 (E.D. Pa. 2021) (statements and self-professed knowledge created strong inference of close involvement and scienter). Indeed, deSouza personally oversaw an effort to find a credible mouthpiece to back Defendants' false claims about GRAIL and Galleri—but was unable to do so, enraging him. ¶120. This is also strong evidence of scienter, particularly when considered alongside the findings of a California court that Defendant deSouza "purposefully" hid assets, his "credibility [was] suspect," and that he "breached his fiduciary duties." ¶¶299-300.

**The Suspicious Resignations of Illumina's Entire Senior Management**. Defendants' scienter is also bolstered by the suspicious and numerous surprise executive resignations here. Most notably, Illumina disclosed that Aravanis and Febbo, the two "cosponsors" of the deal (¶¶36-37), were leaving the company ***the day before it disclosed that the SEC was investigating its representations about the GRAIL acquisition***. ¶¶227-31; *see In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (resignations in the midst of "investigations" supported a strong inference of scienter). And, for his part, deSouza abruptly left without a permanent replacement after a failed proxy contest triggered by his continued misrepresentations concerning GRAIL. *See In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021) (resignation that is effective immediately without a successor in place may be considered "unusual").

Taking a step back, eight of Illumina's senior-most executives at the time deSouza became CEO have departed, including the chief architects of the GRAIL transaction and Thompson, Aravanis, Febbo, and the CFOs responsible for GRAIL's accounting. ¶¶301-03. This also supports scienter. *See San Antonio Fire & Police*

*Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *11 (S.D.N.Y. May 1, 2024) ("there were too many departures to say that they were coincidental with a straight face"); *Glazer v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (resignations "add to the pleading of circumstantial evidence of fraud," particularly where "independent facts indicate that the resignation was somehow tied to the fraud"). Indeed, in leaving when they did, these executives abandoned their prominent roles at Illumina just as GRAIL was purportedly poised to become a multi-billion-dollar revenue generator—either showing that they did not believe in GRAIL as claimed, or undermining the notion that they left for innocent reasons.

**Defendants' Accounting Violations Bolster Scienter**. Scienter is also supported by Defendants' accounting violations. The alleged accounting violations were sophisticated maneuvers designed to conceal highly material facts about insiders' conflicts in the GRAIL transaction, and could only have been carried out with the approval and knowledge of senior management. These facts further bolster the inference of scienter. *See, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."); *Montage Tech.*, 78 F. Supp. 3d at 1226-27 (finding scienter where company failed to disclose that largest distributor was in fact a related party subject to disclosure under GAAP).

### 2. Defendants' Scienter Arguments Are Meritless

Defendants' arguments against scienter are unavailing. ***First***, both the GRAIL and Illumina Defendants contend that scienter has not been alleged because they had no motive to commit fraud. This is wrong. To start, Plaintiffs are not required to plead motive. *See Matrixx*, 563 U.S. at 48; *Arena*, 840 F.3d at 709 n.8. Further Defendants' argument is incorrect. Remarkably, the ***GRAIL*** Defendants disclaim having any motive, even though they do not dispute that they "owned GRAIL shares and stood to profit from the merger." Gr.Br. 13. Indeed, Defendants Bishop and

Ofman together netted **over $230 million** as a result of GRAIL's inflated valuation (¶165)—providing them with an extraordinary motive to mislead. *See supra* 46; *SLM*, 740 F. Supp. 2d at 558. Moreover, the GRAIL Defendants fail to grapple with the motive allegations pertaining to Defendant Klausner, who served on the GRAIL Board and invested $125 million in GRAIL when he knew non-public information that Illumina would acquire GRAIL—providing him with an obvious motive to mislead investors about GRAIL's value. ¶164; *see supra* 46; Section II.F.

Ignoring the Complaint's numerous motive allegations, the Illumina Defendants contend that the Complaint only pleads motive as to Aravanis (Ill.Br. 31-32). The Complaint goes far beyond that. It alleges that a then-current Illumina Director and others with access to confidential Board materials independently determined that Illumina's Board members had been "poisoned by their personal stake in the deal," and that the directors acted with "bad faith and intentional, reckless, or disloyal misconduct." ¶¶287-88. These assertions corroborate Defendants' motive. *See supra* 45; *see also, e.g.*, *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 767, 786-87 (M.D. Tenn. 2013) (scienter for "undisclosed interests" in "one of the acquired entities").

