# Exhibit 43

Exhibit 43
Page 4

EFiled:  Oct 20 2023 04:55PM EDT
Transaction ID 71148547
Case No. 2023-1045-PAF

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ICAHN PARTNERS LP, ICAHN PARTNERS MASTER FUND LP, and MATSUMURA FISHWORKS LLC, derivatively on behalf of ILLUMINA, INC., and individually on behalf of themselves and all other similarly-situated stockholders of ILLUMINA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>FRANCIS DESOUZA, JOHN W. THOMPSON, FRANCES ARNOLD, CAROLINE DORSA, ROBERT EPSTEIN, SCOTT GOTTLIEB, GARY GUTHART, PHILIP SCHILLER, and SUSAN SIEGEL,<br><br>Defendants,<br><br>and<br><br>ILLUMINA, INC.,<br><br>Nominal Defendant. | C.A. No. 2023-1045-PAF<br><br>**PUBLIC VERSION FILED OCTOBER 20, 2023** |

## VERIFIED DERIVATIVE AND CLASS ACTION COMPLAINT

Plaintiffs Icahn Partners LP, Icahn Partners Master Fund LP, and Matsumura Fishworks LLC (the "Plaintiffs"), by their undersigned attorneys, bring this action as stockholders of Illumina, Inc. ("Illumina" or the "Company"), derivatively on behalf of Illumina, and on behalf of themselves and all other similarly situated public

3

Exhibit 43
Page 5

stockholders owning common stock of the Company on the record date of April 3, 2023. Plaintiffs seek to remedy breaches of fiduciary duty by Defendants Francis deSouza, John Thompson, Frances Arnold, Caroline Dorsa, Robert Epstein, Scott Gottlieb, Gary Guthart, Philip Schiller, and Susan Siegel (together "Defendants"), and allege upon personal knowledge as to themselves, and upon information and belief as to all other allegations herein, as follows:

## STATEMENT OF THE CASE

1.    It is axiomatic that "Delaware does not charter lawbreakers." Defendants, current and former members of Illumina's board of directors (the "Board"), nonetheless caused Illumina to break the law by voting on August 17, 2021 to close the Company's acquisition of GRAIL, Inc. ("GRAIL"). As a direct result of Defendants' misguided and illegal act, Illumina has already been fined $476 million and suffered billions in operating losses. Illumina's acquisition of GRAIL has been rejected as anti-competitive by antitrust regulators in both the United States and the European Union ("EU"), and on October 12, 2023, the EU ordered Illumina to unwind its transaction with GRAIL and "restore the situation prevailing before the completion of the acquisition."

2.    Since voting to break the law in August 2021, Defendants have entrenched themselves on the Board wrongfully – and orchestrated Illumina's

4

Exhibit 43
Page 6

widely-reported "crusade" and "obsessive quest" to complete Illumina's acquisition of GRAIL –

3.      All Defendants face personal liability for their actions.  For the seven Defendants who remain on the Board today (the "Conflicted Directors"), however, the specter of GRAIL-related personal liability is linked inextricably with the Company's final resolution of the EU fine and other EU remedial orders, and disqualifies them from acting as Company fiduciaries.  This action therefore seeks – in addition to recovery of damages to Illumina and its shareholders caused by Defendants' fiduciary breaches – disclosure of material facts surrounding the

5

Exhibit 43
Page 7

acquisition, adjudication of Defendants' breaches, and removal of the Conflicted Directors from the Board.

4.    Illumina is one of the world's leading genetics companies.  In 2015, Illumina formed GRAIL as a corporate subsidiary to develop a blood sequencing test capable of detecting cancer early.  Although the blood test developed by GRAIL relied on Illumina's DNA sequencing technology, Illumina spun off GRAIL in 2017 to "encourage investment into many different NGS-based cancer detection companies" so that the world would have "as many shots on goal as possible."  Four years later, however, in September 2020, Illumina announced that it had agreed to reacquire GRAIL for cash and stock consideration of approximately $8 billion (the "GRAIL Acquisition").  Illumina's announcement immediately prompted antitrust regulators in the U.S. and EU to open investigations into the transaction and its anti-competitive effects.

5.    The EU investigation triggered an automatic "standstill" that prohibited Illumina from consummating the GRAIL Acquisition without EU approval.  The unambiguous statutory consequences for violating the EU's standstill provision included, among other things, a fine of up to ten percent of the Company's annual revenue.  Defendants nevertheless voted, defiantly, to close the GRAIL Acquisition in violation of EU law.

**Exhibit 43**
**Page 8**

6.     The results have been predictably disastrous.  After completing their investigation, the EU's European Commission ("EC") formally prohibited the GRAIL Acquisition and imposed an unprecedented $476 million fine on Illumina for deliberately breaching the EU's standstill regulation.  Due to the EC's "hold separate" order, Illumina has for years been unable to integrate GRAIL, to share confidential information with GRAIL, or to benefit from GRAIL in any way. During that same time period, Illumina has been financially supporting GRAIL at an annual cost of more than $700 million.  The GRAIL Acquisition itself has proven nothing short of a disaster.  In 2022, for example, "Core" Illumina – *i.e.,* Illumina independent of GRAIL – generated $481 million in profit.  Yet Illumina as a whole finished 2022 with a net operating loss of $4.404 billion, weighed down by GRAIL's $4.657 billion impairment and operating loss.

7.     Defendants have nevertheless caused Illumina to challenge the EC's determinations at every turn: appealing the EC's assertion of jurisdiction to review the GRAIL Acquisition, appealing the EC's formal prohibition of the GRAIL Acquisition, and appealing the EC's imposition of interim measures, including the "hold separate" order.  Not one of these challenges has succeeded.  On October 12, 2023, the EC "adopted restorative measures requiring Illumina to unwind its completed acquisition of GRAIL" (the "EU Divestiture Order").  The EU Divestiture

7

**Exhibit 43**
**Page 9**

Order permits Illumina to "choose the appropriate divestment method" so long as it complies with three "principles": (1) restoring GRAIL's independence from Illumina "to the same level enjoyed by GRAIL prior to the acquisition"; (2) GRAIL must be "as viable and competitive" as it was before the acquisition; and (3) "the divestment must be executable within strict deadlines and with sufficient certainty."