Moreover, in response to these allegations, Defendant Thompson carefully asserted that "no executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition (including indirect ownership interests)" while tellingly avoiding making the same representation about Illumina's ***directors'*** indirect ownership, even though they were at the center of Icahn's allegations. ¶286. This further bolsters the inference of Defendants' financial motives alleged by those with access to Illumina's internal documents. *See In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) ("non-denial" of public allegations about the defendant's conduct "provide a strong inference of scienter").

Finally, with respect to Defendant Aravanis, Illumina Defendants raise a host of arguments that fall apart under cursory scrutiny. Defendants concede that sales

that are "'dramatically out of line with prior trading" and "calculated to maximize the personal benefit from undisclosed inside information'" are "'suspicious'" (Ill.Br. 32), but they make no argument to try to refute the obvious point that Aravanis's Class Period sales *were* dramatically different than his prior trading and timed in a way that maximized his profits while he had inside information. Instead, they defend the sales as innocuous given that he supposedly "finally receive[d] freely tradable shares" when the deal closed.  Ill.Br. 32.  This is wrong.

To start, on top of approximately $5 million in Illumina shares, Aravanis received at least $5 million *in cash* through the acquisition—so he did not need the liquidity.  ¶¶173, 184, 324.  Moreover, Defendants repeatedly stated that GRAIL was worth more—even as a standalone company—than the acquisition price Illumina paid. ¶¶101-02, 106.  If Aravanis believed that, and also that (as he told investors) Illumina would "accelerate" Galleri's adoption and thereby derive even more value from GRAIL (*see, e.g.*, ¶336), it is not plausible that he would have sold every Illumina share he received through the merger at the first moment he could. ¶173. *See, e.g.*, *Nevsun*, 2013 WL 6017402, at *13.[13]

In addition, Defendants' argument that Aravanis's sales cannot be suspicious because they were made pursuant to a 10b5-1 trading plan (Ill.Br. 32) fails for several reasons. First, the Complaint alleges that he knew insider information at the time he entered the plan given that he was the secret "cosponsor" of the deal. *See, e.g.*, *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 & n.5 (D. Nev. 2009) (defense pursuant to 10b5-1 plan requires factual finding of "good faith" inappropriate on a motion to dismiss ); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ("[t]rading plans are not a cognizable defense to

---

[13] Defendants' case is inapposite, as it did not involve any post-acquisition sales and only "an extremely small portion of his total holdings." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). The Ninth Circuit has since confirmed that sales large in amount or percentage, timed suspiciously, or inconsistent with prior trading, like Aravanis's, support scienter. *See Oracle*, 380 F.3d at 1232.

scienter allegations" if entered when defendants are "already aware of" allegedly undisclosed facts). Second, Defendants do not disclose the details of his 10b5-1 plan, so it only raises fact questions as to what it says and why it supposedly establishes innocence. The Court cannot hold the sales are innocent as a matter of law without even seeing the plan. Third, even if Defendants provided the plan, it clearly cannot provide a defense here given that it enabled Aravanis *to dispose of every single share he received in the acquisition at the earliest possible moment*.[14]

**Second**, Defendants' argument that the Complaint pleads no facts showing fraudulent intent or recklessness ignores the allegations showing precisely that. With respect to the accounting statements, the Complaint alleges far more than a mere "misapplication of accounting principles." Ill.Br. 33. Rather, it alleges several facts that strongly suggest *deliberate* misconduct, including that Illumina's sale of GRAIL equity in 2017, which brought its stake in GRAIL down from over 50% to just under 20%, had *no purpose whatsoever* other than to give Illumina cover for failing to report GRAIL as a related-party and hide any transactions with GRAIL or its insiders, such as Aravanis's GRAIL ownership and personal involvement in the deal. ¶¶306-22. These allegations support scienter. *See supra* 8, 38-39; *McKesson*, 126 F. Supp. 2d at 1273. Defendants' suggestion that the allegations make no sense because Illumina ultimately disclosed Aravanis's and Ronaghi's GRAIL equity (Ill.Br. 33) ignores that the very same disclosure flatly misrepresented that the two were "recused from any decisions to sign and close the GRAIL acquisition." ¶411.

With respect to scienter allegations concerning the insurance policy that Illumina's Board demanded be paid in full before it would close the acquisition (*see, e.g.*, ¶281), Defendants first attempt to suggest that the $100 million premium they paid for $300 million in coverage was not "expensive" or "unprecedented." Ill.Br.