8.     The Company's response to the EU Divesture Order, as with all of the Company's decisions regarding GRAIL going forward, are matters of vital importance to Illumina. The Conflicted Directors, poisoned by their personal stake in the matter, cannot be entrusted with these crucial decisions.

9.     ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Exhibit 43
Page 10



10.

11.    Whatever mélange of rationalizations Defendants ultimately offer for their decision to break the law,

9

**Exhibit 43**
**Page 11**

12.    This looming liability renders the Conflicted Directors incapable of exercising independent judgment with respect to Illumina's relationship with GRAIL and Illumina's dealings with antitrust regulators, particularly the EC. ■

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

13.    Illumina shareholders are entitled to know the truth about Defendants' misconduct, to a Board comprised of faithful fiduciaries untainted by prior misdeeds, conflicts, and definite personal liability, and to damages for Defendants' misconduct. Plaintiffs commence this action in that spirit, and with that purpose.

## PARTIES

*Plaintiffs*

14.    Plaintiffs **Icahn Partners LP** ("Icahn Partners") and **Icahn Partners Master Fund LP** ("Icahn Master") are Delaware limited partnerships located in Sunny Isles Beach, Florida. Collectively, along with their affiliates, they beneficially own 2,198,853 shares (approximately 1.4%) of the Company's issued

10

**Exhibit 43**
**Page 12**

and outstanding common stock, which they have owned continuously since February 13, 2023.

15.    Plaintiff **Matsumura Fishworks LLC** ("Matsumura") is an Ohio limited liability company located in Cincinnati, Ohio.  Matsumura is a wholly-owned subsidiary of Icahn Partners.  Matsumura is the beneficial owner and holder of record of 100 shares of the Company's common stock, which it has owned continuously since February 13, 2023.

*Nominal Defendant*

16.    Nominal Defendant **Illumina, Inc.** is a Delaware corporation with its principal executive offices in San Diego, California.  According to the Company's most recent Form 10-K Annual Report filed with the SEC on February 17, 2023, Illumina is "a global leader in sequencing- and array-based solutions for genetic and genomic analysis," whose "products and services serve customers in a wide range of markets, enabling the adoption of genomic solutions in research and clinical settings."  Illumina was incorporated in California in April 1998, and reincorporated in Delaware in July 2000.  Illumina's common stock trades on the NASDAQ Stock Market under the symbol "ILMN."

11

Exhibit 43
Page 13

*Defendants*

17.    Defendant **Francis deSouza** was the Company's President from 2013 – and Chief Executive Officer ("CEO") from 2016 – until his resignation earlier this year. Defendant deSouza was a member of the Board beginning in January 2014. Defendant deSouza spearheaded the GRAIL Acquisition and made and/or approved misleading disclosures concerning the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings (defined below). Defendant deSouza was further conflicted by his financial interests arising from his ties with and/or domination of his co-Defendants. In Q1 2022, after the GRAIL Acquisition and resulting public controversy, Defendant deSouza received a special grant of stock options from the Board's Compensation Committee – comprised of Defendants Caroline Dorsa, Robert Epstein, and Gary Guthart – to "help ensure" his "retention and focus on innovation and increasing shareholder value." This special grant contributed to the $25 million in long-term equity compensation that Defendant deSouza received from the Company in 2022, in addition to his base salary of $1.1 million. All told, the Company paid Defendant deSouza $52,819,424 for his service as CEO for fiscal years 2020-22, a time period in which Defendant deSouza oversaw a decline in the Company's market capitalization of almost $57 billion.

12

**Exhibit 43**
**Page 14**

18.    Defendant **John Thompson** was a member of the Board from May 2017, and the Chairman of the Board from May 26, 2021, until the May 25, 2023 annual meeting, when the stockholders voted him off the Board.    Defendant Thompson's compensation for his service on the Board in 2022 was $465,078. Defendant Thompson was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.    Defendant Thompson's conflicts during his time at Illumina included a lack of independence from Defendant deSouza, a longtime friend and colleague who brought Defendant Thompson onto the Board.

19.    Defendant **Frances Arnold** has been a member of the Board since 2016.    She is a professor at the California Institute of Technology, where, according to Indeed.com, the average salary is less than $180,000.    Defendant Arnold's total compensation for her service on the Board in 2022 was $400,078.    Defendant Arnold was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

20.    Defendant **Caroline D. Dorsa** has been a member of the Board since January 2017.    Defendant Dorsa has been retired since October 2015, having most-

**Exhibit 43**
**Page 15**

recently worked as Executive Vice President and Chief Financial Officer ("CFO") of Public Service Enterprise Group Incorporated, a diversified energy company. Defendant Dorsa's total compensation for her service on the Board in 2022 was $415,078. Defendant Dorsa was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

21.    Defendant **Robert S. Epstein** has been a member of the Board since November 2012. His total compensation for his service on the Board in 2022 was $405,078. Defendant Epstein was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

22.    Defendant **Scott Gottlieb** has been a member of the Board since 2020. His total compensation for his service on the Board in 2022 was $385,078. Defendant Gottlieb was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

14

**Exhibit 43**
**Page 16**

23. Defendant **Gary S. Guthart**, Ph.D. has been a member of the Board since December 2017. Defendant Guthart is currently President and CEO of Intuitive Surgical, where his base salary as of April 1, 2022 was $880,000. His total compensation for his service on the Board in 2022 was $410,078. Defendant Guthart was involved in the Board's decision to close the GRAIL Acquisition in violation of law ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