---

[14] Defendants argue other insiders' failure to trade on inside information undermines scienter, but courts regularly find that insider trading allegations as to just one or a few insiders support scienter. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1146 (crediting insider trading allegations as to one of three individual defendants).

34. But this counterfactual argument ignores well-pleaded allegations showing exactly that. ¶¶275-79 (alleging that coverage doubled from an amount that was "in line with [Illumina's peers]" at a premium *25 times* more expensive). Defendants' factual arguments cannot be countenanced at this stage. *See Khoja*, 899 F.3d at 1014.

Defendants also argue that the insurance policy only reflects that closing the acquisition in defiance of the standstill risked "fines and opportunistic lawsuits," and point to the EU's later jurisdictional ruling to argue they were "right." Ill.Br. 34. But Illumina's Board abandoned all coverage for *Illumina*, even though it also had exposure to "opportunistic" lawsuits and was the *only* one with exposure to fines—and instead protected themselves and senior management from allegations of breaching their duties to shareholders, at great expense to the Company, while also requiring Illumina to indemnify both Illumina's and GRAIL's executives for any personal liability. ¶¶166-71. This was a completely self-interested maneuver. Further, when confronted about these issues, Defendants issued a dishonest response—asserting that the insurance was "standard" and "not uncommon" without disclosing that they had eliminated Illumina's entity coverage, doubled coverage for Illumina's officers and directors, and made the Company pay a $100 million annual premium to do so—a 2500% increase from the year before. ¶¶280-81. These allegations also support an inference of scienter. *See Citigroup*, 753 F. Supp. 2d at 238 ("incongruity between word and deed establishes . . . scienter").[15]

With respect to Defendants' responses to accusations about conflicts, Defendants try to brush aside the Complaint's allegations as merely repeating falsity

---

[15] Defendants' effort to exploit the EU's jurisdictional ruling is improper, as the securities laws take an *ex ante* approach and the Court must look to the facts as of the time of the statements. *See, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *14 n.10 (N.D. Cal. Sept. 29, 2000). The jurisdictional ruling says *nothing* about Galleri's efficacy, data, FDA timeline, "acceleration," or Defendants' conflicts—or make Defendants' false statement that the insurance was "standard" true.

allegations (Ill.Br. 35), but they ignore that the statements—for example, that Aravanis was "recused" from the decision-making process—could not have been innocently made. That is because Thompson and Illumina's Board clearly would have known about Aravanis's role as a cosponsor of the deal. ¶282; *see Energy Transfer*, 532 F. Supp. 3d at 229 (scienter where "it is extremely unlikely [defendant] did not know" about topic he was responding to). Defendants also ignore allegations that the highly crafted, circumspect word-smithing of Defendant Thompson's denial supports an inference of scienter. ¶283; *see Silvercorp*, 26 F. Supp. 3d at 276.

Defendants also argue that their failure to conduct any investigation is not indicative of scienter (Ill.Br. 35), but courts have repeatedly found exactly that. *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1049 (N.D. Cal. 2023) (finding it "deliberately reckless to not investigate" relevant facts before making statements); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010) (rejecting argument that defendant was "not under a duty to investigate the news articles" because, "once they did take it upon themselves to respond to the news stories, they were required to speak the full truth and accurately inform").[16]

For their part, the GRAIL Defendants argue that Defendant Bishop and Ofman's FTC testimony is mischaracterized. Gr.Br. 14. This argument fails for the reasons set forth above, *supra* 41-43, and, in any event, improperly attempts to dispute the Complaint's well-pled facts. RJN Opp. 7-9. GRAIL's attacks on the FE allegations fare no better. Gr.Br. 14. Tellingly, the GRAIL does not contend that any FE lacked a basis to know the information attributed to him, and instead argue that the FEs are not alleged to have "ever spoken to any of the GRAIL Executives much less know what was in their minds." Gr.Br. 14. But FEs are not required to have

---

[16] *Steinberg v. Schmidt Industries, Inc.* is inapposite. There, the court rejected allegations that defendants should have "conducted a better investigation" into an acquisition target. 2024 WL 1007879, at *17 (D. Or. Feb. 2, 2024). Defendants' claim that they "unequivocally refuted" their financial motives is false. *See supra* 3-4.

contact with a defendant or speak to their state of mind. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (FE allegations supported scienter despite lack of "direct contact" with defendants); *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11-12 (D. Ariz. Nov. 27, 2018) (no personal knowledge of defendants' state of mind required). In all events, the FE allegations do speak to Defendant's knowledge. *E.g.*, ¶¶147, 154 (FE3 worked with Aravanis and joined Ofman on calls and presentations); App'x B.