24. Defendant **Philip W. Schiller** has been a member of the Board since July 2016. Defendant Schiller is also an "Apple Fellow" at Apple Inc., where he receives, on information and belief, only equity compensation, not cash. His total compensation for his service on the Board in 2022 was $395,078. Defendant Schiller was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

25. Defendant **Susan E. Siegel** has been a member of the Board since February 2019. The Company's Proxy Statement is vague about whether Defendant Siegel has other employment, although she worked previously as GE's Chief

15

**Exhibit 43
Page 17**

Innovation Officer and CEO of GE Ventures. Defendant Siegel's LinkedIn webpage indicates that she held these positions from 2017 to 2019. Her total compensation for her service on the Board in 2022 was $390,078. Defendant Siegel was involved in the Board's decision to close the GRAIL Acquisition in violation of law, and later made and/or approved misleading disclosures about the GRAIL Acquisition in the Company's securities filings, including in the 2023 Proxy Filings.

***Relevant Non-Parties***

26. **GRAIL, Inc.** is a Delaware corporation founded as a subsidiary of Illumina. GRAIL was spun off from Illumina on February 28, 2017, and then reacquired in August 2021 for approximately $8 billion in the GRAIL Acquisition. GRAIL is headquartered in Menlo Park, California, with additional offices in Washington, D.C., North Carolina, and the United Kingdom.

27. **Illumina Ventures** is Illumina's investment vehicle, which claims to be "an independently-managed venture fund" that has a "strategic partnership" with Illumina. Illumina provides the majority of Illumina Ventures' capital, and also provides the investment company with what it describes as "access" to Illumina's "expertise and vision" as the world's "leading genomics solutions provider."

28. **ARCH Venture Partners** ("ARCH Ventures") is an American venture-capital firm based in Chicago, Illinois. ARCH Ventures participated in

16

**Exhibit 43**
**Page 18**

GRAIL's Series A and B rounds.  As of November 25, 2020, entities affiliated with ARCH Venture Partners owned 45 million (52.94%) of GRAIL's Series A preferred stock and 18,710,240 (6.05%) of GRAIL's Series B preferred stock, representing 63,710,240 (9.35%) shares of GRAIL's Class A common stock on an as-converted basis.  Entities affiliated with ARCH Ventures were parties to the "Selling Investor Support Agreement" dated September 20, 2020, and executed in connection with the GRAIL Acquisition.

29.    **Helix Holdings I LLC** ("Helix") is a limited liability company that Illumina formed with unrelated third party investors to pursue the development and commercialization of a marketplace for consumer genomics.  Illumina obtained a 50% voting equity ownership interest in Helix in July 2015, and determined that Helix is a variable interest entity because the holders of Helix's at-risk equity investments lacked the power to direct Helix's activities that most significantly impacted its economic performance.

30.    **Jay Flatley** is the Company's former CEO and Executive Chairman, now an advisor to Illumina Ventures.  Mr. Flatley helmed the Company for seventeen years, first as President and CEO from October 1999 through December 2013, then as CEO from December 2013 through July 2016.  Mr. Flatley was replaced as CEO in 2016 by Defendant deSouza, whom Mr. Flatley had previously

**Exhibit 43**
**Page 19**

persuaded to join the Company in 2013. Having been a member of the Board since 1999, Mr. Flatley became the Board's Executive Chairman when he stepped down as CEO in July 2016. Mr. Flatley was also simultaneously chairman of GRAIL's board of directors, from January 2016 to February 2017, and a member of Helix's board of directors, from July 2015 to April 2019. In January 2020, Mr. Flatley's title changed to "Chairman" of the Board. Mr. Flatley resigned from the Board on May 26, 2021, at which time he was replaced by Defendant Thompson, less than three months before the remaining Board approved closing the GRAIL Acquisition.

31.    **Andrew Teno** is a member of the Board duly elected by the stockholders at the Company's May 25, 2023 annual meeting. He has been a Portfolio Manager at Icahn Capital since October 2020.

32.    **Stephen P. MacMillan** was appointed to the Board on June 1, 2023.

33.    **Scott B. Ullem** was appointed to the Board on June 1, 2023.

34.    **Jacob Thaysen** is Illumina's current CEO and a member of the Board. He was appointed to these roles by the Board on or about September 5, 2023, effective as of September 25, 2023.

18

**Exhibit 43**
**Page 20**

## FACTUAL ALLEGATIONS

### I.  Illumina Forms, Spins Off, and Reacquires GRAIL

35.  Illumina is a life-sciences company in the business of developing, manufacturing, and marketing various tools and integrated systems for large-scale analysis of genetic variation and function. Illumina's principal product offerings are short-read, next-generation sequencing ("NGS") instruments used for DNA sequencing and associated consumables and analytics software. Illumina's stock price reached a peak of $526 per share (a market capitalization of over $77 billion) on August 16, 2021 – two days before the Company announced it had closed the GRAIL Acquisition over the objections of the FTC and EC. Since the GRAIL Acquisition, the Company's share price has fallen more than 70%. One analyst described the deal's fallout as "carnage," saying:

> [S]ome CEOs would have folded. Not deSouza. He has pulled his shareholders into a yearslong fight . . . and he failed to telegraph either the risks or duration. It has been an expensive undertaking.

Ed Hammond, The Washington Post, *Illumina CEO's GRAIL Hunt Runs Into a Quagmire* (Apr. 5, 2023).

36.  Illumina and GRAIL have a long and shared history. In early 2015, a team of Illumina employees proposed creating a new company to develop a blood-based cancer-detection test. This proposal led to Illumina forming GRAIL, deriving

19

Exhibit 43
Page 21

its name from the goal of achieving the "holy grail" in the war on cancer: a blood test – enabled by Illumina's sequencing technology – with the power to detect multiple types of cancer in asymptomatic individuals through a single blood draw. This blood test, which is referred to generically as a "liquid biopsy" and branded as the "Galleri test."