### 3. The Remaining Allegations Support Scienter

Defendants also challenge allegations concerning executive departures, deSouza's divorce proceedings, and the core operations inference. Ill.Br. 35-37. As detailed above, each contributes to an inference of scienter. *See supra* 46-49. As to departures, Defendants again ignore the Complaint's allegations, which details why the departures are unusual—including because the two "sponsors" of the GRAIL transaction (Aravanis and Febbo) "resigned" the day before the company disclosed the SEC was investigating. ¶¶227-28. Defendant Thompson was forced out and replaced by Teno, while deSouza left Illumina unexpectedly (as analysts noted), and GRAIL employees were suddenly required to sign arbitration agreements days later, thus limiting the ability to share public. *See* ¶¶303-05.  Similarly, Defendant Samad joined Illumina in 2016, immediately before the accounting fraud is alleged to have begun, yet resigned unexpectedly in the middle of several other alleged fraud-related disclosures, and four separate analysts connected the departure to GRAIL. ¶¶213, 308 421. Illumina's Chief Accounting Officer, Jose Torres, unexpectedly resigned three months later. ¶302. And Samad's replacement, Joydeep Goswami, resigned shortly after the final alleged disclosure in this case. *See id*. These resignations "add[] one more piece to the scienter puzzle." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *Dentsply*, 2024 WL 1898512, at *11.[17]

---

[17] Defendants' cases are inapposite. Ill.Br. 35-36. In *In re Regulus Therapeutics Inc.*

With respect to Defendant deSouza's divorce proceedings, Defendants merely assert they are irrelevant—but as set forth above, his conduct in those proceedings supports his scienter. *See supra* 48.

Finally, Defendants contend that the Complaint lacks allegations showing how the facts contradicting Defendants' statements were "so prominent that it would be 'absurd to suggest that top management was unaware of them.'" Ill.Br. 37; *see also* Gr.Br. 14-15. But that simply ignores the nature of Defendants' statements and the facts underlying them. To start, Plaintiffs rely on the "core operations" doctrine to supplement the inference of scienter, not as its sole basis. Plaintiffs allege that Defendants were directly informed of and testified they knew the contrary facts demonstrating their scienter. *See supra* 41-43.  In any event, as set forth above, it ***would*** be absurd to suggest that Defendants were unaware of several facts that make their statements false—such as the projections they used to analyze the GRAIL acquisition, the fact that there was no plan for how to "accelerate" Galleri's adoption, or the FDA's communications with GRAIL about Galleri's PMA.[18]

### 4.    A Holistic Analysis Supports A Strong Inference of Scienter

Defendants also argue that a purported "holistic" analysis shows Plaintiffs' theory of fraud makes no sense because some Defendants "would" have lost money by pursuing a "bad deal" (ignoring the fact they in fact made millions here). Ill.Br. 37. This is wrong. To start, the Complaint contains numerous allegations that several Defendants were personally incentivized to close the deal—including deSouza and

---

*Securities Litigation*, the single resignation could be explained by other factors, including "cost saving." 406 F. Supp. 3d 845, 861-62 (S.D. Cal. 2019). And in *Zucco Partners, LLC v. Digimarc Corporation*, the resignations had innocent explanations. 552 F.3d 981,1002 (9th Cir. 2009).

[18] The facts here stand in sharp contrast to Defendants' cases. *See Pittleman v. Impac Mortg. Holdings, Inc.*, 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) ("vague accusations and conjecture" about loans failing insufficient); *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 765 (D. Ariz. 2022) (no scienter "solely" on core operations theory where the company had "tens of thousands of contracts").

Illumina's Board (who were "poisoned by their personal stake in the deal" and, deSouza in particular, who received $67 million following the closing), Aravanis (the "cosponsor" whose $10 million stake in GRAIL was undisclosed at the time of the acquisition), and all of the GRAIL Defendants (including Bishop, Ofman, and Klausner), who cashed out and made well over $250 million. *See supra* 46. Defendants' conclusory and contrary assertion cannot be credited. *See Khoja*, 899 F.3d at 1002 (defendants cannot "insert their own version of events into the complaint to defeat otherwise cognizable claims"). Even if no Defendants profited from the fraud, that would not negate scienter because courts cannot "infer innocence by hindsight because the alleged misdeeds did not pay off." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1076 (E.D. Wash. 2016).