37.     Illumina formed GRAIL as a corporate subsidiary, incorporating it in Delaware in late 2015. In 2016, Illumina raised $100 million for GRAIL from new investors, including Bill Gates, Sutter Hill Ventures, ARCH Ventures, and Jeff Bezos' Bezos Expeditions. Illumina initially retained 55% of GRAIL's equity, along with over 90% of the subsidiary's voting power, but later spun off control over the subsidiary in February 2017 by reducing its stake in GRAIL to less than 20%.

38.     Illumina told investors it was spinning off GRAIL "to encourage investment into many different NGS-based cancer detection companies" so that the world would have "as many shots on goal as possible." *In the Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Matter/File Number 201 0144, Dkt. No. 9401, at 60 (Mar. 31, 2023) (OPINION OF THE COMMISSION). At the time, Illumina stated that "reducing its ownership share in GRAIL" would "level the playing field" and "accelerate the liquid biopsy market for all." *Id.*

20

Exhibit 43
Page 22

39.    The newly spun-off GRAIL raised considerable capital. By September 2020, GRAIL had raised $1.9 billion through a combination of venture capital and strategic partners, including Helix and ARCH Ventures, and had grown to over 400 employees. On September 9, 2020, GRAIL registered with the SEC for an IPO.

40.    Eleven days later, on September 20, 2020, the Company inexplicably announced it had agreed to reacquire GRAIL for approximately $8 billion in cash and stock consideration. The deal was championed by Defendant deSouza, who claimed that the deal was "a matter not of corporate expansion but life and death," and that the Board had a "moral obligation" to close.

41.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

II.    ████████████████████████████████████

42.    The legality of the GRAIL Acquisition was called into question within months. EU regulators turned their attention to the GRAIL Acquisition in February 2021. Then on March 30, 2021, the FTC filed a complaint challenging the deal – and seeking to block Illumina from acquiring GRAIL – on grounds that the GRAIL Acquisition would "substantially lessen competition in the U.S. multi-cancer early

21

Exhibit 43
Page 23

detection ('MCED') test market." *In the Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Matter/File Number 201 0144, Dkt. No. 9401, at 2 (Mar. 30, 2021) (COMPLAINT). The FTC sought and obtained a temporary restraining order ("TRO") prohibiting the deal from closing pending a trial on the FTC's request for a preliminary injunction restraining the deal.

43.    On April 19, 2021, less than three weeks after the FTC's complaint, the EC more formally commenced its own preliminary investigation into the deal, which it subsequently expanded into a more comprehensive "in-depth investigation." *See* European Commission, *Mergers: Commission opens in-depth investigation into proposed acquisition of GRAIL by Illumina* (July 22, 2021) (PRESS RELEASE). The EC investigation triggered standstill obligations under the EU Merger Regulation ("EUMR"), which provides, unambiguously, that any merger under review "shall not be implemented" until the companies subject to review have received clearance to do so. EUMR, Art. 7(1). The FTC, relying expressly on Illumina's inability to close the deal in the face of these standstill obligations, dismissed its complaint against Illumina – and the TRO that accompanied it – without prejudice to renew if the EU standstill obligations were lifted.

44.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22

**Exhibit 43**
**Page 24**



23

Exhibit 43
Page 25



49.

50.

24

**Exhibit 43**
**Page 26**



51.

52.

25

Exhibit 43
Page 27

53.

54.

55.

26

Exhibit 43
Page 28



**III.**

56.

57.

**Exhibit 43**
**Page 29**

58.

59.

28

**Exhibit 43**
**Page 30**



60.

61.

29

Exhibit 43
Page 31

[REDACTED]

62. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

## IV.    European and U.S. Regulators Condemn the Closing and Prohibit The GRAIL Acquisition

63.    Notwithstanding the pending FTC litigation, the ongoing EC investigations, and the standstill obligations under European law, Defendants –

[REDACTED]

caused Illumina to close the GRAIL Acquisition on August 18, 2021.

64.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

30

Exhibit 43
Page 32

65.    ███████████████████ the decision to close the GRAIL Acquisition in violation of European law quickly drew the ire of European regulators. The EC's Executive Vice President stated in response: "Companies have to respect our competition rules and procedures. Under our *ex-ante* merger control regime companies must wait for our approval before a transaction can go ahead." The EC opened an additional investigation into the breach of the standstill obligation, notifying Illumina that it faced a fine "up to 10% of [Illumina and GRAIL's] aggregate turnover." European Commission, *Mergers: Commission starts investigation for possible breach of the standstill obligation in Illumina / GRAIL transaction* (Aug. 20, 2021) (PRESS RELEASE) (citing EU Merger Regulation, Art. 14).

66.    On September 20, 2021, the EC added:

> Under our rules, companies have to wait for the Commission's clearance before implementing deals that are subject to our review. The standstill obligation is a cornerstone of our ex-ante merger control regime which aims at preventing harmful effects to competition while our review is ongoing. ***This is the first time companies openly implement their deal while we are carrying out an in-depth investigation.*** Today, we send our objections to the companies informing them of the measures we intend to take to prevent the potentially detrimental impact of the transaction on the competitive structure of the market.

31

Exhibit 43
Page 33

*See* European Commission, *Mergers: The Commission adopts a Statement of Objections in view of adopting interim measures following Illumina's early acquisition of GRAIL* (Sept. 20, 2021) (PRESS RELEASE) (emphasis added).