Moreover, an ***actual*** holistic analysis of the Complaint's allegations shows that nothing about Defendants' preferred innocent inference makes any sense. Defendants could have simply extended the acquisition closing to accommodate the EC review and FTC proceeding. Instead, they engaged in a byzantine series of steps to close the deal in the face of an explicit regulatory prohibition—securing an extraordinary insurance policy and entering into a secret letter agreement in which they waived regulatory conditions and Illumina indemnified GRAIL directors and officers. They did this to rush to pay GRAIL's investors $8 billion, even though their internal valuations showed it was worth a fraction of that amount, while agreeing to hold the companies separate anyways and exposing Illumina to nearly $500 million in fines. They tried to justify the closing based on their ability to "accelerate" Galleri and "save lives," but had no plan or ability to do the former, and no evidence supporting the latter—and when questioned about their motives, they issued a series of patently misleading denials. Then, when the Fifth Circuit upheld the FTC's decision to block the deal, Illumina was forced to sell GRAIL at a ***95% loss***—for less than its cash on hand. Taken together, as they must be (*see Tellabs*, 551 U.S. at 322-23), these allegations show that no innocent inference is remotely plausible.

**C.     The Complaint Adequately Pleads Loss Causation**

**1.     The Complaint Alleges Loss Causation With Particularity**

As the Ninth Circuit explained in *First Solar*, and courts have held in dozens of cases since, loss causation entails only the "familiar test for proximate cause." 881 F.3d at 753. This is a "context-dependent inquiry, as there are an infinite variety of ways for a tort to cause a loss." *Id.* Ultimately, "[t]o prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Id.* While revelation of fraud in the marketplace is one of the "infinite" ways to show proximate cause, the Ninth Circuit has unequivocally held that it is not the only one: a disclosure need not actually "correct" a prior misstatement or reveal an alleged fraud to cause a loss. *Id.* at 754 (explaining that plaintiffs can, for example, "prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss"). Moreover, it is "inappropriate" to rule on loss causation now—it is a matter for "proof at trial and not to be decided on a Rule 12(b)(6) motion." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages"); *First Solar*, 881 F.3d at 753 (it is a "context-dependent inquiry").

Defendants first contend that the Complaint fails to meet Rule 9(b)'s requirements because it supposedly does not identify "which challenged statements the alleged corrective disclosures supposedly correct." Ill.Br. 38.[19] But "Rule 9(b)'s

---

[19] Defendants' cases (Ill.Br. 38) are inapposite. *Anderson v. McGrath* involved issues of individual reliance for 107 plaintiffs and a complaint so poorly drafted that the Court could not "connect-the-dots" between plaintiffs and the statements they relied on despite "many hours of attempting" to do so. 2013 WL 1249154, at *4 (D. Ariz. Mar. 26, 2013). In *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, the plaintiff alleged misstatements caused a "year-long decline in Uber's valuation" but provided evidence showing the opposite. 998 F.3d 397, 407-10 (9th Cir. 2021).

particularity requirement usually adds little to the plaintiff's burden" to plead loss causation, *In re BofI Holding, Inc. Sec. Litig.,* 977 F.3d 781, 794 (9th Cir. 2020) (allegations sufficient where they "give . . . the court some assurance that the theory has a basis in fact"), and Defendants' ***exact*** argument has been squarely rejected by courts in this Circuit. *See, e.g.*, *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at *21 (N.D. Cal. Mar. 27, 2024) (rejecting defendants' argument that plaintiff "fail[ed] to identify challenged statements that were corrected" by the disclosures because this "is not the law" under *First Solar*); *see also First Solar*, 881 F.3d at 754 (disclosure need not "correct" a misstatement).

And to the extent Defendants are arguing that Plaintiffs have failed to explain how the alleged disclosures are causally connected to the facts concealed by Defendants' fraud, they ignore the Complaint, which does just that. The chain of proximate causation is clear. ***First***, the fraud concerned GRAIL's inflated valuation (¶¶100-08), Galleri's effectiveness (¶¶121-54), and insiders' conflicted reasons for pursuing the deal (¶¶155-65), which if revealed would foreseeably cause a loss.