67.    The EC also set forth a list of "interim measures" governing Illumina's post-acquisition conduct (the "Interim Measures"):

> **GRAIL shall be kept separate from Illumina** and be run by (an) independent Hold Separate Manager(s), exclusively in the interest of GRAIL (and not of Illumina).
>
> **Illumina and GRAIL are prohibited from sharing confidential business information**, except where the disclosure is required to comply with the law or in line with the ordinary course of their supplier-customer relationship.
>
> **Illumina has the obligation to finance additional funds necessary for the operation and development of GRAIL.**
>
> **The business interactions between the parties shall be undertaken at arm's length**, in line with industry practice, hence without unduly favouring GRAIL to the detriment of its competitors.
>
> **GRAIL shall actively work on alternative options to the transaction** to prepare for the possible scenario in which the deal would have to be undone in case the Commission were to declare the transaction incompatible with the internal market.

32

Exhibit 43
Page 34

European Commission, *Mergers: Commission adopts interim measures to prevent harm to competition following Illumina's early acquisition of GRAIL* (Oct. 29, 2021) (PRESS RELEASE) (emphasis added).

68.    On September 6, 2022, the EC affirmatively prohibited the GRAIL Acquisition, stating that, "[t]he European Commission has prohibited, under the EU Merger Regulation, the implemented acquisition of GRAIL by Illumina.  The merger would have stifled innovation, and reduced choice in the emerging market for blood-based early cancer detection tests. Illumina did not offer remedies sufficient to address these concerns."  *See* European Commission, *Mergers: Commission prohibits acquisition of GRAIL by Illumina* (Sept. 6, 2022) (PRESS RELEASE).  As the EC noted:  "In the past ten years, the Commission has approved over 3,000 mergers. Today's prohibition is only the tenth merger that the Commission has blocked over the same period." *Id.*

69.    The EC communicated to Illumina its expectation that to remedy the unlawful GRAIL Acquisition, Illumina must sell GRAIL and continue to hold GRAIL separate, and avoid integration, until the divestment is complete.  The European Commission made its expectations clear:

> First, the dissolution of the transaction must **restore GRAIL's independence from Illumina**, to the same

33

Exhibit 43
Page 35

level that GRAIL had prior to the completion of the transaction.

Second, **GRAIL must be as viable and competitive** after the divestment as it was before Illumina's acquisition, to ensure that the innovation race between GRAIL and its rivals can continue as before.

Finally, the **divestment must be executable swiftly and with sufficient certainty**, so that the pre-transaction situation can be restored promptly.

As regards the envisaged transitional measures:

They will **ensure that Illumina and GRAIL remain separate** until the transaction is unwound in order to prevent further integration of GRAIL into Illumina's business and subsequently irreparable harm to competition.

They also oblige Illumina to maintain **GRAIL's viability**.

European Commission, *Mergers: The Commission adopts a Statement of Objections outlining measures to unwind Illumina's blocked acquisition of GRAIL* (Dec. 5, 2022) (emphases original).

70.    The FTC followed suit. On March 31, 2023, the FTC concluded that the acquisition violated both the Clayton Act and the Federal Trade Commission Act, and ordered Illumina to divest GRAIL. *In the Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Matter/File Number 201 0144, Dkt. No. 9401 (Mar. 31, 2023) (OPINION OF THE COMMISSION), and *id.* (FINAL ORDER). Illumina is currently appealing the FTC's order.

34

Exhibit 43
Page 36

71.    Illumina has publicly acknowledged the monumental burdens and expenses incurred by the Company as a result of these regulatory actions:

> ***Such hold separate arrangement, and our obligations pursuant thereto, have imposed implementation and administrative processes and additional costs, which have been burdensome to implement and administer, and which we expect to continue for the duration of the hold separate arrangement (pursuant to the New Interim Measures Order or any replacement thereof).*** Such burdens and additional costs, independently or together with additional burdens, costs and/or liabilities arising from such arrangement, may result in loss of revenue and other adverse effects on our business, financial condition and results of operations and have an adverse impact on our ability to achieve the anticipated benefits of the Acquisition. Further, our failure to comply with the terms of the New Interim Measures Order may result in the European Commission seeking to impose fines or other penalties on us.

ILMN, Form 10-K, at 21 (Feb. 17, 2023) (emphasis added).

72.    According to Illumina, losses from operations in 2022 alone increased by $4.2 billion, "primarily due to an impairment of $3.9 billion on goodwill related to GRAIL" and "a legal contingency of $458 million related to a potential fine we expect the European Commission to impose related to the closing of our acquisition of GRAIL . . . ."   ILMN, Form 10-K, at 31 (Feb. 17, 2023).

35

Exhibit 43
Page 37

73.    While the Company has not disclosed an exact dollar figure for the additional costs incurred as a result of holding GRAIL under the EC's hold-separate order, those costs likely far exceed ***two billion dollars***. *See* Hammond, *Illumina CEO's GRAIL Hunt Runs Into a Quagmire* ("Illumina, still unable to integrate a deal it ostensibly closed on in 2021, is spending about $700 million a year to keep it running in limbo. If it is forced to divest GRAIL, there is no obvious path where it doesn't take a loss on the billions it paid for it. These are not minor issues, even for a company of Illumina's size.").

74.    Defendants have caused Illumina to challenge the EC's determinations at every turn: appealing the EC's assertion of jurisdiction to review the GRAIL Acquisition, appealing the EC's formal prohibition of the GRAIL Acquisition, and appealing the EC's imposition of the Interim Measures, including the "hold separate" order. EU General Court Case Nos. T-277/21, T-755/21, T-709/22, T-5/23, and T-591/23; EU Court of Justice Case No. 6-611/22 P. Not one of these challenges has succeeded. The Company continues to appeal each of these determinations.