***Second***, each disclosure was unquestionably connected to that fraud:

**<u>Disclosures Concerning Conflicts and Accounting.</u>** The decision to close the acquisition despite the standstill obligation (¶¶199-201 (disclosure on August 18, 2021)), the CFO's surprise departure (¶¶210, 213-15 (June 9, 2022)), the "resignations" of deal "cosponsors" Aravanis and Febbo together with the simultaneous disclosure of an SEC investigation into the acquisition (¶¶227-31 (August 9-10, 2023), and Icahn's revelation of Illumina insiders' "personal stake" and fiduciary breaches (¶¶232-37 (October 20, 2023))—were causally related to Defendants' misrepresentations concerning, among other things, their reasons for closing the deal, their undisclosed conflicts of interest, and Illumina's fraudulent accounting. Each of these disclosures was caused by facts Defendants intentionally concealed through those misstatements, including their conflicts of interest, inflated "compensation," and improper accounting treatment of GRAIL. ¶228.

The "combination of partial disclosures" here—including executive resignations, together with disclosures of an SEC investigation, and corroborating allegations from a then-current director, each followed by contemporaneous statistically significant stock declines—"is sufficient to plead loss causation at this stage." *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *12 (S.D. Cal. July 12, 2016) (finding similar partial disclosures sufficient); *see, e.g.*, *Berson*, 527 F.3d at 989-90 (disclosure revealing revenue declines but not underlying causes); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (stock decline following announcement of SEC investigation); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021) (disclosure revealing "fact" (but not contents) of whistleblower letter, from which market allegedly "deduce[d]" fraud); *Rudolph v. UTSTarcom*, 2008 WL 4002855, at 4 (N.D. Cal. Aug. 21, 2008) (disclosures "put the market on notice that such disclosures [concerning fraud] might be forthcoming").

**Disclosures Concerning GRAIL's Efficacy and FDA Timeline**. Similarly, the disclosures concerning clinicians' doubts about Galleri's effectiveness (¶¶202-03 (November 23, 2021)); ¶¶211-15 (June 10, 2022)) and deSouza's admission of a longer FDA timeline (¶¶204-06, 208-09 (May 5, 2022)) are clearly causally connected to facts misstated or concealed by Defendants' misrepresentations concerning those very same topics—Galleri's efficacy and its FDA approval and commercialization timeline. Here, Defendants' misrepresentations concerning Galleri's efficacy and FDA timeline are clearly causally related to stock declines triggered by revelations that the FDA timeline was longer than represented and Galleri's efficacy was worse than represented. *See, e.g.*, *Iso Ray*, 189 F. Supp. 3d at 1079-80 (loss causation pled based on article, which provided facts missing from company statements about study and which caused stock price to decrease).

**Disclosures Concerning GRAIL's Value and Performance.** Last, disclosures of GRAIL's financial underperformance—including missed expectations (¶¶207-09 (May 5, 2022); ¶¶216-18 (August 11, 2022)) and the near $1

billion goodwill impairment related to GRAIL Illumina took at the end of the Class Period (¶¶238-42 (November 9, 2023))—are causally connected to, among other things, Defendants' false GRAIL valuations and statements about GRAIL's efficacy and commercial promise. Stock declines resulting from disclosures revealing GRAIL's true value are plainly caused by misrepresentations that falsely inflated that value. *See First Solar*, 881 F.3d at 753 (plaintiffs need only "trac[e] the loss back to the very facts about which the defendant lied" to plead loss causation). Indeed, as the Ninth Circuit had held, plaintiffs "may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 754. Further, in addition to revealing GRAIL's underperformance, Illumina's layoff of 10% of its R&D workforce as part of a bid to reduce expenses by $100 million per year was causally connected to the facts Defendants concealed about their extraordinary $100 million per year insurance policy. ¶¶219-26 (June 26, 2023). *See, e.g.*, *Gilead*, 536 F.3d at 1057-58 (loss causation where cessation of concealed misconduct caused stock decline); *Berson*, 527 F.3d at 989-90 (similar); *Karinski v. Stamps.com*, 2020 WL 281716, at *17-18 (C.D. Cal. Jan. 17, 2020) (similar).

**Third**, when Illumina made each of these disclosures, its stock price declined in a statistically significant manner, resulting in Plaintiffs' loss. *See* ¶¶197-242.