## V.    Defendants Entrench Themselves on the Board Through Misleading Disclosures and Other Machinations

75.    ████████████████████████████

████████████████████████████

36

Exhibit 43
Page 38



76. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants sought to entrench themselves as directors to assert complete control over Illumina's strategy and disclosures regarding GRAIL and the GRAIL Acquisition. ▮▮▮▮

77. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

37

Exhibit 43
Page 39

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

78.    In January 2023, Illumina renewed a $750 million loan from Bank of America.  This five-year revolving credit facility included a "Change in Control" provision that triggers an event of default if a majority of the board is removed or replaced in any two-year period without approval of the incumbent board.  Such "proxy put" provisions are recognized entrenchment devices due to their chilling effect on proxy challenges.  The Bank of America loan was disclosed in an 8-K filing on January 4, 2023, but the Change of Control provision is buried in the 156-page agreement without comment.

79.    From March through May of 2023, in connection with Defendants' attempt to secure reelection to the Board, Defendants issued a series of misleading statements in twenty-three securities filings in 2023 (the "2023 Proxy Filings"), including the Company's corporate proxy filed on April 20, 2023.  ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

38

**Exhibit 43**
**Page 40**



(collectively, the "Undisclosed Matters.").

80. On April 20, 2023, five weeks before the May 25, 2023 shareholder vote, Defendants preemptively announced their intention to propose the addition of two new directors to the Board at some future time. On June 1, 2023, after Defendant Thompson was voted off the Board, Defendants voted to increase the size of the Board from nine to eleven members and elected two additional directors, MacMillan and Ullem.

a. ███████████████████████

81. Since announcing the contemplated merger, Defendants repeatedly touted the "compelling" reasons to reunite GRAIL and Illumina, describing closing as a "moral obligation." For example, in an August 18, 2021 press release approved by one or more Defendants, Illumina proclaimed that "The deal will save lives." The press release acknowledged that "regulators in the EU are reviewing the

Exhibit 43
Page 41

transaction," declared that Illumina would "hold GRAIL as a separate company during the European Commission's ongoing regulatory review," and asserted that "the company believes that the European Commission does not have jurisdiction to review the merger." Nowhere in this press release or any subsequent public disclosure, however, did Defendants disclose any of the Undisclosed Matters.

82.    As another example, in a May 12, 2023 supplement to the Company's proxy, Defendants asserted they had engaged in "a rigorous, comprehensive process in deciding to close the acquisition of GRAIL," that the "process was informed by external experts," and that their "decisions were informed by legal and regulatory external advice from EU, U.S. and UK counsel." ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

83.    As another example, Defendants issued a May 18, 2023 supplement to the Company's proxy one week before the stockholder vote for directors. The Board Chairman at the time, Defendant John W. Thompson, whose reelection had already been opposed by *both* Glass Lewis and Institutional Shareholder Services, issued an open letter to stockholders purporting to "share some reflections" and his "perspectives on the real 'state of Illumina.'" Thompson reiterated Defendants'

40

Exhibit 43
Page 42

claim that there was "**no faster path to resolution**," (emphasis original), of the GRAIL situation than to press the U.S. and EU appeals to their full conclusion. He claimed that the appeals were "a **finite process** ending in a decision by early 2024." (Emphasis original). ████████████████████████████

████████████████████████████████

b. ███████████████████████████████

84. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

85. ██████████ less than three months after the deal closed, Defendants caused the Company to attach a nebulous and unsigned "Insurance Matters Agreement" (the "IMA"), without a word of explanation, to the Company's November 5, 2021 Quarterly Report. The IMA was clear as mud, but seemingly implied that Defendants had requested an unknown quantum of additional insurance in connection with approving the GRAIL Acquisition. The IMA appears to be effective "as of" August 18, 2021 – the same day as the deal closing – but its content leaves the timing of any such agreement completely unclear.

41

Exhibit 43
Page 43

86.    Later, on March 24, 2023, in a Schedule 14-A proxy filing, Defendants misleadingly stated that:

> Directors and Officers (D&O) insurance and corporate indemnification **are standard for Delaware companies**, and support directors in making decisions in the best interests of shareholders. **All major U.S. public companies, including Illumina, regularly review their D&O insurance to reflect appropriate coverage.** As the Financial Times reported earlier today, "**it is not uncommon for a company buying another business to increase insurance limits during the acquisition process.**"

(Emphases added). ████████████████████████████

████████████████████████

87.    As another example, on April 27, 2023, Defendants echoed these misleading insurance-related statements in a presentation disseminated to stockholders. Defendants claimed that it was a "Myth" that "Illumina's Board acted inappropriately and expanded its D&O insurance prior to completing the GRAIL acquisition."  Defendants claimed that instead, the "Fact" was that "[a]s a general matter, companies regularly resize and rescope their D&O coverage in connection with M&A events.  There's nothing inappropriate or unusual about a growing business enhancing its D&O coverage." ███████████████

███████████████████████████████

████████████████████

42

**Exhibit 43**
**Page 44**

c.

88. ████████████████████████████████████████

████████████████████████████████ several other aspects of the GRAIL Acquisition warrant additional disclosures.

89. ***The Company's Tax Basis in Grail.*** On September 6, 2022, the Company disclosed that, despite having paid $8 billion for the GRAIL Acquisition, the Company's tax basis in GRAIL is somehow "approximately $700 million." *See* ILMN, Form 8-K Current Report, (filed Sept. 6, 2022). This number was revised in later disclosures to the tax basis being "currently estimated to be between $500 million and $1 billion." *See, e.g.*, Form 10-Q Quarterly Report, at 42 (Nov. 4, 2022). This low tax basis defies any rational economic explanation, and the Company has never disclosed how or why the acquisition was structured to include this irrational feature. The Company's stockholders are entitled to understand why the Board agreed to structure the transaction in this illogical and value-destructive manner, and what information the Board had concerning the tax basis at the time it approved the GRAIL Acquisition.