### 2.    Defendants' Arguments Fail

Defendants' other loss causation challenges fail. **First**, Defendants argue that information in certain disclosures was already "public." Ill.Br. 39-41 (disclosures on August 18, 2021, November 23, 2021, May 5, 2022, June 10, 2022, and October 20, 2023). To start, under black letter law, this improper "truth-on-the-market" argument cannot be resolved now. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 481-82 (2013) (whether truth "credibly entered the market. . . is a matter for trial"); *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) ("heavy burden of proof" for truth-on-the-market defense **at summary judgment**). In any event, Defendants

counterfactual assertions strain credulity. For example, Defendants somehow contend that the decision to close the transaction on August 18, 2021 revealed *nothing new* to the market. Ill.Br. 39. But that is wrong in light of analyst reaction that called the closing both surprising and unprecedented. ¶200. Defendants similarly contend that the November 23, 2021, May 5, and June 10, 2022 disclosures did not reveal anything new related to criticisms of Galleri or its evidence base, Ill.Br. 39, but they ignore the Complaint's allegations. *See* ¶¶131, 202-03 (clinicians "began to warn" about Galleri after analyzing data); ¶¶205-06 (in response to an analysts' concern that additional data was required following critique by expert, deSouza admitted it would "take a long time to get that kind of data"); ¶¶210-11 (Illumina disclosed that Defendant Samad was leaving, which analysts called a "surprise" and connected to GRAIL, and *The New York Times* provided account from an expert *who had worked at GRAIL* about insufficiency of the studies).[20]

Defendants also contend that all of the information contained in the October 20, 2023 *verified* complaint was public, Ill.Br. 41-42, but point to nothing previously disclosing the allegations of Illumina Board members' "personal stake" based on inside information from an Illumina director. ¶¶232-36. Disclosures like these are routinely upheld. *See Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 997 (D. Ariz. 2015) (departure of CEO); *BofI*, 977 F.3d at 788, 791 ("whistleblower lawsuit filed by a company insider"); *QuantumScape*, 580 F. Supp. 3d at 742 (disclosure that "tests were compromised, its results misleading, and its product not at the stage of development presented"); *MannKind*, 835 F. Supp. 2d at 815-16 (disclosure that company "had not in fact received pre-approval" of its protocol from FDA).[21]

---

[20] Defendants mischaracterize Samad's departure as "not too surprising." But the cited report states that his departure was unsurprising *because* Samad's new role might have been "safer" than Illumina "given the impact of GRAIL." ¶213.

[21] Defendants' authorities, Ill.Br. 39, are inapposite. *See Palm Harbor v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023) (defendant previously

***Second***, with respect to the May 5, 2022 and August 11, 2022 revelations that GRAIL had missed earnings estimates, Defendants argue that "[l]oss causation requires more than an earnings miss." Ill.Br. 40. But *First Solar* held the exact opposite—that a "plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss." 881 F.3d at 754. Defendants' citation to *Oracle* (a summary judgment decision) and other cases where plaintiffs specifically "plead a causation theory based on market revelation of the fraud" are irrelevant, as the courts there "naturally evaluate[d] whether plaintiffs" had met that standard, but do not do so in cases like this one where plaintiffs proceed under a different causation theory. *First Solar*, 881 F.3d at 752-54; *supra* 60-61 (GRAIL's inflated valuation causally connected to losses from GRAIL's revenue misses).[22]

***Third***, Defendants wrongly contend that "the announcement of an [SEC] investigation, standing alone, is insufficient to establish loss causation." Ill.Br. 41. In doing so, Defendants rely on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), yet another case that pre-dates *First Solar*.[23] But the Ninth Circuit has held that the announcement of an investigation ***can*** serve as a basis for loss causation where plaintiff alleges a subsequent confirming event, *Lloyd*, 811 F.3d at 1210-11; *Mattel*, 2021 WL 1259405, at *11-13. Here, the announcement of an investigation combined with a significant stock price decline *and* subsequent confirming events—including suspicious executive resignations, that an Illumina director uncovered that insiders had a "personal stake" in the deal, and that GRAIL was worth a fraction of

---

disclosed it expected to miss target). In *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, the plaintiffs pled a different loss causation theory. 540 F.3d 1049, 1063 (9th Cir. 2008).

[22] Unlike in *Huang v. Higgins*, Plaintiffs ***do*** allege a causal tie between the concealed facts and the disclosure. 2019 WL 1245136, at *16 (N.D. Cal. Mar. 18, 2019).

[23] Defendants' reliance on *Loos* is further misplaced for the same reasons that the Ninth Circuit cabined cases like *Metzler*, *Oracle*, and *Loos*, which plead a different theory of loss causation. *First Solar*, 881 F.3d at 752-54.

what Illumina paid—is sufficient. ¶¶238-42.