90. ***Director and Major Shareholder Conflicts.*** Illumina's extraordinary decision to close the GRAIL Acquisition has long given rise to questions regarding whether Illumina's directors and officers had personal financial motives for closing

43

Exhibit 43
Page 45

the deal. ████████████████████████████████████████

██████████████████

91.    For example, one week before the May 2023 shareholder vote, Defendant Thompson wrote to stockholders that:

> On conflicts of interest, there is an important question I would like to put to bed: "Did any Illumina directors have a financial interest in GRAIL at the time of the acquisition?" This question is not a matter of interpretation or explanation. The answer is simply no. As we have said before, no director who oversaw any part of the GRAIL transaction has ever owned any equity interest in GRAIL – that includes Jay Flatley, Francis deSouza, myself, and any member of the Board now or at the time of acquisition.

Thompson's rhetorical question and answer regarding the "Illumina directors" is a partial disclosure that begs the question of whether Defendants had *indirect* or non-financial interests in GRAIL, particularly in light of Thompson's statement, in the same letter, regarding Illumina's "executive officers"

> In addition, no executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition (including indirect ownership interests such as through trusts, LP or GP stakes in investment vehicles, or through derivative securities), . . . .

Stockholders are entitled to know if and how Defendants benefitted from the GRAIL Acquisition – including through "indirect ownership interests such as through trusts, LP or GP stakes in investment vehicles, or through derivative securities" – not

44

Exhibit 43
Page 46

merely whether Defendants owned "equity interests in GRAIL" when the deal closed. This includes whether Defendants benefitted from the GRAIL Acquisition indirectly through investment vehicles like Illumina Ventures, Helix, and/or ARCH Ventures. Stockholders are also entitled to understand what diligence Defendants conducted before making the assertions in their May 18 supplemental proxy statement.

92.    Baillie Gifford & Co. ("Baillie"), a Scottish investment management firm, is Illumina's largest stockholder and also advises (or has advised) three significant GRAIL shareholders. Baillie owned or had voting power for approximately 10.6% of Illumina's stock according to Illumina's Preliminary Proxy Statement filed April 7, 2023. In 2022, Baillie owned or had voting power for approximately 13% of Illumina's stock. As of November 27, 2019, Baillie was an investor in GRAIL and was a party to GRAIL's Investor Rights Agreement, signing on behalf of three different entities: Scottish Mortgage Investment Trust plc, Monks Investment Trust plc, and The Schiehallion Fund Ltd. *See, e.g.,* GRAIL Form S-1 Registration Statement, Exhibit 10.1 (as filed with the SEC on July 31, 2020). This dual ownership of both Illumina and GRAIL stock means that Baillie or its investors profited from the decision to close the GRAIL Acquisition. The extent to which any

45

Exhibit 43
Page 47

Defendant is connected to or under the influence of Baillie (or any other significant investor in GRAIL) is material to Illumina stockholders, and should be disclosed.

## **DEMAND FUTILITY**

93.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

94.     Plaintiffs bring this action derivatively on behalf of Illumina to redress injuries suffered as a direct and proximate result of Defendants' misconduct.

95.     Plaintiffs have owned Illumina continuously since February 13, 2023, an 8-month period in which:  (i) the Company's GRAIL-related decisions (including the decision not to divest GRAIL and not to strike a compromise with EU regulators) were tainted by Defendants' conflicts; (ii) Defendants made inadequate and misleading disclosures concerning GRAIL, including with respect to the Undisclosed Matters, in the 2023 Proxy Filings; and (iii) Defendants wrongfully entrenched themselves as directors through these inadequate and misleading disclosures.  Plaintiffs continue to hold Illumina stock.

96.     Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting the Company's rights, and have retained counsel experienced in stockholder class action and derivative litigation.

46

**Exhibit 43
Page 48**

97. At the time of this filing, the Board comprised the following eleven directors: Defendants Frances Arnold, Caroline Dorsa, Robert Epstein, Scott Gottlieb, Gary Guthart, Philip Schiller, and Susan Siegel (together the "Conflicted Directors") and non-parties Jacob Thaysen, Andrew Teno, Stephen MacMillan, and Scott Ullem (together with the Conflicted Directors, the "Demand Board").

98. Plaintiffs did not make a demand on the Demand Board prior to instituting this action because any such demand would be futile.

99. The Conflicted Directors comprise seven of eleven members of the Demand Board, and are not capable of independently and disinterestedly considering a demand in this action or pursuing the claims herein on behalf of the Company. The Conflicted Directors face a substantial likelihood of liability █████████

47

**Exhibit 43**
**Page 49**

████████████████████████████████████████████

████████  The Conflicted Directors' knowledge and intent is further demonstrated by their obsessive quest to complete the GRAIL Acquisition at all costs.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery, on behalf of themselves and all other owners of Illumina common stock as of close of business on April 3, 2023, the record date for the 2023 annual meeting (except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who were injured by Defendants' wrongful actions, as more fully described herein (the "Class").

101.    This action is properly maintainable as a class action.

102.    The Class is so numerous that joinder of all members is impracticable. As of April 3, 2023, the Company had approximately 158 million shares of common stock issued and outstanding, which were publicly traded and held by thousands of beneficial owners.

103.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual

48

**Exhibit 43**
**Page 50**

litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

104.  There are questions of law and fact common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*:

(a)  whether Defendants breached their fiduciary duties to the Class;

(b)  whether Plaintiffs and the Class have been harmed by the wrongs complained of herein;

(c)  whether Defendants should be required to provide supplemental and/or corrective disclosures; and

(d)  whether Plaintiffs and the Class are entitled to injunctive or other related relief.

105.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

106.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

107.  Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are

**Exhibit 43**
**Page 51**

typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

108. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## COUNT I
### Direct Claim for Breach of Fiduciary Duty of Disclosure
### (Against All Defendants)

109. Plaintiffs repeat and incorporate by reference each of the allegations set forth above.

110. At all relevant times, Defendants, in their capacities as officers and directors of the Company, owed fiduciary duties to the Company and its stockholders, including the Class.