*Fourth*, the GRAIL Defendants argue that Plaintiffs fail to "link" Defendant Bishop and Defendant Ofman's "acceleration" and clinical validity misstatements to the disclosures. Gr.Br. 16-17. But such misrepresentations concerning Illumina's ability to "accelerate" Galleri's adoption and Galleri's clinical validity and efficacy are directly related to disclosures concerning clinician's doubts about Galleri and GRAIL's true value. *First Solar*, 881 F.3d at 753; *see also supra* 60. And Defendant Ofman's misleading statement about Galleri's clinical efficacy made in March 2023 concealed facts that were causally connected to the nearly $1 billion write-down of GRAIL valuation announced in November 2023.

## D.    The Complaint Adequately Pleads Scheme Liability

Defendants are also liable under SEC Rules 10b-5(a) and (c), which captures "a wide range of conduct" that can (but does not need to) include false statements. *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79 (2019). The Ninth Circuit has rejected the argument that Rule 10b-5(a) and (c) "are violated only when conduct other than misstatements is involved," as Defendants contend. *Alphabet*, 1 F.4th at 709 & n.10; Ill.Br. 42; Gr.Br. 18. Rather, under *Alphabet*, scheme liability "can be based on a scheme to take advantage of misleading statements." *See, e.g.*, *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023).

Here, Defendants engaged in a scheme to defraud investors so that insiders could profit. Defendants' deceptive acts included, among other things: (i) using non-public knowledge of the acquisition to "invest" tens of millions in GRAIL while concealing evidence of Defendant Klausner's purchase of GRAIL equity; (ii) concealing evidence of insiders' personal stakes in GRAIL by violating GAAP; (iii) purchasing $300 million in D&O insurance (as a closing condition) at a $100 million premium, lying about it, and closing the deal to enrich insiders; (iv) disseminating false statements that over-valued GRAIL; (v) making false and unsubstantiated claims about Galleri's effectiveness; and (vi) avoiding FDA scrutiny

of Galleri by launching Galleri as an LDT.   ¶452(i)-(vi).  Courts have repeatedly upheld scheme liability claims like those here. *See, e.g.*, *SEC v. Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021) (scheme claim pled where defendants "made actionable misrepresentations" and "created false appearances of fact by misleading" investors about sustainability of business); *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *18, *19 n.10 (W.D. Pa. May 18, 2023) (finding "scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits" adequately pled).

Relying on *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, Illumina argues that the scheme claim fails because the deceptive conduct was supposedly not "well-pled" or "disclosed to the public." Ill.Br. 42. But in *CareDx*, plaintiffs had not adequately alleged the defendant committed any deceptive acts—while here, Defendants' scheme to inflate GRAIL's value was inherently public-facing and involves insider trading, a "classic" Rule 10b-5(a) and (c) "scheme." *Cf.* 2023 WL 4418886, at *12 (N.D. Cal. May 24, 2023) (defendant made no statements and alleged scheme involved kickbacks that were not disclosed to public); *Galena*, 117 F. Supp. 3d at 1195-96 (noting "wide variety" of scheme conduct and collecting cases sustaining claims like those here).

For its part, GRAIL contends that Bishop and Ofman are not named in the scheme liability allegations. Gr.Br. 17-18. But the Complaint pleads their scheme conduct. *See* ¶¶254, 273, 324-30, 351-54, 375-78, 395-96. Likewise, contrary to GRAIL's characterization of Klausner's investment as "routine," the Complaint alleges it was deceptive as it was made while knowing of Illumina's impending bid. *See* ¶¶163-64; *Vaxart*, 2023 WL 3637093, at *2 (upholding similar allegations).

## IV.    CONCLUSION

Defendants' motions should be denied. If the motions are granted in any part, Plaintiffs respectfully request leave to amend. *See Daou*, 411 F.3d at 1013.

Dated: December 20, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

John Rizio-Hamilton
(johnr@blbglaw.com)
Michael D. Blatchley
(michaelb@blbglaw.com)
Alec Coquin
(alec.coquin@blbglaw.com)
Michael M. Mathai
(michael.mathai@blbglaw.com)
Emily A. Tu
(emily.tu@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs Universal and ACATIS, and Lead Counsel for the Class*

CASE NO. 3:23-CV-02082-LL-BJC
PLAINTIFFS' OMNIBUS OPP. TO DEFS.' MTD