111. ███████████████████████████████

███████████████████████████████

50

Exhibit 43
Page 52



112.   Defendants' inadequate, partial, and misleading disclosures concerning the material facts surrounding the GRAIL Acquisition, including in the 2023 Proxy Filings, deprived the Class of material information needed to inform their decisions, including their votes at the Company's May 25, 2023 Annual Meeting.

113.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and the Class were deprived of the meaningful exercise of the stockholder franchise; of the meaningful choice of their preferred individuals to manage the Company's affairs; and of faithful fiduciaries who would manage Illumina in the Company's best interest and for the benefit of shareholders.  Plaintiffs and the Class have been, and continue to be, irreparably harmed by the ongoing bad faith of their fiduciaries.

51

Exhibit 43
Page 53

114. Plaintiffs and the Class have no adequate remedy at law.

## COUNT II
### Derivative Claim for Breach of Fiduciary Duty – Entrenchment
### (Against All Defendants)

115. Plaintiffs repeat and incorporate by reference each of the allegations set forth above.

116. At all relevant times, Defendants, in their capacities as officers and directors of the Company, owed fiduciary duties to the Company and its stockholders.

117.

118. Defendants,

52

Exhibit 43
Page 54



have taken actions to entrench themselves on the Board.

119.

120. Further, using the Company proxy, Defendants have made inadequate, partial, and misleading disclosures concerning the GRAIL Acquisition, including in the 2023 Proxy Filings. As a result of these inadequate, partial, and misleading disclosures, only a single Defendant – former Chairman John Thompson – was voted off the Board at the 2023 director election. Had the Board not concealed the material facts surrounding the GRAIL Acquisition and misused the corporate proxy, including by concealing the Undisclosed Matters, other stockholders would likely have nominated designees to the Board, and Defendants would likely have been removed from the Board by stockholders, by special election or otherwise.

53

**Exhibit 43**
**Page 55**

121. The Company and its stockholders were, and continue to be, irreparably harmed as a direct and proximate result of the Defendants' entrenchment.

122. The Company and its stockholders have no adequate remedy at law.

## COUNT III
**Derivative Claim for Breach of Fiduciary Duty – Bad Faith & Disloyalty
(Against All Defendants)**

123. Plaintiffs repeat and incorporate by reference each of the allegations set forth above.

124. At all relevant times, Defendants, in their capacities as officers and directors of the Company, owed fiduciary duties to the Company and its stockholders. These duties included the duty to act in good faith and in the best interests of the Company and its stockholders at all times.

125. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

54

Exhibit 43
Page 56



127.    The transaction challenged herein, the Board's bad faith pursuit of the GRAIL Acquisition, is ongoing and constitutes a continuing wrong under Delaware law. Among other things, the GRAIL Acquisition was void as a violation of European law, has never been consummated due to the EC's "hold separate" order, and must be unwound under the EC Divestiture Order.

128.    Defendants' bad faith pursuit of their "holy grail" acquisition has caused billions of dollars in harm to the Company and its stockholders.

55

Exhibit 43
Page 57

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief, on behalf of themselves, the Company, and all members of the Class, against Defendants as follows:

A.    Declaring Count I of this action to be a class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

B.    Declaring that Defendants breached their fiduciary duties of disclosure in connection with the 2023 Proxy Filings;

C.    Ordering the Conflicted Directors, on behalf of the Company, to issue supplemental and corrective disclosures to the 2023 Proxy Filings, including but not limited to disclosing full and complete material information on the following topics:

1) all material facts concerning Defendants' decision to close the GRAIL Acquisition, including the Undisclosed Matters;

2) all material facts concerning Illumina's tax basis in GRAIL; and

3) all material facts concerning the financial interest of Illumina's directors and officers in GRAIL, whether direct or indirect;

56

Exhibit 43
Page 58

D.   Declaring Counts II and III of this action to be properly maintainable as a derivative action on behalf of the Company, including by declaring demand to be excused;

E.   Declaring that Defendants breached their fiduciary duties of care, loyalty, good faith, and candor as alleged herein, including for the purposes of facilitating an application pursuant to Section 225(c) removing the Conflicted Directors from the Board;

F.   Declaring that Defendants' breaches of fiduciary duties are ongoing;

G.   Awarding the Company damages, on Counts II and III, in an amount to be determined at trial, but not less than

   1) $476 million in respect of the EC regulatory fine;

   2) all costs associated with supporting GRAIL under the EC's hold-separate order;

   3) all costs associated with complying with the EC Divestiture Order; and

   4) all legal costs incurred after August 18, 2021, in connection with GRAIL Acquisition-related proceedings in the EU and the U.S.;

H.   Declaring that the 2023 reelection of each Conflicted Director to the Board is void;

57

Exhibit 43
Page 59

I.      Removing the Conflicted Directors as directors as a consequence for their breaches of fiduciary duties, or in the alternative, ordering the Company to hold a special stockholder meeting to elect new directors;

J.      Ordering this case consolidated with one or more other class actions, and/or shareholder derivative actions, to the extent necessary and appropriate to ensure that all of the harm complained of herein is redressed;

K.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

L.      Granting such other and further relief as the Court may deem just and proper.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*Of counsel:*                                    /s/ *C. Barr Flinn*
                                                 C. Barr Flinn (#4092)
Michael A. Hanin                                 M. Paige Valeski (#6336)
Christian T. Becker                              1000 North King Street
Andrew L. Schwartz                               Wilmington, DE  19801
Andrew M. Meerwarth                              Telephone: (302) 571-6600
KASOWITZ BENSON TORRES LLP
1633 Broadway                                    *Attorneys for Plaintiffs*
New York, NY 10019
(212) 506-1700

Dated:  October 17, 2023

58

Exhibit 43
Page 60