1  **BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
2  Jonathan D. Uslaner (Bar No. 256898)
   (jonathanu@blbglaw.com)
3  2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Telephone: (310) 819-3481

5  *Counsel for Lead Plaintiffs*
   *Universal and ACATIS and*
6  *Lead Counsel for the Class*

7  [Additional counsel appear on signature page.]

8  **UNITED STATES DISTRICT COURT**
   **SOUTHERN DISTRICT OF CALIFORNIA**

9

10 | *In re Illumina, Inc. Securities* | Case No. 3:23-cv-02082-LL-MMP |
   | *Litigation* | |

11 | | CLASS ACTION |

12 | | **THIRD AMENDED** |
   | | **CONSOLIDATED CLASS ACTION** |
   | | **COMPLAINT FOR VIOLATIONS** |
13 | | **OF THE FEDERAL SECURITIES** |
   | | **LAWS** |

14 | | DEMAND FOR JURY TRIAL |

15 | | HON. LINDA LOPEZ |

16

17

18

19

20

21

22

23

24

25

26

27

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:23-cv-02082-LL-MMP

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................3

II.    JURISDICTION AND VENUE ....................................................12

III.    THE PARTIES ..............................................................................13

    A.    Lead Plaintiffs ...................................................................13

    B.    Defendants..........................................................................13

        1.    Illumina ....................................................................13

        2.    GRAIL.......................................................................14

        3.    The Illumina Executive Defendants ........................14

        4.    The GRAIL Executive Defendants...........................16

IV.    RELEVANT  BACKGROUND  CONCERNING  ILLUMINA'S
    ACQUISITION OF GRAIL ..........................................................17

    A.    Illumina, a Dominant Provider of Next Generation Sequencing
        Platforms, Forms and Spins Off GRAIL.........................17

    B.    Illumina  Announces  Shocking  Plans  to  Acquire  GRAIL  for
        More Than $8 Billion .........................................................19

    C.    Antitrust  Authorities  Intervene,  Questioning  the  GRAIL
        Acquisition's Impact on Competition and Ordering a "Standstill"
        .............................................................................................20

    D.    Illumina Defies Regulators and Closes the Acquisition, Claiming
        It Was Necessary to "Save Lives"....................................23

V.    DEFENDANTS MADE NUMEROUS MATERIALLY FALSE AND
    MISLEADING STATEMENTS ...................................................25

    A.    Defendants Misled the Market About GRAIL's Valuation and
        Financial Projections .........................................................25

        1.    Illumina Concealed that Its Own Forecasts Ascribed a
            Much Lower Value to GRAIL..................................27

        2.    GRAIL Never Expected Broad-based Reimbursement by
            2025...........................................................................29

        3.    Even  Defendants'  Internal  Valuations,  Which  Were
            Substantially  Lower  than  the  Ones  That  Were  Publicly
            Presented, Were Inflated..........................................31

B.   Defendants Misrepresented Illumina's Ability to "Accelerate" the Galleri Test's Commercialization, Regulatory Approval, and Payor Reimbursement .........................................................................32

1.   Illumina Lacked the Capability to Accelerate Galleri .............35

2.   Illumina Never Had Any Plan to Accelerate Galleri ................37

3.   Illumina Did Not Expect Any Synergies Through the Transaction—But Rather Hundreds of Millions in "Dis-synergies"...............................................................................39

C.   Defendants Misrepresented Galleri's Ability to Detect 50 Cancers in Asymptomatic Patients, the Clinical Evidence Supporting Galleri's Effectiveness, and Galleri's Prospects for FDA Approval Based on the Clinical Data...........................................39

1.   There Was No Evidence that Galleri Could Detect 50+ Cancers in an Asymptomatic Population, or that It Was Otherwise "Effective" ..................................................42

2.   The Galleri Studies Were Insufficient for FDA Approval .......46

D.   Defendants Misrepresented that the Acquisition and Closing the Deal Would "Save Lives" ..................................................................48

1.   There Was No Evidence that Galleri Could "Save Lives".......49

2.   GRAIL Prohibited Its Employees from Stating that Galleri Could Save Lives Because There Was No Evidence to Support that Claim .................................................................51

3.   Illumina Could Not Accelerate Galleri, So Closing the Deal Would Not Save Lives Anyways ......................................52

E.   Illumina Misrepresented the Sources of GRAIL Revenue, GRAIL Revenue Guidance, and the Progress Towards Achieving It ..................................................................................................52

2.   GRAIL's Guidance Lacked a Reasonable Basis and Senior Sales Leadership Objected to Publicly Reporting It Because the Guidance Was Unachievable................................54

3.   Galleri Was Not Gaining Traction with Health Systems, Employers, or Payers, and Illumina Misrepresented the Numbers of Customers Purchasing Galleri .............................55

4.   GRAIL Was Not "On Track" to Meeting Its Revenue Guidance in May 2022 ................................................................56

F.   Defendants Falsely Asserted that the Deal Was Conflict-Free and Subject to Arm's Length Negotiations..............................................57

1.   The Decision to Acquire GRAIL Was Heavily Conflicted......58

G.   Following the EU's Announcement of an "In-Depth Investigation," Defendants Falsely Represented that Illumina Would Cooperate with Regulators and Was Committed to Satisfying Their Concerns .................................................. 62

1.   On July 12, 2021, Illumina Decided to Close the Transaction Without EC Approval ............................................ 63

2.   Confirming the Decision, Defendants Decided to Obtain a Remarkable Insurance Policy to Cover Their own Liability at the Same Meeting .................................................. 64

H.   Defendants Issued a Series of False Statements in Response to Investor Scrutiny About the Deal and Defend Illumina's D&O Insurance as "Appropriate," "Standard" and "Common" .................. 66

VI.   LOSS CAUSATION—INVESTORS WERE HARMED AS A SERIES OF DISCLOSURES CONNECTED TO DEFENDANTS' FRAUD TRIGGERS MASSIVE DECLINES IN THE PRICE OF ILLUMINA SHARES .................................................. 67

A.   FIRST LOSS CAUSING EVENT—Contrary to Defendants' Prior Representations, on August 18, 2021, Defendants Close the GRAIL Acquisition in Violation of the Automatic Standstill ........... 69

B.   SECOND LOSS-CAUSING EVENT—Undermining Defendants' Prior Representations, on November 23, 2021, Prominent Clinicians Raise Serious Doubts About Galleri's Clinical Validity .................................................. 72

C.   THIRD LOSS CAUSING EVENT—Contrary to Defendants' Prior Representations, Illumina Disclosed Disappointing Grail Revenues Amid Growing Criticism of Galleri .................................................. 73

D.   THE FOURTH LOSS-CAUSING EVENT—Illumina Suddenly Announced Its CFO's Departure as *The New York Times* Raised Further Questions About Galleri's Effectiveness ............................... 76

E.   THE FIFTH LOSS-CAUSING EVENT—Illumina Announced Disappointing Results and Guidance for GRAIL, Leading Analysts to Slash Their Price Targets ............................... 79

F.   THE SIXTH LOSS-CAUSING EVENT—Illumina Disclosed an SEC Investigation .................................................. 81

G.   THE SEVENTH LOSS-CAUSING EVENT—Icahn Filed a Complaint Confirming Defendants' Conflicts of Interest ................ 83

H.   THE EIGHTH LOSS-CAUSING EVENT—Illumina Announced Nearly $1 Billion Impairment Due to GRAIL ................ 85

VII.   POST-CLASS PERIOD DEVELOPMENTS .................................................. 89

A.   Illumina Agreed to Divest Grail, But Cannot Find a Buyer and Is Forced to Spin It Out For Pennies on the Dollar ................................... 89

B.    NHS Postponed the Rollout of Galleri Based on Data From the First Year and Key Stakeholders in the U.K. Raise Serious Concerns About Galleri and the NHS-Galleri Trial............................91

C.    Under a New Administration, the SEC Dropped Its Investigation of Illumina, Along With At Least 20 Other Matters............................92

VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER ........................................92

A.    Defendants Had Actual Knowledge That Their Statements Were False or at Best Misleading ........................................92

1.    Defendants' Publicly Reported GRAIL Valuations .................93

2.    Defendants' "Acceleration" Misstatements..............................95

3.    Defendants' Misstatements Concerning Galleri's Ability to Detect 50 Cancers in an Asymptomatic Population and FDA Approval...................................................................98

4.    Defendants' "Save Lives" Misstatements...............................101

5.    Defendants' Conflict of Interest Misstatements .....................102

6.    Illumina's Misstatements About Its Plans for GRAIL ...........104

7.    Defendants' D&O Insurance Misstatements ...........................105

8.    Illumina's Misstatements Concerning GRAIL's Revenue Guidance ................................................................106

9.    Illumina's Accounting of GRAIL...........................................108

B.    The Importance of the GRAIL Acquisition to Defendants and Analysts' Intense Focus On the Deal Support Scienter ....................109

C.    Defendants' Personal Financial Motives Support Scienter...............109

1.    Defendant Aravanis's Financial Motive Supports Scienter ...................................................................109

2.    Defendants Bishop and Ofman's Financial Motives Support Scienter.......................................................110

3.    Defendant Klausner's Financial Motive Supports Scienter ...................................................................110

4.    Defendant deSouza's Financial Motive Supports Scienter ....111

D.    Defendant deSouza's Prior History of Making False Statements Supports Scienter................................................................112

E.    The Resignations of Numerous Defendants and Illumina Senior Executives Support Scienter................................................113

IX.    ILLUMINA'S SEC FILINGS VIOLATED GAAP AND RELEVANT

SEC RULES BY IMPROPERLY ACCOUNTING FOR GRAIL.............114

X.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND HALF-TRUTHS ....................................................122

    A.   During and After the Announcement of the GRAIL Acquisition, Defendants State That Acquiring GRAIL Created Value and Was Necessary to "Accelerate" Galleri's Adoption and "Save Lives" ....122

    B.   Defendants Continued to Falsely State That the GRAIL Acquisition Was Needed to "Accelerate" Galleri's Adoption and "Save Lives" After Closing the Transaction in Defiance of Illumina's Regulators ........................................................143

    C.   Defendants Misrepresent the Sources of GRAIL Revenue, GRAIL's Guidance, and the Progress Towards Achieving It...........148

    D.   Defendants Continue to Issue False Statements About GRAIL and Galleri in Response to Increasing Investor Scrutiny................154

    E.   In Response to Icahn's Inquiries, Defendants Continue to Misrepresent GRAIL's Value, the Reasons for the Acquisition, and Illumina's Accounting ................................................158

    F.   Defendants Violated GAAP by Failing to Disclose GRAIL as a Related Party ................................................................165

XI.  THE PRESUMPTION OF RELIANCE.......................................166

XII. CLASS ACTION ALLEGATIONS.............................................168

XIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR......169

XIV. CLAIMS FOR RELIEF .........................................................170

    COUNT I – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST DEFENDANTS ILLUMINA, GRAIL, DESOUZA, SAMAD, FEBBO, ARAVANIS, THOMPSON, BISHOP, AND OFMAN)...................................170

    COUNT II – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5(A) AND (C) PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ................................................................172

    COUNT III – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE ILLUMINA EXECUTIVE DEFENDANTS AND THE GRAIL EXECUTIVE DEFENDANTS) ................................................................175

XV.  PRAYER FOR RELIEF .........................................................178

XVI. JURY TRIAL DEMAND ........................................................178

Lead Plaintiffs Universal-Investment-Gesellschaft mbH ("Universal Gesellschaft") and UI BVK Kapitalverwaltungsgesellschaft mbH ("UI BVK" and, together with Universal Gesellschaft, "Universal") and ACATIS Investment Kapitalverwaltungsgesellschaft mbH ("ACATIS," together with Universal, "Lead Plaintiffs" or "Plaintiffs") bring this securities class action against Illumina, Inc. ("Illumina" or "the Company"), GRAIL, LLC (n/k/a GRAIL, Inc.) ("GRAIL"), and certain of their current and former senior executives and directors (collectively, "Defendants"). Lead Plaintiffs assert claims against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of all investors who purchased or otherwise acquired Illumina common stock between September 21, 2020 and November 9, 2023, inclusive (the "Class Period").

The allegations in this Complaint are based upon Lead Plaintiffs' personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the independent investigation of their counsel. This investigation included, among other things, a review and analysis of: (1) Illumina's and GRAIL's public filings with the SEC; (2) research reports prepared by securities and financial analysts concerning Illumina and GRAIL; (3) transcripts of Illumina's investor conference calls; (4) Illumina's and GRAIL's investor presentations; (5) press releases and media reports; (6) securities pricing data; (7) interviews with former Illumina and GRAIL employees; (8) consultation with numerous experts; (9) pleadings, evidence, transcripts, and Lead Counsel's discussions with counsel in related litigation involving Illumina and GRAIL, including *In re Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Docket No. 9401, *Icahn Partners LP v. deSouza*, C.A. No. 2023-1045-PFA (Del. Ch.) ("*Icahn*"), *City of Omaha Police & Firefighters Retirement System v. Francis deSouza,* C.A. No. 2024-0172-PAF (Del. Ch.) ("*Omaha*"), *City of*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    1
CASE NO. 3:23-cv-02082-LL-MMP

*Roseville General Employees Retirement System v. deSouza*, C.A. No. 2024-0398-PAF (Del. Ch.) ("*Roseville*"), *Pavers & Road Builders Benefit Funds. v. Illumina, Inc.*, C.A. No. 2024-0136-PAF (Del. Ch.) ("*Pavers*"), and *Thomas P. DiNapoli, Comptroller of the State of New York, as Trustee for the New York State Common Retirement Fund v. Thompson*, C.A. No. 2024-0864-PAF (Del. Ch.) ("*New York State*"); (10) material obtained through Freedom of Information Act ("FOIA") and similar public access requests, and (11) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

This Third Amended Complaint is filed in accordance with the Court's order addressing loss causation.  ECF No. 78.  The amended loss causation allegations are set forth in Section VI, titled "Loss Causation—Investors Are Harmed As A Series of Disclosures Connected To Defendants' Fraud Triggers Massive Declines in the Price of Illumina Shares."  This Third Amended Complaint also alleges new facts obtained through interviews with high-ranking Illumina and GRAIL former employees ("FEs"), FOIA requests, and other sources obtained through Lead Counsel's investigation.[1]  The Complaint provides an overview of the fraud (Section I) and necessary background (Section IV), sets forth the categories of Defendants' false and misleading statements and the reasons they are false (Section V), details those false and misleading statements one-by-one (Section X), and alleges facts

---

[1] As used herein, the term "FE" refers to Illumina and GRAIL "former employees" whose reports are discussed in this Complaint. In order to preserve the former employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all the former employees, regardless of actual gender.

1  demonstrating Defendants' scienter throughout, in addition to including a summary

2  of those scienter facts in Section VIII.

3  **I.    INTRODUCTION**

4       1.    This case arises out of a series of misrepresentations concerning the

5  most monumental transaction in Illumina's history—its acquisition of a cancer

6  detection test company called GRAIL.  Analysts have described this transaction as

7  one of the "most disastrous attempted mergers in biotech history."

8       2.    On September 21, 2020, the first day of the Class Period, Defendants

9  announced that Illumina would acquire GRAIL for more than $8 billion.  The

10  proffered justification for the acquisition was that GRAIL's cancer test, Galleri,

11  could detect "50 different cancers before they are symptomatic" through a single

12  blood draw, and was nearing FDA approval and commercial adoption.  Defendants

13  presented financials and forecasts suggesting that GRAIL was a bargain at the

14  acquisition price.  They further stated that, by acquiring GRAIL, Illumina would

15  "accelerate" Galleri's FDA approval and widespread adoption by leveraging

16  Illumina's expertise and capabilities, generating billions in revenue that much faster.

17  Defendants repeated these statements with increasing fervor when antitrust

18  regulators moved to stop the deal—telling investors they had a "moral obligation"

19  to defy regulators and close the deal because combining Illumina and GRAIL was

20  "necessary" to "accelerate" the test's broad adoption and thus save "tens of

21  thousands of lives."

22       3.    Unfortunately for investors, these statements were false.  In reality,

23  GRAIL was worth far less than the price Defendants paid, Galleri could ***not*** detect

24  50 cancers, and its clinical validity was unproven and dubious.  Further, as the Fifth

25  Circuit Court of Appeals later confirmed, Illumina's statements that it would

26  "accelerate" Galleri's commercial adoption were baseless.  Illumina was ultimately

27  forced to divest GRAIL.  When it could not find a buyer, it spun GRAIL out at an

28  approximately ***95% discount*** to the price it paid for GRAIL less than three years

before.  As a result of Defendants' misstatements, the price of Illumina shares has collapsed, causing massive investor losses.

4.    Defendants' misrepresentations about GRAIL were highly material, and driven by the need for Defendants to justify a questionable acquisition that was intensely scrutinized by investors from the start.  Illumina, the foremost provider of next-generation genetic sequencing ("NGS") technology, had spun out GRAIL in 2016 to develop a cancer detection test using a blood sample drawn from asymptomatic patients (the "Holy Grail" of cancer detection).  Over the next three years, GRAIL raised billions of dollars in private financing rounds, bringing its rumored valuation to around $4 billion after a final capital raise in May 2020.

5.    On September 21, 2020, Illumina announced that it would reacquire GRAIL for over $8 billion in cash and Illumina stock—twice its rumored valuation in May.  When asked why the Company was willing to pay so much, so soon, Defendants provided investors with revenue projections assuming "broad reimbursement" and billions of dollars in revenue by 2025, as well as a "conservative" valuation for GRAIL of $11 billion and an optimistic valuation reaching $44 billion.  In other words, Defendants conveyed to investors that the more than $8 billion price tag was a steal.

6.    Soon after the acquisition was announced, regulators in the United States and Europe began reviewing the deal under antitrust laws because it threatened GRAIL's competitors who relied upon Illumina technology for their own tests.  On March 30, 2021, the Federal Trade Commission ("FTC") sued to block the deal.  In response, Defendants intensified their statements about Illumina's ability to accelerate Galleri's commercialization.  For example, Illumina CEO Defendant Francis deSouza published an op-ed in *The Wall Street Journal* warning that the FTC was "jeopardizing our chance to save more lives from cancer" since the merger would speed up commercialization "by years," "accelerat[e] the test's broad adoption," and save "tens of thousands of lives."

7. These representations reassured investors and had their intended effect. By August 2021, Illumina's stock price had skyrocketed 90% from the time the controversial merger was announced on the first day of the Class Period.

8. By that time, however, the European Commission's antitrust investigation had evolved into a full-blown inquiry as it considered whether to approve the deal. While the investigation was pending, Illumina was placed under a "standstill obligation" imposed by European Union merger rules that prohibited Illumina from closing the deal. Meanwhile, in May 2021, the FTC continued with its own administrative action, completed discovery, and prepared for trial beginning on August 24, 2021. At the same time, Defendants told investors that Illumina was working cooperatively to address the European Commission's concerns, including by providing the "information and assurances necessary to approve this transaction."

9. In a brazen and unprecedented move, however, Illumina announced on August 18, 2021 that it had closed the GRAIL transaction despite the European Commission's standstill. Illumina justified the action by telling investors that it needed to close to prevent regulatory proceedings from "killing the deal by running out the clock." In a media interview that day, deSouza claimed that Illumina had to close because the "stakes are just too high to risk" for patients that the deal would fall through.

10. Illumina's regulators reacted swiftly. Within days, the European Commission issued a statement emphasizing that the standstill obligation was one of the "cornerstones of the Merger Regulation," and that it took Illumina's actions "very seriously."

11. Analysts were puzzled by Illumina's actions, and questioned why it closed the merger in defiance of its regulators. For example, Citigroup noted the lack of "any precedent for an acquirer intentionally closing a deal ahead of regulatory approval"—and that doing so presented an obvious "risk that this tactic does not sit well with the regulatory bodies." In response to such concerns, deSouza reiterated

that closing was a moral imperative because it would accelerate the adoption of the Galleri test and "save lives."

12.    As corroborated by numerous former high-ranking executives, a full record and trial before the FTC, Defendants' own testimony, and Lead Plaintiffs' investigation, these statements were misleading and omitted material facts.  To start, Illumina's true internal valuation and revenue projections for GRAIL were materially below the lofty valuations and aggressive revenue projections Illumina reported to investors.  In truth, the internal revenue projections prepared by GRAIL and Illumina management and reviewed by Illumina's Board—but concealed from investors—were approximately one-quarter to one-half those Illumina publicly reported in SEC filings.  Further, according to Illumina's SEC filings, one of the key "assumptions" backing GRAIL's projected revenues was that Galleri would obtain "broad reimbursement" by 2025.  But in reality, both Illumina and GRAIL senior management did not target "broad reimbursement" until 2026 or 2027 at the earliest, and even that aggressive timeline was predicated on Congress enacting new legislation to fast-track cancer-test reimbursement.  Without such legislation, reimbursement was not possible until 2028 or 2029.

13.    Further, Defendants' "acceleration" claims had no basis in reality.  In truth, Illumina had neither modeled any potential "acceleration" in its "deal model," nor identified any steps it could take to "accelerate" Galleri.  And contrary to deSouza's representations that Illumina's "manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities would "accelerate" Galleri, Illumina did not have any infrastructure, expertise, or experience necessary to make any "acceleration" possible.  Rather, as the Fifth Circuit held after reviewing the extensive evidentiary record in the FTC action, "Illumina had not established that such acceleration would actually occur, much less shown how it would be achieved."

14.    In addition, in stark contrast to Defendants' representations about Galleri's ability to detect "50 different cancers before they are symptomatic," Galleri could not detect 50 cancers, was unproven, and ineffective.  Based on Defendants' own admissions, the FTC concluded that Defendants' public claims about Galleri's ability to screen for 50 types of cancer in asymptomatic patients was "simply false" because there was "simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population."

15.    Defendants' repeated representation that Galleri's adoption would "save lives" were also untrue.  Numerous former high-ranking executives confirmed that Defendants Bishop and Ofman internally prohibited GRAIL employees from publicly representing that Galleri could "save lives" because there was no clinical evidence to support that claim.  Despite this prohibition, Defendants deSouza and Bishop made this very claim in joint presentations to investors—stating that the "Galleri test can conservatively save 10,000 additional lives in the US," that this "deal saves lives," and that "joining forces with Illumina" will ultimately "accelerate availability" of Galleri, "sav[e] tens of thousands of lives," and "lead[] to significant health care cost savings."

16.    Defendants' misleading and unsupported statements about Galleri's ability to "save lives" are particularly striking in light of the fact that, prior to the Class Period, the FDA directly informed GRAIL that its body of planned clinical trials was insufficient to show that the test worked.  Specifically, the FDA told GRAIL that its proposed clinical strategy would not support FDA premarket approval because the studies did not "directly confirm the results of [the] test" or "assess how the test results impacted patient treatment decisions," and because they were based on clinical data gathered in the U.K., which has a vastly different standard of care for cancer than the United States.

17.    Consistent with the FDA's concerns, and unknown to investors, GRAIL's real-world experience had shown that Galleri caused substantial harm to

patients, with no discernible clinical benefit, at an extraordinary cost. In one example, the San Francisco Firefighters Cancer Prevention Foundation funded Galleri screening for 1,786 active and retired firefighters at cost of over $1 million—which the founder of the organization described to Lead Plaintiffs' counsel as being "sold a bill of goods." The tests missed numerous confirmed cancers, generated approximately 50% false positives, and only "detected" cancers that were too "late stage" to make any difference. In reality, contrary to Defendants' positive statements about GRAIL's "efficacy," clinicians decried Galleri's results and "miss rates as high as 93%" as "scary," "problematic," and "misleading"—and warned that the test's false positive rates will necessarily lead to a "large number of non-cancer patients who will undergo additional, unnecessary, and probably harmful testing."

18. The truth about Galleri's ineffectiveness was no secret to Illumina's and GRAIL's senior leadership. As one high-ranking executive who routinely interacted with deSouza explained, deSouza "overstated GRAIL's clinical data many times," "overhyped the value" of GRAIL, and made "Illumina's false claims about GRAIL" to investors without any basis. Defendant deSouza himself internally acknowledged that neither he nor Illumina had any actual evidence that Galleri could save lives. As reported by another former Illumina employee, in 2023, deSouza directed an effort to identify an independent scientist or other backer to publicly praise the GRAIL acquisition and provide legitimacy to deSouza's statements that Illumina would "accelerate" Galleri's adoption and "save lives." But despite weeks of work and outreach, Illumina was unable to identify anyone willing to publicly make that representation—enraging deSouza.

19. In addition to overstating the value of GRAIL and its clinical data, Defendants also misled investors about their plans to close the acquisition. For example, after the European Commission announced its in-depth investigation on July 22, 2021, Defendants publicly represented that Illumina would provide any "assurances necessary" to obtain regulators' approval before closing. Unknown to

investors, however, Illumina's senior leadership, including Defendants deSouza, Samad, Febbo, and Aravanis, had determined two weeks before, in a July 12, 2021 meeting, that Illumina would not provide its regulators with any further assurances but would instead close the deal despite the mandatory standstill. Moreover, following this decision, the Illumina Board took out acquisition-related D&O insurance coverage of $300 million—at the extraordinary cost of an over ***$72 million premium*** (multiples the cost of similar policies)—precisely because the Board and senior management knew they were incurring personal liability for their misconduct. This unprecedented policy, which was solely for the benefit of the directors and senior management, demonstrates that Defendants knew their conduct gave rise to liability, and that their statements about working with Illumina's regulators and closing the deal were untrue.

20. At the same time Defendants were making their false statements, they sought to capitalize on investors' ignorance by selling their personally held Illumina shares at inflated prices in a series of highly suspicious insider trades, which netted them millions of dollars in profits before investors learned the truth. Defendant Aravanis—GRAIL's former Chief Scientific Officer who became Illumina's Chief Technology Officer just before the acquisition and "sponsored" it before Illumina's Board—sold every single Illumina share he received in the deal, soon after the deal closed, reaping over $5 million in proceeds.

21. As insiders were unloading their shares, Defendants did not breathe a word of any financial motivations for closing the deal, despite analysts' questions probing its rationale. Then, in May 2023, renowned activist investor Carl Icahn began posing these same questions directly to Illumina's senior leadership in connection with his proxy contest seeking to replace members of Illumina's Board. In doing so, Icahn publicly questioned Illumina insiders' financial interest in the GRAIL transaction, imploring "the board to bring in an outside—and demonstrably

independent—law firm and forensic accounting team to investigate and address these questions publicly."

22.    Rather than admit the truth or conduct any investigation, on May 18, 2023, Illumina Board chair and longtime deSouza confidant Defendant John W. Thompson issued a statement to investors flatly denying any wrongdoing or conflicts of interest whatsoever.    In that strongly worded denial, Defendant Thompson specifically addressed the role of Defendant Aravanis in the GRAIL acquisition, and assured investors that he was "recused" from the Board's decision-making. Specifically, Defendant Thompson represented that Defendant Aravanis's "economic interests" in GRAIL "were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices," Aravanis was "recused from any decisions to sign and close the GRAIL acquisition."

23.    These statements were materially false and misleading.    In reality, as would be later uncovered by a then-current Illumina director, Illumina's Board of Directors, including Defendant deSouza, closed the GRAIL transaction because of their "personal stake" in the deal—self-interested motivations that were never properly disclosed to investors.    In fact, rather than follow "good corporate governance practices" and "recuse" Defendant Aravanis from decisions concerning GRAIL, Aravanis served as a lead "cosponsor" of the acquisition.    Aravanis presented the deal to Illumina's Board, "negotiated" the deal's terms with his prior employer, and participated in the Board's decision-making.    As one high-ranking former employee reported, as opposed to being "recused" from GRAIL decision-making, Defendant deSouza relied almost exclusively on Aravanis for any questions or decisions he had to make concerning GRAIL.

24.    Defendant Aravanis's role and the undisclosed self-interest driving the acquisition was uncovered only at the end of the Class Period by a newly elected Illumina director, Andrew Teno, who joined Illumina's Board in June 2023 in connection with Icahn's proxy campaign.    Just weeks after Teno was elected to

Illumina's Board, he gained access to internal confidential and privileged Board documents concerning the GRAIL transaction, which revealed information that caused him to become "extremely concerned" about his own obligations as a director and his "fiduciary duties to Illumina shareholders," resulting in him bringing these concerns to Icahn.

25.    Based on these confidential materials, Icahn immediately concluded that members of Illumina's Board were hopelessly conflicted and "***poisoned by their personal stake***" in the deal.  Armed with this knowledge, on October 20, 2023, Icahn sued the other members of Illumina's Board of Directors—alleging, based on Teno's internal and privileged documents in a sworn complaint, that they lied about the Company's conduct in closing the acquisition and demanding that investors be told "the truth about Defendants' misconduct."

26.    While Illumina and GRAIL insiders pocketed hundreds of millions in illicit profits, Illumina's public investors—Lead Plaintiffs and the members of the Class—saw their investments plummet in value as a result of the misconduct alleged herein.  Specifically, Illumina's stock price declined in a statistically significant manner following disclosures revealing that Illumina was pressing ahead with the GRAIL transaction in defiance of its regulators; scientists questioned Galleri's effectiveness; senior executives involved in the GRAIL transaction had unexpectedly or forcibly "resigned"; and the SEC was investigating Defendants' public statements.  In response to these disclosures, Illumina shares cratered, falling from $523 per share on August 17, 2021, the day before Defendants closed the acquisition, to $175 per share on August 14, 2023, when Illumina disclosed it was being investigated by the SEC.  Finally, on November 9, 2023, the last day of the Class Period, Illumina disclosed that it was taking another near-$1 billion write-down on GRAIL (after writing it down nearly $4 billion the year before)—confirming it was actually worth a fraction of what Illumina paid.  On this news, Illumina stock price fell 13%, closing at $92.79 on November 13, 2023—its lowest

trading price in a decade. The loss causation allegations connecting these disclosures to Defendants' misstatements are set forth in Section VI.

27.    Since that time, additional facts have further corroborated Defendants' fraud.  Those include Illumina's disclosure that it was unable to find any willing buyer for GRAIL, and was instead forced to divest it through a distribution of shares to Illumina shareholders.  That divestiture confirmed that GRAIL was, in truth, ***worth no more than $500 million—or just 6% of the over $8 billion*** that Illumina paid to acquire it—and likely far less due to Illumina's ongoing obligations to finance GRAIL's operations.

28.    While Illumina's public investors have seen their investments plummet in value due to Defendants' fraud, the primary architects of the GRAIL acquisition— including Defendants deSouza, Bishop, Klausner, and Aravanis—landed lucrative new roles at other start-ups funded by the windfall GRAIL's backers received from the acquisition.  Plaintiffs bring this action to hold Defendants accountable for the shareholder value they destroyed.

## II.    JURISDICTION AND VENUE

29.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

30.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Illumina maintains its corporate headquarters in San Diego, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred

in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiffs

32.    Lead Plaintiffs Universal Gesellschaft and UI BVK are members of the Universal Investment Group.  Universal Gesellschaft and UI BVK are investment companies based in Frankfurt am Main, Germany.  They collectively administer fund assets of over €1 trillion as of March 2024.  Universal Gesellschaft's funds and UI BVK's funds purchased shares of Illumina common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities alleged herein.

33.    Lead Plaintiff ACATIS, headquartered in Frankfurt-am-Main, Germany, was founded in 1994, and is one of Germany's leading asset managers for retail and institutional clients with more than €11.7 billion assets under management as of March 2023. ACATIS's funds purchased shares of Illumina common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities alleged herein.

### B.    Defendants

#### 1.    Illumina

34.    Defendant Illumina develops, manufactures, and markets systems for biological analysis, including next-generation DNA sequencing technology. Illumina is incorporated in Delaware and maintains its principal executive offices at 5200 Illumina Way, San Diego, California.  Illumina's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "ILMN."  As of November 6, 2023, Illumina had over 158 million shares of common stock outstanding, owned by at least hundreds of thousands of investors.

## 2. GRAIL

35.     Defendant GRAIL is a Delaware corporation that was initially founded as a subsidiary of Illumina called GRAIL, Inc.  GRAIL was spun off from Illumina on February 28, 2017, and, after several funding rounds, reacquired by Illumina in August 2021 for more than $8 billion.  GRAIL's principal product, Galleri, is a multi-cancer early detection ("MCED") test purportedly designed to screen for up to 50 different cancers.  Galleri uses Illumina's sequencing technology to attempt to identify cancer DNA in a "liquid biopsy"—*i.e.*, a patient blood draw.  After GRAIL was reacquired in August 2021, it became an Illumina subsidiary named "GRAIL, LLC."  On June 3, 2024, Illumina disclosed GRAIL would be separated from Illumina through a spin-off, and that 85.5% of GRAIL's shares would be distributed to current Illumina shareholders.  That spin-off closed on June 24, 2024, at which time GRAIL, LLC was converted to a Delaware corporation named GRAIL, Inc.  For ease of reference, and because the liabilities for the misconduct alleged herein were assumed by the successor corporate entity as described above, both GRAIL, Inc. and GRAIL, LLC are referred to as "GRAIL."

## 3. The Illumina Executive Defendants

36.     Defendant Francis A. deSouza ("deSouza") was Illumina's Chief Executive Officer ("CEO") from 2016 until his resignation on June 11, 2023.  Defendant deSouza was a member of Illumina's Board of Directors beginning in January 2014, having previously joined Illumina in 2013 as President.  As CEO, Defendant deSouza spearheaded the GRAIL acquisition, and made numerous false and misleading statements to Illumina investors about the GRAIL acquisition. In 2019, the year before the disastrous GRAIL acquisition, deSouza earned $1.5 million—but over the next three fiscal years, Illumina paid him approximately $67 million for his service as CEO even as the Company's market capitalization declined by almost $14 billion.  He resigned from his role as Illumina's CEO and as a Director in June 2023.

37.     Defendant Aravanis served as Senior Director of R&D for Illumina from 2013 to 2016.  In 2016, he co-founded GRAIL, where he served as Chief Scientific Officer, Head of R&D, and Chief Medical Officer ("CMO") until May 2020.  At GRAIL, he led the research, development, operational, and clinical teams developing its MCED test.  In May 2020, Defendant deSouza rehired Aravanis to rejoin Illumina as its Chief Technology Officer ("CTO"), Head of Research and Product Development.  In this position, unknown to investors, Aravanis helped lead Illumina's Board and management's decision-making and negotiations in the GRAIL acquisition, serving as a "cosponsor" of the acquisition and overseeing all the activities related to the acquisition.  He left his role at Illumina in 2023.

38.     Defendant Phillip G. Febbo, M.D. ("Febbo") served as CMO of Illumina from 2018 to 2023.  He was responsible for developing and executing Illumina's medical strategy to drive genomic testing in healthcare practice.  He was also a "cosponsor" of the GRAIL acquisition. Together with Aravanis and Illumina Chief Strategy Officer ("CSO") Joydeep Goswami, Febbo presented the GRAIL acquisition to Illumina's Board and served as a key member of management who "over[saw] all the activities" related to the acquisition, including evaluating the "business case" for the deal and advising the "Executive Leadership Team" or "ELT" and the Board.

39.     Defendant Sam A. Samad ("Samad") was Illumina's CFO and Senior Vice President from January 2017 to July 8, 2022, and had responsibility for the Company's finance, accounting, investor relations, internal audit, and treasury functions up until his unexpected resignation, which analysts immediately tied to GRAIL.

40.     Defendant John W. Thompson ("Thompson") was a member of Illumina's Board of Directors starting in May 2017.  He served as Board Chairman from May 2021 to May 25, 2023, when he was voted out at the 2023 annual stockholder meeting.  Thompson previously served as the CEO and board Chair of

Symantec, where deSouza served in senior positions until he joined Illumina in 2016. In 2017, deSouza recruited Thompson to serve on Illumina's Board. As deSouza described their relationship in a November 2021 presentation, "I've known John over the last 15 years, as sometimes a boss, many many times a mentor, and always as a friend."

41.    Defendants deSouza, Aravanis, Febbo, Samad, and Thompson are collectively referred to herein as the "Illumina Executive Defendants." Each participated in the management of Illumina as members of Illumina's Executive Leadership Team ("ELT") and had direct supervisory involvement in Illumina's day-to-day operations (or in Thompson's case, Board oversight of Illumina's operations), and had the ability to control and did control Illumina's statements to investors. They were involved in drafting, reviewing, publishing, certifying, and/or making the Company's statements to investors, including the false and misleading statements and half-truths alleged herein.

### 4.    The GRAIL Executive Defendants

42.    Defendant Hans Bishop ("Bishop") served as GRAIL's CEO from June 2019 until its acquisition by Illumina closed in October 2021. As reported by former GRAIL employees, Bishop was hired to help plan private equity investors' "exit" from GRAIL either through a sale of the business or an IPO.

43.    Defendant Joshua J. Ofman, M.D. ("Ofman") serves as President at GRAIL. He previously served as its CMO and Head of External Affairs from January 2020 to June 2022, and as its Chief of Corporate Strategy and Head of External Affairs from June 2019 to January 2020.

44.    Defendant Richard D. Klausner, M.D. ("Klausner") was Senior Vice President and CMO at Illumina from 2013 to 2014 and then Chief Opportunity Officer at Illumina until February 2016. Klausner left Illumina to found GRAIL and served as a GRAIL director from 2016 through the GRAIL acquisition. Through Milky Way Investments Group ("Milky Way"), an opaque investment vehicle that

Klausner founded and managed that was registered in the British Virgin Islands, Klausner held 27,753,292 shares of GRAIL worth approximately $250 million at the time the GRAIL acquisition was announced.

45.    Defendants Bishop, Ofman, and Klausner are collectively referred to herein as the "GRAIL Executive Defendants."  The GRAIL Executive Defendants directly participated in the management of GRAIL, had direct and supervisory involvement in GRAIL's day-to-day operations (or in Klausner's case, Board oversight of GRAIL's operations), and had the ability to control and did control GRAIL's statements to investors.  They were involved in drafting, reviewing, publishing, and/or making GRAIL's statements to investors, including the false and misleading statements and half-truths alleged herein.

## IV.    RELEVANT    BACKGROUND    CONCERNING    ILLUMINA'S ACQUISITION OF GRAIL

### A.    Illumina, a Dominant Provider of Next Generation Sequencing Platforms, Forms and Spins Off GRAIL

46.    Illumina specializes in the manufacture and sale of next-generation sequencing ("NGS") platforms.  NGS is a method of DNA sequencing that is used in medical applications.  Illumina currently dominates gene sequencing, controlling an estimated 80% of the global market.  In each of 2023, 2022, and 2021, sequencing revenue comprised 91% of Illumina's revenue.

47.    Starting in 2012, Illumina began exploring the potential for detecting cancer in a blood sample using genetic sequencing—an approach sometimes called a "liquid biopsy."  Illumina researchers soon discovered that the Company's sequencers were able to detect trace amounts of DNA in blood samples.

48.    In mid-2015, Illumina began to consider how to develop a cancer detection test based on these signals.  Soon after, in September 2015, Illumina formed a wholly-owned subsidiary, GRAIL—so-named because its goal was to reach the "holy GRAIL" of cancer research, the creation of a multi-cancer early

detection ("MCED") test that could identify the presence of multiple types of cancer from a single blood sample in asymptomatic individuals.

49.    The possibility of a safe and effective MCED test has profound appeal. Cancer is the leading cause of death worldwide and is second only to heart disease in the United States.  Despite being one of the leading causes of death, only five cancer types have recommended screenings—breast, cervical, colorectal, lung (smokers considered at risk), and prostate cancers.  Cancers that lack population screening methods are expected to account for about half of new cancer diagnoses each year, according to the American Cancer Society.  MCED tests could potentially meet this unmet need, fueling the hope that earlier and more accurate detection of cancer would reduce mortality, improve patients' lives, and reduce healthcare costs.

50.    GRAIL's MCED test, which GRAIL would later call "Galleri," works by identifying patterns in cell-free DNA, or "cfDNA." All cells—cancer and healthy ones—shed cfDNA into the bloodstream.  One of the "hallmarks of cancer" is abnormal methylation of DNA, or the chemical process at the DNA level that plays a role in gene expression.  GRAIL's MCED test was developed to use Illumina's NGS and machine-learning algorithms to analyze cfDNA methylation patterns to determine if a cancer signal was present and, if so, to predict the tissue type or organ where the cancer signal originated.

51.    On January 10, 2016, Illumina issued a press release publicly announcing the formation of GRAIL.  At the time of GRAIL's formation, an MCED test did not exist, but then-Illumina CEO Jay Flatley stated he was "confident it [would] within a year."  To accomplish that, Illumina and GRAIL's senior executives told investors that this endeavor would be costly, and that significant investment would be required.

52.    Between early 2016 and 2020, GRAIL raised more than $1.9 billion through four fundraising rounds.  Following these successive fundraising rounds, GRAIL began pursuing an initial public offering ("IPO") purportedly to raise

additional money to fund the launch and commercialization of its MCED test, Galleri. The market reacted with excitement to the announcement of GRAIL's IPO. For example, on September 10, 2020, *Bloomberg* published an article noting that GRAIL was "finally taking advantage of the blistering hot market for offerings, ending a wait of over two years for the cancer test startup to reach public markets."

## B. Illumina Announces Shocking Plans to Acquire GRAIL for More Than $8 Billion

53. GRAIL never went public in 2020. On September 21, 2020, the first day of the Class Period, Illumina announced its intention to acquire GRAIL for over $8 billion. The over $8 billion price tag was huge—more than 4.5 times greater than the $1.76 billion of cash and cash equivalents Illumina had on-hand and almost double Illumina's then-total assets of $4.33 billion.

54. Illumina's acquisition announcement quickly became the subject of intense investor focus and scrutiny. Analysts questioned several aspects of the deal, including the acquisition's hefty $8 billion price tag in comparison to its reported value just months earlier. Analysts from UBS, for example, wanted to know, "Why buy GRAIL now, after starting GRAIL in 2016, spinning in 2017, and after the recent financings plus filing for the IPO?" The analysts pointed to questions about the "financial and profitability outlook for GRAIL," Illumina's "confidence in GRAIL's clinical performance/utility," and the "Risks/opportunity with GRAIL's regulatory and commercial strategy."

55. Similarly, analysts from Canaccord had a "hard time justifying the $8B acquisition price" particularly "given the fact that several other precision oncology companies appear further along (in terms of annual revenues and clinical evidence generation)," while Wells Fargo analysts noted the "company will be challenged to convince investors of its merits at the proposed price tag." Guggenheim analysts noted that, when GRAIL was spun off from Illumina several years before, "the implied valuation was meaningfully below the predicted $8B valuation today" and

that it "seems odd to us that the company's strategic rationale would change so quickly and at a much higher valuation."

56.    To assuage investor concern over the acquisition, Defendants made a series of false and misleading statements designed to convince investors that the GRAIL acquisition was a value-enhancing proposition that would deliver billions of dollars in returns for Illumina shareholders.  Specifically, as detailed further in subsequent sections of the Complaint, Defendants made a series of misrepresentations concerning: (1) the value of and financial projections for GRAIL; (2) Illumina's ability to "accelerate" Galleri's commercialization, regulatory approval, and payor reimbursement by acquiring GRAIL; and (3) the clinical evidence purportedly supporting Galleri's "proven technology" and ability to "save lives."

57.    Defendants' representations had their desired effect, with analysts gaining comfort with Illumina's explanations of the deal rationale and price.  For example, SVB analysts credited Defendants' representations that Illumina would accelerate GRAIL's adoption, giving Illumina an "Outperform" rating, SVB's highest.  In doing so, the SVB analysts noted the acquisition "lets ILMN leverage their scale to accelerate GRAIL's commercialization," and concluded Illumina would "significantly improve GRAIL's speed to market and eventual clinician adoption upon launch."  And following deSouza's remarks at a September 24, 2020 investor conference, Cowen analysts remarked that deSouza "did a commendable job directly addressing many of the key lingering questions/concerns from earlier this week [and] directionally, we feel a bit better now than we did earlier today," and assigned Illumina an "Outperform," their highest rating.

### C.    Antitrust Authorities Intervene, Questioning the GRAIL Acquisition's Impact on Competition and Ordering a "Standstill"

58.    The GRAIL acquisition also raised significant concerns in the eyes of American and European competition authorities.  On March 30, 2021 and April 1,

2021, respectively, the U.S. Federal Trade Commission filed an administrative complaint and sued in U.S. federal court to block Illumina's acquisition of GRAIL.

59.    Then, on April 19, 2021, the European Commission began to review the GRAIL acquisition under Article 22 of the EU Merger Regulation.  Following a preliminary investigation, the Commission announced on July 22, 2021 that it would "carry out an in-depth investigation into the effects of the transaction to determine whether its initial competition concerns are confirmed."  In that announcement, the Commission explained that it had "90 working days, until 29 November 2021, to take a decision."

60.    The gravamen of the antitrust concerns was simple.  Illumina provided critical NGS products that were necessary for the work performed by GRAIL and its competitors in the MCED space, and regulators worried that, through the GRAIL acquisition, GRAIL would obtain an advantage over its competitors that would ultimately harm competition.  Specifically, regulators were concerned that, in acquiring GRAIL, Illumina would favor GRAIL over its competitors and that the acquisition could: (1) increase the price for MCED tests; (2) deter others from improving MCED tests through research and development; (3) limit the supply of MCED tests; (4) limit the overall quality and availability of MCED tests; and/or (5) bind MCED test developers to Illumina's products.  Thus, they were concerned that the GRAIL acquisition would ultimately cause harm to the public.

61.    Under the EU Merger Regulation, transactions under investigation are subject to a "standstill obligation" and are not permitted to close without clearance. As explained by the European Commission, the standstill obligation "prevents the potentially irreparable negative impact of transactions on the competitive structure of the market, pending the outcome of the Commission's investigation."

62.    The European Commission has stated that it "considers any breach of the standstill obligation to be a very serious infringement, as it undermines the effective functioning of the EU merger control system."  Under the EU Merger

Regulation, the Commission can impose fines of up to 10% of the aggregated turnover of companies, "which intentionally or negligently breach the standstill obligation."

63.    Due to the European Commission's investigation, on May 21, 2021, the FTC filed an application withdrawing its request for a preliminary injunction to enjoin the transaction. The FTC explained that, because the European Commission was conducting an investigation into the acquisition already, and Illumina and GRAIL could not close before the European Commission investigation cleared, a preliminary injunction was no longer "necessary to preserve the *status quo*."

64.    While the FTC's dismissal request was granted on June 1, 2021, the FTC administrative proceeding continued to move forward, with trial scheduled to begin on August 24, 2021. The FTC never gave Defendants the go-ahead to proceed with the closing of the acquisition, instead expecting Defendants to abide by the EU Merger Regulation.

65.    After the European Commission's announcement that it was conducting an "in-depth investigation" into the GRAIL acquisition, Defendants assured the market that Illumina was working to provide the needed assurances to obtain E.U. regulatory approval. For example, on July 22, 2021, Illumina issued a press release asserting that it would "continue to work with the European Commission (EC) to ensure that it has the information and assurances necessary to approve this transaction." Similarly, during Illumina's August 5, 2021 earnings call, Defendant deSouza stated that "the way the timing is going to work is the deal contract last[s] till December 20. . . . we are not yet at the stage where the clock has run out." He further explained that Illumina remained "committed to working through this period to get this to a conclusion." At the time, analysts credited these assurances, with J.P. Morgan analysts reporting that "management expects to provide a go/no-go update in late November/early December."

66.     As antitrust regulators probed the deal, Defendants continued to vocally defend it by pointing to GRAIL's commercial prospects, the effectiveness of the Galleri test, the value of the acquisition to Illumina shareholders, and the moral imperative of the combination's ability to "save lives."  For example, after the European Commission announced it was conducting an "in-depth investigation" on July 22, 2021, deSouza reaffirmed Illumina's commitment to the deal and warned investors that "If this acquisition does not proceed, GRAIL's European roll-out will be slower and the cost will be measured in the unnecessary loss of life."  Enabling Illumina to acquire GRAIL "will accelerate availability of the GRAIL test by many years" in Europe and globally, "saving tens of thousands of lives, and leading to significant health care cost savings."

67.     Defendants' representations had their intended effect, and Illumina's share price nearly doubled from when the deal was announced at the beginning of the Class Period—and increased 42% from when the FTC announced its challenge on March 30, 2021—reaching over $500 per share by August 2021.  As Canaccord analysts noted in an August 6, 2021 report, we "view GRAIL as an excellent addition to Illumina that could significantly accelerate the company's growth, enabling direct participation in the lucrative liquid biopsy market."

**D.    Illumina Defies Regulators and Closes the Acquisition, Claiming It Was Necessary to "Save Lives"**

68.     Just weeks later, on August 18, 2021, after market close, Illumina shocked investors by announcing that it had closed its acquisition of GRAIL in violation of the European Commission's automatic standstill obligation.

69.     Numerous reporters and analysts expressed confusion at Illumina's closing of the acquisition despite not having regulatory approval—a fact that many remarked was unprecedented and contradicted Defendants' prior assurances.  As one reporter summed up, "Illumina completes GRAIL acquisition, regulators be damned."  Analysts from Cowen noted that the closing was "a surprising and

seemingly aggressive tactical move," while analysts from Bank of America likewise found the move "surprising and aggressive."  Citi analysts remarked that the closing of the acquisition was "confusing" and that they "could not find any precedent for an acquirer intentionally closing a deal ahead of regulatory approval particularly in a case where the approval process has been somewhat contentious with the outcome uncertain."  Analysts from SVB noted "rising uncertainty with [Illumina's] action yesterday to close the GRAIL acquisition," explaining that the "somewhat 'rushed' closing without clearing all the regulatory hurdles raises more questions than it answers for investors."

70.    In sharp contrast to Defendant deSouza's statements less than two weeks prior, Illumina stated that the European Commission's final decision on whether to approve the acquisition was "projected after the deal expires" and that Illumina was "locked into a situation where the deal terms will expire before there is a chance for full review; the clock will just run out"—and therefore the deal could only receive "a thoughtful and full review by the EU regulators and the US courts . . . if Illumina acquires GRAIL now."

71.    On the same day Illumina closed the acquisition, the Company held a conference call in which Defendants deSouza, Samad, Bishop, and Charles Dadswell, Illumina's General Counsel explained the closing to investors.  During the call, Defendant deSouza emphasized the "high stakes" involved, underscoring that there was "a moral obligation" to close the deal because "[w]ith Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S., and additional lives in the EU over the next nine years," and that acquiring GRAIL was "the fastest way to make this test available to everyone, everywhere."

72.    The European Commission did not take Illumina's defiance lying down.  On August 20, 2021—just two days after the acquisition closed—the European Commission announced that it had opened an investigation into whether

Illumina had breached the standstill obligation. Executive Vice-President Margrethe Vestager of the European Commission remarked:

> We deeply regret Illumina's decision to complete its acquisition of GRAIL, while our investigation into the transaction is still ongoing. Companies have to respect our competition rules and procedures. Under our ex-ante merger control regime companies must wait for our approval before a transaction can go ahead. This obligation, that we call standstill obligation, is at the heart of our merger control system and we take its possible breaches very seriously.

73.     Despite the regulators' actions, Defendants continued to falsely assure investors about the GRAIL acquisition.  For example, on September 13, 2021, at the Morgan Stanley Global Healthcare Conference, in response to questions about the acquisition, Defendant deSouza again repeated his assurances that Illumina closed because Illumina "felt a moral obligation to close the deal," and that "we will save many thousands of lives by getting this test into the hands of more people and making it more affordable than GRAIL would do on their own."

## V.    DEFENDANTS MADE NUMEROUS MATERIALLY FALSE AND MISLEADING STATEMENTS

74.     Unfortunately for investors, Defendants made several categories of false and misleading statements when investors, analysts, and regulators questioned the acquisition.  These misstatements, and the reasons why they were false and misleading, are summarized in this Section V.

### A.    Defendants Misled the Market About GRAIL's Valuation and Financial Projections

75.     To justify the acquisition price, in November 2020, Illumina filed a Form S-4 containing two forecasts for GRAIL's financial performance "prepared by GRAIL management." One of the forecasts, "Case A," was purportedly based on more conservative assumptions, including "that broad reimbursement for Galleri would be achieved in calendar 2025." The other, "Case B," was purportedly more aggressive, and assumed even wider adoption by then. The S-4 specifically stated that the assumptions underlying the valuation were "considered reasonable by GRAIL management as of the date of their use in preparing the GRAIL Forecasts."

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT        25
CASE NO. 3:23-cv-02082-LL-MMP

76.     As Illumina stated in the filing, under the "Case A" assumptions, GRAIL was expected to generate $14 billion in annual revenues by 2030, while under the "Case B" assumptions, GRAIL's revenues would approach $24 billion by that time:

| | | | | Fiscal year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (*In millions*) | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
| **GRAIL Forecasts:** | | | | | | | | | | |
| GRAIL Total Revenue – Management Case A Estimate | $ 19 | $ 119 | $ 462 | $ 892 | $1,704 | $3,916 | $ 6,625 | $ 9,884 | $12,129 | $ 14,387 |
| GRAIL Total Revenue – Management Case B Estimate | 56 | 327 | 1,042 | 2,142 | 4,075 | 9,570 | 13,629 | 17,747 | 21,277 | 23,980 |

77.     Using these forecasts, GRAIL's financial advisor, Morgan Stanley, valued GRAIL at $11 billion to $44 billion as a standalone entity—easily justifying GRAIL's $8 billion price:

| Forecast Scenario | ($ in millions) |
|---|---|
| Case A | $11,150 - $17,450 |
| Case B | $28,200 - $43,950 |

78.     These statements were material to investors.  For example, following the S-4's publication, in a December 2020 report, Wolfe Research analysts projected GRAIL's "enterprise value" at $7 billion and forecasted over $1 billion in Galleri revenues by 2025, while Cowen analysts concluded in January 2021 that GRAIL could represent one-third of Illumina sales and 40-50% of its revenue growth.

79.     As discussed in greater detail below, these statements were materially false and misleading for multiple reasons:

(i)     ***Illumina concealed that Defendants' own actual forecasts ascribed a much lower value to GRAIL.***  Both Illumina Board materials from

April 2020 and Illumina's "deal model"—the model it actually relied on to value GRAIL—showed that GRAIL would generate roughly half the revenues in the more conservative S-4 forecast. That these internal estimates were more accurate is supported by the facts that Illumina's outside auditor concluded that GRAIL was worth roughly $4 billion, which "aligned with prior analysis" that Illumina had concealed, and that GRAIL was eventually spun out for a small fraction of its purchase price.

(ii)    ***GRAIL never expected broad-based reimbursement by 2025.*** As a well-placed FE explained, GRAIL's own internal estimates, discussed in its Long Range Plan ("LRP"), reflected that it never expected broad-based reimbursement by 2025—the key "assumption" touted in the S-4 driving GRAIL's valuation. Rather, GRAIL expected it to occur by 2026 or 2027 at the very earliest—and only if Congress enacted legislation to fast-track reimbursement for tests like Galleri. Absent such legislation, the LRP did not target "broad reimbursement" until 2028 or 2029.

(iii)   ***Even Defendants' internal valuations, which were substantially lower than the ones that were publicly presented, were inflated.*** Both Illumina and GRAIL assumed that approximately 70% of Galleri customers would re-take the test every year, but that number had no basis in reality. In fact, within a year of Galleri's commercial launch, retake rates were confirmed to be only 2-4%—and they never reached past 8-10%, even when Defendants made significant efforts to improve them. That the lower, internal valuations were inflated confirms that the multiples-larger ones in the S-4 were vastly inflated.

### 1.    Illumina Concealed that Its Own Forecasts Ascribed a Much Lower Value to GRAIL

80.    Unknown to investors, the actual projections considered by Illumina's Board and management were far more pessimistic than even the supposedly conservative "Case A" scenario.

81.    As reflected in documents made public through shareholder derivative litigation in Delaware Chancery Court, Illumina's Board reviewed management-prepared slide decks on April 28, 2020 that showed that "[a]n acquisition of GRAIL could generate revenues of >$8B by 2030." That figure was approximately half the revenues projected in the Form S-4's conservative Case A, and one-third to one-fourth of the revenues projected in its more optimistic Case B.

82.     Testimony and documents produced in the FTC proceeding, much of which still remains redacted or under seal, likewise confirm that the actual numbers secretly presented to Illumina's Board were far lower than those disclosed to Illumina's public investors.   Specifically, documents produced in the FTC proceeding show that the actual "Deal Model"—the model that Illumina used to value GRAIL—projected test sales of 1.5 million from 2022 to 2024, and 50.5 million from 2025 to 2030, which translate into revenues that are roughly half those reported in the S-4's purportedly "conservative" Case A.

83.     Consistent with these lower internal revenue estimates, the materials the Illumina Board considered in April 2020 also placed GRAIL's true valuation at levels dramatically lower than what Defendants publicly disclosed.   Specifically, those materials showed valuations for GRAIL as low as $3.3 billion to $11.9 billion—figures far below the valuations Illumina broadcast to investors in the S-4 (or GRAIL's actual purchase price).   The most aggressive and optimistic internal valuation in April 2020 barely approached the low end of the range reported in the S-4 under the purportedly "conservative" Case A scenario, and was a small fraction of the more optimistic $28.2 billion to $43.95 billion Case B.

84.     GRAIL's true value was also internally documented by outside auditors, who likewise concluded that Illumina's over $8 billion valuation had no basis in reality.   As would be revealed in another related Delaware litigation after the end of the Class Period, in May 2023, Illumina management commissioned KPMG to conduct a third-party valuation of GRAIL.   KPMG concluded that its "[c]urrent valuation *aligned with prior analysis* and supports $4.7B independent valuation"—or just over half the $8 billion Illumina paid to buy it only two years before.

85.     The valuation GRAIL eventually achieved when Illumina divested it is similarly at odds with the S-4's valuation of GRAIL of up to $44 billion.   When Illumina divested GRAIL, GRAIL had a market capitalization of under $500

million, even though Illumina provided it with approximately $1 billion in cash in connection with the divestiture. This represented an approximately 93% discount to the over $8 billion Illumina paid for GRAIL less than three years earlier, and an approximately 99% discount to the $44 billion top-of-the-range valuation provided in the S-4.

### 2. GRAIL Never Expected Broad-based Reimbursement by 2025

86. The projections and valuations contained in the November 2020 S-4 were also false and misleading because they were based on knowingly false "assumptions" about when Galleri would achieve "broad reimbursement"—*i.e.*, when insurers would start to cover Galleri widely, allowing it to generate significant revenue.

87. The November 2020 S-4 stated that the projections it contained were prepared in August 2020 and reflected GRAIL management's "best currently available estimates and judgments" and management's "reasonable assumptions" about GRAIL's financial performance. Specifically, the S-4 stated that these financial forecasts "were prepared on a reasonable basis, reflected the best currently available estimates and judgments at the time of preparation, and presented as of the time of preparation, to the best of GRAIL management's knowledge and belief, the reasonable projections of the future financial performance of GRAIL," were "prepared utilizing GRAIL's historical internal forecast approach," and subject to judgments and assumptions "considered reasonable by GRAIL management as of the date of their use in preparing the GRAIL Forecasts."

88. Among those assumptions were key ones about when "broad reimbursement" would be achieved. The purportedly conservative Case A forecast assumed that "broad reimbursement would be achieved in calendar 2025," which management forecasted would significantly increase the acceptance and sales of GRAIL's products. The Case B forecast assumed an even broader acceptance of GRAIL's products across health systems and employers and more significant growth

in coverage after broad reimbursement was achieved in 2025. These assumptions translated directly into expected revenues.

89. The S-4's "broad reimbursement" assumptions were directly contrary to the "available estimates and judgments" at the time the S-4 was prepared. Specifically, while the S-4's "conservative" Case A revenue scenario incorporated the assumption that "broad reimbursement would be achieved in calendar 2025," GRAIL never held that view or planned for that possibility. To the contrary, GRAIL's earliest estimate for FDA approval at the time of the S-4 was in 2026 or 2027, which GRAIL management considered extremely aggressive, and was based on new legislation being enacted.

90. FE5 served as a high-ranking Illumina executive during the period from 2020 through 2023 who had responsibility for, among other things, Illumina business reviews, strategic initiatives, and corporate reporting, and had visibility into senior-level functions and decision-making. During that time, FE5 attended meetings with Defendant deSouza and others from Illumina's Executive Leadership Team, was included on emails with them, and participated in presentations concerning the GRAIL acquisition with them. As FE5 reported, GRAIL's internal plans never assumed "broad reimbursement" in 2025 and instead aggressively forecasted FDA approval—a necessary precursor to "broad reimbursement"—in 2026, and more likely in 2027, at the earliest. As FE5 reported, the S-4's "broad reimbursement" date of 2025 was "pulled out of thin air."

91. GRAIL's long-range plan, or "LRP," reflected the actual goals and assumptions of GRAIL's senior leadership (including Defendants Bishop and Ofman) provided an "aggressive" FDA approval goal of 2026 to 2027. The LRP, which reflected this FDA approval timeline, was contemporaneously available to Illumina's senior leadership in August 2020 as part of Illumina's due diligence of GRAIL. As FE5 confirmed, neither Illumina nor GRAIL's senior leadership ever assumed "broad based reimbursement" by 2025, including because such an

assumption was impossible, and there were no facts or plan to support it. In fact, even the assumption for "broad reimbursement" by 2026 or 2027—i.e., a year or more after the 2025 date referenced in the S-4—was aggressive. This is because it was predicated on Congress passing legislation that would fast-track reimbursement for MCED tests. Under the LRP, without such legislation passing, reimbursement was not likely until 2028 or 2029.

### 3. Even Defendants' Internal Valuations, Which Were Substantially Lower than the Ones That Were Publicly Presented, Were Inflated

92.    That the S-4's public forecasts and valuations had no basis in reality is further confirmed by the fact that the corresponding internal estimates—which were themselves much lower than those that were publicly reported in the S-4—were *still* inflated by baseless assumptions about the proportion of Galleri customers who would re-take the Galleri test.

93.    Former high-ranking executives at both Illumina and GRAIL reported that the re-take rates used in Illumina's internal modeling were false. As FE5 reported, Illumina assumed that 70-75% of Galleri customers would repeat the test annually, which was an assumption driving early revenues (i.e., before FDA approval or "broad reimbursement"). However, there was no factual data at GRAIL based on market testing at the time of the acquisition to support that assumption. To the contrary, GRAIL's market testing undermined the notion that patients would re-use the test, or that there was any market for Galleri at the prices in Illumina's model. As FE5 reported, GRAIL's pricing elasticity survey results indicated that a sale price below $300 would be required to drive customers to pay for the test, which was something GRAIL could not do given that, at the time, it cost GRAIL $500 to run each test.

94.    In fact, according to FE5, while Illumina assumed a 70-75% re-test rate, in reality, a year after the Galleri launch, in the first part of 2022, just 2 to 4% of first-time Galleri users repeated the test. Addressing this disastrously low re-take

rate became a top priority for Defendant deSouza and GRAIL's senior leadership in 2022, which assigned a dedicated team to undertake a commercial effort to boost that number. But despite months of effort and work, the test re-take rate—i.e., Galleri patients who would take the test every year—never reached more than 8 to 10%. Defendant Ofman was aware of these re-take rates, including because he was involved in determining what GRAIL could say publicly about retaking the test. In fact, rather than support the notion that 70% of Galleri users would re-take the test every year, GRAIL and Defendant Ofman determined that GRAIL could not publicly state that the test should be retaken every year, as GRAIL would have required years of data to support such a claim.

**B.     Defendants Misrepresented Illumina's Ability to "Accelerate" the Galleri Test's Commercialization, Regulatory Approval, and Payor Reimbursement**

95.     Throughout the Class Period, Defendants deSouza and Illumina made several statements touting Illumina's ability to "accelerate" Galleri's commercialization, regulatory approval, and payor reimbursement. For example, on the first day of the Class Period, when Illumina announced the acquisition, Defendant deSouza told investors that Illumina's "reason to acquire [GRAIL] is because we have very clear line of sight into how we can accelerate the plan that they are on today. And we can only do that when they're part of Illumina." He further stated that Illumina did in fact "have a clinical sales team," and also "manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities that were necessary to "accelerate" Galleri's adoption. Similarly, Defendant Bishop told investors that same day that the "merger with Illumina will get the Galleri test to people far faster." In a September 2020 press release, Illumina stated that one of the "Strategic Benefits" of the deal was that it would "Accelerate[] Adoption of NGS-Based Early Multi-Cancer Detection Test to Reach More Patients Faster" by "levera[ging] [Illumina's] global scale, manufacturing and clinical capabilities to support GRAIL's commercialization

efforts, realize the total addressable market potential and drive significant growth in the clinical value chain."

96.    Defendants continued to make similar representations throughout the Class Period.  For example, in August 2021, Defendant deSouza stated that Illumina would accelerate Galleri's commercialization "by many years" because Illumina had "the teams that can work on reimbursement and regulatory approval, and so we can dramatically accelerate getting this test into the hands of people whose lives it could save."  In February 2022, Defendant Febbo stated that the acquisition would "speed the test to market and make it more accessible more broadly, more quickly" because Illumina had "incredible . . . commercial capability, support capability, regulatory capability and reimbursement experience to help bring this test globally."

97.    Consistent with Defendants' statements that Illumina's acquisition of GRAIL would "accelerate" adoption, Defendants represented in the Form S-4 that Illumina entered into the transaction "with the expectation that the Transaction would result in various benefits, including, among other things, operating efficiencies, synergies and cost savings."  "Synergies" represent value that arises specifically from combining two companies together; in other words, the idea that the "whole is better than the sum of its parts."  For example, if, as Defendant deSouza claimed, Illumina had pre-existing "manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities that could accelerate Galleri's adoption, that would create synergies from merging Illumina and GRAIL because the two companies would be worth more as a combined entity than as separate ones.

98.    These statements were important to investors.  SVB analysts concluded in a September 22, 2020 report that, given Illumina's clinical labs, "robust regulatory team," and prior success in clinical markets, "[f]ull ownership lets ILMN leverage their scale to accelerate GRAIL's commercialization" and that "[w]e expect ILMN to significantly improve GRAIL's speed to market and eventual clinician adoption upon launch."  Similarly, after Illumina announced the closing of the acquisition in

August 2021, Canaccord credited Defendants' representations that the acquisition would "accelerate the commercialization and reimbursement efforts for Galleri," while Evercore ISI concluded that Illumina "can now accelerate Grail development timelines." And in January 2022, Piper Sandler concluded that "Illumina can accelerate growth of this market, beyond what an independent Grail would have done otherwise," while Morgan Stanley highlighted Illumina's "substantial experience in driving market access," "deep regulatory experience," and "operational synergies in scaling up capacity and lab infrastructure."

99. As discussed in greater detail below, these statements were materially false and misleading for several reasons:

(i) ***Illumina lacked the capability to accelerate Galleri.*** As FE5 explained, Illumina's Board and senior-most executives specifically discussed how Illumina lacked key infrastructure required to launch Galleri, and how entering the cancer-screening business would require Illumina to acquire and build new capabilities and expertise the Company did not have. Evidence before the FTC confirmed this. For example, the executive in charge of Illumina's Market Access team testified that the Market Access team had a budget of $11 million—a tiny fraction of the $500 million required to achieve the clinical data needed for FDA approval. The Fifth Circuit Court of Appeals ultimately ruled that there was "substantial evidence" supporting the FTC's claim that "Illumina had not established that such acceleration would actually occur, much less shown how it would be achieved."

(ii) ***Illumina never had any plan to accelerate Galleri.*** As FE5 explained, when deSouza first claimed that Illumina would "accelerate" Galleri's adoption to investors, there was no plan, method, or even evaluation of how Illumina would do that. Instead, the former employee confirmed that Illumina's Board and senior executives planned to operate GRAIL as a separate division, with its own leadership and commercial teams. Confirming there was no plan to accelerate Galleri, during the FTC trial, Defendants Aravanis, Bishop and other knowledgeable Illumina and GRAIL executives admitted that they could not quantify and did not model any acceleration of GRAIL by Illumina, and no analysis was performed by the relevant teams at either company to determine the extent of any acceleration Illumina could provide.

(iii) ***Illumina did not expect any synergies through the transaction—but rather hundreds of millions of dollars in dis-synergies.*** Contrary to Defendants representation that Illumina expected "operating efficiencies, synergies, and cost savings," an internal September 2020

Illumina FAQ document addressed to Defendants deSouza and Samad stated the very opposite: "We do not expect material synergies to the transaction." In fact, Illumina actually expected dis-synergies—i.e., increased costs and reduced revenues for the combined company compared to those of the—of hundreds of millions of dollars. The absence of synergies further confirms that Illumina had no architecture or ability to accelerate Galleri.

### 1. Illumina Lacked the Capability to Accelerate Galleri

100. Contrary to Defendants' statements, Illumina lacked any capability to accelerate Galleri. FE5 reported that members of Illumina's ELT—including Defendants deSouza, Aravanis, Samad, and Febbo—and its Board discussed how Illumina *lacked* key infrastructure required to launch an MCED like Galleri. They further discussed that entering into the cancer-screening business by acquiring GRAIL would require Illumina to *fundamentally change its business* and to both *acquire and build new capabilities and expertise that the Company did not have*. For example, these Defendants discussed that because Illumina lacked scalable global clinical testing operations, the Company would have to buy or build those operations in both the U.S. and abroad. Similarly, because Galleri would need to be sold through prescribing physicians, Illumina would need to build a primary care and physician salesforce, which it did not have.

101. Moreover, Illumina admitted during the FTC proceeding that its sales team does not even sell Illumina products to physicians—the target customer for Galleri—and would need to develop that sales force from scratch.

102. Testimony from the FTC action also confirmed that Illumina lacked relevant infrastructure and expertise in FDA approval or insurance reimbursement that would support its ability to accelerate Galleri's adoption. For example, contrary to Defendants' public statements touting Illumina's supposedly "incredible" and "experienced" regulatory and reimbursement team as a key advantage in "accelerating" Galleri's FDA approval, Illumina's Global Market Access head Ammar Qadan, the individual at Illumina responsible for Galleri's regulatory and

reimbursement strategy, testified that Illumina did not have that expertise. Qadan testified that GRAIL would need half a billion dollars to achieve the clinical data needed for FDA approval and market access, and that Illumina's 13-person Market Access group did not have the budget needed for Galleri's clinical tests—its budget was only $11 million.

103. Similarly, FE5, who confirmed that Qadan was the most knowledgeable executive at Illumina concerning the GRAIL reimbursement strategy, reported that Qadan said it would be virtually impossible to get Galleri reimbursed by any major payor (like United Health and other large similar insurers) in the foreseeable future because those payors would require FDA approval and data from clinical studies that would take years to generate.

104. Not surprisingly, Qadan was right, and this is exactly what happened. All of the "Big 5" insurers have designated Galleri as "investigative and experimental (I&E)," "experimental, investigational or unproven," "not medically necessary," "investigational; therefore not covered," and "not covered." The I&E classification effectively blocks reimbursement. As described by one former GRAIL sales manager, "If you get that designation in [the insurers'] claim system, they're not paying for the test, no matter what," as the I&E designation is "a killer from a testing standpoint."

105. Notably, the FTC's decision also confirms that Illumina lacked the ability to accelerate Galleri. After voluminous discovery and trial, on March 31, 2023, the full Commission issued a 98-page opinion barring Illumina's acquisition of GRAIL, finding in relevant part that Illumina and GRAIL had failed to substantiate at all their "claim that the Acquisition will accelerate Galleri's widespread commercialization through faster regulatory approval and payer acceptance." Specifically, the FTC held that, while Illumina and GRAIL bore the burden to establish that the acquisition would accelerate the availability and adoption of the Galleri test by one year, the only competent evidence they proffered was "the

unsupported and vague assertions of management personnel"—namely, Defendant Febbo's testimony that he and others in management "feel that [the acquisition] will improve our regulatory path, it will improve the payers' speed at which they provide reimbursement, it will improve the efficiencies in performing the test, and those will shift the availability of Galleri meaningfully forward by a year." But Febbo conceded that Illumina had not identified any "specific areas" where it could accelerate Galleri's rollout, and both Illumina and GRAIL admitted that they were "unable to substantiate" their acceleration and efficiency claims.

106. In reviewing the FTC record after the Class Period, the Fifth Circuit Court of Appeals made numerous findings that directly contradicted Defendants' statements. It found that the claimed "operational efficiencies" Defendants touted were wholly unsubstantiated, as Illumina "presented no model" or even any "underlying . . . assumptions" to support them. The Fifth Circuit also recognized that Illumina and GRAIL's "acceleration" claims were baseless and that Illumina had no evidence that its supposed "clinical and regulatory infrastructure" and "robust regulatory team for market access" could accelerate Galleri's adoption:

> [T]he Commission, again supported by substantial evidence, found that Illumina had not established that such acceleration would actually occur, much less shown how it would be achieved. For instance, Illumina's own financial modeling of the merger did not assume that Galleri's widespread commercialization would be accelerated. Nor did it account for the costs that would be associated with achieving any such acceleration, such as diverting Illumina personnel to work on GRAIL projects. And, in any event, Illumina had failed to demonstrate that its claimed "regulatory expertise" was superior to that which GRAIL already possessed. Indeed, GRAIL had already obtained breakthrough device designation for Galleri on its own. Illumina, on the other hand, had only ever obtained pre-market approval for one Class III NGS-based diagnostic test, and in that instance, a third party sponsored the clinical study upon which approval was granted.

### 2. Illumina Never Had Any Plan to Accelerate Galleri

107. Consistent with Illumina's inability to accelerate Galleri, Illumina never had any plan to accelerate it. FE5 recounted that, when deSouza first publicly stated that Illumina had a "very clear line of sight into how" it would "accelerate" Galleri's adoption to investors, there was no plan, method, or even evaluation of how

Illumina would accelerate FDA approval. According to FE5, neither deSouza nor anyone else in Illumina's senior leadership had made any attempt to involve personnel from Illumina medical affairs to inquire whether any FDA or reimbursement "acceleration" would be possible. FE5 likewise confirmed that, at the time of the acquisition, Illumina's Board and ELT plan always contemplated operating GRAIL as a separate division of Illumina; that GRAIL would have its own leadership team; and that Illumina and GRAIL's separate commercial teams would report into independent divisions.

108.   Consistent with this, and as confirmed by documents and testimony in the FTC proceeding, neither Illumina nor GRAIL conducted any analysis to determine whether Illumina could in fact "accelerate" Galleri's adoption and neither planned for that possibility. For example, neither GRAIL's Financial Planning & Analysis team (which was led by GRAIL CFO Aaron Freidin and was responsible for assessing the combination) nor GRAIL's Medical Affairs and Regulatory teams conducted any analysis of the extent of any acceleration to FDA approval that would occur if GRAIL were acquired by Illumina. Consistent with this, Illumina's then-CMO, Defendant Febbo, testified that Illumina did not include any acceleration efficiency in its financial model for the acquisition—a fact that was confirmed by Illumina's own expert. Similarly, Freidin testified that Illumina had not provided GRAIL with an estimate of how much acceleration Illumina expected for Galleri as a result of the transaction, and that GRAIL "hadn't done any modeling as if Grail was acquired by Illumina," let alone any analysis of any "potential synergies" or "potential dissynergies" that would result from the acquisition. Not surprisingly, in the FTC action, GRAIL's then-CEO, Defendant Bishop, testified that he could not quantify how much sooner he expected GRAIL to receive FDA approval with Illumina's assistance versus without.

109.   During the FTC proceeding, Defendant Aravanis admitted that any purported "supply chain and laboratory operation efficiencies" arising from the

merger were first identified by the Company's litigation experts the week prior to his March 30, 2021 testimony—*i.e.*, **six months after** deSouza told investors that Illumina had a "very clear line of sight into how we can accelerate" Galleri's adoption. And the findings of the FTC and the Fifth Circuit Court of Appeals, discussed above, confirmed that these made-for-litigation purported efficiencies were illusory.

### 3. Illumina Did Not Expect Any Synergies Through the Transaction—But Rather Hundreds of Millions in "Dis-synergies"

110. Illumina's internal documents confirm that Illumina, contrary to the S-4, Illumina never expected any synergies from transaction, and in fact expected the opposite. An internal September 2020 Illumina FAQ document concerning Illumina's acquisition of GRAIL, which was addressed to Defendants deSouza and Samad, stated: "We do not expect material synergies to the transaction"—meaning that acquiring GRAIL would not generate additional revenue any faster than GRAIL would on its own. Instead, FE5 recalled that, at the time the acquisition was announced, the Illumina Executive Defendants expected that the acquisition would result in hundreds of millions of dis-synergies, reflecting the fact that acquiring GRAIL would not generate additional revenue or cost savings any faster than GRAIL would on its own, but pose an aggregate cost on Illumina.

### C. Defendants Misrepresented Galleri's Ability to Detect 50 Cancers in Asymptomatic Patients, the Clinical Evidence Supporting Galleri's Effectiveness, and Galleri's Prospects for FDA Approval Based on the Clinical Data

111. Defendants falsely touted Galleri's effectiveness on several occasions. To start, in an August 18, 2021 press release, Illumina stated: "***GRAIL's Galleri blood test detects 50 different cancers before they are symptomatic.***" Similarly, in a March 28, 2023, video presentation that was featured on GRAIL's website, Defendant Ofman represented that "Our Galleri multi-detection test can identify 50 different cancers with a single blood draw. And we

can do that with a very low false positive rate, and a very high accuracy to predict in the body any cancer signal is found, and that allows physicians to make an efficient and rapid diagnosis."

112. Defendants also made several other misrepresentations during the Class Period concerning Galleri's supposedly "proven technology" and the clinical evidence underlying such statements. For example, on September 21, 2020, Defendant deSouza stated that, since Illumina had spun GRAIL out in 2016, Galleri's "value has been demonstrated" through the "clinical data required to launch" Galleri that GRAIL had developed. Similarly, in an appearance on Bloomberg TV on April 26, 2023, deSouza described GRAIL as a "proven technology" supported by "large studies that show the efficacy of GRAIL as well as the performance metrics around GRAIL."

113. In addition, Defendants repeatedly touted the state of the clinical evidence supporting Galleri's effectiveness and FDA approval. Throughout the Class Period, Defendants pointed to Galleri's CCGA and PATHFINDER studies, as well as its STRIVE, SUMMIT and United Kingdom National Health Service (or "NHS") studies, as supporting Defendants' publicly represented FDA submission timeline of 2023 and future broad reimbursement. For example, on March 2, 2021, Defendant deSouza told investors that "[W]e don't believe additional studies are necessary for Galleri to be successful," and that, accordingly, GRAIL's intent was "to do an FDA submission in 2023 and then pursue broader reimbursement."

114. Defendants' false statements about the quality of the clinical data backing Galleri gave credence to their false statements about the timeline for Galleri's FDA approval—a necessary precursor to broad-based payor reimbursement and the basis for the publicly reported valuation of GRAIL.

115. These representations were material to investors. For example, Wolfe Research noted in a December 2020 report that Galleri's "screening for >50 cancers is favorable relative to current breast/colon cancer methods" and that the STRIVE

and SUMMIT studies would "secure reimbursement by showing efficacy in both low and high-risk populations." Piper Sandler noted in a December 21, 2020 report that GRAIL represented an "underappreciated" opportunity given the expected FDA submission in 2023 "supported by STRIVE (~100k women) and SUMMIT (~25k heavy smokers that will also have low-dose CT scans) data." Similarly, SVB noted in an April 7, 2021 report that launching Galleri as an LDT would generate "robust 'real world' clinical data which can be used in future FDA submissions," and that GRAIL would seek FDA "approval in 2023 with a dossier of clinical evidence including STRIVE, PATHFINDER, CCGA, SUMMIT, and real-world data from early commercialization efforts."

116. As discussed in greater detail below, these statements were materially false and misleading for several reasons:

(i) ***There was no evidence that Galleri could detect 50+ cancers in an asymptomatic population, or that it was otherwise "effective."*** Record evidence in the FTC proceeding demonstrated that there was "simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population." In fact, GRAIL's own expert conceded that Galleri "has been clinically shown to detect only seven types of Stage I through Stage III cancer in an asymptomatic population." Moreover, Galleri's real-world performance showed that Galleri was not effective, prohibitively costly, and ineffective at catching early-stage cancer.

(ii) ***The Galleri studies were insufficient for FDA approval.*** The FDA specifically informed Defendants in meetings in 2019 and in formal written feedback in February 2020 that GRAIL's Galleri studies were insufficient to support approval because they did not measure the test's effectiveness in its intended population, due to patient demographics in the tests and the fact that some tests were being conducted in the UK, which has a different standard of care. In the FTC action, Defendants' own experts admitted that it would take "seven to ten years at minimum" to conduct the prospective, interventional clinical study needed to demonstrate the effectiveness of the cancer screening test in an asymptomatic population. And several well-placed former employees reported that it was widely known and confirmed by senior executives at GRAIL that the FDA would never approve Galleri as a 50-cancer screening test.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    41
CASE NO. 3:23-cv-02082-LL-MMP

1

2

      **1.**     **There Was No Evidence that Galleri Could Detect 50+ Cancers in an Asymptomatic Population, or that It Was Otherwise "Effective"**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

    117.   Contrary to Defendants' representations, and as confirmed by both the FTC and a knowledgeable former Illumina employee, there was no evidence to substantiate that Galleri could detect 50 cancers in an asymptomatic population. Following discovery, the FTC concluded that Defendants' statement that Galleri "has demonstrated it can simultaneously screen for more than 50 types of cancer in asymptomatic patients and accurately localize the cancer in positive cases (i.e., detect cancer signal of origin)" was "simply false" because the clinical evidence showed it could only screen for seven cancers out of the advertised 50. In truth, and as corroborated by testimony by Defendant Ofman and Illumina's own experts, the FTC concluded that there was "simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population." Defendant Ofman admitted in the FTC proceeding that the trial required to demonstrate Galleri's ability to detect 50+ cancers in an asymptomatic population would "require hundreds of thousands of people" and would take years. And GRAIL's own expert admitted that Galleri "has been clinically shown to detect only seven types of Stage I through Stage III cancer in an asymptomatic population."

19

20

21

22

23

24

    118.   GRAIL's clinical trials were therefore not sufficiently powered to obtain FDA approval of Galleri's purported ability to detect 50 cancers in an asymptomatic population. Former Illumina and GRAIL employees corroborated these facts. FE3 worked with both Defendants Aravanis and Ofman over his over-decade long career at Illumina and GRAIL and served as Associate Director of Key Accounts at GRAIL from 2020 through 2021.[2] FE3 reported the same thing as

25

26

27

28

[2] FE3 served as Associate Director of Key Accounts at GRAIL from 2020 through 2021. Prior to this, he served in various roles at Illumina, including as an Executive Account Manager from 2008 through 2020 and as a Clinical Specialist at Illumina from 2017 through 2020. During this time, FE3 worked with both Defendants

Defendant Ofman: he recounted that such a trial would take 20 years, if it could be conducted at all, including because certain of the 50 cancers were so rare there simply was not enough data to conduct a sufficiently robust trial: "It was impossible to design or afford a trial of that size."  FE3 also confirmed that none of the in-progress or proposed clinical trials would assess that outcome.

119.    FE3 further explained that it was common knowledge inside GRAIL that the FDA had informed GRAIL that none of the clinical data generated for Galleri was sufficient for FDA approval of the MCED test and its purported ability to detect 50 cancers.   As FE3 explained and record evidence in the FTC proceeding confirmed, there was no viable pathway to FDA approval because the FDA required clinical evidence that Galleri could in fact screen for 50 types of cancer, as Defendants publicly represented—but that this was an insurmountable task in light of the lack of any in-progress or proposed clinical trial or trials that would assess that outcome.  As the former consultant confirmed, even well after the end of the Class Period, GRAIL did not have an agreement with the FDA on a study design that would support FDA approval—let alone the kind of clinical study results required for approval.

120.    Former GRAIL and Illumina employees responsible for Galleri's clinical and commercial strategy also confirmed that the FDA would never approve Galleri as a 50-cancer test.   As FE2, FE3, and FE5 explained, it was widely understood at GRAIL and Illumina that Galleri would never obtain FDA approval for 50 cancers.[3]  According to these witnesses, while it was conceivable the FDA

Aravanis and Ofman.

[3] FE2 worked as a Director of Key Accounts at GRAIL from April 2020 through January 2022. FE2's team was charged with implementing a commercial effort to have health systems and hospitals pay for the Galleri test. He participated in meetings with Senior Vice President of Market Access & Health System Partnerships at GRAIL Mark Morgan, who reported to Defendant Ofman, to discuss the company's commercial strategy.

could one day approve a test for 5 to 10 cancers, there was no realistic possibility GRAIL could achieve FDA approval for the 50 cancers that Galleri supposedly screened, as Illumina and GRAIL publicly represented.

121.   Galleri's actual real-world performance provides further evidence that Defendants' Class Period statements about Galleri's effectiveness were false when made.  In one such "real-world" experiment involving the San Francisco Firefighters Cancer Prevention Foundation, the test did not identify the statistically expected number of cancers, provided false positives for half the cancers it did identify, and missed at least three cases of confirmed cancer.  In other words, the exercise showed Galleri to be a disaster.

122.   In that example, GRAIL provided 1,786 Galleri screenings to a group of San Francisco firefighters and their family members, a "high risk" group for certain kinds of cancer.   During that testing round, which was conducted on December 6, 2022, Galleri generated six false positives and identified only five instances of cancer.  As the clinicians Lead Counsel consulted noted, such a result is alarming in light of the fact that, based on statistical experience, cancer should have been detected in about 29 (not five) of the 1,786 tests.  Moreover, of the five instances in which cancer signals were identified, two individuals already knew they had cancer to begin with, and all of the instances of detected cancer were at a "late stage," where the cancer was too advanced to make any difference for the patients.

123.   Galleri also missed at least six instances in which patients actually had cancer—failing to identify instances of melanoma, prostate cancer, and lymphoma that were identified by private doctors just months after the Galleri test indicated "no cancer signal."   About six months after the screenings, additional firefighters reported that they had been diagnosed with cancer, even though Galleri had shown "no cancer signal" for them. Further, in one instance in the trial, Galleri generated a false positive, leading the patient to undergo a painful bone marrow biopsy procedure. In that case, the bone marrow biopsy, which is clinically shown to

potentially involve the "worst possible pain" a patient can experience, revealed that there was, in fact, no cancer.

124.    According to Tony Stefani, the organization's founder, the screenings demonstrated that the probability of catching an early-stage cancer through the Galleri test was "negligible," and the screenings only caught "some serious cancers at a later stage," which likely would have been detected within one or two months without the test.  In addition, as Stefani noted, the price of the tests—over $1.1 million, more than 10 times the amount the organization had spent on other cancer prevention studies or tests—was "ridiculous."  Given the test's high costs and useless real-world performance, Stefani stated that Galleri was a total "disappointment" and that the foundation had been sold a "bill of goods."  Despite this, GRAIL nonetheless prominently featured the trial on its website and in marketing materials as an example of how "[m]ulti-cancer early detection screening can be critical for those at elevated cancer risk."

125.    Another Galleri testing round funded by the City of Mesa, Arizona at the Vincere Cancer Center in Scottsdale beginning in October 2021 produced similarly abysmal results.  In that instance, 2,000 first responders were screened, but the test missed at least 28 cancers, leading the program's director to conclude that Galleri "gives a false perception that you have cancer or you don't."  The test's sensitivity in the Mesa program (6.7%) was much lower than that publicly reported by GRAIL (29%), and the test missed a staggering 93 of every 100 cancers in the screened population.

126.    Thus, rather than represent a "proven technology" that "really work[ed]" and whose "efficacy" was backed by large clinical studies, as deSouza represented, Galleri's performance had not been clinically validated, and there was no basis to claim it had clinical effectiveness or efficacy.

## 2.    The Galleri Studies Were Insufficient for FDA Approval

127.    Throughout the Class Period, Defendants also misrepresented the quality of Galleri's clinical data in order to mislead investors into believing that FDA approval and "broad reimbursement" would be obtained by 2025.    Among other things, Defendants pointed to Galleri's STRIVE, CCGA, PATHFINDER, SUMMIT, and the United Kingdom National Health Service (or "NHS") studies in glowing terms as supporting Defendants' publicly represented FDA submission timeline as early as 2023, with broad reimbursement and extraordinary revenues achieved shortly thereafter.    For example, deSouza stated on March 2, 2021 that "*we don't believe additional studies are necessary for Galleri to be successful*" from either a "performance perspective" or a "launch perspective," and that GRAIL's intent was "to do an FDA submission in 2023," with "broader reimbursement from CMS and private payers" to follow.    Similarly, on a May 5, 2022 call with analysts and investors, when asked by an analyst about the "timeline for FDA approval of Galleri," Defendant deSouza stated that GRAIL "powered the studies they need sufficiently," and that "the dialogue have been constructive with the FDA."

128.    Contrary to these representations, and unknown to investors, Defendants had been directly informed by the FDA prior to the beginning of the Class Period that GRAIL's set of proposed studies would not be sufficient, nor sufficiently powered, to obtain FDA approval for Galleri.    The FDA privately informed GRAIL that FDA approval required clinical evidence to demonstrate the test's actual benefits—i.e., an ability to improve patient treatment decisions—for the intended test population, which the studies did not do.

129.    As reflected in private communications with the agency quoted in the FTC proceeding, the FDA informed GRAIL senior management, including in May 2019, that its prospective, observational STRIVE study was not sufficient for FDA approval.    This was because GRAIL could not "directly confirm the results of [its] test nor will [GRAIL] assess how the test results impacted patient treatment

decisions."  The FDA further told GRAIL that the STRIVE study would not support approval because it was not sufficiently representative of Galleri's intended patient population.  The CCGA, SUMMIT and PATHFINDER studies suffered from these same flaws, as none was designed to assess the right outcomes in the right patient population.  Defendant Bishop conceded at trial that the clinical trials that GRAIL had completed were ***not*** "sufficient" for Galleri to obtain premarket approval, which would instead require "data from some additional, very large clinical trials."  Thus, GRAIL's current and prospective clinical studies were not sufficiently powered for FDA approval—despite deSouza's representations to analysts and investors that GRAIL had "powered the studies they need sufficiently."

130.  Defendant Bishop further admitted in May 2021 testimony that GRAIL was "***still years away from seeking FDA approval*** for its multi-cancer screening test," while Defendants' own experts concluded that it would take "***seven to ten years at minimum***" to conduct the prospective, interventional clinical study needed to demonstrate the effectiveness of the cancer screening test in an asymptomatic population—at least five years longer than Defendants reported in their public approval timeline.

131.  Along similar lines, GRAIL senior management knew and had been informed that Galleri was not going to receive FDA approval based on its NHS or SUMMIT studies, which were to be conducted in the U.K.  FDA regulations are clear that foreign data will support FDA approval only when they are "applicable to the U.S. population and U.S. medical practice," 21 C.F.R. § 814.15, a fact that GRAIL would be required to support with convincing evidence.  But in or around early 2019, GRAIL senior management was informed by the FDA the NHS and SUMMIT trials would be insufficient for FDA approval because of the differences in standard of care between the U.S. and U.K.

132.  Specifically, according to a former industry consultant who was working to develop a cancer detection test for one of GRAIL's competitors and who

had spoken to GRAIL senior management about GRAIL's interactions with the FDA, the FDA told GRAIL that there was "no way" that GRAIL could get approval for the Galleri test using U.K. data because of the differences in standard of care between the U.S. and U.K. Confirming that the NHS and SUMMIT trials would be insufficient for FDA approval, after the Class Period, GRAIL belatedly warned investors of the risk that "data from research conducted outside the United States, including the NHS-Galleri Trail [sic] does not meet the FDA's requirements for submission," including because this "foreign data are not applicable to the U.S. population and U.S. medical practice."

133. The former consultant, who has led cancer detection and therapy research efforts at leading biotechnology companies and testified in the FTC proceeding, reported to Lead Counsel that he and his team had all the information about the implementation of GRAIL's trial with the NHS, and his own discussions with the FDA made clear that there would be no way the NHS data would support FDA approval for Galleri—a fact that was conveyed to GRAIL by the FDA.

## D. Defendants Misrepresented that the Acquisition and Closing the Deal Would "Save Lives"

134. Defendants also repeatedly misrepresented that Galleri, and Illumina's "accelerating" its adoption, would "save lives." For example, in August 2021, Defendant deSouza stated that the merger would save "tens of thousands of lives that would not be saved if we didn't buy GRAIL." These representations continued when Illumina announced in August 2021 that it was closing the acquisition despite the EU standstill, with Illumina's press release stating: "Illumina's acquisition of GRAIL will accelerate access and adoption of this life-saving test worldwide." In the same press release, Defendant Bishop stated that "with Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S. and additional lives in the E.U. over the next nine years."

135.    Analysts credited these representations.  For example, SVB noted in an April 7, 2021 report that "Both CTO Aravanis and CMO Febbo emphasized the importance of bringing early cancer detection technology to the market as soon as possible to save lives."

136.    As discussed in greater detail below, these statements were materially false and misleading for several reasons:

(i)     ***There was no evidence that Galleri could "save lives."***  There was no evidence that Galleri was effective at improving patient outcomes. Moreover, none of the Galleri studies came close to supporting a conclusion that Galleri could "save lives" because the studies did not (and could not) measure whether there was any effect on mortality. And real-world evidence from the SFFCPF and the City of Mesa that was obtained by GRAIL suggested that Galleri had no effect on saving lives, as did analyses by prominent clinicians.

(ii)    ***GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim.***  As confirmed by a former employee who attended weekly internal meetings of GRAIL's Product Market/Regulatory Committee (the "PMRC"), the PMRC determined that GRAIL could not publicly make the statement that Galleri "saved lives." Defendants Bishop and Ofman personally and repeatedly stressed that GRAIL could not represent that Galleri could "save lives" because there was no clinical evidence supporting that claim. This was documented in GRAIL's sales materials, which prohibited sales employees from stating that Galleri could "save lives" because there was no data to support that claim.

(iii)   ***Illumina could not accelerate Galleri, so closing the deal would not save lives anyways.***  The fact that Illumina could not accelerate Galleri meant that closing the deal would not save any additional lives regardless of Galleri's effectiveness.

**1.     There Was No Evidence that Galleri Could "Save Lives"**

137.    Because none of the Galleri studies were designed to test its effectiveness as to patient outcomes, there was no evidence that Galleri could actually "save lives."  In truth, the FDA privately informed GRAIL that FDA approval required clinical evidence to demonstrate that Galleri actually was effective in improving patient outcomes and treatment decisions for the intended test population—i.e., asymptomatic patients over the age of 50 in the United States.

Despite this unambiguous communication from the FDA before the Class Period, none of the Galleri studies actually measured the test's effectiveness for the relevant patient outcomes, including mortality. They were thus wholly inadequate to support the statement that Galleri "saves lives." Indeed, historically, such cancer screening trials entail very large sample sizes (hundreds of thousands of patients) and extended follow-up periods of between a decade and up to 26 years in order to be sufficiently powered to measure statistically significant reduction in mortality.

138. As detailed above, GRAIL's real-world experience with Galleri confirmed that the test would not "save lives." In the San Francisco Firefighters trial, GRAIL provided 1,786 Galleri screenings, generating six false positives, identifying only five instances of actual cancer, all of which were already known or late-stage, and missing more than six instances of cancer—prompting the organization's founder to call Galleri a total "disappointment" where the firefighters had been sold a "bill of goods." The City of Mesa's experience was similar: there, the test missed at least 28 cancers, 93% of the screened population, and had only a 6.7% sensitivity.

139. This was consistent with the accounts of a former member of Illumina's Executive Leadership Team who reported that Defendant deSouza internally admitted his statements that the acquisition would "save lives" were not supported by any actual facts. As FE1 confirmed, despite repeated requests from Illumina's investor relations and communications personnel for supporting data, there was no data to support Defendants' repeated public claim that Galleri could "save lives." In 2023, deSouza himself directed an effort to identify an independent scientist or other backer to publicly praise the GRAIL acquisition and provide legitimacy to deSouza's statements that Illumina would "accelerate" Galleri's adoption and "save lives." According to FE1, who was a member of Illumina's Executive Leadership Team during the Class Period, despite weeks of work and outreach, Illumina was not

able to identify a single credible source willing to publicly make that unqualified representation.  This enraged deSouza, who became increasingly frustrated.

**2.    GRAIL Prohibited Its Employees from Stating that Galleri Could Save Lives Because There Was No Evidence to Support that Claim**

140.    The fact that Galleri was not truly effective, and could not "save lives," was extensively documented in GRAIL's internal records.  Specifically, GRAIL's Product Market/Regulatory Communications ("PMRC") committee held weekly meetings with various product, communications, legal and regulatory executives. The PMRC concluded that GRAIL could not publicly make the statement that Galleri "saved lives."  FE6 and other former employees interviewed by Lead Counsel attended these meetings.[4]  They confirmed that the PMRC's conclusion that Defendants could not represent that Galleri "saved lives" was well known and understood by Defendants Bishop and Ofman, who were aware of the clinical data behind GRAIL and who personally and repeatedly stressed that GRAIL could not represent Galleri could "save lives" because that claim was not supportable.  These witnesses also reported that this admonition was repeated in clear and unequivocal terms in GRAIL's sales and marketing materials, which stated that sales representatives were not allowed to say that Galleri could "save lives" because of the lack of data to support that claim.

141.    Testimony from the FTC proceeding also confirms that it was against FDA regulations and flatly inappropriate for Defendants to suggest otherwise when they lacked any evidence to support that claim.  As Kevin Conroy, Chairman and CEO of Exact Sciences—which acquired GRAIL competitor Thrive Earlier

---

[4] FE6 served as Leader of Medical Affairs at GRAIL from January 2021 through August 2024. During this time, FE6 reported to Defendant Ofman.  FE6's team was responsible for medical training, operations, and promotional and non-promotional review of Galleri.  FE6 was in charge of approving or disapproving advertising claims.  FE6 was further a member of GRAIL's PMRC committee and participated in weekly meetings.

Detection Corp. ("Thrive")—explained during his testimony there: "As a CEO of a company that is regulated by the FDA, one thing we don't do is talk about saving lives as it relates to a specific test . . . as a company offering screening tests, we don't make claims that we save lives."

### 3. Illumina Could Not Accelerate Galleri, So Closing the Deal Would Not Save Lives Anyways

142. Defendants' statements to the effect that closing the deal would "save lives" were false for the independent reason that Illumina could not accelerate Galleri. Thus, Illumina's acquisition of Galleri would have had no effect on the number of lives "saved" by the test.

### E. Illumina Misrepresented the Sources of GRAIL Revenue, GRAIL Revenue Guidance, and the Progress Towards Achieving It

143. Following the launch of Galleri as an LDT in June 2021, and Illumina's closing of the GRAIL transaction in the defiance of the EU stand-still in August 2021, Defendants sought to portray GRAIL as meaningfully contributing to Illumina's revenues in order to reassure investors about their aggressive pursuit of the $8 billion acquisition. For example, Illumina disclosed annual revenue guidance for GRAIL at the January 10, 2022 JPMorgan Healthcare Conference, with Defendant deSouza stating that "GRAIL expects strong revenue in the range of $70 million to $90 million as their Galleri test gains traction." On that same call, Defendant Ofman pointed to the "positive reception to the value proposition of Galleri" by payers, including "the reception by commercial payers and large self-insured employers."

144. A month later, on Illumina's February 10, 2022 fourth quarter 2021 earnings call, Illumina reaffirmed this guidance and gave more detail on GRAIL's current sales experience to justify it. For example, when questioned by analysts about the $70 to $90 million guidance, deSouza emphasized that GRAIL was "seeing traction" with "multiple large employers and payers adopting Galleri."

145.   Defendants repeated this guidance at the February 17, 2022 SVB Leerink Annual Global Healthcare Conference, the February 24, 2022 Citi Research Healthcare conference, and the March 7, 2022 Cowen & Co. Health Care Conference.  For example, at the February 17 SVB Leerink conference, Defendant Samad told investors the $70 to $90 million revenue guidance was "concentrated on the Galleri side with health systems" and that "revenues are coming from . . . the eight health systems that they've signed up."

146.   Defendants continued to tout GRAIL's performance during Illumina's May 5, 2022 first quarter earnings call, with Defendant deSouza reassuring investors that GRAIL "continue[s] to be ***on track*** to meet the revenue outlook that we laid out at the beginning of the year, the $70 to $90 million," despite the lower GRAIL results reported that day.  In doing so, Defendant deSouza pointed to GRAIL's progress in "increasing the number of partners across health systems, employers and insurers . . . up to 34" as evidence of the fact that GRAIL "continue[s] to be on track to meet the revenue outlook."

147.   Defendants' assurances concerning GRAIL's revenue guidance, the source of those revenues, and GRAIL's progress to achieving it, had their intended effect.  Analysts at Cowen, Canaccord, and elsewhere reassessed their valuations of Illumina stock upward in response to the "impressive" guidance numbers, which were "big upside surprise," and were reassured by Defendants' representations.  For example, in February 2022, analysts at Canaccord, Cowen, and JPMorgan, respectively, reported that "Management noted multiple large employers and payers have adopted Galleri," with "GRAIL commentary reflect[ing] healthy early momentum across 1.5K prescribers," and that the revenue guidance came "mostly from Galleri, which was ordered by 11 employers, eight health systems, and >1500 providers."  Similarly, in May 2022, Canaccord analysts were comforted by Defendant deSouza's statements about achieving GRAIL's full-year guidance despite GRAIL's reported first quarter results, noting "We remain impressed by

GRAIL's performance, as Galleri has been prescribed by more than 2,400 physicians and GRAIL has entered into 34 partnerships with innovative health systems and other entities."

148.    Defendants' representations were knowingly false:

(iv)    *GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said it was unachievable.*  Before it was publicly announced, GRAIL senior sales executives, including Michael Vicari, told GRAIL senior management that the $70 to $90 million guidance provided to investors was unsupportable.

(v)    *GRAIL was not gaining traction with health systems, employers, or payers, and the numbers Illumina represented were incorrect.*  There were far fewer health systems, employers, and payers responsible for Galleri sales than Defendants represented, and rather than "gaining traction," sales revenue through these channels were coming in between 0% to 44% of forecasts.

(vi)    *By May 2022, GRAIL was not "on track" to meet the $70 to $90 million guidance but rather clearly doomed to miss it.*  By May 2022, when Defendant deSouza represented that GRAIL was "on track" to meet the $70 to $90 million revenue guidance, total sales revenue to date was 58.5% of forecasts, the supposedly key sales channels for Galleri drivers that Defendants represented were going to help GRAIL meet guidance (health systems, payers, and insurers) had sales revenue of either zero or 7% of forecasts, and it was clear the guidance would be missed.

### 2.    GRAIL's Guidance Lacked a Reasonable Basis and Senior Sales Leadership Objected to Publicly Reporting It Because the Guidance Was Unachievable

149.    The revenue projections Illumina reported for GRAIL were unachievable, and Defendants' public statements bore no resemblance to GRAIL's actual sales experience.  In reality, before Illumina publicly reported the $70 to $90 million guidance, GRAIL's SVP of Sales Michael Vicari objected to doing so and told GRAIL senior management that guidance was unsupportable based on GRAIL's sales experience to-date.  The fact that Vicari had objected to reporting these sales figures in January and that Defendants knew they were unachievable all along was confirmed in an August 2022 sales meeting, before Illumina disclosed that GRAIL would miss its guidance by a wide margin, during which Vicari reminded CEO Bob

Ragusa that he objected to the guidance before it was provided to investors. Ragusa yelled at Vicari during this meeting, and Vicari was terminated shortly thereafter.

150. The GRAIL sales employees responsible for Galleri sales during this time period (in 2020, 2021 and 2022) confirmed Vicari's account and said that it was apparent to GRAIL's senior leadership that the reported guidance was unachievable. For example, FE3 who worked with Defendant Ofman and attempted to sell Galleri to large health systems in 2021, the year before Illumina publicly reported the GRAIL revenue guidance, said that those large healthcare systems would laugh at GRAIL's commercial team because GRAIL was asking for those systems to pay millions of dollars for a test that had no reimbursement. FE3 confirmed that this fact was well known to GRAIL's senior leadership, including Defendant Ofman, including because Defendant Ofman joined FE3 on calls and presentations to health system executives about Galleri. FE2, a former GRAIL Director of Key Accounts who also sought to sell large health systems on Galleri, similarly explained that GRAIL's commercial plan to seek reimbursement from hospital systems and other healthcare networks was preposterous because such providers required detailed clinical data based on patient outcomes and FDA approval before they would consider paying for a test like Galleri. FE2 described the forecasts that GRAIL management developed for 2022 as made up; he understood senior leaders had pushed back on the guidance, but the final forecasts GRAIL issued were ridiculous and not achievable.

### 3. Galleri Was Not Gaining Traction with Health Systems, Employers, or Payers, and Illumina Misrepresented the Numbers of Customers Purchasing Galleri

151. In the first quarter of 2021, each of GRAIL's reported sales channels— health systems, employers, and payers—were performing disastrously and generating sales at a fraction of internal forecasts and none were "gaining traction," as Defendants represented. These facts were confirmed in internal documents, including an April 25, 2022 "Commercial Business Review" provided or available

to GRAIL executives including Defendant Ofman, CEO Ragusa, and CFO Freidin, that showed GRAIL was disastrously behind internal targets. For example, contrary to Defendant Samad's February 17, 2022 statement that revenue was "concentrated" in the "eight health systems they've signed up," in reality, as of March 2022, GRAIL had secured just four "health system" customers in the first quarter, which accounted for $100,000 in sales, a mere *7%* of forecasted revenue ($1.4 million) with "low YTD uptake" in that channel. Contrary to Defendant Ofman's January 10, 2022 statement that Galleri's "reception by commercial payers" was "positive," in reality, as of March 2022, GRAIL secured just *one* new payer customer in the quarter, and *none* of the forecasted revenue ($900,000) for that channel.

152. Similarly, contrary to the 34 secured health system, employer, and insurer "partners" touted to investors by deSouza on May 5, 2022, in truth, the internal document reflected that there were only 11 total employer, health system and payer customers in the quarter—and *no* insurer "partners." Moreover, for Illumina's employer partners, the actual number of employees who were taking Galleri (resulting in sales) were a fraction of forecasts, with employers like Google, Viacom, and Novartis having only 2%, 5%, and 0% of eligible Galleri users actually taking the test. Even Illumina and GRAIL employees refused to take the test. Despite their personal involvement in the product, only 52% of eligible GRAIL and 38% of eligible Illumina employees were taking the test. In other words, Galleri was not "gaining traction" with health systems and employers, as Defendants represented.

### 4. GRAIL Was Not "On Track" to Meeting Its Revenue Guidance in May 2022

153. By no later than the end of the first quarter (i.e., March 30, 2022), GRAIL's actual sales experience confirmed GRAIL would not achieve anything close to the $70 to $90 million revenue guidance Defendants presented to investors. As reflected in the April 25, 2022 Commercial Business Review, total revenues for the first quarter amounted to a mere *58.5%* of forecasted revenue for the quarter—

demonstrating Illumina's $70 to $90 million revenue guidance was not remotely achievable. In fact, the key sales channels that Defendants had publicly represented as driving Galleri sales were drastically short of forecasts, with key segments like health systems coming in at 7% of revenue forecasts; employers coming in at 44%; and payer and insurer channels responsible for *zero* revenue in the quarter. GRAIL did not have any viable path to making up the huge shortfall, and sales were in fact on a downward trajectory. In all events, GRAIL not remotely close to "***on track*** to meet the revenue outlook" of $70 to $90 million, as deSouza told investors on May 5, 2022, but required nothing short of a miracle to meet it. In fact, just three months later, Defendants admitted that the guidance would not be met, and sales would be at least $20 million short of the prior guidance range.

### F. Defendants Falsely Asserted that the Deal Was Conflict-Free and Subject to Arm's Length Negotiations

154. The Illumina Defendants made several false and misleading statements concerning (1) the manner in which the deal was negotiated, and (2) their reasons for entering into and closing the GRAIL deal (in addition to statements touting the acquisition's ability to "accelerate" Galleri and "save lives," discussed above). For example, shortly after the deal was announced, in the November 2020 S-4, Illumina asserted that the deal was "negotiated through an arm's length process." In that filing, Defendants also asserted that talks about an acquisition of GRAIL by Illumina began on July 31, 2020, ***after*** GRAIL began considering an IPO in June 2020.

155. As discussed in greater detail below, these statements were materially false and misleading for several reasons:

> (i) ***The decision to acquire GRAIL was heavily conflicted.*** For example, Defendant Aravanis was heavily involved in the merger discussions in the summer of 2020, and in fact presented the deal to Illumina's Board as one of its sponsors. He held GRAIL shares at the time, which were exchanged for 11,704 Illumina shares as a result of the closing of the very merger that he participated in negotiating. And within months of closing, he sold those shares and more, reaping a $5 million windfall.

---

(ii)    ***Contrary to Defendants' representations in the S-4, talks about the merger began well before July 31, 2020 and involved numerous "unauthorized" communications.***   Prior to that date, Defendant deSouza had several conversations with GRAIL Board members about acquiring GRAIL beginning no later than January 2020. These discussions included ones with Mostafa Ronaghi (GRAIL co-founder), Defendant Klausner (who purchased a huge amount of GRAIL equity after the discussions, in advance of the deal announcement), and Defendant Aravanis (who deSouza brought on board at Illumina to close the deal, and who became one of its sponsors at Illumina).

## 1.    The Decision to Acquire GRAIL Was Heavily Conflicted

156.   Far from being an arm's length negotiation, Illumina's acquisition of GRAIL was heavily conflicted.  Despite the S-4 representing that Illumina and GRAIL began discussing a transaction in July 2020, according to FE5, serious discussions about Illumina acquiring GRAIL in fact began no later than January 2020.  That same month, deSouza was in discussions with a GRAIL Board member who asked that the two meet for a private, in-person meeting to discuss the potential acquisition.  Based upon information and belief, this GRAIL Board member was Defendant Klausner or Defendant Bishop.  Meeting in-person would avoid a written record of their conversation.

157.   Following these high-level communications between deSouza and a GRAIL Board member, deSouza undertook a series of maneuvers to ensure that the GRAIL acquisition would close by installing Defendant Aravanis, GRAIL's then-Chief Scientific Officer, at Illumina.  Defendant Aravanis would go on to serve as one of the "cosponsors" of the deal and lead Illumina's efforts to reacquire GRAIL.

158.   In April 2020, deSouza began working to install Defendant Aravanis as Illumina's Chief Technology Officer.   At the same time, deSouza was also discussing with Illumina's then-Chief Technology Officer, GRAIL co-founder Mostafa Ronaghi, the plan for Ronaghi to relinquish that position, take on a new role of Senior Vice President of Entrepreneurial Development at Illumina, and to serve as a new, additional director on the GRAIL Board.

159.    Immediately after Defendant Aravanis began his job at Illumina in May 2020, Aravanis was tasked with leading the effort to reacquire GRAIL as one of the "cosponsors" of the deal.  As such, he was responsible for convincing Illumina's Board of the merits of the deal and negotiating its terms with GRAIL, his prior employer.  As Defendant Febbo—another of the deal's "cosponsors"—testified during the FTC proceeding, the cosponsors "over[saw] all the activities" related to the acquisition, including evaluating the "business case" for the deal and advising the Executive Leadership Team and the Board.

160.    On August 4, 2020, Aravanis led a meeting to present the acquisition of GRAIL—which was code-named "Valor"—to Illumina's Board of Directors, together with Febbo and another cosponsor, Illumina's then-Chief Strategy & Corporate Development Officer, Joydeep Goswami.  At that time, Aravanis held approximately 1,361,824 GRAIL shares—which would be valued at over $10 million when the acquisition was announced—and was thus personally incentivized to maximize the value of those GRAIL shares in any transaction.  During that presentation, Aravanis touted the market opportunity presented by GRAIL and sought Board approval "to engage with Valor."  In fact, members of Illumina senior management, including deSouza and Aravanis, had already engaged with GRAIL and proposed a $6 billion offer to GRAIL on August 3, two days before.

161.    After GRAIL countered the August 3 offer, in a subsequent August 25, 2020 Illumina Board meeting that Aravanis attended, Illumina's Board authorized management, including Aravanis, to counter with yet another offer of "up to $8.2 billion" for GRAIL.  After further negotiations, on September 1, 2020, Illumina management requested additional funds to make a "best and final" consisting of $8 billion upfront and an additional $1.5 billion for royalties, for a total "offer value up to $9.5 billion."  The Board again authorized Illumina management to make this offer.

162.   On September 6, 2020, Aravanis and other members of Illumina senior management met with Illumina's Board to provide an update on the progress of negotiations.  Notably, in that update, management acknowledged that "formal diligence" focusing on numerous issues surrounding the GRAIL acquisition had not been conducted, despite the multiple offers and counter-offers.  Aravanis also met with Illumina's Board on September 7, 2020 to discuss "Valor's responses and proposals with respect to valuation considerations and payment structures and a post-acquisition revenue share arrangement."   Following further negotiation, Illumina's directors unanimously approved the acquisition during a Board meeting on September 14, 2020—which Aravanis also attended. In fact, as FE5 reported, Defendant deSouza relied on Defendant Aravanis almost exclusively for all information and decisions he made concerning GRAIL.

163.   That Aravanis played such a lead role in the GRAIL acquisition is particularly striking in light of the fact that he offloaded his personally-held Illumina shares almost immediately after the GRAIL acquisition closed.  On August 18, 2021, the day the GRAIL acquisition closed, Defendant Aravanis received 11,704 shares of Illumina stock in exchange for his GRAIL shares, on top of the 5,503 Illumina shares he had previously been awarded in July 2020 and February 2021.  Then, in a highly suspicious series of transactions in October and November, Defendant Aravanis sold 12,065 shares of stock, totaling approximately $5 million in value— disposing of all of the equity he received in connection with the GRAIL acquisition promptly after the merger closed.

164.   As a GRAIL Board member, Defendant Klausner was involved in the personnel changes that facilitated the acquisition, and profited massively through his advance knowledge about the transaction.  Specifically, at the same time deSouza installed Aravanis at Illumina and tasked him with championing the GRAIL transaction and appointed Ronaghi to GRAIL's board in May 2020, GRAIL was in the process of conducting another private fundraising round.  Specifically, on May

6, 2020, two days after Illumina announced that Aravanis would become its CTO and Ronaghi would take a Board position at GRAIL, GRAIL disclosed that it had raised $390 million in Series D financing, including from "two undisclosed investors" and other unidentified backers.

165.   GRAIL's amended Form S-1 filed on September 17, 2020 subsequently disclosed that one of the "undisclosed investors" was, in fact, the British Virgin Islands-registered investment vehicle Milky Way—and that Defendant Klausner, a GRAIL director, was the "founding partner" of Milky Way.  Milky Way's other investors, if any, have never been disclosed.  In other words, Defendant Klausner purchased approximately $125 million in GRAIL stock in GRAIL's Series D round at the exact same time Illumina was making plans to reacquire GRAIL, and while Klausner as a GRAIL director was personally involved in approving significant personnel changes at GRAIL that were intended to facilitate GRAIL's acquisition by Illumina.

166.   Further corroborating the suspicious timing of this massive investment in GRAIL and the influence of GRAIL leadership on Illumina's decision-making, Illumina Board materials produced in related litigation after the Class Period revealed that, according to an anonymous survey of Illumina's directors and officers, "there were multiple streams of unauthorized communications between an Illumina board member and GRAIL board members and the bankers."  Such "unauthorized" communications took place between a GRAIL Board member and deSouza in the early part of 2020, around the same time GRAIL Board member Klausner purchased $125 million in GRAIL stock in GRAIL's Series D round, and continued as the transaction remained pending before GRAIL's divestment.

167.   In September 2020, just four months after Klausner made his $125 million investment in GRAIL's Series D through the "undisclosed investor" Milky Way while simultaneously approving numerous personnel changes intended to facilitate Illumina's acquisition of GRAIL, the shares he purchased would more than

double in value when the acquisition was announced—delivering Klausner over $125 million in risk-free profits. Milky Way was dissolved on July 4, 2023, just weeks after deSouza's resignation from Illumina.

168.   The profits reaped by other insiders as a result of the GRAIL acquisition were similarly eye-popping. Defendant Bishop's GRAIL stake personally netted him over $100 million, while Defendant Ofman's personal stake in GRAIL exceeded $55 million as a result of the deal. And after Defendant deSouza orchestrated the GRAIL acquisition, Illumina's Board rewarded him with approximately $67 million in compensation for the next three years—an extraordinary increase from the $1.9 million he earned in 2019—while at the same time Illumina's public investors saw their investments lose $14 billion in market capitalization.

## G.   Following the EU's Announcement of an "In-Depth Investigation," Defendants Falsely Represented that Illumina Would Cooperate with Regulators and Was Committed to Satisfying Their Concerns

169.   After the European Commission announced on July 22, 2021 that it would conduct an "in-depth investigation" into the transaction over the next 90 working days, a period running up until November 29, 2021, Defendants stated that they would continue to work cooperatively towards EU approval. That day, Illumina issued a press release asserting that it would "continue to work with the European Commission (EC) to ensure that it has the information and assurances necessary to approve this transaction" and "look[ed] forward to presenting our position during [] Phase II [of the EU's] process." During Illumina's August 5, 2021 earnings call, Defendant deSouza reiterated these statements, explaining that Illumina expected to work through the period until the investigation was complete to get the deal to a "conclusion," that "the deal contract last[s] till December 20" and "we are not yet at the stage where the clock has run out."

170.   Analysts credited these assurances. JPMorgan analysts reporting at the time that "management expects to provide a go/no-go update in late November/early December" while Evercore analysts echoed deSouza's August 5, 2021 comments,

citing the December 2020 deadline, and noting it was "possible to get FTC-EU approval by that time frame."

171. Defendants' representations were knowingly false for multiple reasons:

(i)   ***On July 12, 2021, Illumina decided to close the transaction without EC approval.***  Contrary to its representations on July 22, 2021 that Illumina would ensure that the EC received the "assurances necessary to approve" the deal, almost two weeks before, during a July 12, 2021 Illumina ELT meeting, Defendant deSouza and the ELT decided to close the acquisition in defiance of the standstill rather than offer additional assurances or remedies to allay the EU's concerns about competition.

(ii)  ***Confirming the decision, Defendants decided to obtain a remarkable insurance policy to cover their own liability at the same meeting.*** Because closing violated EU merger laws, the ELT recognized that it posed severe personal liability risks for them and the Illumina Board. As a result, at the July 12, 2021 meeting, the ELT decided to purchase highly unusual insurance to indemnify themselves against claims of acquisition-related misconduct: a $300 million D&O insurance policy with an over $72 million premium.  At the same time, the ELT decided to drop coverage for Illumina that could be used pay any fines, instead requiring the Company to fund any acquisition-related liabilities.

### 1.    On July 12, 2021, Illumina Decided to Close the Transaction Without EC Approval

172.  In order to monetize insiders' GRAIL shareholdings, Illumina had to actually close the transaction—which was the moment that GRAIL shares were converted into Illumina stock and cash under the merger agreement.  As described above, Illumina and GRAIL did so on August 18, 2021 despite the fact that Illumina was then under a standstill obligation imposed by its EU regulators and ongoing litigation before the FTC.

173.  According to FE5, who attended ELT meetings during his tenure at Illumina, the ELT made this decision on July 12 during a meeting attended by each of the Illumina Executive Defendants.  This decision followed the EU's communication to Defendants the week before, on July 7, that the concessions Illumina had offered to address the EU's concerns were insufficient, and that Illumina had until July 14 to offer additional remedies to address the regulator's

concerns.  At the meeting, the ELT concluded that Illumina would not offer any additional remedies, and instead agreed that Illumina would simply pay any fine assessed by the EU, even though the executives understood and discussed that such a fine could amount to 10% of Illumina's annual revenues.  The ELT also discussed that, upon closing, GRAIL would be held separate and that no integration activities would be undertaken.  Defendants thus understood there could be no practical way for Illumina to "accelerate" Galleri's adoption while GRAIL remained separate.

### 2. Confirming the Decision, Defendants Decided to Obtain a Remarkable Insurance Policy to Cover Their own Liability at the Same Meeting

174.    Unknown to investors at the time, Illumina's senior leadership and Board of Directors secured an extraordinary insurance policy to cover their own personal liability for pursuing the transaction, at tremendous cost, all while leaving the Company itself to self-insure.  Specifically, at the July 12, 2021 ELT meeting attended by each of the Illumina Executive Defendants, when Illumina's senior leadership determined to proceed with closing in defiance of the EU standstill, they also required the Company to secure $300 million in D&O insurance to cover their personal liability for doing so.

175.    Significantly, according to FE5, who attended ELT meetings during his tenure at Illumina, the ELT discussed that the Company would fund any EU fine, which would not be covered by the D&O policy.  The decision to obtain $300 million in insurance was based on Illumina's assessment of what it would cost to "settle" any claims brought against the Board and management for causing Illumina to incur damages for closing in defiance of the EU standstill.  The ELT acutely appreciated and discussed that the cavalier move to defy the EU regulators posed significant litigation, reputational and other risks.  For this reason, at the meeting, the ELT discussed how it would be important for Defendant deSouza to put out Illumina's "narrative" to the market on why the Company decided to close—i.e., that Illumina's

1  acquisition of GRAIL would "save lives"—before the EU issued any orders or

2  statements criticizing the Company for breaking the law.

3     176.   Previously, Illumina had carried far less insurance at a more reasonable

4  cost—a $150 million Side A-C D&O insurance, which benefitted the Directors,

5  Senior Management, and Illumina, at an annual premium of $3.76 million.  But just

6  two weeks before closing on the transaction, Illumina's Board declined to renew that

7  existing insurance, instead opting to obtain twice as much coverage ($300 million)—

8  at a staggering premium of over $72 million, or nearly 20 times the premium from

9  the prior year—just for the Board's and senior management's personal acquisition-

10  related conduct.  Because the policy does not cover Illumina as an insured, the policy

11  does not cover any fines or sanctions that may be imposed on the Company; it only

12  covers  personal  liability  of  Illumina's  executives  and  directors  related  to  the

13  acquisition.  An "Insurance Matters Agreement" produced in related litigation after

14  the Class Period likewise confirms that Illumina's Board and senior management

15  made obtaining this additional insurance protection—and Illumina's payment of its

16  premiums in full—a condition to closing the acquisition.

17     177.   In other words, Illumina's directors and officers, knowing they would

18  incur personal liability in connection with their decision to close the acquisition,

19  decided to make Illumina pay over $72 million to protect them from liability and, in

20  fact, made that a requirement before they would approve the deal—while at the same

21  time abandoning $150 million in insurance for the Company and eliminating any

22  entity insurance altogether, even as Illumina courted massive fines.

23     178.   At the same time, Illumina and GRAIL secretly entered into a letter

24  agreement in which they agreed certain conditions in the merger agreement requiring

25  regulatory approval (including antitrust regulatory approval) had been satisfied—

26  even though neither the EU nor the FTC had approved the deal, the parties were

27  prevented from closing under the EU's mandatory standstill, and the FTC had

28  dropped its injunction precisely because the parties were under a legal prohibition

not to close. The letter agreement further provided that Illumina would indemnify Illumina's and GRAIL's executives for their actions in proceeding with acquisition in the face of the standstill obligation. This highly material letter agreement was never publicly disclosed by Illumina or GRAIL, and its existence was only revealed to the public through its production in parallel litigation in Delaware Chancery Court.

179. Moreover, after securing this remarkable insurance policy and closing the deal in the face of a mandatory standstill obligation, Illumina and GRAIL insiders could and did dump their Illumina shares, reaping tens of millions of dollars in profit. They did so at the same time Defendants continued to make additional false statements to justify their closing of the GRAIL acquisition in defiance of Illumina's regulators, and to present Illumina's false narrative to investors.

## H. Defendants Issued a Series of False Statements in Response to Investor Scrutiny About the Deal and Defend Illumina's D&O Insurance as "Appropriate," "Standard" and "Common"

180. After Illumina closed the deal in August 2021 despite the EU standstill, renowned activist investor Carl Icahn began to ask questions about it, including about conflicts of interest and the D&O insurance policy Illumina's board took out in advance of the closing. In response to Icahn's March 2023 letter calling out the D&O insurance, Defendants claimed that such insurance and "corporate indemnification are standard for Delaware companies," "[a]ll major U.S. public companies, including Illumina, regularly review their D&O insurance to reflect appropriate coverage," and that "it is not uncommon for a company buying another business to increase insurance limits during the acquisition process." And in response to an April 2023 letter to shareholders concerning potential conflicts of interest, Illumina stated that, while Defendant Aravanis held GRAIL shares, he was "recused from any decisions to sign and close the GRAIL acquisition."

181. The market credited these representations. For example, while Canaccord analysts "did not expect" the closing of the GRAIL acquisition, they

credited Defendants' assurances concerning the FTC and European Commission proceedings, as well as Defendants' justifications for the acquisition: "[W]e reiterate our view that regulatory opposition surrounding the merger is unfounded," and that Illumina "believes it can help accelerate the commercialization and reimbursement efforts for Galleri." Indeed, Canaccord analysts specifically sought out Illumina's assurances, complaining that they lacked "context (or historical analogy)" to assess whether Illumina's insurance was "unusual" or significant.

182. These statements were materially false and misleading. To start, as detailed above, ***Illumina's insurance was anything but "appropriate," "standard" or "common"—it was highly unusual***. The bespoke $300 million insurance policy Illumina secured was multiples Illumina's prior coverage, cost an extraordinary $72 million, was acquired to cover the personal liability the Illumina Executive Defendants knew they were incurring, and was acquired while relinquishing entity coverage that would have protected Illumina against fines Defendants knew they were courting by their decision to close. Rather than act "appropriately" in securing the insurance, as a Delaware Chancery Court later ruled, the insurance reflected Defendants' understanding that closing in the face of the EU standstill would result in personal liability and supported a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law."

183. In addition, as detailed above, the statement that Defendant Aravanis was "recused from any decisions to sign and close the GRAIL acquisition" was highly misleading because ***Aravanis played a central role in the Board's decision to acquire GRAIL***. As detailed above, Defendant Aravanis participated in the Illumina board's decision-making process as one of the "co-sponsors" of the deal; participated in the negotiations; and was brought to Illumina by Defendant deSouza, with the knowledge of GRAIL's insiders, to serve in that role.

## VI.  LOSS CAUSATION—INVESTORS WERE HARMED AS A SERIES OF DISCLOSURES CONNECTED TO DEFENDANTS' FRAUD

**TRIGGERS MASSIVE DECLINES IN THE PRICE OF ILLUMINA SHARES**

184. The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) ("*First Solar*"). The test for loss causation "requires no more than the familiar test for proximate cause," and there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754. Pleading loss causation does not require that the disclosure at issue reveal a fraud – as the Ninth Circuit has held, loss causation can be proven "by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.*

185. Here, Lead Plaintiffs allege Defendants' misrepresentations were a substantial factor in causing their economic loss as recognized in *First Solar*. As in many frauds, the full revelation of the "truth" has not yet occurred in this case. Rather, investors' losses here were caused when portions of the "***relevant*** truth about the fraud began to leak out." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (emphasis added). That happened when investors learned that, contrary to Defendants' representations: GRAIL was worth a fraction of what Defendants' portrayed; its Galleri test was ineffective and problematic; FDA approval and "broad reimbursement" would not occur for years, if ever; Illumina could not "accelerate" this timeline anyway; and the acquisition was not the product of an "arms' length negotiation" and was driven by self-interest and undisclosed conflicts of interest that were covered up by Defendants' failure to comply with GAAP.

186. Throughout the Class Period, Defendants made a series of materially false and misleading statements concerning these subjects, including by misrepresenting GRAIL's valuation and financial projections, Illumina's ability to accelerate Galleri's commercialization, Galleri's efficacy and prospects for FDA approval, and Defendants' justifications for pursuing GRAIL. Defendants'

misrepresentations were intended to, and did, create a misleading impression about GRAIL which inflated the value of Illumina's shares during the Class Period. Class members purchased Illumina shares at these inflated prices and were harmed when Illumina's share price declined in response to disclosures related to the facts that Defendants misrepresented or omitted, and the artificial inflation was removed.

187. Further, it was foreseeable that Defendants' materially false and misleading statements and half-truths would artificially inflate or maintain the existing artificial inflation of the price of Illumina common stock. It was also foreseeable to Defendants that the disclosures would cause the price of Company stock to fall as the artificial inflation caused and maintained by Defendants' misstatements and half-truths and scheme to defraud was removed. According to FE5, Defendant deSouza said GRAIL was only one of two things during the Class Period that investors cared about and moved Illumina's stock price—an acknowledgment he understood Defendants' statements about GRAIL impacted Illumina's share price.

## A. FIRST LOSS CAUSING EVENT—Contrary to Defendants' Prior Representations, on August 18, 2021, Defendants Close the GRAIL Acquisition in Violation of the Automatic Standstill

188. On August 18, 2021, after market close, Illumina surprised investors by announcing that it had closed the GRAIL acquisition in violation of the European Commission's standstill obligation. This disclosure contradicted Defendants' prior statements that Illumina was cooperating with European regulators to provide any needed "assurances" and would follow EU merger law and not close the transaction until receiving approval to do so.

189. Numerous reporters and analysts immediately tied the disclosure to Defendant deSouza's contrary representations just two weeks earlier that "we are working [with] both the FTC and the European Commission to get approval" to close by December 20, 2021]" and Defendants' statement on July 22, 2021 that "Illumina

will continue to work with the European Commission (EC) to ensure that it has the information and assurances necessary to approve this transaction."

190.   At the time, analysts had repeated Defendants' false assurances about Illumina's purported plan to work to satisfy EU regulators in valuing Illumina shares.  For example, UBS noted on August 6, 2021, that "[m]anagement continues to strike an optimistic tone on GRAIL, despite the EC review process." Canaccord reported on August 6, 2021 that Illumina was "working with the FTC and the European Commission ***to obtain approval*** by December 20." JPMorgan similarly reported that Illumina "***remains committed to making its case with regulators***" while Wolfe Research noted that "[m]anagement remains committed to the deal" and was "***working . . . to get approval ahead of the December 20th deadline***."

191.   On August 18, 2021, when Defendants announced the close of the merger, investors and analysts reacted with surprise.  For example, Canaccord noted the closing came as a complete surprise given deSouza's prior representations, noting that it "believe[d] the merger would close, but under different circumstances" and closing before approval was "premature." Cowen analysts described the announcement as "a surprising and seemingly aggressive tactical move," while Bank of America analysts said it was "surprising and aggressive."  In direct response to the disclosure, SVB analysts downgraded Illumina shares because of the "rising uncertainty with [Illumina's] action yesterday to close the GRAIL acquisition," explaining that "closing without clearing all the regulatory hurdles raises more questions than it answers for investors."

192.   In response to these disclosures, the price of Illumina common stock declined nearly 7.9%, from a closing price of $510.61 on August 18, 2021, to a closing price of $470.36 on August 19, 2021 on extraordinarily high trading volume. The fact that Illumina shares were bought and sold at far greater volumes the day after the August 18 disclosure reflects that market participants viewed the announcement as new and important, and impacted the value of Illumina shares.

193.    As noted above, the August 18, 2021 disclosure was causally related to Defendants' misrepresentations concerning, among other things, Defendants' earlier misrepresentations about Illumina's "commitment" to work with EU regulators and provide the necessary "assurances" to obtain approval.    The August 18, 2021 disclosure revealing that Illumina was in fact closing the transaction despite the standstill contradicted these prior false statements, triggering a price decline that removed a portion of the artificial inflation in Illumina's stock price.

194.    However, on that same day and in the days that followed, Defendants continued to make false and misleading statements to reassure investors concerning the acquisition and their reasons for closing. Those false statements included Defendants' assurances about Galleri's ability to "save lives" and Illumina's ability to "accelerate" Galleri's approval and reimbursement. For example, in the press release announcing the closing of the merger, Illumina stated that "the deal will *save lives*." Defendant Bishop stated that "[t]he merger with Illumina will get the Galleri test to people *far faster*." Similarly, the next day, Defendant deSouza appeared on CNBC's Power Lunch to reassure investors about GRAIL and stem the decline in Illumina's share price.    In doing so, Defendant deSouza repeated false and misleading statements concerning Illumina's ability to accelerate reimbursement and save lives, stating that "if we accelerated reimbursement in the US by just 1 year, over 10,000 lives could be saved."



195.    The media and analysts credited and repeated these misrepresentations, which buoyed the price of Illumina shares and kept them artificially inflated. For example, on August 19, 2021, an article in *Front Line Genomics* titled "Illumina closes $8bn Grail merger," reported that Illumina and GRAIL "claim the deal will save lives by making early detection screening available to as many people as possible." Defendants' positive (but false) statements about GRAIL stunted the decline in Illumina's share price, which reacted immediately in response to deSouza's comments on CNBC, rebounding slightly just after his comments.

**B.    SECOND LOSS-CAUSING EVENT—Undermining Defendants' Prior Representations, on November 23, 2021, Prominent Clinicians Raise Serious Doubts About Galleri's Clinical Validity**

196.    On November 23, 2021, three leading pathology, pathobiology, and biochemistry clinicians published an article in the widely-respected peer-reviewed journal *Diagnostics*, titled "Can Circulating Tumor DNA Support a Successful Screening Test for Early Cancer Detection? The Grail Paradigm." Their independent, expert analysis of "the latest experimental data from Grail's clinical trial," as set forth in the article's abstract, "confirmed the low sensitivity for early cancer detection" and generally "cast[] doubt" on whether Galleri "could become a viable pan-cancer clinical screening tool."

197.    The article rebutted GRAIL's recent interpretation of its own clinical data, explaining:

> Recently, . . . the Grail group presented a large validation study. . . . Th[e] study was the third and final part of a series of studies by the same authors/company that incorporates their best analytics thus far. . . . These data prompted the authors to conclude that their results support the feasibility of the blood-based multi-cancer early detection test as a complement to existing, single-cancer screenings tests.
>
> In our view, ***the claim that such tests are close to reaching the clinic is premature***, mainly because ***the test's sensitivity is poor for early-stage tumors***. Based on the way patients were enrolled, we can safely predict that about 9 out of 10 small, asymptomatic tumors, which are

amendable to curative therapies, will likely be missed. . . . ***We seriously question whether a successful screening program can be sustained*** with such low [positive predictive values]. The false positive rates will lead to a rather large number of non-cancer patients who will undergo additional, unnecessary, and probably harmful testing.

198.    This new analysis, rebutting recently published conclusions by GRAIL about its own data, directly undermined Defendants' prior false and misleading statements concerning Galleri's (1) ability to "detect[] 50 different cancers before they are symptomatic, and we can do that with a very low false positive rate," (2) the purportedly "peer-reviewed" clinical evidence supporting Galleri's effectiveness, including that the test's "value has been demonstrated" and that the "technology works" (3) Galleri's prospects for FDA approval, and (4) the test's ability to "save lives."    In fact, the *Diagnostics* article directly questioned the veracity of Defendants' prior representations.    The revelations in the *Diagnostics* article triggered a share price decline that dissipated a portion of the artificial inflation in Illumina's stock price that had been created and maintained by these false statements.

199.    In response to the *Diagnostics* article, the price of Illumina common stock declined by more than 3%, from a closing price of $377.15 on November 22, 2021, to a closing price of $365.74 on November 23, 2021.

200.    However, the full truth was not disclosed, Defendants continued to make false statements about Galleri's effectiveness, and Illumina's stock price remained artificially inflated.

## C.    THIRD LOSS CAUSING EVENT—Contrary to Defendants' Prior Representations, Illumina Disclosed Disappointing Grail Revenues Amid Growing Criticism of Galleri

201.    After the November 2021 *Diagnostics* article was published, in the months leading up to Illumina's May 5, 2022 earnings release and investor call, prominent oncologists and other cancer specialists continued to raise questions about the clinical validity of Galleri.  For example, on April 21, 2022, the Director of the

Division of Cancer Prevention at the National Cancer Institute, Dr. Philip E. Castle, published an article titled "Screening for Many Cancers with One Test: Uncertainty Abounds." In the article, Dr. Castle underscored the unanswered questions that remain about MCED tests and their clinical validity, including: "Do these tests actually reduce deaths from cancer?" Dr. Castle further explained that, to achieve the aim of reducing deaths from cancer, "the screening test itself is just the beginning" and "[m]any steps must then occur to confirm that result and, if necessary, treat the cancer." Dr. Castle also explained that "more studies on the underlying basic and clinical science of MCED tests" were needed, including studies to "validate the performance of the MCED tests under development" like Galleri through "large clinical trials."

202. Analysts echoed these critiques during the May 5, 2022 investor call. For example, analyst Jack Meehan from Nephron Research asked Defendant deSouza to respond to Dr. Castle's criticisms that it was not enough for MCED tests like Galleri to "detect[] cancer," but that they also needed to "improve survival." Meehan further asked for the "timeline for FDA approval of Galleri," and Defendant deSouza's "level of confidence that the study is underway" and that "the enrollment [was] large enough to get FDA approved." In response, Defendant deSouza conceded that "it will take a long time to get that kind of data" on Galleri's impact on cancer survival rates, and did not provide any update on FDA approval.

203. Confirming the growing scientific and public consensus about both Galleri's lack of effectiveness and lack of clinical data necessary for FDA approval, Illumina disclosed during its May 5, 2022 earnings call that GRAIL had obtained only $10 million in revenue during the first quarter of 2022, which was flat from the prior quarter and significantly underperformed prior guidance of $70 to $90 million for 2022, falling far short of analysts' expectations based on Defendants' statements.

204. In response to these disclosures, analysts immediately expressed concern about Galleri's pathway to regulatory approval and GRAIL's "long-term

potential." For example, on May 6, 2022, Evercore ISI highlighted GRAIL's lengthy clinical pathway, stating, "we don't think the GRAIL related spending is likely to step down any time soon . . . getting a product FDA approved is the first step – potential commercial and marketing spend could total to Bns over the next 5 to 7 years."

205. Analysts from Evercore ISI and UBS further noted that GRAIL's revenues from the first quarter of 2022 had missed consensus. JPMorgan similarly reported that "the Grail ramp ($10M revenue in 1Q, flat q/q) appears light relative to FY target ($70-90M)."

206. Defendants' disclosures concerning GRAIL's material revenue miss directly related to Defendants' prior misleading statements concerning GRAIL's valuation issued in the S-4 and Defendants' statements concerning the sources of GRAIL's revenues, GRAIL's 2022 revenue guidance, and progress towards achieving that guidance. Defendants' disclosures, which provided investors with new insight into GRAIL's true value and financial prospects, also directly undermined Defendants' prior false and misleading statements concerning Galleri's (1) ability to "detect[] 50 different cancers before they are symptomatic," (2) clinical evidence, including that the test's "value has been demonstrated" and that the "technology works," and (3) its ability to "save lives." The revelation of Galleri's lackluster sales and true financial prospects reflected a lack acceptance and demand spurred by a growing scientific and public consensus surrounding the facts about Galleri.

207. The share price decline triggered by these disclosures caused statistically significant declines in the price of Illumina shares, and dissipated a portion of the artificial inflation in Illumina's stock price. Following these disclosures, the price of Illumina common stock tumbled nearly 14.63%, from a closing price of $291.72 on May 5, 2022, to a closing price of $249.05 on May 6, 2022.

208.    However, the full truth about these issues was not disclosed, and Illumina's stock price remained artificially inflated.    At the same time these disclosures raised concerns about Galleri's prospects, Defendants made other misrepresentations to convince investors of GRAIL's value, including Defendant deSouza's statement reaffirming GRAIL's 2022 revenue guidance of $70-90 million, which he told investors "continue[d] to be *on track*."

### D.    THE FOURTH LOSS-CAUSING EVENT—Illumina Suddenly Announced Its CFO's Departure as *The New York Times* Raised Further Questions About Galleri's Effectiveness

209.    On June 9 and 10, 2022, Illumina investors were provided with two distressing pieces of news causally related to Defendants' false and misleading statements.    First, on June 9, 2022, after market close, investors learned that Defendant Samad would be departing Illumina on July 8, 2022 for Quest Diagnostics, and that Joydeep Goswami, then-Chief Strategy and Corporate Development Officer, would serve as interim CFO.

210.    Second, on June 10, 2022, before market open, *The New York Times* published an article titled "Blood Tests That Detect Cancers Create Risks for Those Who Use Them" that cast further doubt on the clinical validity of Galleri.    The article specifically highlighted how a cancer statistician who was asked to join GRAIL's scientific advisory board at GRAIL's founding was mysteriously asked to leave just prior to Galleri's launch. As the article reported:

Testing Into Overtreatment?

When GRAIL was first formed, its leaders invited Donald Berry, a statistician at MD Anderson Cancer Center in Houston, to be on its scientific advisory board.

"They said they needed a skeptic," Dr. Berry said. "I told them I was a skeptic and I was quite negative. I told them there was this real hurdle — they will have to run very large clinical trials and the endpoint must be survival. They have to show that detecting cancer early is more than just detecting cancer early. It has to mean something."

A few years later, the company restructured its scientific advisory board to include many new experts, and Dr. Berry is no longer a member. He is not sure why.

"Being generous, I'd say they no longer needed my expertise," Dr. Berry said. "Being realistic, they got tired of hearing my complaints that finding cancer early was not enough."

Yet difficult questions from him and other critics remain.

211.   The article went on to cite other leading cancer experts who questioned GRAIL's approach, highlighted the dangers and patient harm involved in failing to conduct clinical trials that showed cancer screening tests actually improved patient outcomes, and warned that GRAIL's approach with Galleri could "bankrupt Medicare."   For example, the article quoted Dr. H. Gilbert Welch, a senior investigator at the Center for Surgery and Public Health at Brigham and Women's Hospital, as stating that "GRAIL proposes to test every Medicare beneficiary every year, making it the screening test that could bankrupt Medicare." The expert also said that "finding cancers earlier could mean just as many deaths, with the same timing as without early diagnosis," since certain cancers may not be able to be cured even if found early.   The article also quoted Dr. Barnett Kramer, a former director of the Division of Cancer Prevention at the National Cancer Institute, as stating that he feared that tests like Galleri would come into widespread use without ever showing they are beneficial and "I hope we are not halfway through a nightmare."

212.   The conclusions of numerous respected clinicians, researchers, and thought leaders concerning Galleri reported by *The New York Times* directly undermined Defendants' prior false and misleading statements concerning Galleri's (1) ability to "detect[] 50 different cancers before they are symptomatic" and "very low false positive rate," (2) the purportedly "peer-reviewed" clinical evidence supporting Galleri's effectiveness, including that the test's "value has been demonstrated" and that the "technology works" (3) Galleri's prospects for FDA approval, and (4) the test's ability to "save lives."   Defendant Samad's abrupt departure, as the person who signed GRAIL's S-4 containing Defendants' false statement concerning the "arm's-length" nature of the acquisition and who certified

Illumina's false accounting treatment of GRAIL, was directly related to Defendants' prior false and misleading statements on those topics.

213.    Illumina's stock price reacted harshly to the negative disclosure. Illumina's share price declined 9% on June 10, 2022, falling from a closing price of $224.47 on June 9, 2022 to a closing price of $204.19 on June 10, 2022.

214.    Defendants publicly responded to counter both disclosures, and to stem a further decline in Illumina's share price.  With respect to Defendant Samad's sudden departure, Illumina provided a purported justification—that Samad was leaving for "personal reasons" to be "near family"—while GRAIL published a formal response to *The New York Times* article on its website that day.

215.    Analysts immediately connected Samad's departure to Defendants' representations about GRAIL.  For example, SVB remarked that Samad's "sudden departure" was "bound to come as a surprise to investors at a time when the company is facing rising competitive noise [and] uncertainty about GRAIL," while Bank of America noted that Samad's departure was troubling in light of the fact that "Grail's Galleri test is in early stages of commercialization" and "remains highly controversial in the investment community."

216.    These analysts and other journalists also tied the stock decline on June 10 to these two events.  For example, in an article published the following Monday, June 13, titled "Illumina Will Be Fine Despite Recent Concerns, Says CEO," *Barron's* reported that Illumina's stock had declined in response to the CFO's departure and *The New York Times* article.  The article pointed out that investors "were discomfited by news that Illumina's chief financial officer will move to another firm" and by news report, which "raised questions about the cancer blood tests that are one of Illumina's big bets."

217.    However, the full truth was not disclosed, Defendants continued to make false statements about Galleri's effectiveness, and Illumina's stock price remained artificially inflated.  For example, GRAIL published a formal response to

*The New York Times* article on its website on June 10, 2022 repeating Defendants' false and misleading statements about Galleri's ability to save lives and further touting Galleri trial endpoints as "scientifically and clinically acceptable," when the opposite was true. Similarly, a June 13 *Barron's* article quoted Defendant deSouza, who said that none of this news should concern investors. Instead, deSouza touted Galleri's supposedly "unusually low rate of false positive readings."

### E.    THE FIFTH LOSS-CAUSING EVENT—Illumina Announced Disappointing Results and Guidance for GRAIL, Leading Analysts to Slash Their Price Targets

218.    On August 11, 2022, after market hours, Illumina issued second-quarter 2022 financial results and guidance that included several discouraging results for GRAIL. Among other things, GRAIL revenues came in 25% below consensus estimates and Illumina reduced fiscal-year 2022 guidance for GRAIL by approximately 25%, from a range of $70-90 million to a range of $50-70, blaming "a more measured pace" of "commercial progress . . . as health systems ramp up."

219.    Analysts reacted negatively to these disclosures, slashing their price targets. JPMorgan discussed the GRAIL revenue miss and guidance reduction, noting that Illumina "is blaming the miss and guidance cut . . . on disappointing GRAIL ramp," concluding that "GRAIL has yet to prove its ability to gain market traction." SVB similarly remarked that "GRAIL revenue was also lower vs our expectations." UBS slashed its price target based on a reduction in "long-term GRAIL upside value of ~$39 from $42," which was based on the "lower-end of the fast growth peer set."

220.    In light of Defendants' disclosures concerning GRAIL, an analyst with *TheStreet.com* asked on August 12, 2022, "Was the Grail Acquisition Worth It?" Elaborating, the analyst explained that "Illumina (ILMN) second-quarter 2022 results suggest the integration of Grail is proving painful…. Grail contributed just $12 million of revenue and an operating loss of $187 million during the three months ended June 2022…. If investors exclude the one-time fines—and they may not be

one-time—then Illumina would've reported operating profit of just $26 million for Q2 2022. That's what happens when your liquid-biopsy subsidiary contributes an operating loss of $187 million."

221.    News reporting also seized on Defendants' purported rationale for lowered GRAIL guidance, which Defendants attributed to delayed uptake by health systems. For example, an article in *Barrons* published on August 12, 2022, titled "Illumina Stock Drops as Gene Sequencer's Results Fall Short" noted that "Sales of Grail's innovative blood test for 50 kinds of cancer were just $12 million in the quarter, up from $10 million in the March quarter. Illumina blamed the reluctance of insurers to cover the test, and yanked down its forecast for Grail's revenue this year to between $50 million and $70 million, from its prior guidance for $70 million to $90 million."

222.    Defendants' disclosures concerning GRAIL's material revenue miss and reduced guidance directly related to Defendants' prior misleading statements concerning GRAIL's valuation issued in the S-4 and Defendants' statements concerning the sources of GRAIL's revenues, GRAIL's 2022 revenue guidance, and progress towards achieving that guidance. These disclosures, which provided investors with new insight into GRAIL's true value and financial prospects, also directly undermined Defendants' prior false and misleading statements concerning Galleri's (1) ability to "detect[] 50 different cancers before they are symptomatic," (2) the clinical evidence supporting Galleri's effectiveness, including that the test's "value has been demonstrated" and that the "technology works," and (3) the test's ability to "save lives." The revelation of Galleri's lackluster sales, revised guidance, and true financial prospects reflected a lack of acceptance and demand for Galleri, including by insurers, health systems, and other payers spurred by a growing scientific and public consensus surrounding the test's lack of effectiveness, its dubious clinical utility, and unproven ability to save lives.

223.   The share price decline triggered by these disclosures dissipated a portion of the artificial inflation in Illumina's stock price that had been created and maintained by Defendants' prior false statements. In response to these disclosures, Illumina's stock price declined significantly, falling 8.4%, from a close of $227.44 per share on August 11, 2022 to close at $208.33 per share on August 12, 2022, on elevated volume.  However, Defendants continued to make misrepresentations about GRAIL, and Illumina's stock price remained artificially inflated.

### F.   THE SIXTH LOSS-CAUSING EVENT—Illumina Disclosed an SEC Investigation

224.   The fallout from the GRAIL acquisition continued when, in August 2023, Illumina suddenly disclosed the departures of two of the key executives responsible for the GRAIL debacle and that the SEC had been investigating the GRAIL acquisition.  On August 9, 2023, Illumina filed a Form 8-K reporting that Defendant Aravanis was leaving Illumina "to pursue another opportunity outside of the company" and that Defendant Febbo had departed on August 7, 2023 after over five years with the Company.

225.   The next day, August 10, 2023, after market close, Illumina revealed that the SEC was investigating the Company's statements regarding GRAIL. Specifically, in its Form 10-Q for the period ended July 2, 2023, Illumina stated:

> In July 2023, we were informed that the staff of the SEC was conducting an investigation relating to Illumina and was requesting documents and communications primarily related to Illumina's acquisition of GRAIL and *certain statements and disclosures concerning GRAIL, its products and its acquisition*, and related to the *conduct and compensation of certain members of Illumina and GRAIL management*, among other things. Illumina is cooperating with the SEC in this investigation.

226.   Analysts expressed concern about these sudden departures and the disclosure of the SEC investigation.  For example, UBS noted that Illumina had disclosed "that it is cooperating with SEC on the investigation regarding GRAIL acquisition."  On Friday, August 11, 2023, *Bloomberg* reported that Illumina's stock was down 3.7% as a result of the investigation, putting it "among the biggest

decliners in the S&P 500 Friday," while *BioSpace* reported on the SEC investigation alongside the departures of Defendants Aravanis and Febbo.

227.  News outlets continued reporting on the SEC investigation over the next several days.  For example, on Monday, August 14, 2023, reports from the *San Diego Union-Tribune* and from *MedTech Dive* highlighted the focus of the SEC investigation and Illumina's ongoing dispute with antitrust regulators.

228.  The announcement of the SEC investigation into Illumina's acquisition of GRAIL, GRAIL's "products," Defendants' statements and disclosures concerning GRAIL, Galleri, and Defendants' compensation relate to Defendants' false statements concerning several topics.  Specifically, the disclosure of the SEC investigation into Defendants' "conduct and compensation" in connection with the "acquisition of GRAIL" directly called into question Defendants' prior representations about Illumina executives' conflicts of interest and  accounting for GRAIL, including Defendants' representations that the transaction was negotiated at "arm's length," that Illumina's D&O insurance was "standard" and "typical," and that Defendant Aravanis was "recused" from Illumina's decision-making about the deal.  The announcement of the SEC investigation into Defendants "statements and disclosures" concerning GRAIL's "products" also directly called into question Defendants' false and misleading statements about the clinical evidence purportedly supporting Galleri's effectiveness, its "proven technology" and "efficacy," its prospects for FDA approval, and its ability to "save lives."

229.  The share price decline triggered by these disclosures dissipated a portion of the artificial inflation in Illumina's stock price that had been created and maintained by Defendants' prior false statements.  The market reacted severely to these revelations, with the price of Illumina common stock declining approximately 2.5% on August 11, 2023, and another 2.96% on August 14, 2023, the following trading day.  Taken together, Illumina's common stock declined from a closing price of $185.12 on August 10, 2023, to a closing price of $175.14 on August 14, 2023.

However, the full truth about these issues was not disclosed at the time, and Illumina's stock price remained artificially inflated.

## G. THE SEVENTH LOSS-CAUSING EVENT—Icahn Filed a Complaint Confirming Defendants' Conflicts of Interest

230.    In the summer of 2023, Andrew Teno was elected to the Illumina Board in connection with Carl Icahn's proxy campaign.  Just weeks after being elected to Illumina's Board and gaining access to internal Board documents and privileged information concerning the GRAIL acquisition, Teno concluded that members of Illumina's Board had breached their fiduciary duties and could not be trusted to make decisions for the Company because they were "poisoned by their personal stake" in the deal.

231.    Armed with this knowledge, Icahn sued certain members of Illumina's Board of Directors, filing a public version of the complaint after market close on October 20, 2023.  The complaint was verified by Icahn Partners LP's Chief Operating Officer, who swore in his accompanying affidavit and verification that the "facts alleged" in the complaint—which were based on extensive citations to internal and privileged Illumina Board documents—were "true and correct."  As Illumina explained in moving to strike the complaint, it contained 47 paragraphs of "direct quotes from and/or descriptions of privileged memoranda and advice provided to [Illumina] by its outside counsel" related to the GRAIL acquisition.  In a submission related to Illumina's motion, Teno testified that his review of some of these materials made him "extremely concerned" about the conflict posed by the Illumina leadership's "personal stake" in the deal, which prompted the lawsuit.

232.    While large portions of the public complaint are redacted and unavailable to the public, the complaint asserted that "[t]he conflicted directors" were "***poisoned by their personal stake in the matter***," could not be "entrusted" with "matters of vital importance to Illumina," and lied about the Company's reasons for closing the acquisition.  Among other things, the complaint sought an order seeking

"disclosure of material facts surrounding the acquisition," as Illumina shareholders were "entitled to know the truth about Defendants' misconduct" and have their fate determined by a Board comprised "of faithful fiduciaries untainted by prior misdeeds, conflicts, and definite personal liability."

233.   At an investor conference the same day the complaint was filed, Icahn rebuked Defendants' conduct, remarking: "Throughout my long, long career as an activist, I have never found it necessary, until today, to sue a board of directors in this manner," and that he had "never seen one as bad as this, and I've been around a long time."

234.   On Monday, October 23, 2023, during mid-day trading, *Bloomberg* published a detailed article highlighting Icahn's allegations that "'[t]he conflicted directors, poisoned by their personal stake in the matter, cannot be entrusted' with the company's next move."  Similarly, *Law360* reported on Icahn's allegations that the individual defendants named in the lawsuit "wrongfully 'entrenched themselves' on the board and 'orchestrated Illumina's widely reported crusade and obsessive quest to complete Illumina's acquisition of Grail."  These reports continued into October 24, when, for example, *MedTech Dive* reported that Icahn was seeking to remove individuals from Illumina's Board due to their "bad faith pursuit of their 'holy grail' acquisition."

235.   The Icahn lawsuit and related press coverage called into question Defendants' prior misleading statements concerning their conflicts of interest, their D&O insurance coverage, and Illumina's accounting for GRAIL.  Specifically, the disclosures were directly related to Defendants' false and misleading statements and half-truths that the deal was an "arm's length" transaction, that Illumina's D&O insurance was "standard" and "typical," and that Defendants had no conflicts of interest in pursuing GRAIL.

236.   The share price decline triggered by these disclosures dissipated a portion of the artificial inflation in Illumina's stock price that had been created and

maintained by those prior false statements. Following this news, the price of Illumina common stock declined in a statistically significant manner by nearly 3%, from a closing price of $119.64 on October 20, 2023, to a closing price of $116.10 on October 24, 2023.

## H. THE EIGHTH LOSS-CAUSING EVENT—Illumina Announced Nearly $1 Billion Impairment Due to GRAIL

237. Shortly after market close on November 9, 2023, Illumina issued an earnings release in which the Company announced that it would be taking an $821 million impairment due to GRAIL. Illumina concluded that GRAIL's "carrying value exceeded its estimated fair value." As a result, the Company "recorded $712 million of goodwill impairment related to our GRAIL reporting unit," as well as $109 million intangible asset impairment, which it attributed primarily to "*a decrease in projected cash flow[s]*" for GRAIL. Later that day, during the Company's earnings call, Defendants also announced that GRAIL revenues were projected to come in "at the low end of the range of $90 to $110 million for 2023," missing analyst expectations of at least $100 million in revenue.

238. The recent GRAIL impairment followed just a year after Illumina took a massive $3.9 billion impairment during the third quarter of fiscal year 2022. At the time of the prior write-down, Illumina executives downplayed it, with CFO Goswami explaining that the "reassessment of GRAIL's book value was really more of an accounting requirement, triggered by some of the regulatory decisions coming out of Europe" and that "[t]he underlying . . . performance of GRAIL in terms of how it's progressing on its clinical results and signing up customers really has not changed" and "in fact has improved a little bit over the last few quarters." The November 2023 write-down, by contrast, had no such exculpatory explanation. Rather, Illumina wrote down GRAIL due in part "to a decrease in projected cash flows"—i.e., because GRAIL would generate less revenue.

239.   Analysts immediately reacted to the news of the new impairment.  For example, Morgan Stanley reported that Illumina "took an $821M goodwill/intangible impairment charge related to GRAIL in 3Q, following the $3.9B charge taken in the same period last year."  Likewise, Leerink Partners noted that Illumina had "recognized a $821 million impairment for GRAIL, which follows a $3.9B impairment in 3Q22."  For its part, Canaccord discussed a potential divestment of GRAIL, stating that the price would likely be "below $3 billion" but that "Illumina may not have much leverage in this situation"—thus suggesting that, even with the additional write-down, GRAIL was *still* overvalued.

240.   Defendants' disclosures concerning GRAIL's write down and disappointing guidance directly related to Defendants' prior misleading statements concerning GRAIL's valuation issued in the S-4.  Indeed, following these disclosures, certain analysts changed their valuation of GRAIL to $0.

241.   Defendants' disclosures, which provided investors with new insight into GRAIL's true value and financial prospects, also directly undermined Defendants' prior false and misleading statements concerning Galleri's clinical effectiveness, "value," "proven technology," and ability to "save lives," among others.  Specifically, the revelation of Galleri's lackluster sales and true financial prospects reflected a lack acceptance and demand that had been spurred by a growing scientific and customer consensus concerning Galleri.

242.   Once again, the market reacted severely to these revelations, and the price of Illumina common stock declined 13.3%, from a closing price of $106.98 on November 9, 2023, to a closing price of $92.79 on November 13, 2023—its lowest trading price in a decade.

243.   The net result of the two impairments was that, within approximately two years of the acquisition closing, Illumina had reduced its valuation of GRAIL by well over 50%.  Analysts now understood that GRAIL was worthless, with UBS reporting on November 10, 2023, that it had assigned "~$0 valuation for GRAIL

(from $2 prior, DCF-based)." Similarly, in a report published after the latest impairment was announced, Barclays had harsh words, and criticized Defendants for their prior representations about GRAIL. As the Barclays analysts put it, GRAIL "burns >$600m of cash per year and has fallen well short of mgmt's targets over the past two years," there was a lack of needed clinical data about "test accuracy," and as a result they would "remain on sidelines until we get clarity on what happens with GRAIL." Similarly, RBC Capital reflected on how Illumina's investors had been burned by the GRAIL acquisition: "Inventing a time machine and convincing his predecessor to forget about GRAIL would have been a good way to gain investor confidence; but yesterday afternoon [deSouza's replacement] Mr. Thaysen did the next best thing: he confirmed the GRAIL divestiture process has begun."

\*          \*          \*

244. Each of the alleged loss-causing disclosures was associated with a statistically significant "abnormal" decline, meaning that the stock price declines cannot be explained by broader market or industry price movements. Each of the nine loss-causing events are also summarized in the chart below. Specifically, the chart below provides, for each loss-causing event, a brief description of the disclosure, the closing price of Illumina shares following the disclosure, a list of related categories of Defendants' false and misleading statements, and the abnormal price decline over that same interval.

| Event | Date* | Disclosure Summary | Related Categories of False Statements | Abnormal % Decline |
|---|---|---|---|---|
| 1 | 8/19/21 | Illumina announces the closing of the GRAIL acquisition. | Statements concerning continued cooperation with European regulators. | -6.168% |
| 2 | 11/23/21 | Clinicians in *Diagnostics* article question Galleri's validity and whether "this test could become a viable pan-cancer clinical screening tool." | Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, (3) prospects for FDA approval, and (4) ability to "save lives." | -2.971% |

| Event | Date* | Disclosure Summary | Related Categories of False Statements | Abnormal % Decline |
|-------|-------|-------------------|----------------------------------------|--------------------|
| 3 | 5/6/22 | Illumina reports a revenue miss due to GRAIL. | Statements concerning GRAIL's valuation and guidance.<br><br>Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, (3) prospects for FDA approval, and (4) ability to "save lives." | -11.294% |
| 4 | 6/10/22 | *The New York Times* reports on the high expense and low clinical validity of Galleri and MCED tests.<br><br>Illumina announces the departure of Defendant Samad. | Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, (3) prospects for FDA approval, and (4) ability to "save lives."<br><br>Statement concerning conflicts of interest and compliance with GAAP. | -4.747% |
| 5 | 8/12/22 | Illumina reports results showing that GRAIL missed analyst estimates. | Statements concerning GRAIL's valuation issued in the S-4 and GRAIL guidance.<br><br>Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, and (3) ability to "save lives." | -10.424% |
| 6 | 8/11/23<br>8/14/23 | Illumina discloses that it is the target of an SEC investigation. | Statements concerning conflicts of interest and compliance with GAAP.<br><br>Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, (3) prospects for FDA approval, and (4) ability to "save lives." | -2.669%<br>-3.022% |
| 7 | 10/24/23 | News media report on an Icahn shareholder derivative complaint alleging Defendants' "Personal Stake" in the GRAIL acquisition. | Statements concerning conflicts of interest, D&O insurance coverage, and compliance with GAAP as it related to conflicts. | -4.538% |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    88
CASE NO. 3:23-cv-02082-LL-MMP

| Event | Date* | Disclosure Summary | Related Categories of False Statements | Abnormal % Decline |
|-------|-------|--------------------|-----------------------------------------|--------------------|
| 8 | 11/10/23 11/13/23 | Illumina announces that it will be taking an $821 million write down related to GRAIL. | Statements concerning GRAIL's valuation issued in the S-4.<br><br>Statements concerning Galleri's (1) ability to detect 50 different cancers, (2) clinical evidence, and (3) the test's ability to "save lives."<br><br>Statements concerning conflicts of interest and Illumina's accounting for GRAIL. | -9.150% -5.365% |

*Indicates the days when Illumina's stock price declined in response to the loss-causing event.*

## VII.  POST-CLASS PERIOD DEVELOPMENTS

245.  Events occurring after the end of the Class Period have further confirmed that Defendants knew or recklessly disregarded the truth about GRAIL during the Class Period—and that, in reality, GRAIL was worth a fraction of what Illumina paid to acquire it.

### A.  Illumina Agreed to Divest Grail, But Cannot Find a Buyer and Is Forced to Spin It Out For Pennies on the Dollar

246.  On December 15, 2023, the U.S. Court of Appeals for the Fifth Circuit issued its decision in the matter of *Illumina v. the Federal Trade Commission*, finding that there was substantial evidence supporting both the FTC's March 31, 2023 determination that the deal threatened competition in the market for MCED tests and that Illumina failed to establish that the deal would lead to cognizable efficiencies.

247.  On December 17, 2023, Illumina announced that it had elected not to pursue further appeals of the Fifth Circuit's decision and that it would divest GRAIL through a third-party sale or capital markets transaction with the goal of finalizing the terms by the end of the second quarter of 2024.  In response to Illumina's

announcement, FTC Bureau Competition Director Henry Liu stated that Illumina's "decision to unwind its acquisition" of GRAIL was a "major win for the FTC," as well as "a victory for patients who need affordable, high-quality quality cancer detection tests."

248.   On June 3, 2024, Illumina announced that it would spin GRAIL off to current Illumina shareholders, rather than sell GRAIL to a third party.  Illumina completed the spin-off on June 24, 2024, and GRAIL now trades on NASDAQ under the ticker "GRAL."

249.   Just three days later, on June 27, 2024, Illumina announced that it expected to take well over $1 billion in additional impairments, including all of its remaining goodwill recorded for GRAIL and 75% of its in-process research and development, in the second quarter of 2024.

250.   After Illumina's divestiture from GRAIL, GRAIL had a market capitalization of **under $500 million**—an approximately 93% discount to the over $8 billion Illumina paid for it just a few years ago—even though Illumina provided it with approximately $1 billion in cash in connection with the divestiture.

251.   Significantly, GRAIL's initial filings as a publicly traded company provide further confirmation that Defendants' Class Period representations were false and misleading.  For example, in GRAIL's first Form 10-Q filed on August 13, 2024 contained telling new risk disclosures.  Among other things, GRAIL's belated risk warnings confirmed that the studies it had in place during the Class Period were insufficient for FDA premarket approval—noting that some of its studies "have been or may be conducted in populations (such as our SUMMIT study which was conducted in a population of tobacco users) or under other circumstances which make their results more complicated to interpret or result in data that is more difficult to compare," and that there is a risk that "***data from research conducted outside the United States, including the NHS-Galleri Trial [sic], does not meet the FDA's***

*requirements*," including because "***the foreign data are not applicable to the U.S. population and U.S. medical practice***."

> **B.** **NHS Postponed the Rollout of Galleri Based on Data From the First Year and Key Stakeholders in the U.K. Raise Serious Concerns About Galleri and the NHS-Galleri Trial**

252. Contrary to Defendants' statements that NHS study data would support FDA approval in 2024 and broad-based reimbursement shortly thereafter, the NHS study, to date, has done nothing of the sort. On May 29, 2024, the NHS announced that it would not roll out the NHS Galleri trial as had been originally contemplated based on a data "snapshot" of selected first year results. The NHS reported that it "has reviewed preliminary data from the first year of the NHS-Galleri trial and ***did not find them compelling enough to justify proceeding straight away with a large-scale pilot programme of the test in NHS clinical practice***."

253. The announcement cast further doubt on Galleri's clinical validity. In an article published in the highly reputed medical publication *The BMJ* discussing "mounting evidence against [Galleri's] implementation as a screening tool for early cancer," *The BMJ* reported that "the chair of the independent UK National Screening Committee, has privately voiced 'serious concerns' to Amanda Pritchard, NHS England's chief executive, about the trial and its ability to provide sufficient evidence 'on whether the benefits of testing outweigh any potential harms and at reasonable cost.'"

254. The article further revealed that members of the UK's National Screening Committee ("NSC")—a UK government agency that "advises ministers and the NHS in the 4 UK countries about all aspects of screening and supports implementation of screening programmes" and makes "decisions on what constitutes cost effective NHS screening"—had raised "serious concerns" about Galleri and the NHS-Galleri trial. Specifically, the article quoted documents showing that, in September 2023, NSC members had told the NHS that they would need "'a fair degree of confidence that the major screening questions (eg test

accuracy, diagnosis, treatment, acceptability, ethics) are answered or there is strong reason to believe [Galleri] would meet the criteria'" but that the "Grail test is well short of most of these, so the UK NSC would have been very unlikely to recommend large scale programmatic evaluation without more basic research." The article cited an anonymous NHS source as stating that the "clinical or scientific data doesn't stack up, but that should have come first. This is not the way to do a trial—it should be done transparently. It's not been thought through at all.'"

### C.    Under a New Administration, the SEC Dropped Its Investigation of Illumina, Along With At Least 20 Other Matters

255.    On May 8, 2025, Illumina disclosed that the SEC had dropped its investigation into Illumina's $8 billion acquisition of GRAIL. Notably, the SEC's decision follows a broader pattern of the SEC dropping numerous investigations and lawsuits against corporations under the second Trump administration. As of March 27, 2025, the SEC had dropped at least 18 investigations and cases; numerous actions have been halted since then, and the agency is now pursuing 28% fewer enforcement actions than it did at the same time last year. In addition, the SEC has lost 15% of its staff as part of the new administration's broader effort to reduce staff across the federal government.

## VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

256.    As set forth above and summarized below, numerous facts establish that Defendants acted with scienter when they misled investors about the subjects recounted above. These facts, as set forth above and summarized below, demonstrate that Defendants acted with scienter in making the materially false and misleading statements and half-truths alleged herein.

### A.    Defendants Had Actual Knowledge That Their Statements Were False or at Best Misleading

257.    Defendants possessed actual knowledge that their statements were misleading, or at minimum acted with reckless disregard for the truth.

## 1.  Defendants' Publicly Reported GRAIL Valuations

258.  Defendants had actual knowledge that the Form S-4 touted far rosier projections than the more pertinent, darker projections that both GRAIL management believed were possible and that Illumina and its Board considered in connection with the acquisition.

259.  Defendants deSouza, Aravanis, and Febbo each testified about Illumina's internal "Deal Model" during the FTC proceedings, demonstrating their intimate knowledge of the model. That Deal Model, which was prepared in connection with the decision to acquire GRAIL, projected GRAIL's revenues as just a small fraction of the revenues from the more conservative set of GRAIL assumptions publicly detailed in the Form S-4.

260.  Illumina Board materials from April 2020, which were viewed at minimum by Board members including Defendants deSouza and Thompson, likewise demonstrated that "[a]n acquisition of GRAIL could generate revenues of >$8B by 2030"—approximately half the revenues projected in the publicly-reported conservative scenario.  Importantly, those Illumina Board materials were prepared by Defendant Febbo, then-Senior Vice President of Corporate Development & Strategic Planning Joydeep Goswami, and other senior management at Illumina.  As revealed in filings in derivative actions in Delaware after the Class Period, Illumina management's internal projections valued GRAIL at only $3.3 billion to $11.9 billion—billions of dollars lower than the valuations in Illumina's public SEC filings, which ranged from $11.1 billion to $43.95 billion.

261.  In addition to the Illumina Executive Defendants, GRAIL management, including Defendants Bishop and Ofman, had actual knowledge that the Form S-4's valuation assumption "that broad reimbursement would be achieved in calendar 2025" was baseless and contrary to GRAIL's actual projections.  GRAIL's long-range plan or LRP, which reflected the actual goals and assumptions as determined by Defendants Bishop and Ofman, provided an "aggressive" FDA approval goal of

2026 to 2027—*not 2025*.  Significantly, GRAIL's LRP, which included the 2026 or 2027 FDA projection, was accessible to Illumina Executive Defendants deSouza, Aravanis, Samad, and Febbo.  As Defendant Bishop, Defendant Ofman, and Ammar Qadan (the individual at Illumina responsible for Galleri's regulatory and reimbursement strategy), testified in the FTC proceeding, FDA approval was a necessary precursor to broad reimbursement, and such reimbursement could not be achieved without it.  For example, Bishop testified that FDA approval "will likely be a prerequisite for getting broad-based reimbursement," while Ofman testified that "we don't expect that we'll be able to get Medicare reimbursement without FDA approval, and we don't expect that larger U.S. payers are going to provide coverage for [Galleri] without FDA approval."  Moreover, Illumina's own expert testified that he was "not the source" for the conclusion that Illumina could accelerate the process for Galleri to achieve payer reimbursement.

262.  The account of FE5 confirms that Illumina and GRAIL's senior leadership never assumed "broad reimbursement" by 2025 because there were no facts or plan to support that assumption.  Indeed, even the 2026 or 2027 reimbursement timeline would only have been possible if Congress passed legislation to speed up reimbursement for cancer screening tests like Galleri.  Both GRAIL's LRP (the assumptions of which were determined by Defendants Bishop and Ofman) and Illumina's deal documents (which were accessible to the Illumina Executive Defendants) assumed that reimbursement was not possible until 2028 or 2029 without legislation being passed.

263.  Illumina's internal "Deal Model" further assumed a 70-75% re-test rate when, in truth, Defendants knew that this re-test rate had no basis in reality.  Specifically, according to FE5, there was no GRAIL factual data that Illumina possessed on market testing at the time of the acquisition to support that assumption, nor was there any market or other data supporting that claim at any point during the Class Period.  In reality, in the first part of 2022, just *2 to 4%* of first-time Galleri

users repeated the test. Addressing this low re-take rate became a top priority for Defendant deSouza and GRAIL's senior leadership—including Defendant Ofman, who was involved in determining what GRAIL could say publicly to encourage patients to re-take the test. Rather than help support a 70-75% retake rate, GRAIL's PMRC committee determined that GRAIL could not recommend to physicians that patients re-take the test every year because GRAIL lacked the clinical data needed to support that claim.

### 2.    Defendants' "Acceleration" Misstatements

264.    Defendants had actual knowledge that their statements that Illumina would "accelerate" Galleri's adoption and had a "clear line of sight" to do so by acquiring GRAIL were untrue and without basis, which further supports an inference of scienter.

265.    To start, as discussed in ¶¶107-09, everyone on the ELT, including Defendants deSouza, Aravanis, Samad, and Febbo, knew that there was no plan, method, or consideration as to how Illumina would accelerate FDA approval, payer reimbursement, or Galleri's adoption.

266.    For example, Defendant deSouza publicly stated that Illumina would accelerate Galleri's adoption through Illumina's "clinical sales team," "manufacturing, regulatory, reimbursement, clinical labs, and clinical sales and marketing" capabilities. Similarly, Defendant Febbo publicly stated that the acquisition would "speed the test to market" because Illumina had "incredible . . . commercial capability, support capability, regulatory capability and reimbursement experience to help bring this test globally." However, these Defendants knew that Illumina did *not* have those capabilities. Specifically, the ELT—including Defendants deSouza, Aravanis, Samad, and Febbo—discussed how Illumina lacked key infrastructure required to launch an MCED like Galleri and did *not* have a "clinical sales and marketing team" that could sell Galleri to prescribing physicians, but would instead have to hire and build that team. Defendants deSouza, Aravanis,

Samad, and Febbo further discussed how Illumina lacked the "regulatory, reimbursement, and clinical labs" necessary to develop Galleri and run the necessary clinical trials for approval but would have to build or acquire those capabilities, and how Illumina lacked any FDA-approved manufacturing capabilities, as would be required to manufacture Galleri.

267.    Internal documents and testimony in the FTC proceeding corroborate that Defendants had actual knowledge that their statements that Illumina's acquisition of GRAIL would accelerate Galleri's widespread adoption were misleading.  In particular, Defendants knew that neither Illumina nor GRAIL had ever conducted any analysis to determine whether Illumina could in fact "accelerate" Galleri's adoption.

268.    For example, Defendant Febbo, who served on the ELT with Defendants deSouza, Aravanis, and Samad, testified that Illumina did ***not*** include any acceleration efficiency in its financial model for the acquisition—a fact confirmed by Illumina's own expert.  Defendant Febbo further testified that Illumina had not identified any "specific areas where [Illumina could] help [GRAIL] accelerate" Galleri's FDA approval.

269.    Similarly, GRAIL's CFO Freidin testified that GRAIL "hadn't done any modeling as if Grail was acquired by Illumina."  In reality, according to Freidin, when GRAIL agreed to combine with GRAIL in September 2020, GRAIL had not quantified the efficiencies that could result from the combination, let alone conducted any analysis of any "potential synergies" or "potential dissynergies" that would result from the acquisition.  Freidin also admitted at trial that Illumina had not provided GRAIL with an estimate of how much acceleration Illumina expected for Galleri as a result of the transaction—because that estimate did not exist.

270.    Likewise, GRAIL's then-CEO Defendant Bishop testified on August 31, 2021 that he could not "give [] a precise quantification" as to how much sooner he expected GRAIL to receive FDA approval with Illumina's assistance versus

without—despite publicly stating just two weeks before that "The merger with Illumina will get the Galleri test to people *far faster*." Bishop further testified that *no* discussion of any plans to accelerate FDA approval had ever taken place between Illumina and GRAIL, even though documents produced in the FTC proceeding reveal that Defendants deSouza, Aravanis, Febbo had already begun discussing integration planning (i.e., the process of combining two companies) with Defendant Bishop and other high-level executives at GRAIL as early as October 2020.

271. Defendants also had actual knowledge that Illumina did not have the necessary expertise needed to accelerate Galleri. Illumina's Global Market Access head Ammar Qadan, the individual at Illumina responsible for Galleri's regulatory and reimbursement strategy (who also reported to and communicated directly with Defendant deSouza), testified that Illumina did not have the necessary FDA approval or reimbursement expertise necessary for acceleration. Specifically, Qadan testified that GRAIL would need half a billion dollars to achieve the clinical data needed for FDA approval and market access. He further testified that Illumina's Market Access group (which consisted of 13 members and had a budget of $11 million) did not have the $500 million budget needed for Galleri's clinical tests.

272. In addition to Defendants' testimony, internal Illumina documents produced in the in the FTC proceeding confirmed that no such "acceleration" was contemplated or possible. An internal September 20, 2020 Illumina FAQ document concerning Illumina's acquisition of GRAIL that was provided to both Defendants deSouza and Samad stated: "*We do not expect material synergies to the transaction.*" The lack of material synergies demonstrates that Illumina did not expect any financial benefit by combining with GRAIL. For example, Defendant deSouza highlighted Illumina's use of its supposedly pre-existing clinical sales force, reimbursement, FDA approval, and manufacturing capabilities as providing potential synergies. But in reality, as reflected in contemporaneous internal

documents addressed to Defendants deSouza and Samad, these synergies did not exist.

### 3. Defendants' Misstatements Concerning Galleri's Ability to Detect 50 Cancers in an Asymptomatic Population and FDA Approval

273. Defendants had actual knowledge that their statements that Galleri "detects 50 different cancers before they are symptomatic," was a "proven technology," and was supported by "large studies that show the efficacy of GRAIL," were untrue. Defendants also knew that their statement that Galleri had an FDA submission timeline as early as 2023 was false.

274. Contrary to Defendants' representations that Galleri could "detect[] 50 different cancers *before they are symptomatic*," Defendants *knew* that clinical evidence showed Galleri could only screen for seven cancers out of the advertised 50. In fact, the FTC concluded after reviewing the record evidence that there was "*simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population*." GRAIL's own expert conceded that Galleri "has been clinically shown to detect *only seven types of Stage I through Stage III cancer in an asymptomatic population*."

275. Further, despite Defendant Ofman's statement to investors that Galleri could "identify 50 different cancers with a single blood draw," Defendant Ofman knew that there was no clinical data to support this claim. Defendant Ofman admitted at trial that "to find all 50 cancers . . . in a real-world population is going to require hundreds of thousands of people," and that GRAIL's clinical trials were "not designed to do that." In fact, as Defendant Ofman conceded at trial, GRAIL's PATHFINDER study—which supposedly screened 6,600 individuals with no suspicion of cancer and which Ofman described as "a more powerful way to add to our clinical validation than [STRIVE and SUMMIT]"—did *not* provide any clinical evidence of Galleri's ability to screen for more than 50 types of cancer in an asymptomatic population.

276. Numerous well-placed former GRAIL and Illumina employees, including FE2, FE3, and FE5, confirmed that that it was widely known within GRAIL and by its senior leadership that Galleri would never obtain FDA approval for 50 cancers. According to these witnesses, while it was conceivable the FDA could one day approve a test for 5 to 10 cancers, there was no realistic possibility GRAIL could achieve FDA approval for the 50 cancers that Galleri supposedly screened, as Illumina and GRAIL publicly represented.

277. In addition, contrary to Defendants' statements that GRAIL would submit Galleri for FDA approval in 2023, and their representations that GRAIL had "been working . . . with the FDA for a number of years on designing the studies that will be part of the ultimate submission," Defendants had actual knowledge that GRAIL's clinical studies could not support FDA approval such that submission could not occur in 2023. For example, Defendant Bishop admitted at the FTC proceeding that the clinical trials that GRAIL had completed were not "sufficient" for Galleri to obtain FDA approval, which would instead require "data from some additional, very large clinical trials."

278. Indeed, the FDA privately informed GRAIL senior management in meetings in 2019 and in formal written feedback in February 2020 that the STRIVE study would not support approval because the Galleri test results were not returned to patients under the study design. Thus, GRAIL could not "directly confirm the results of [its] test nor will [GRAIL] assess how the test results impacted patient treatment decisions." The FDA further told GRAIL that the STRIVE study would not support approval because it was not sufficiently representative of Galleri's intended patient population. FE3, who worked with Defendants Aravanis and Ofman at Illumina and GRAIL, corroborated that it was common knowledge that the FDA had informed GRAIL that none of the clinical data generated for Galleri was sufficient for FDA approval.

279.    As Chief Medical Officer at GRAIL, Defendant Ofman was charged with "oversee[ing] the regulatory, quality and clinical compliance of the organization, which is focused on getting [GRAIL] ready for FDA approval and to be regulated by the FDA," and certainly received feedback from the FDA concerning these facts. This is confirmed by numerous emails produced in the FTC proceeding that were sent to or received by Ofman concerning, for example, "FDA feedback," "first look at results" from Galleri's clinical trials, "STRIVE data," and "Galleri's PMA [Premarket Approval]."

280.    Defendants also had actual knowledge that GRAIL's clinical studies did not support Galleri's clinical efficacy, as confirmed by their testimony in the FTC proceeding. For example, Defendant Ofman admitted that the CCGA study did not involve the intended use population for Galleri (i.e., asymptomatic screening population); GRAIL had not analyzed the data from the SUMMIT or STRIVE studies as of the FTC trial; and the PATHFINDER study could not support any effectiveness claim because it involved far too small a population.

281.    Like Ofman, the Illumina Executive Defendants also knew, or at minimum recklessly disregarded, that their statements that Galleri was a "proven technology" with established "efficacy" were materially misleading. According to FE5, at an internal September 18, 2020 meeting, Defendant deSouza admitted that recent data showed that Galleri's detection of Stage 1 cancers was low, and that the Company needed to downplay this data and publicly highlight other points in order to create the impression of the test's purported benefits. That the Illumina Executive Defendants knew Galleri was *not* a "proven technology" is further confirmed by Illumina's access to and review of GRAIL's interactions with the FDA. The merger agreement between GRAIL and Illumina provided the Illumina Defendants with unrestricted access to GRAIL's FDA file, including "all correspondence, pre-submissions, submissions and other communications with the FDA since January 1, 2018," as well as the Galleri data generated by GRAIL.

### 4.    Defendants' "Save Lives" Misstatements

282.    While Defendants repeatedly stated to investors that the closing of the GRAIL acquisition and Galleri's adoption would "save lives," Defendants had actual knowledge that such statements were unsupported by any clinical evidence and were materially misleading.  Further, a mountain of other evidence demonstrates Defendants were, at minimum, reckless.

283.    For example, Defendants Bishop and Ofman personally knew of GRAIL's policy of prohibiting GRAIL employees from publicly representing that Galleri "saved lives," a statement GRAIL determined could not be made because it was not supported by any clinical evidence.

284.    This policy was documented internally.  As reported by FE6, GRAIL's PMRC committee, which held weekly meetings with product, communications, legal and regulatory executives, concluded that GRAIL could not publicly state that Galleri "saved lives."  According to former employees on the PMRC committee, Bishop and Ofman were well aware of GRAIL's official prohibition on publicly claiming that Galleri could "save lives," including because the PMRC committee approved GRAIL's public communications and reported to Bishop and Ofman.

285.    In addition, former Illumina employees confirm that Defendant deSouza knew his statements that the acquisition would "save lives" were not supported by any actual facts.  Specifically, in 2023, after deSouza had told investors on numerous occasions that the GRAIL deal would "save lives," deSouza himself directed an effort to identify an independent scientist or other backer to publicly praise the GRAIL acquisition and provide legitimacy to deSouza's statements.  According to FE1, who was directly involved in deSouza's efforts, Illumina was not able to identify a single credible source willing to publicly make that unqualified representation despite weeks of outreach.

286.    Additional facts corroborate Defendants' knowledge that the claim that Galleri's adoption would "save lives" was untrue.  Internal documents produced in

the FTC proceeding further confirm that Defendant deSouza discussed these claims directly with Defendant Bishop, who oversaw GRAIL's policy prohibiting GRAIL from publicly stating that Galleri "saved lives." For example, a May 6, 2021 opinion piece authored by Defendant deSouza in *The Wall Street Journal* represented that the FTC was "jeopardizing our chance to **save more lives** from cancer." On April 25, 2021, just over a week before the publication of deSouza's op-ed, Defendant Bishop emailed Defendant deSouza regarding a "suggested WSJ op-ed by Hans Bishop," and attached a draft of the op-ed titled, "OpEd Bishop 4-25 AM.pdf." Their email exchange, and the fact that deSouza (and not Bishop) ultimately "authored" the op-ed, confirms that the two discussed the representations contained in that article, and provides a strong inference that Bishop informed deSouza of GRAIL's prohibition from publicly making the claims about Galleri's ability to "save lives" contained in that article.

287. Moreover, deSouza's knowledge that Illumina did not have the capabilities to accelerate Galleri's adoption and that GRAIL's clinical studies did not support its clinical efficacy further demonstrates that he knew, or at minimum recklessly disregarded, that his representations that the acquisition would "save lives" were misleading. As set forth above, deSouza had actual knowledge that Illumina lacked the infrastructure and capabilities necessary to accelerate Galleri, that there were no material synergies to be gained from the transaction, and further that Galleri did not have clinical efficacy as described.

### 5. Defendants' Conflict of Interest Misstatements

288. Defendants knew that their statements beginning in July 2020 that the GRAIL acquisition was conflict-free and subject to arm's length negotiations were false and omitted material facts.

289. Contrary to Defendants' representations in the Form S-4 that the GRAIL acquisition was "negotiated through an arm's length process" and that talks about the acquisition began on July 31, 2020, Defendants knew that such statements

were false and misleading. In reality, deSouza had several conversations with GRAIL Board members well before July 2020, and beginning in no later than January 2020. Those conversations about acquiring GRAIL included GRAIL co-founder Mostafa Rongahi (who served as Illumina's Chief Technology Officer from 2008 to 2020 and then Senior Vice President of Entrepreneurial Development from 2020 to 2021); Defendant Klausner, who subsequently purchased a huge amount of GRAIL equity in advance of the deal announcement; and Defendant Aravanis, who Defendant deSouza brought on board at Illumina to close the deal, and who became one of the deal's co-sponsors.

290. In addition, when analysts and investors raised questions about Illumina's conflicts of interest, Defendants made false and misleading statements that Defendant Aravanis was "***recused*** from any decisions to sign and close the GRAIL acquisition" and that his financial interests in GRAIL were "***fully disclosed***" to the Board and "consistent with good corporate governance practices"—all while knowing that that Aravanis had played a significant role in negotiating and closing the GRAIL deal.

291. Each of the Illumina Executive Defendants knew that Aravanis was one of the deal's "cosponsors," including because that was his official role in the transaction and they were there when he presented the deal to Illumina's Board, participated in numerous Board meetings about the deal, and led the "negotiations" with his former employer GRAIL. Defendant Aravanis was undoubtedly aware of his own role in the GRAIL acquisition. Defendant deSouza, who relied on Defendant Aravanis almost exclusively on all questions he had about GRAIL and was present at the ELT meetings and discussions about the GRAIL acquisition, was also aware of Aravanis's role in presenting and closing the GRAIL deal. Illumina's Board, which included Defendants deSouza and Thompson, was similarly well aware of Aravanis's role in the GRAIL acquisition because Aravanis was one of its "cosponsors" that presented the deal to Illumina's Board. Defendant Ofman

likewise knew of Aravanis's role in closing the GRAIL acquisition because he led the "negotiations" with his former employer.  And Defendant Klausner, who sat on GRAIL's Board, oversaw Defendant Aravanis's transition from GRAIL to Illumina to serve as Illumina's CTO in May 2020, and further oversaw the transition of Illumina's then-CTO to serve on GRAIL's Board.

292.    Internal documents produced in related proceedings further confirm that Defendants knew that their misrepresentations that the GRAIL acquisition was subject to arm's length negotiations that began in July 2020 were false.  For example, Illumina Board materials produced in parallel litigation in Delaware Chancery Court reveal that Defendants participated in "multiple streams of unauthorized communications between an Illumina board member and GRAIL board members and bankers."  In addition, contrary to Defendants' representation that deal discussions began on July 31, 2020, a GRAIL Board member asked Defendant deSouza in *January* 2020 to meet in-person and in private to discuss the potential deal. As further revealed by documents produced in the FTC proceeding, Mostafa Ronaghi (who had just joined the GRAIL board in May 2020) texted deSouza on July 22, 2020, asking "Do you have a few min for a call today about Grail?"—again confirming that deal discussions did *not* begin on July 31, and further that the deal was *not* "negotiated through an arm's length process."

### 6.    Illumina's Misstatements About Its Plans for GRAIL

293.    Despite knowing by July 12, 2021 that Illumina would not provide the EU with any more concessions and would close despite the mandatory standstill imposed by EU merger law, Defendants represented to investors on July 22, 2021 that Illumina would continue to work to bring the deal to a "conclusion" and "ensure that [the European Commission] has the information and assurances necessary to approve this transaction."

294.    On July 7, 2021, the EU rejected Illumina's proposed concessions.  Five days later, at a meeting on July 12, 2021, the ELT—including Defendants deSouza,

Aravanis, Samad, and Febbo—decided that Illumina would proceed with closing the GRAIL acquisition in violation of the standstill. Further, the ELT determined that Illumina would not offer the EU any further assurances or "remedies" to allay the EU's competition concerns, and would instead secure $300 million in D&O insurance to cover shareholder claims that would result from closing the transaction.

### 7.    Defendants' D&O Insurance Misstatements

295.    Contrary to Defendants' statements that the $300 million in D&O insurance Illumina had obtained was "standard for Delaware companies," "not uncommon," and "appropriate," Defendants knew that the expensive insurance policy was highly unusual and had been obtained to cover shareholder claims arising out of the acquisition, further demonstrating a compelling inference of scienter.

296.    At the July 12, 2021 ELT meeting, Defendants deSouza, Aravanis, Febbo, and Samad determined to proceed with closing in defiance of the EU standstill. In taking that drastic step, these Defendants determined that the Company should secure approximately $300 million in D&O insurance to cover their personal liability for doing so. This special insurance came at an eye-popping cost of $72 million and covered Illumina's directors and officers for "any and all claims against any of them arising out of or related to" the GRAIL acquisition, including "any determinations or decisions in connection with regulatory approvals, rulings or other actions."

297.    Contrary to being "standard" and "appropriate," this insurance was multiples greater than the insurance the Board had procured the year before. In 2020, the Board approved D&O insurance with $150 million coverage, at an annual premium of up to $3.8 million with a retention of $10 million. The following year, in August 2021, just prior to closing the GRAIL acquisition, Illumina's Board and management met to discuss the GRAIL acquisition, D&O insurance, a "Competition and Antitrust Update and Review," and the risks of closing the GRAIL acquisition. These numerous discussions demonstrate that Defendants thoroughly understood

that their conduct in connection with the GRAIL acquisition would give rise to personal liability for the Board and senior management. In addition, the Illumina Board—including Defendants deSouza and Thompson—eliminated Side C "entity" coverage for Illumina, which would be forced to self-insure the full cost of any Illumina financial losses arising from the acquisition. At the same time, Illumina and GRAIL secretly entered into a letter agreement in which they agreed to sidestep certain conditions in their merger agreement requiring that all necessary regulatory approvals be obtained before closing.

298. Notably, this extraordinarily expensive insurance policy—which was made a condition to closing the GRAIL acquisition—was not disclosed by Illumina until months after the deal was closed. Then, when Illumina was directly asked about it by Carl Ichan in 2023, Defendants lied and said the insurance was "appropriate," "standard" and "common," when they knew it was unusual, bespoke, and uncommon. Specifically, on November 5, 2021, months after the date of the insurance agreement and the close of the GRAIL acquisition, Illumina attached an exhibit titled "Form of Insurance Matters Agreement" to its quarterly report, publicly disclosing for the first time the existence of the insurance agreement. Despite its public disclosure, the insurance agreement did not include any information about the $72 million premium the Company paid for it, or that the insurance policy had been obtained to cover shareholder claims arising out of the acquisition—key facts of which the Illumina Executive Defendants were well aware.

### 8. Illumina's Misstatements Concerning GRAIL's Revenue Guidance

299. Defendants knew that their statements concerning GRAIL's revenue guidance for 2022 of $70 million to $90 million were false and omitted material facts.

300. Contrary to Defendants' statements that the revenue guidance was "concentrated on the Galleri side with health systems," and that GRAIL was "seeing good traction," Defendants knew that GRAIL was not and could not meet its target

test volume with respect to health systems, as well as each of its other channels. GRAIL's internal documents—which were available or provided to Defendant Ofman, CEO Ragusa, and CFO Freidin—showed that by the end of the first quarter of 2022, GRAIL missed all of its target test volume numbers for all of its channels, with "health systems" coming in at *7%* of forecast and total revenues amounting to only *58.5%* of forecasted revenue for the quarter.

301. The Illumina Executive Defendants knew that GRAIL's revenue guidance for 2022 was unachievable because they had access to the same data that GRAIL's senior officers had. As Defendant Samad himself admitted at a February 24, 2022 conference, Illumina "work[ed] closely" with GRAIL on the guidance, on GRAIL's "***funding needs*** for their budget," and that Illumina senior management "***get details on the assumptions***," assuring investors that Illumina had a "high degree of confidence in [GRAIL's] guide" and its "achievability."

302. Samad's admissions about the Illumina Executive Defendants' knowledge of the data underlying GRAIL's revenue guidance is supported by the accounts of former employees. In fact, according to FE5, Defendant deSouza effectively held veto power over GRAIL's reported revenue guidance, and worked with GRAIL CEO Ragusa and other GRAIL senior management to determine GRAIL's publicly reported guidance—despite objections of sales leaders like GRAIL SVP of Sales Michael Vicari, who told GRAIL senior management that GRAIL's $70 to $90 million guidance was unsupportable and unachievable based on its experience to-date. Further, as FE5 reported, GRAIL and Illumina's communications and legal departments held monthly meetings to discuss GRAIL revenue figures. Brian Blanchett, Vice President, Finance & Treasurer at Illumina, was involved in these monthly meetings and prepared the "readouts" for the Illumina Executive Defendants based on sales data that he received from GRAIL senior management.

## 9. Illumina's Accounting of GRAIL

303. Throughout the Class Period, Illumina repeatedly accounted for GRAIL using the cost method, rather than the equity method, in order to conceal the benefits that insiders obtained through the GRAIL acquisition. These accounting maneuvers in violation of GAAP were undertaken at Illumina's highest levels, and are highly indicative of fraudulent intent.

304. In 2017, Illumina reduced its equity stake in GRAIL to just below a key threshold in order to achieve an accounting treatment that would require virtually no disclosure to investors of Illumina insiders' secret stake in GRAIL. Notably, Illumina accomplished this equity reduction by having GRAIL repurchase a significant portion of Illumina's equity stake at a time when Illumina had no need for any such funding—and when GRAIL desperately needed it.

305. Further, Illumina made a series of false disclosures and omissions in connection with these accounting machinations. In particular, Illumina omitted Jay Flatley's service on the GRAIL Board as an "observer," failed to conduct the appropriate "significant influence" test required by U.S. generally accepted accounting principles ("GAAP") when Ronaghi joined the GRAIL Board in 2020, and failed to disclose that Defendant Aravanis had a significant personal financial stake in GRAIL.

306. These accounting maneuvers were known, or at minimum recklessly disregarded, by Defendants deSouza, Samad, and Aravanis, who were intimately familiar with the background of the GRAIL acquisition as members of the ELT and the ties between Illumina and GRAIL and their respective officers and directors. Further, deSouza and Samad signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") attached to each of the filings at issue and further attested to the filing's accuracy and the disclosure of all fraud, supporting an inference of scienter.

**B.     The Importance of the GRAIL Acquisition to Defendants and Analysts' Intense Focus On the Deal Support Scienter**

307.    The over $8 billion GRAIL acquisition was the single most important transaction in either Illumina or GRAIL's histories and was thus of paramount importance to both Defendants and the investing public.

308.    The GRAIL acquisition was a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements during the Class Period in response to this scrutiny. Given the importance of the GRAIL acquisition and its impact on the value of Illumina's stock, analysts were focused on the acquisition throughout the Class Period, repeatedly asking about the transaction itself, GRAIL's Galleri test and its clinical trials, and the antitrust proceedings before the FTC and European Commission.

309.    According to FE5, Defendant deSouza in particular was highly focused on GRAIL, and called it only one of two things during the Class Period investors cared about and that moved Illumina's stock price.  The immense importance of the transaction and the Defendants' focus on it reinforces the scienter inference.

**C.     Defendants' Personal Financial Motives Support Scienter**

310.    Defendants were personally motivated to carry out the GRAIL acquisition and make numerous public misrepresentations about the deal, the Galleri test, and Illumina's ability to "accelerate" Galleri's FDA approval and widespread adoption, due to their financial stakes in GRAIL. Such financial motives further support a compelling inference of scienter. While Illumina's investors saw their investments decline sharply in value, Defendants have reaped hundreds of millions of dollars.

**1.     Defendant Aravanis's Financial Motive Supports Scienter**

311.    As one of the "cosponsors" of the GRAIL acquisition, Defendant Aravanis was motivated to close the transaction and maximize the value of his secret stake of 1.3 million GRAIL shares, which was never properly disclosed to investors.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     109
CASE NO. 3:23-cv-02082-LL-MMP

In fact, soon after the deal closed, Aravanis reaped the benefits of closing the GRAIL acquisition when he sold every single Illumina share he received in the deal and received $5 million in proceeds.

### 2. Defendants Bishop and Ofman's Financial Motives Support Scienter

312. Defendants Bishop and Ofman each had a personal interest in ensuring that Illumina pay as much as possible for GRAIL and that the deal closed, so that they could cash in on their respective GRAIL stakes. Bishop and Ofman's false statements to investors touting Galleri and Illumina's ability to accelerate its adoption enabled them to do so. Indeed, when the GRAIL acquisition closed, Defendant Bishop's GRAIL stake personally netted him over $100 million, while Defendant Ofman's personal stake in GRAIL exceeded $55 million.

### 3. Defendant Klausner's Financial Motive Supports Scienter

313. Defendant Klausner's investment in GRAIL at the exact same time Illumina was working to acquire it provides powerful evidence of fraudulent intent.

314. Before Milky Way invested $125 million in GRAIL's Series D fundraising round, which closed on May 6, 2020, Defendant deSouza and Illumina's management were making plans to acquire GRAIL. In January 2020, before Milky Way invested $125 million in GRAIL's Series D fundraising round, a GRAIL Board member reached out to Defendant deSouza to discuss Illumina acquiring GRAIL and, shortly thereafter, Defendant deSouza and Illumina's management were making plans to do just that. Significantly, the Board member's outreach to Defendant deSouza was in a private, in-person meeting, which meant that no written record of their conversation would be created or preserved.

315. That Defendant Klausner had advance inside information pertaining to Illumina's acquisition of GRAIL when he invested another $125 million in GRAIL's Series D round demonstrates that Klausner was personally motivated to ensure that Illumina paid as much as possible for GRAIL and that the deal closed. In fact,

Klausner's GRAIL investment doubled in value when the acquisition was announced just months later on September 21, 2020.

### 4.    Defendant deSouza's Financial Motive Supports Scienter

316.    After Defendant deSouza orchestrated the GRAIL acquisition, Illumina's Board rewarded him with approximately $67 million in compensation for the next three years—an extraordinary increase from the $1.9 million he earned in 2019.

317.    The Illumina Executive Defendants were further personally financially motivated to misrepresent the value of GRAIL and its Galleri test because their executive compensation was directly linked to the performance of Illumina's stock price and, as Defendant deSouza internally acknowledged, GRAIL was one of only two things that "moved" Illumina's stock price.  For example, in 2019, 2020, 2021 and 2022, Defendants deSouza, Aravanis, Febbo and Samad were awarded stock options whose value increased in tandem with Illumina's stock price and, assuming certain vesting and earnings-per-share (or "EPS") targets were met, amounted to tens of millions of dollars in personal compensation.  Specifically, 75% of each Defendant's long-term equity compensation targets for these years required Illumina to meet certain EPS targets.  However, in calculating these EPS targets, GRAIL's actual financial performance and substantial operating losses were not considered.  This means that, while investors' views of GRAIL had a tremendous impact on Illumina's stock price and the value of Defendants' stock-option awards, GRAIL's actual financial performance did not impact whether the Illumina Executive Defendants were able to monetize those stock-option awards.  Moreover, in 2022, Defendant deSouza, and Defendant Aravanis were each issued "special grants" valued at $12.5 million and $4 million, respectively, with an exercise price of $330.25.  This provided a further incentive for Defendants deSouza and Aravanis to maintain Illumina's stock price at this inflated level so that they could monetize these massive awards.

318. The personal financial motives of Illumina's Board and senior management were also confirmed by then-outside director Andrew Teno, who was elected to the Board in June 2023 by shareholder vote in connection with Carl Icahn's proxy campaign. After Teno gained access to internal Board materials and privileged communications relating to the transaction, he and Carl Icahn determined that Illumina's Board had been "poisoned by their personal stake" in the GRAIL acquisition. Based on the privileged information Teno received, Icahn concluded that the Board's misconduct was exceptionally egregious and disloyal. He stated: "Throughout my long, long career as an activist, I have never found it necessary, until today, to sue a board of directors in this manner."

319. Despite calls from Carl Icahn to conduct an "unbiased investigation" into Defendants' personal stakes in GRAIL, which had been raised by an analyst in April 2023, to date, Illumina has not conducted an independent forensic investigation into these allegations.

## D. Defendant deSouza's Prior History of Making False Statements Supports Scienter

320. Defendant deSouza has a history of making false statements, including in court proceedings, supporting an inference of scienter.

321. Specifically, a California judge overseeing Defendant deSouza's divorce proceedings, in which deSouza was accused of hiding assets and breaching his fiduciary duties, found that deSouza's "credibility [was] suspect" and his testimony was "not to be trusted." In that proceeding, deSouza denied the existence of restrictive stock awards that he received during his marriage, a claim the judge found "hard to believe" given that "Francis is far too sophisticated and experienced to not remember one, let alone three RSAs."

322. Instead, the court found that "Francis purposefully obfuscated this issue" and that "Francis's testimony without documentary backup is not to be trusted."

**E.    The Resignations of Numerous Defendants and Illumina Senior Executives Support Scienter**

323.    The circumstances surrounding the numerous "resignations" of Illumina senior executives further strengthen the scienter inference.  While some executive turnover at a major publicly traded company can be expected, the massive departure of Illumina's senior executives is extraordinary.

324.    Of Illumina's eight named executives at the time Defendant deSouza was announced as Jay Flatley's replacement, seven have since departed—with General Counsel Dadswell, the sole remaining member of the ELT, stepping down as General Counsel in October 2024.

325.    In light of the GAAP violations committed by Illumina, the turnover at the role of the Company's chief accounting positions is particularly notable and supportive of an inference of scienter.  Since the beginning of the Class Period, Illumina has replaced its CFO or Chief Accounting Officer at least three times, with CFO Samad suddenly "resigning" in June 2022, Chief Accounting Officer Jose Torres unexpectedly "resigning" in September 2022, and Samad's replacement Goswami suddenly "resigning" after the Class Period, in April 2024.  The departures further support an inference of scienter as to the accounting violations alleged herein.

326.    In addition, the chief architects of the GRAIL acquisition—including Defendant deSouza, Defendant Aravanis, and Defendant Thompson—have similarly been forced out of their roles.  Analysts expressed concern about the sudden announcement of these departures, as well as skepticism about their purported reasons.  For example, after Defendant deSouza's resignation, analysts at Barclays viewed the announcement as "the biggest surprise given the seemingly successful battle against the recent activist campaign," as well as the timing of the announcement after a "recent slew of product launches."

327.    The departures of Defendants deSouza, Samad, and Aravanis, as well as Goswami, cannot be explained by innocent reasons. In leaving when they did,

they abandoned their prominent roles at Illumina just as GRAIL was purportedly poised to supposedly become a multi-billion-dollar revenue generator. The stronger inference is that these Defendants were forced to leave the Company because they had misled the public as to GRAIL's true value.

## IX. ILLUMINA'S SEC FILINGS VIOLATED GAAP AND RELEVANT SEC RULES BY IMPROPERLY ACCOUNTING FOR GRAIL

328.   SEC Regulation S-X, 17 C.F.R. § 210, et seq. ("Regulation S-X"), governs the content of financial statements filed with the SEC in registration statements under the Securities Act and under the Exchange Act. Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." GAAP is the set of principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP has been codified in the Accounting Standards Codification ("ASC"), the authoritative source of GAAP promulgated by the Financial Accounting Standards Board ("FASB").

329.   The manner in which Illumina accounted for and publicly reported its ownership interest in GRAIL violated GAAP.  When Illumina and several third-party investors founded GRAIL in 2016, Illumina accounted for its investment in GRAIL as a consolidated variable interest entity ("VIE"), a business structure which first gained notoriety in the early 2000s due to its role in the Enron scandal.  Under a VIE structure, an investor (here, Illumina) has a controlling interest in the entity but does not have a majority of the voting rights.

330.   Illumina continued to account for its ownership in GRAIL as a consolidated VIE until February 2017. On February 28, 2017, immediately following Defendant Samad's hiring as Illumina's CFO in December 2016, GRAIL completed a fundraising round, which raised over $900 million.  In connection with

that financing, GRAIL repurchased $278 million worth of its own shares back from Illumina.

331.    Significantly, these transactions brought Illumina's ownership in GRAIL from 52% to just under 20%—a significant threshold under the accounting rules.    Accounting standards required Illumina to account for its investment in GRAIL using the equity method if Illumina's ownership of GRAIL was between 20% and 50%, but provided a presumption that Illumina could use the fair (cost) value method if it owned less than 20% of GRAIL.    Specifically, GAAP required Illumina to account for its investment in GRAIL using the equity method if Illumina's ownership of GRAIL was between 20% and 50%, but provided a presumption that Illumina could use the fair (cost) value method if it owned less than 20% of GRAIL.

332.    That Illumina reduced its ownership interest in GRAIL to just below this significant accounting threshold in this manner is highly unusual.    Lead Plaintiffs have not been able to identify any other examples of a strategic investor (like Illumina) in a high-profile biotech start-up (like GRAIL) diverting hundreds of millions of dollars of capital from technology development to repurchase shares from the strategic investor.    Here, the share repurchase occurred just one year after GRAIL's founding, when GRAIL was rapidly ramping up its research and development efforts—and within a year, GRAIL raised another $300 million in outside funding, roughly the same amount it spent to repurchase shares from Illumina the year before, demonstrating its need for capital.    Further, Illumina did not have any disclosed funding needs at that time: it generated $875 million in operating cash flow from the $2.75 billion in revenue it earned that year.

333.    In other words, through the share repurchase that brought Illumina's equity stake down to just under 20%, Illumina gave up a significant piece of its equity ownership in GRAIL—a heralded start-up—in exchange for cash it did not need.    When it announced the GRAIL acquisition, Illumina then bought back that

same equity for roughly three times what it sold it for just three years before.  These otherwise inexplicable facts suggest that the repurchase was solely intended to influence the accounting treatment for GRAIL.

334.  Importantly, even though Illumina reduced its ownership interest to below 20%, under ASC 323-10-15-6, Illumina was still required to report its ownership in GRAIL under the equity method if it had "significant influence" over GRAIL.  Based on numerous Illumina and GRAIL former employees' accounts and other non-public information, from before the beginning of the Class Period through the close of Illumina's acquisition of GRAIL, Illumina exerted "significant influence" over GRAIL and was, under ASC 323-10-15-6, required to publicly report its ownership interest on an equity-method basis, ***not*** under the "cost method," regardless of its percentage of equity ownership.  Thus, Illumina's accounting treatment for GRAIL as a "cost method" investment violated GAAP.

335.  Several facts demonstrate that Illumina exerted "significant influence" over GRAIL during the time period when Illumina's equity ownership of GRAIL was less than 20%. ASC 323-10-15-6 provides a list of indictors of "significant influence" that show that Illumina exercised such an influence over GRAIL— including because of GRAIL's "technological dependence" on Illumina; the extent of "material intra-entity transactions" between Illumina and GRAIL; Illumina's "participation in policy-making decisions" at GRAIL; Illumina's undisclosed "representation on the board of directors"; and the extensive "interchange of managerial personnel" between Illumina and GRAIL:

- **Technological Dependence:**  GRAIL was entirely technologically dependent on Illumina.  As GRAIL's former CEO Defendant Bishop testified in the FTC proceeding, Illumina was GRAIL's "only" supplier of NGS instruments and reagents that could be used with Galleri and the only supplier GRAIL even attempted to "validate[] with our technology, so if they're not available to us, we don't have a validated alternative."  Similarly, FE4, a GRAIL Data Scientist from September 2019 to October 2021, explained that Galleri was entirely dependent upon Illumina's NGS sequencers and that to replace Illumina's NGS

sequencers with a different supplier would require re-validation of an enormous amount of data and a complicated process that would take years.[5]  Further, Illumina ceased providing GRAIL with certain perpetual licenses to its technology, further indicating that Illumina exercised significant influence over GRAIL.

- **Material Intra-Entity Transactions:** Illumina entered into material intra-entity transactions with GRAIL through which GRAIL purchased highly specialized NGS sequencers and reagents from Illumina, which was GRAIL's only supplier.  For example, Illumina's long-term supply commercialization agreement amended in February 2017 supplied GRAIL with products and certain rights GRAIL required to run the Galleri tests, including, for example, products needed to conduct genomic sequencing and service contracts for Illumina's NGS sequencers.  A September 2020 presentation prepared for GRAIL's Board by Morgan Stanley to evaluate the acquisition highlighted GRAIL's dependence on Illumina, including the "[m]argin impact from supply agreement and royalties owed to [Illumina] may limit financial and strategic flexibility" and GRAIL's "heavy reliance on Illumina's products."

- **Interchange of Managerial Personnel:**  Former and current members of Illumina's senior leadership served in significant management roles at GRAIL.  As set forth in Appendix A, these included: Defendant Aravanis, who served as Illumina's CTO, was GRAIL's co-founder and previously served as GRAIL's Chief Scientific Officer and Head of R&D from 2016 to 2020; Mostafa Ronaghi, who served at Illumina from 2008 to 2021 in various roles, including most recently as Senior Vice President of Entrepreneurial Development, was GRAIL's co-founder, and served as a GRAIL director from 2020 through the acquisition; Defendant Klausner, who served as Illumina's CMO from 2013 to 2014 and Illumina Chief Opportunity Officer from 2014 to 2016, was GRAIL's co-founder, and served as a GRAIL director from 2016 through the acquisition; William H. Rastetter, who served as a director at Illumina from 1998 to 2016 and Illumina Chair from 2005 to 2016, and then served as GRAIL CEO from August to December 2017 and Chair from 2017 to 2018; Gautam Kollu, who previously

---

[5] FE4 served as a Data Scientist at GRAIL from September 2019 through October 2021.  In his role, FE4 conducted process monitoring and handled the data quality process for operational, business, and research systems and presented this information to Defendant Ofman, the head of clinical, and members of operations.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    117
CASE NO. 3:23-cv-02082-LL-MMP

served at Illumina from 2013 to 2019 in various roles, including most recently as Global Head of Market Development, and GRAIL's Chief Commercial Officer from 2019 to 2022; and Satnam Alag, who served as Illumina's Vice President of Software Engineering, Enterprise Informatics from 2013 to 2020 and previously served as GRAIL's Senior Vice President of Software Engineering and Chief Security Officer from 2020 to the present.

- **Representation on the Board of Directors**: Illumina had representation on GRAIL's Board of Directors. Specifically, Ronaghi, an Illumina employee, was appointed to GRAIL's Board by Illumina in May of 2020, in connection with an additional investment in GRAIL by Illumina at that time. Further, after Illumina's former CEO and Executive Chairman Jay Flatley "resigned" from GRAIL's Board in February 2017, he continued to serve as a GRAIL Board observer "in his personal capacity."

336.  Illumina's representation on GRAIL's Board is particularly noteworthy. Guidance on this point provided by PricewaterhouseCoopers ("PwC"), GRAIL's auditor, notes that "[a]n investor that has representation on the board of directors can influence the operating and financial policies of an investee through its presence and participation at the board of directors meetings" even when owning less than 20% of the company. Likewise, Ernst & Young ("EY"), Illumina's auditor, notes that "representation on the board of directors may indicate that an investor has the ability to exercise significant influence over an investee's operating and financial policies." Each factor listed by PwC as relevant to whether a board seat constitutes significant influence unambiguously militates in favor of such a finding, including (i) board representation relative to an investor's ownership interest, (ii) the number of board seats relative to the size of the board, and (iii) the manner of Ronaghi's appointment. Three out of 11 GRAIL directors at the time of Ronaghi's appointment (Ronaghi, Defendant Klausner, and Rastetter) possessed ties to Illumina— significant representation on a small board, and proportionally greater than the 14.5% minority stake Illumina retained in GRAIL at the time. Moreover, Ronaghi

was appointed to the Board by Illumina, and Flatley remained a GRAIL Board observer even after resigning from GRAIL's Board in February 2017.[6]

337.    Thus, while Illumina's transactions to bring its ownership under 20% gave the appearance that Illumina could appropriately report its GRAIL investment on a "cost method" basis, and appear to have had no other purpose, Illumina's "significant influence" over GRAIL rendered this reporting improper, and Illumina's statements concerning its accounting for GRAIL materially false and misleading when made.

338.    Moreover, by improperly reporting Illumina's ownership of GRAIL on a cost-method accounting basis, Defendants were also able to ostensibly avoid disclosing highly material facts about Illumina insiders' conflicts of interest and how those insiders profited through the GRAIL acquisition.

339.    By reporting GRAIL on a cost-method accounting basis, Illumina was able to avoid disclosing that GRAIL was a "related party," and thus sidestepped GAAP standards requiring meaningful public disclosures about transactions with related parties.    Specifically, ASC 850-10-20 automatically presumes that transactions with investees (like GRAIL) that are accounted for under the "equity method by the investing entity" (i.e., Illumina) are "related party" transactions. Among other things, this requirement obligates the investing entity (Illumina) to publicly describe the "nature of the relationship(s) involved" and a "description of the transactions" with the investee.

---

[6] Other public companies' use of the equity method for investments where an investor had less than a 20% ownership interest in an investee—but where the investee was highly dependent upon the investor—similarly support that Illumina's accounting treatment of GRAIL was improper.  For example, both Coca-Cola and Exxon/Mobil have disclosed equity method investments even where their ownership interests were less than 20% based on business relationships that have a similar dependency between the investor and investee as Illumina and GRAIL did here.

340.   Guidance provided by both GRAIL's auditor, PwC, and Illumina's auditor, EY, make clear that all material transactions between Illumina and GRAIL would have to be publicly disclosed and accounted for as "related party" transactions if Illumina had accounted for GRAIL under the equity method.  For example, PwC explains that "equity method" investees like GRAIL are "*by definition, related parties of the equity holder*," Illumina.  EY's guidance similarly provides that an "investor and its equity method investee *are considered related parties under ASC 850 and should disclose material intra-entity transactions as related-party transactions*."

341.   By improperly accounting for GRAIL on a cost-method basis, Illumina was able to ostensibly avoid describing GRAIL as a "related party" and publicly disclosing its dealings with GRAIL—including the GRAIL acquisition—as "related party" transactions in its public filings.   These omissions were significant.  For example, Illumina's 10-Q and 10-K filings for 2017, 2018, and 2019 make no meaningful disclosures about Illumina's investment in GRAIL whatsoever, even as Defendants began setting in motion a scheme to allow insiders to profit from the GRAIL acquisition.

342.   Not only did Illumina fail to properly disclose GRAIL as a "related party" and provide required supplemental disclosures about the nature of those transactions, Defendants went further, and falsely represented that the GRAIL acquisition was an "arm's length" one.  For example, in a November 25, 2020 prospectus and in numerous other SEC filings, Illumina represented that the GRAIL transaction was negotiated through an "arm's length process."  Similarly, in a February 2021 prospectus related to the acquisition, Illumina described the "Background of the Transaction" in which it identified the first communication between Illumina and GRAIL about an acquisition as occurring on July 31, 2020— supposedly only after GRAIL had begun to explore an IPO in June.  That transaction background omitted any reference to deSouza's discussion with a GRAIL Board

member (either Defendant Bishop or Defendant Klausner) about a potential acquisition in January 2020, deSouza's further outreach and discussions with Defendant Aravanis in April 2020, deSouza's texts with Ronaghi in July 2020, or any of the other steps Illumina was taking to reacquire GRAIL in April and May—highly material facts bearing on the merits of the deal.

343. However, as GRAIL's auditor PwC has explained, transactions "involving related parties *cannot be presumed to be at arm's length*" and, under ASC 850-10-50-5, "a reporting entity should only disclose that a transaction was at arm's length when it can substantiate such a representation." An accurate disclosure of GRAIL's status as a related party—which Illumina avoided by improperly accounting for GRAIL under the cost method—would have required Illumina to provide meaningful disclosures concerning the conflicts of interest in the GRAIL acquisition, the justifications for the price Illumina paid, and evidence about how the deal was a fair one.

344. At minimum, Illumina would have had to disclose Defendant Aravanis's role in the transaction and his personal financial stake in GRAIL, as these facts were highly material and demonstrated the GRAIL acquisition was not "consummated on terms equivalent to those that prevail in arm's-length transactions" and anything but "arm's length." Although undisclosed to investors, at the time Defendant Aravanis became Illumina's CTO, Aravanis held approximately 1,361,824 shares of GRAIL stock valued at over $10 million when the acquisition was announced. Moreover, before and throughout the pendency of the transaction, Defendant deSouza relied on Aravanis almost exclusively concerning any questions he had about GRAIL or Galleri. However, at no point during the Class Period did Defendants disclose Aravanis's key role as a "cosponsor" of the deal or his enormous GRAIL stake, and thus the magnitude of his personal interest in having Illumina pay as much as possible. When Defendant Aravanis was directly asked about his GRAIL stake by the news publication

*GenomeWeb* in April 2021, he refused to disclose it—even though that fact was required to be, and should have been, disclosed to investors under GAAP.

## X. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND HALF-TRUTHS

345. Throughout the Class Period, Defendants made a series of materially false and misleading statements and half-truths that were disseminated to investors through calls, public filings, press releases and other Company statements, and news and media outlets. Defendants' statements and omissions were materially false and misleading because they gave the impression of a state of affairs that differed in a material way from the one that actually existed. Those statements principally fall into the following categories: (1) the reported valuation of and financial projections for GRAIL; (2) Illumina's ability to "accelerate" the Galleri test's commercialization, regulatory approval, and payor reimbursement; (3) Galleri's ability to detect 50 cancers in asymptomatic patients, the clinical evidence purportedly supporting Galleri's effectiveness, and its prospects for FDA approval; (4) the GRAIL acquisition and its closing would "save lives"; (5) the deal was conflict-free and subject to arm's-length negotiations beginning in July 2020; (6) Illumina's characterizations of its cooperation with the European Commission's "investigation" into the transaction and its commitment to satisfying its regulators' concerns; (7) Illumina's D&O insurance policy was "appropriate," "standard," and "common"; (8) Illumina's false GRAIL revenues; and (9) Illumina's reported accounting treatment for the GRAIL asset.

### A. During and After the Announcement of the GRAIL Acquisition, Defendants State That Acquiring GRAIL Created Value and Was Necessary to "Accelerate" Galleri's Adoption and "Save Lives"

346. On September 21, 2020, Illumina issued a press release announcing that Illumina and GRAIL had entered into a merger agreement whereby Illumina would acquire GRAIL for $8 billion in cash and stock. The press release listed, among the "Strategic Benefits" of the deal, that it would "Accelerate[] Adoption of NGS-Based

Early Multi-Cancer Detection Test to Reach More Patients Faster" by "levera[ging] its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts."  In the press release, Defendant Bishop further stated: "Combining forces with Illumina enables broader and faster adoption of GRAIL's innovative, multi-cancer early detection blood test, enhancing patient access and expanding global reach."

347.    On a conference call that same day to discuss the transaction, Defendants made additional representations about Illumina's ability to "accelerate" the adoption, commercialization, and payor reimbursement of the Galleri test by acquiring GRAIL.  Specifically, on the call, Defendant deSouza stated:

> Now as they stand poised to bring products to market in 2021, we believe this is the right time to bring the GRAIL team into Illumina so that we can help to commercialize and accelerate adoption. . . . [T]he reason to acquire them is because **we have very clear line of sight into how we can accelerate the plan that they are on today**. **And we can only do that when they're part of Illumina.**

348.    On the same call, in response to a question from a Cowen analyst about the "clinical operating synergies" that would result from the acquisition, deSouza stated:

> [W]e've also built the regulatory capabilities, the market access capabilities, in-country surveillance capabilities to support clinical offerings around the world. . . . So those are some of the clinical capabilities, but frankly, we spent the last five-plus years building that GRAIL plugs into immediately.

349.    Also on the same call, Defendant Bishop stated:

> [B]y joining forces with Illumina, we'll achieve scale faster preventing more late-stage cancer diagnos[e]s. . . . With Illumina's international footprint and expertise across market access, regulatory, government affairs and manufacturing, we'll accelerate our ability to realize our mission and goals of improved patient outcomes.

350.    The statements in ¶¶346-49 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to state that acquiring GRAIL would "[a]ccelerate[]" the adoption of MCED tests, that "[c]ombining forces with Illumina" would enable "broader and faster adoption" of

Galleri, and that two companies "joining forces" would "achieve scale faster preventing more late-stage cancer diagnosis" and "accelerate" the ability to realize "improved patient outcomes."  It was also materially false and misleading for Defendant deSouza to state that Defendants "ha[d] a very clear line of sight into how we can accelerate the plan that they are on today," and that this acceleration can only happen "when they're part of Illumina."  As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

351.    It was also materially false and misleading for Defendants to state that Illumina "built the regulatory capabilities, the market access capabilities, in-country surveillance capabilities to support clinical offerings around the world" and that Illumina had spent "the last five-plus years building that," such that GRAIL could "plug[] into" Illumina's capabilities "immediately," and would leverage "international footprint and expertise across market access, regulatory, government affairs and manufacturing" to "accelerate" Galleri's commercialization. It was also materially false and misleading for Defendants to state that "Illumina's international footprint and expertise across market access, regulatory, government affairs and manufacturing," would allow GRAIL to "accelerate our ability to realize our mission and goals of improved patient outcomes." As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities

necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

352.    In the same press release and during the same September 21, 2020 investor conference announcing the acquisition, Defendants also made false statements about Galleri's clinical effectiveness.  Specifically, Defendant deSouza pointed to "the exceptional progress in developing the technology and clinical data required to launch [Galleri]," telling investors that "the results [GRAIL is] demonstrating from their large-scale clinical studies have put to bed a lot of the questions that we had" and that, therefore, GRAIL's "value [has been] demonstrated."  Defendants further stated that Illumina could "leverage its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts."

353.    The statements in ¶352 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to state that GRAIL had made "exceptional progress in developing the technology and clinical data required to launch" Galleri, and that "the results [GRAIL is] demonstrating from their large-scale clinical studies" "demonstrated" GRAIL's "value."  As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

354.    It was also materially false and misleading for Defendants to state that Illumina could "leverage its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts."  As set forth in Section V.B.1-2, these

statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate, including any manufacturing, commercial, regulatory, reimbursement, clinical sales, or marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

355.    On September 24, 2020, Defendant deSouza represented Illumina at an investor event hosted by investment banking firm Cowen called Cowen's Liquid Biopsy Summit.  During that event, in response to why Illumina had decided to acquire GRAIL when it did, Defendant deSouza stated:

> So let's talk about the why now question. And we really do believe that we're in an inflection point in the early detection of cancer market and we're in a place where the binary risk about will the product work or not is largely behind us. . . . [I]t was really in the last year, through the data that GRAIL started to publish from its large-scale clinical studies at ASCO, at ESMO, the peer-reviewed journal that they published earlier this year that gave us comfort to realize, well, *I think they've cracked the code. Their technology works, it's been tested in very large numbers, and the data has been peer-reviewed. And so there will be a product that works, and the GRAIL team is ahead.* So that made us start to shift our thinking to say we've identified, A, that the binary risk seems to be behind us now, that there is a product that meets the characteristics that would be successful. And then, two, that GRAIL has the right approach and it's differentiated.
>
> And so we started looking at it more seriously. And with GRAIL getting to commercialize its products next year, we realized that *we could really accelerate the development of this market if we acquired GRAIL now.* And so, that's sort of the why now. *They have a product. It's demonstrated that the binary risk is largely retired, and that if we get involved now, we can accelerate the development of what's going to be the largest genomic application we've ever seen.*

356.    The statements identified in ¶355 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that GRAIL's "technology works" and was a "product that works" based on Galleri having been "tested in very large numbers." As set forth in Section V.C, these statements were materially false and misleading because: (i)

there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

357.  It was also materially false and misleading to state that Illumina "can accelerate the development of" Galleri.  As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

358.  On the same call, in response to another question about "having the clinical infrastructure in place to help GRAIL move more quickly to market, not just in the US, but globally," Defendant deSouza stated:

> So over the last eight years, we've been building out our clinical capabilities to build on our strength in the research markets. . . . **_From selling clinical products – we do have a clinical sales team,_** Doug – **_but also manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing_**.

359.  The statements identified in ¶358 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that Illumina had "a clinical sales team," and also "manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities to accelerate Galleri's adoption. In truth, Illumina lacked those capabilities.  ¶¶100-06.  As set forth in Section V.B.1, these statements were materially false and misleading because Illumina lacked the critical manufacturing,

regulatory, reimbursement, clinical sales, and marketing capabilities and would instead have to acquire or build those capabilities from scratch. *Id.*

360.   On the same call, in response to another question about the decision to acquire GRAIL for $8 billion, Defendant deSouza stated that Illumina's "financial analysis" of GRAIL embedded "***conservative assumptions***" which demonstrated that "owning GRAIL" was "***significantly value-accretive to Illumina shareholders***."

361.   The statements identified in ¶360 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that "owning GRAIL" was "significantly value-accretive," and that Defendants had used "conservative assumptions" in their models.  As set forth in Section V.A.1, these statements were materially false and misleading because Illumina concealed that its own actual forecasts ascribed a much lower value to GRAIL.  ¶¶80-85. Specifically, both Board materials from April 2020 and Illumina's "deal model" showed that GRAIL would generate roughly half the revenues in the more conservative S-4 forecast.  *Id.*

362.   It was also materially false and misleading to state that Defendants used "conservative assumptions" in their models. As set forth in Section V.A.2-3, these statements were materially false and misleading because: (i) the purported "assumptions" in Illumina's deal model, including the false 2025 date for broad reimbursement, were not supported "assumptions" or "judgments" that GRAIL management in fact held, but rather had been "pulled out of thin air" (¶¶86-91); and (ii) even Defendants' internal valuations were inflated (¶¶92-94).

363.   On November 25, 2020, Illumina filed a registration statement with the SEC on Form S-4, which was signed by Defendants deSouza, Samad, and Thompson, among others.  In the Form S-4, Defendants stated that the consideration for the GRAIL acquisition "was determined through arm's-length negotiations between GRAIL and Illumina."

364.   The statement identified in ¶363 above was materially false and misleading.  It was materially false and misleading for Defendants to state that the consideration for the GRAIL acquisition "was determined through arm's-length negotiations between GRAIL and Illumina."   As set forth in Section V.F, this statement was materially false and misleading because the decision to acquire GRAIL was heavily conflicted (¶¶156-68).  For example, Defendant Aravanis (a GRAIL shareholder) was heavily involved in the merger discussions in the summer of 2020, and in fact presented the deal to Illumina's Board as one of its sponsors.  *Id.*

365.   In the registration statement, Defendants also described the "[b]ackground" of the GRAIL acquisition, stating in part as follows:

> Beginning in late June 2020, GRAIL commenced initial preparations for a potential IPO.
>
> On July 31, 2020, GRAIL confidentially submitted its draft registration statement on Form S-1 with the U.S. Securities and Exchange Commission (the "SEC"). On the same day, Illumina's Chief Executive Officer met with GRAIL's Chief Executive Officer and noted that Illumina wanted to explore a potential acquisition of GRAIL. GRAIL's Chief Executive Officer asked that Illumina's Chief Executive Officer provide him with a proposal with respect to such an acquisition.

366.   The statements identified in ¶365 above were misleading because they omitted material facts.  It was materially false and misleading for Defendants to create the impression that Illumina's consideration of GRAIL was initiated on July 31, 2020. As set forth in Section V.F, these statements were materially false and misleading because Defendant deSouza had several conversations with GRAIL Board members about acquiring GRAIL beginning no later than January 2020 (¶156).

367.   In the same registration statement, Illumina provided a fairness opinion offered by Morgan Stanley on behalf of GRAIL based on two forecasts "prepared by GRAIL management."   Specifically, the S-4 publicly presented two sets of GRAIL financial forecasts for fiscal years 2021 through 2030 based on two scenarios ("Case A" and "Case B") reflecting, respectively, lower and higher internal targets.

As Illumina stated in the Form S-4, under the lower "Case A" scenario, GRAIL would generate $14.4 billion in revenues by 2030, while under "Case B," GRAIL's revenues would approach $24 billion by that time:

| (In millions) | Fiscal year ended December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
| **GRAIL Forecasts:** | | | | | | | | | | |
| GRAIL Total Revenue – Management Case A Estimate | $ 19 | $ 119 | $ 462 | $ 892 | $ 1,704 | $ 3,916 | $ 6,625 | $ 9,884 | $ 12,129 | **14,387** |
| GRAIL Total Revenue – Management Case B Estimate | 56 | 327 | 1,042 | 2,142 | 4,075 | 9,570 | 13,629 | 17,747 | 21,277 | **23,980** |
| GRAIL Operating Profit (Loss) – Management Case A Estimate | (427) | (586) | (576) | (454) | (110) | 876 | 1,943 | 3,339 | 4,015 | 4,460 |
| GRAIL Operating Profit (Loss) – Management Case B Estimate | (436) | (589) | (427) | (37) | 920 | 3,683 | 5,630 | 7,493 | 8,846 | 9,305 |
| **Unlevered Free Cash Flow:** | | | | | | | | | | |
| GRAIL Unlevered Free Cash Flow – Case A Estimate | (424) | (541) | (566) | (453) | (156) | 714 | 1,650 | 2,464 | 3,048 | 3,440 |
| GRAIL Unlevered Free Cash Flow – Case B Estimate | (433) | (541) | (431) | (87) | 719 | 2,713 | 4,137 | 5,634 | 6,776 | 7,268 |

368.    The S-4 also represented that, using these two sets of financial forecasts, Morgan Stanley valued GRAIL at $11.15 billion (the lowest valuation under Case A) to $43.95 billion (the highest valuation under Case B):

| Forecast Scenario | Equity Value Range |
|---|---|
| | ($ in millions) |
| Case A | $11,150- $17,450 |
| Case B | $28,200- $43,950 |

369.    Further, Illumina stated that these projections and valuations "were based on estimates, assumptions and judgments made by GRAIL management." Illumina further stated that these projections and valuations "were prepared on a reasonable basis, reflected the best currently available estimates and judgments at the time of preparation, and presented as of the time of preparation, to the best of GRAIL management's knowledge and belief, the reasonable projections of the

future financial performance of GRAIL," were "prepared utilizing GRAIL's historical internal forecast approach," and subject to judgments and assumptions "considered reasonable by GRAIL management as of the date of their use in preparing the GRAIL Forecasts." For Case A and Case B, those assumptions included "growth in the number of health systems and employers offering GRAIL's products, that new products such as DAC and MRD would be successfully launched and that *broad reimbursement would be achieved in calendar 2025*, which management forecasted would significantly increase the acceptance of GRAIL's product." For Case B, the forecasts assumed "broader acceptance of GRAIL's products across health systems, employers and more significant coverage after broad reimbursement is achieved."

370.   The statements identified in ¶¶367-69 above were materially false and misleading and omitted material facts. It was materially misleading for Defendants to provide the projections noted above to Illumina shareholders while withholding the far more pessimistic projections and valuations that Illumina's management prepared and its Board reviewed. As set forth in Section V.A.1, these statements were materially false and misleading because those concealed projections showed that the GRAIL acquisition would only generate *half* the revenues Illumina publicly reported to investors in its conservative Case A scenario and *one-third to one-fourth* of the revenues projected in its more optimistic Case B forecast (¶¶80-85).

371.   It was also materially misleading for Defendants to publish the valuation range in the Form S-4 while withholding the far more pessimistic valuation range that Illumina's Board reviewed. As set forth in Section V.A.1, these statements were materially false and misleading because Illumina's Board considered and reviewed a discounted cash flow analysis that valued GRAIL between $3.3 billion and $11.9 billion, which barely approached the lowest range of Illumina's publicly reported valuations of $11 billion to $17.45 billion under the more conservative Case A scenario (¶¶80-85).

372.   It was also materially false and misleading for Defendants to state that the Case A and Case B projections "were based on estimates, assumptions and judgments made by GRAIL management," including "growth in the number of health systems and employers offering GRAIL's products, . . . and that broad reimbursement would be achieved in calendar 2025, which management forecasted would significantly increase the acceptance of GRAIL's product," and that the Case B projections assumed "broader acceptance of GRAIL's products across health systems, employers and more significant coverage after broad reimbursement is achieved." As set forth in Section V.A.2, these statements were materially false and misleading because Defendants knew that these "assumptions" and "judgments" were baseless as Defendants did not expect broad reimbursement by 2025 (¶¶86-91).

373.   In the same registration statement, Defendants also stated that the GRAIL transaction "would result in various benefits, including, among other things, operating efficiencies, synergies and cost savings."

374.   The statement identified in ¶373 above was materially false and misleading and omitted material facts. As set forth in Section V.B.3, this statement was materially false and misleading because Illumina did not expect any synergies from the transaction (¶110).

375.   On February 25, 2021, Defendant Samad represented Illumina at the SVB Leerink Global Healthcare Conference. In response to a question from an analyst concerning "GRAIL's expansion," Defendant Samad stated:

> ***I think there are a lot of synergies that we have with Illumina, whether it's market access, regulatory, just clinical capability.*** We are one of the largest companies in terms of – in genomics, probably one of the largest companies in clinical. ***And so we bring a lot of expertise and knowhow and knowledge with our workforce that can – that we can bring to bear on the GRAIL acquisition.*** Then you have also synergies with regards to population genomics initiatives.
>
> I mean we have teams that work with governments in terms of population genomics initiatives. And so, to the extent that there are population health – early cancer screening population health studies or initiatives, ***there's a lot of synergies that can be brought to bear with Illumina as well***.

376.   The statements identified in ¶375 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant Samad to state that "there are a lot of synergies we have with Illumina," including "market access, regulatory," or "clinical capability," that could be "[brought] to bear on the GRAIL acquisition" and "with Illumina as well."  As set forth in Section V.B.1-3, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09); and (iii) Illumina did not expect any synergies from the transaction (¶110).

377.   On March 2, 2021, Defendant deSouza represented Illumina at the Cowen & Co. Health Care Conference.  At the conference, an analyst asked, "And then in terms of the studies you're going to need to do . . . I think the assumption is there's going to have to be some prospective randomized studies done that are probably pretty sizable on the tens of thousands of patients, if not well above 100,000 patients, to support FDA approval and then broader CMS reimbursement. . . . But those types of studies, should we expect that those could be or will be initiated in 2022 or is that not necessarily the case?"  In response, deSouza stated:

> *[W]e don't believe additional studies are necessary for Galleri to be successful*. . . . And so, *we don't think that any studies are essential from a performance perspective but also from a launch perspective*.
>
> . . .
>
> [GRAIL's] intent is to do *an FDA submission in 2023 and then pursue broader reimbursement from CMS and private payers*. And to do that, what they'll look to do is continue to amass the body of evidence that shows both the clinical utility as well as the economic value of rolling out Galleri.

378.    The statements identified in ¶377 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that "additional studies" were not "necessary for Galleri to be successful," that further studies were not "essential from a performance perspective but also from a launch perspective," and that GRAIL would "do an FDA submission in 2023 and then pursue broader reimbursement from CMS and private payers."  As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

379.    Soon after Illumina announced the acquisition, antitrust authorities in the United States and Europe began investigating the deal because it threatened GRAIL's competitors who relied upon Illumina technology for their own tests.  On March 30, 2021, the FTC sued to block the acquisition.  In response, Defendants made a series of false and misleading statements intended to assuage investors' concerns about the acquisition and to justify Illumina's actions in pursuing the deal.

380.    On March 30, 2021, the day the FTC sued to block the deal, Illumina stated in a press release: "In reuniting the two organizations [Illumina and GRAIL], *Illumina will leverage its global scale of manufacturing and clinical capabilities, as well as its global regulatory and reimbursement expertise, to bring early-stage, multi-cancer testing to patients more quickly and more affordably, resulting in more lives being saved*."  Illumina further stated: "Illumina will pursue its right to proceed with the transaction, *the impact of which would accelerate the adoption of a breakthrough multi-cancer early detection blood test*."

381.    In the same press release, Defendant Bishop stated: "***Combining GRAIL's innovative multi-cancer early detection test with Illumina's experience and scale will enable more patients in both the United States and worldwide to garner access to GRAIL's test faster***."

382.    The statements identified in ¶¶380-81 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to state that, through the GRAIL acquisition, Illumina would "leverage its global scale of manufacturing and clinical capabilities, as well as its global regulatory and reimbursement expertise, to bring early-stage, multi-cancer testing to patients more quickly and more affordably, resulting in more lives being saved," "accelerate the adoption" of Galleri, and "enable more patients" to "garner access to GRAIL's test faster."   As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

383.    It was materially false and misleading for Defendants to state that the acquisition would "result[] in more lives being saved." As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

384.   It was also materially false and misleading for Defendants to state that Illumina would leverage "global scale of manufacturing and clinical capabilities, as well as its global regulatory and reimbursement expertise."  As set forth in Section V.B.1, this statement was materially false and misleading because, as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06).

385.   On April 2, 2021, Defendant Aravanis defended the GRAIL acquisition in a news article published by *GenomeWeb*.  Aravanis stated, "***In fact, delaying the acquisition may already, over time, have resulted in potential lives lost***."

386.   The statement identified in ¶385 above was materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant Aravanis to state that "delaying the acquisition may . . . have resulted in potential lives lost." As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

387.   On April 6, 2021, Defendant deSouza gave an interview on CNBC concerning Illumina's results for the first quarter of 2021.  Defendant deSouza stated: "***By doing this acquisition we can accelerate patient access to [the Galleri] test and also drive accelerated reimbursement***."

388.   The statement identified in ¶387 above was materially false and misleading and omitted material facts.  It was materially false and misleading for

Defendant deSouza to state that, that Illumina was "doing [the GRAIL] acquisition" to "accelerate patient access to [the Galleri] test and also drive accelerated reimbursement." As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

389.  On April 6, 2021, SVB hosted Defendants Aravanis and Febbo at a virtual fireside meeting as part of SVB's Second Annual Liquid Biopsy and Oncology Diagnostics Summit.  During the meeting, Defendants Aravanis and Febbo discussed the GRAIL acquisition, with SVB reporting that the two members of senior management "emphasized the importance of bringing early cancer detection technology to the market as soon as possible to save lives," that launching Galleri as an LDT would generate "robust 'real world' clinical data which can be used in future FDA submissions," and that the "current plan is for GRAIL to submit a single-site PMA for approval in 2023 with a dossier of clinical evidence including STRIVE, PATHFINDER, CCGA, SUMMIT, and real-world data from early commercialization efforts."

390.  The statements identified in ¶389 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants Aravanis and Febbo to state that launching GRAIL as an LDT would generate "robust 'real world' clinical data" which could be used in "future FDA submissions," and that GRAIL's plan was to "submit a single-site PMA for approval in 2023 with a dossier of clinical evidence."  As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence

1  that Galleri was "effective" in improving patient outcomes and treatment decisions

2  in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies

3  for GRAIL did so in a sufficiently powered manner to support FDA approval, and

4  there was a total absence of the kind of clinical evidence necessary to support FDA

5  approval, commercialization, and payor reimbursement (¶¶127-33).

6      391.    It was also materially false and misleading for Defendants Aravanis and

7  Febbo to state that the acquisition would "save lives."  As set forth in Section V.D,

8  this statement was materially false and misleading because: (i) there was no evidence

9  that Galleri could save lives, including because there was no evidence that Galleri

10  was effective at improving patient outcomes and none of the Galleri studies

11  measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL

12  prohibited its employees from stating that Galleri could save lives because there was

13  no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate

14  Galleri's adoption, so closing the deal would not save lives (¶142).

15      392.    On April 20, 2021, Illumina issued a press release in which Defendant

16  deSouza stated: "***Reuniting GRAIL and Illumina will allow us to bring GRAIL's***

17  ***breakthrough early detection multi-cancer test to patients across the world faster***

18  ***and consequently save lives***."

19      393.    The statement identified in ¶392 above was materially false and

20  misleading and omitted material facts.  It was materially false and misleading for

21  Defendant deSouza to state that, by merging GRAIL and Illumina, Illumina would

22  bring Galleri to "patients across the world faster."  As set forth in Section V.B.1-2,

23  this statement was materially false and misleading because: (i) as the Illumina

24  Executive Defendants discussed in August 2020, Illumina lacked the capability to

25  accelerate Galleri, including because Illumina lacked the critical manufacturing,

26  commercial, regulatory, reimbursement, clinical sales, and marketing capabilities

27  necessary to develop and sell Galleri and would instead have to acquire or build them

28

(¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

394. It was also materially false and misleading for Defendant deSouza to state that acceleration would "consequently save lives." As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

395. On May 6, 2021, Defendant deSouza published an opinion piece titled "FTC Imperils a Cancer Breakthrough" in the *Wall Street Journal*. Defendant deSouza wrote:

> The Federal Trade Commission is jeopardizing our chance to save more lives from cancer. . . . We announced last year our intent to reunite with GRAIL to make this cancer-screening test widely available, accessible and affordable, accelerating the test's broad adoption and saving tens of thousands of lives.

396. The statements identified in ¶395 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state that Illumina's acquisition of GRAIL could "make this cancer-screening test widely available, accessible and affordable, accelerating the test's broad adoption." As set forth in Section V.B.1-2, this statement was materially false and misleading because: as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had

any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

397.    It was also materially false and misleading for Defendant deSouza to state that acceleration would "sav[e] tens of thousands of lives." As set forth in Section V.D, this statement was materially false and misleading because:  (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

398.    On July 22, 2021, Illumina issued a press release affirming its commitment to re-acquire GRAIL as the European Commission opened an in-depth investigation into the acquisition, entering its second phase.  In the press release, Defendant deSouza stated:

> When people have access to early cancer detection, lives will be saved. If this acquisition does not proceed, GRAIL's European roll-out will be slower and the cost will be measured in the unnecessary loss of life. ***Re-uniting GRAIL with Illumina will accelerate availability of the GRAIL test by many years in the [European Economic Area] and globally, saving tens of thousands of lives, and leading to significant health care cost savings***.

399.    The statements identified in ¶398 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that the acquisition "[would] accelerate availability of the GRAIL test" and "lead[] to significant health care cost savings."  As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have

to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

400.   It was also materially false and misleading for Defendant deSouza to state that acceleration would "sav[e] tens of thousands of lives."  As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

401.   In the same press release, Illumina further stated:

> This acquisition is procompetitive, and we have offered far-reaching structural and behavioral remedies to address any potential concerns. **Illumina will continue to work with the European Commission (EC) to ensure that it has the information and assurances necessary to approve this transaction**.

402.   The statement identified in ¶401 above was materially false and misleading and omitted material facts.  It was materially false and misleading for Illumina to state that Illumina would ensure that the EC received the "assurances necessary to approve" the deal.  As set forth in Section V.G, this statement was materially false and misleading because: (i) on July 12, 2021, Defendant deSouza and the ELT decided to close the acquisition in defiance of the standstill rather than offer additional assurances or remedies to allay the EC's concerns about competition (¶¶172-73); and (ii) Defendants decided to obtain a $300 million D&O insurance policy with an over $72 million premium to indemnify themselves against claims of acquisition-related misconduct (¶¶174-79).

403.   On August 5, 2021, Illumina held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter

of 2021.  On that call, in response to an analyst question about why Illumina remained committed to the GRAIL acquisition, Defendant deSouza stated:

> So the way the timing is going to work is the ***deal contract lasts till December 20***. . . . And so at this point, ***we're not yet at the stage where the clock has run out. And at this stage, we are committed to working through this period to get this to a conclusion***. . . . ***We continue to believe that this deal will result in the savings of tens of thousands of lives that would not be saved if we didn't buy GRAIL***, simply because we can accelerate the business. So to answer the question, ***we are committed to working through this deal***.

404.  The statements identified in ¶403 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that Illumina's acquisition of GRAIL "[would] result in the savings of tens of thousands of lives that would not be saved if [Illumina] didn't buy GRAIL" because Illumina would "accelerate the business."  As set forth in Section V.B.1-2 these statements were materially false and misleading because:  (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

405.  It was also materially false and misleading for Defendant deSouza to state that acceleration would "result in the savings of tens of thousands of lives."  As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina

could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

406.   It was further materially false and misleading for Defendant deSouza to state that Illumina expected to get the deal to a "conclusion," that "the deal contract last[s] till December 20" and "we are not yet at the stage where the clock has run out."  As set forth in Section V.G, these statements were materially false and misleading because: (i) on July 12, 2021, Defendant deSouza and the ELT decided to close the acquisition in defiance of the standstill rather than offer additional assurances or remedies to allay the EC's concerns about competition (¶¶172-73); and (ii) Defendants decided to obtain a $300 million D&O insurance policy with an over $72 million premium to indemnify themselves against claims of acquisition-related misconduct (¶¶174-79).

**B.    Defendants Continued to Falsely State That the GRAIL Acquisition Was Needed to "Accelerate" Galleri's Adoption and "Save Lives" After Closing the Transaction in Defiance of Illumina's Regulators**

407.   On August 18, 2021, Illumina issued a press release announcing that it had closed the transaction and acquired GRAIL.  In the press release, Illumina stated, "GRAIL's Galleri blood test detects 50 different cancers before they are symptomatic. Illumina's acquisition of GRAIL will accelerate access and adoption of this life-saving test worldwide."

408.   In the same press release, Illumina described the "reasons to reunite the two companies," including, in part:

- ***The deal will save lives***. Cancer kills around 10 million people annually worldwide and 600,000 people in the US alone. Cancers responsible for nearly 71% of cancer deaths have no recommended early detection screening, and most cancers are detected when chances of survival are lower. Illumina feels there is a moral obligation to have the deal decided by a thoughtful and full review by the EU regulators and the US courts. ***This can only be done if Illumina acquires GRAIL now.*** Otherwise, the company is locked into a situation where the deal terms will

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    143
CASE NO. 3:23-cv-02082-LL-MMP

expire before there is a chance for full review; the clock will just run out.

- Right now, the Galleri test is available but costs $950 because it is not covered by insurance. ***Reuniting the two companies is the fastest way to make the test broadly available and affordable.*** Illumina's expertise in market development and access has resulted in coverage of genomic testing for over 1 billion people around the world already. This experience will help lead to coverage and reimbursement for the Galleri test.

409.   In the same press release issued by Illumina, Defendant Bishop stated, "***The merger with Illumina will get the Galleri test to people far faster***. . . . ***A one-year acceleration of access to the Galleri test for the US population has the potential to save 10,000 lives over a 9-year period***."

410.   On a conference call that same day to discuss the GRAIL transaction, Defendants made additional representations about Illumina's "acceleration" and the lives that would be saved by the acquisition.  During the call, Defendant deSouza stated, "The stakes here are high, because simply put, ***this deal saves lives***, and we feel a moral obligation to ensure that the deal has a full review. . . . ***[W]ith Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S. and additional lives in the E.U. over the next nine years***."

411.   The statements identified in ¶¶407-10 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Illumina to state that "GRAIL's Galleri blood test detects 50 different cancers before they are symptomatic." As set forth in Section V.C.1, this statement was materially false and misleading because there was no evidence that Galleri could detect 50+ cancers in an asymptomatic population. ¶¶117-26.

412.   It was also materially false and misleading for Illumina to state that Illumina's acquisition of GRAIL "[would] save lives," that "[t]his [could] only be done if Illumina acquires GRAIL now," and the deal would "save 10,000 additional lives in the U.S. and additional lives in the E.U. over the next nine years."  Likewise,

it was materially false and misleading for Defendant deSouza to state that "with Illumina's acceleration," Galleri "can conservatively save 10,000 additional lives in the U.S. and additional lives in the E.U. over the next nine years." And it was materially false and misleading for Defendant deSouza to state that, "simply put, this deal saves lives." As set forth in Section V.D, these statements were materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

413.   It was also materially false and misleading for Defendants to state that the acquisition would "accelerate access and adoption" of Galleri "worldwide," and that the acquisition was "the fastest way to make the test broadly available and affordable" and would "get the Galleri test to people far faster." As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

414.   On August 19 and 20, 2021, in an effort to quell investor concerns about Illumina's closing of the transaction, Defendant deSouza gave a series of interviews to the news media and analysts. In an interview on podcast Masters of Scale on August 19, Defendant deSouza was asked, "Now, this deal with GRAIL has put you

in conflict with a different part of the government, with the FTC, the Federal Trade Commission, as well as with European regulators. Can you explain to us how you find yourself in this situation?"  In response, deSouza stated:

> What we want to do is bring the GRAIL test to market as fast as possible to people around the U.S. and around the world. GRAIL has a terrific technology, and Illumina, we have the commercial presence in over 140 countries around the world. ***We have the teams that can work on reimbursement and regulatory approval, and so we can dramatically accelerate getting this test into the hands of people whose lives it could save.***

415.    The statements in ¶414 above was materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that Illumina acquired GRAIL to "dramatically accelerate getting this test into the hands of people whose lives it could save."  As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

416.    On September 13, 2021, Defendant deSouza represented Illumina at the Morgan Stanley Global Healthcare Conference. In response to an analyst's question about the GRAIL acquisition and its "key considerations," deSouza stated:

> In addition to the considerations around shareholder value and making sure we're doing the move that long term maximizes shareholder value, we also felt a moral obligation to close the deal because the – potentially life savings, the savings life associated with doing this deal are so substantial. ***By accelerating GRAIL in terms of its global distribution and the accessibility of the tests globally, we will save many thousands of lives by getting this test into the hands of more people and making it more affordable than GRAIL would do on their own.*** And so, there was a moral element here, too, by saying in addition to creating long-term shareholder value, we have an obligation to have this deal reviewed and get to a decision because of the life-saving potential of doing this deal. And so all those considerations came together and that's how we made the decision.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    146
CASE NO. 3:23-cv-02082-LL-MMP

417.    The statements identified in ¶416 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that the acquisition would "accelerat[e] GRAIL in terms of its global distribution and the accessibility of the tests globally."  As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

418.    It was also materially false and misleading for deSouza to state that the acquisition would "save many thousands of lives by getting this test into the hands of more people and making it more affordable than GRAIL would do on their own."  As set forth in Section V.D, this statement was materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

419.    At the same conference, Defendant deSouza stated:

And so **we have deep expertise and so we can accelerate reimbursement for the GRAIL test around the world**, and that has very dramatic implications on the revenue ramp and the number of lives that can be saved. **So that's market access. We also have deep regulatory expertise.** Illumina has cleared products in dozens of countries around the world. **And so we can accelerate getting GRAIL cleared in countries around the world**.

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT     147
CASE NO. 3:23-cv-02082-LL-MMP

Next, *there are operational synergies*. We can scale up their lab infrastructure. . . . Our tests have run at this capacity to run to millions of tests a year. That means we have the real estate, the facilities, we have the equipment, we have the trained lab personnel, and *we can scale up GRAIL's production lab capabilities very dramatically very quickly*.

420. The statements identified in ¶419 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state that Illumina had "deep expertise" with respect to "market access," so that Illumina could "accelerate reimbursement for the GRAIL test around the world." It was also materially false and misleading for deSouza to state that Illumina had the capability to "scale up GRAIL's production lab capabilities very dramatically very quickly." As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

421. It was also materially false and misleading for Defendant deSouza to state that "there are operational synergies" with respect to the GRAIL acquisition. As set forth in Section V.B.3, this statement was materially false and misleading because Illumina did not expect any synergies from the transaction (¶110).

**C. Defendants Misrepresent the Sources of GRAIL Revenue, GRAIL's Guidance, and the Progress Towards Achieving It**

422. On January 10, 2022, Defendants deSouza Ofman represented Illumina at the JPMorgan Healthcare Conference. During the conference, deSouza stated that "*GRAIL expects strong revenue in the range of $70 million to $90 million as their Galleri test gains traction*."

423.    At that conference, Defendant Ofman stated in response to a question about "commercial payer" coverage: "We've been very encouraged by the ***positive reception to the value proposition of Galleri, particularly by payers.* . . . *We've also been pleasantly encouraged by the reception by commercial payers and large self-insured employers*** who, as you know, are also payers."

424.    The statements identified in ¶¶422-23 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that "GRAIL expects strong revenue in the range of $70 million to $90 million as their Galleri test gains traction."  It was also materially false and misleading for Defendant Ofman to point to the "positive reception to the value proposition of Galleri" by "by commercial payers and large self-insured employers."  As set forth in Section V.E.1-2, these statements were materially false and misleading because: (i) GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said the guidance was unachievable (¶¶149-50); and (ii) large commercial payers and insurers were not receptive to Galleri's "value proposition" (¶¶149-52).    Contrary to positively receiving Galleri's "value proposition," large commercial payers and insurers refused to purchase Galleri because it lacked a value proposition, and told GRAIL they required FDA approval, reimbursement, and clinical data supporting Galleri before they would purchase it. ¶¶149-52.

425.    On February 8, 2022, in an interview with *Medtech Insight*, Defendant Febbo stated: "We feel very strongly that ***this acquisition will speed the test [Galleri] to market and make it more accessible more broadly, more quickly, and save lives***."

426.    The statements identified in ¶425 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant Febbo to state that the acquisition would "speed the test [Galleri] to market and make it more accessible more broadly [and] more quickly," and "save

lives." As set forth in Section V.D, these statements were materially false and misleading because: (i) there was no evidence that Galleri could save lives, including because there was no evidence that Galleri was effective at improving patient outcomes and none of the Galleri studies measured whether Galleri had any effect on mortality (¶¶137-39); (ii) GRAIL prohibited its employees from stating that Galleri could save lives because there was no evidence to support that claim (¶¶140-41); and (iii) Illumina could not accelerate Galleri's adoption, so closing the deal would not save lives (¶142).

427.   On February 10, 2022, Illumina held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2021. During that call, when questioned by analysts about the $70 to $90 million revenue guidance, Defendant deSouza represented that GRAIL was "*seeing traction, as we've said, with employers*." On the same call, deSouza further stated, "*It's great to see the initial market reception, with multiple large employers and payers adopting Galleri*."

428.   On February 17, 2022, Defendant Samad represented Illumina at the SVB Leerink Annual Global Healthcare Conference. When questioned by analysts about the $70 to $90 million revenue guidance, Defendant Samad stated, "*That $70 [million] to $90 [million] is concentrated on the Galleri side with health systems*; with, to some extent, self-insured employers; concierge medicine; but *it's really health systems* . . . So, that's the expectation of where these revenues are going to come from." Defendant Samad further stated, "[W]here the *revenues are coming from are the eight health systems that they've signed up, the partnerships that they've signed up,* including with some banner health systems in cancer like the Mayo Clinic, the Cleveland Clinic, and more to come."

429.   The statements identified in ¶¶427-28 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state that GRAIL was "seeing traction" "with employers,"

and that "multiple large employers and payers" were "adopting Galleri." It was also materially false and misleading for Defendant Samad to state that the $70 million to $90 million revenue guidance was "concentrated" in "health systems," that it was "really health systems," and that "revenues are coming from are the eight health systems that they've signed up, the partnerships that they've signed up." As set forth in Section V.E.1-2, these statements were materially false and misleading because: (i) GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said the guidance was unachievable (¶¶149-50); and (ii) GRAIL was not gaining traction with health systems, employers, payers, or any of its other channels (¶¶151-52). In fact, revenue for the health systems, employers, and payers channels only came in at between 0% to 44% of forecasted revenue by the end of the quarter (¶¶148, 153). Moreover, contrary to Defendant Samad's statement that "revenues are coming from . . . the eight health systems that they've signed up," in fact, GRAIL had secured just four health systems secured prior to the end of the quarter (¶151).

430. On February 24, 2022, Defendant Samad represented Illumina at the Citi Research Healthcare Conference. In response to a question from an analyst about Illumina's "confidence level" around the $70 to $90 million revenue guidance, Defendant Samad stated, "We have a high degree of confidence in the guide. . . . ***So, we have good confidence around the guide that they are giving***."

431. The statements identified in ¶430 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant Samad to state that Illumina had "good confidence around the [$70 to $90 million] guide that they are giving." As set forth in Section V.E.1-2, this statement was materially false and misleading because: (i) GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said the guidance was unachievable (¶¶149-50); and (ii) GRAIL was not gaining traction with health systems, employers, payers, or any of its other channels (¶¶151-52). In fact, revenue

for the health systems, employers, and payers channels only came in at between 0% to 44% of forecasted revenue by the end of the quarter (¶¶148, 153).

432.    On March 7, 2022, Defendant deSouza represented Illumina at the Cowen & Co. Health Care Conference.  In response to a question from an analyst about the $70 to $90 million revenue guidance and how the guidance was "from health system customers [and] self-insured employers," deSouza stated, "They are seeing **good traction in each of the segments that they talked about**."

433.    The statements identified in ¶432 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that there was "good traction in each of the segments that they talked about." As set forth in Section V.E.1-2, this statement was materially false and misleading because: (i) GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said the guidance was unachievable (¶¶149-50); and (ii) GRAIL was not gaining traction with health systems, employers, payers, or any of its other channels (¶¶151-52).  In fact, revenue for the health systems, employers, and payers channels only came in at between 0% to 44% of forecasted revenue by the end of the quarter (¶¶148, 153).

434.    On May 5, 2022, Illumina held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2021.  During that call, in response to a question from an analyst about the $10 million in GRAIL revenue announced for the first quarter and the "fairly steep ramp to the rest of the year," Defendant deSouza stated:

> So if we look at the traction that they got in Q1, not just the $10 million in revenue but if you look at the traction they have made also with increasing the number of prescribing physicians to 2,400, *increasing the number of partners across health systems, employers and insurers and up to 34, they continue to be on track to meet the revenue outlook that we laid out at the beginning of the year, the $70 million to $90 million*.

435.    The statements identified in ¶434 above were materially false and misleading and omitted material facts.  It was materially false and misleading for

Defendant deSouza to state that GRAIL "continue[s] to be on track" to meet the $70 to $90 million revenue guidance for the year, and that GRAIL was "increasing the number of partners across health systems, employers and insurers and up to 34." As set forth in Section V.E, these statements were materially false and misleading because: (i) GRAIL's guidance lacked a reasonable basis and GRAIL's senior sales leadership said the guidance was unachievable (¶¶149-50); (ii) GRAIL was not gaining traction with health systems, employers, payers, or any of its other channels (¶¶151-52); and (iii) by May 2022, total revenue to date were 58.5% of forecasts, the supposedly key sales channels for Galleri drivers that Defendants represented were going to help GRAIL meet guidance (health systems, payers, and insurers) had sales revenue of either zero or 7% of forecasts, with sales revenue for employers making up only 44% of forecasts (¶¶148, 153). Further, contrary to deSouza's statement that GRAIL was "increasing the number of partners across health systems, employers and insurers and up to 34," an internal April 25, 2022 GRAIL document showed that GRAIL had only secured 11 total employer, health system and payer customers in the quarter—and *no* insurer "partners." ¶152.

436. On the same call, in response to a question from an analyst about the "timeline for FDA approval of Galleri," Defendant deSouza stated: "The team has continued to make progress in terms of engaging with the FDA, there's sort of no new timelines to be announced. ***I don't think the size of the study is going to be the problem.*** I think it will just take time. ***I think they've powered the studies they need sufficiently and the dialogues have been constructive with the FDA.***"

437. The statements identified in ¶436 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state the "size of the study" was not "going to be the problem," and that GRAIL had "powered the studies they need sufficiently and the dialogues have been constructive with the FDA." As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence that Galleri

was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

### D. Defendants Continue to Issue False Statements About GRAIL and Galleri in Response to Increasing Investor Scrutiny

438. On November 8, 2022, in an interview on the Harry Glorikian Show, Defendant Febbo stated: "***So we have incredible commercial kind of—commercial capability, support capability, regulatory capability and reimbursement experience*** to help bring this test globally."

439. The statement identified in ¶438 above was materially false and misleading and omitted material facts. It was materially false and misleading for Defendant Febbo to state that Illumina had "incredible commercial capability, support capability, regulatory capability and reimbursement experience to help bring this test globally." As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

440. On November 29, 2022, Defendant Aravanis represented Illumina at the Evercore ISI HealthCONx Conference. At that conference, Aravanis stated in response to a question about the NHS-Galleri trial: "So, ***it'll be an exciting piece of clinical evidence for GRAIL***, not just in the U.K., but also in the U.S., right? So,

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    154
CASE NO. 3:23-cv-02082-LL-MMP

*you can imagine how useful that will be if successful in adoption, in just – in discussions with regulators about approval and so on*."

441.   The statements identified in ¶440 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant Aravanis to state that the NHS-Galleri trial would be "an exciting piece of clinical evidence for GRAIL," and that the study would be "useful" in "discussions with regulators about approval and so on."  As set forth in Section V.C.2, these statements were materially false and misleading because the FDA told GRAIL that there was "no way" that GRAIL could get approval for the Galleri test based on the NHS-Galleri trial, including due to significant differences in population characteristics, screening, and treatment practices between the U.S. and the U.K. ¶¶131-33.

442.   On January 9, 2023, Defendant deSouza represented Illumina at the JPMorgan Healthcare Conference.  During the conference, deSouza stated that "***GRAIL is making progress towards reimbursement***, with 300,000 participants across multiple studies ***and a final FDA submission expected in 2024/2025***," and that the "exciting momentum" from these studies had "translate[d] into an expected GRAIL revenue CAGR of 60 to 90% over the next five years."

443.   The statements identified in ¶442 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that GRAIL was "making progress towards reimbursement" and "a final FDA submission" was "expected in 2024/2025."  As set forth in Section V.C, these statements were materially false and misleading because:  (i) there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical

evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

444.    On January 19, 2023, Defendant deSouza gave an interview on CNBC. Defendant deSouza stated:

> I think the GRAIL test is very important in terms of the impact it's going to have. ***Illumina can really accelerate GRAIL***. So it's a startup. Again, we founded it, go through the trials, we had to raise more money and then we bought it back. GRAIL, on its own, we'll make a difference, but with Illumina, we can make the test available much more broadly than this startup could on its own. . . . ***So what we want to do is make that test available more broadly, more affordably, more quickly than [GRAIL] could on its own***.

445.    The statements identified in ¶444 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendant deSouza to state that "Illumina can really accelerate GRAIL."  As set forth in Section V.B.1-2, this statement was materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them (¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

446.    On February 7, 2023, Illumina held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2022.  During that call, in response to an analyst question about FDA approval, Defendant deSouza stated that GRAIL had "***been working . . . with the FDA for a number of years on designing the studies that will be part of the ultimate submission***," and was "***making good progress***."  deSouza further stated that GRAIL had "***been talking to the FDA about submitting data from the NHS trial as part of the FDA submission***.  Now that's really powerful because that's a very large

trial. ***And so that continues to add to the bolus of evidence that GRAIL was able to get and submit into the FDA***." As a result, deSouza stated, Illumina was "***starting to see the benefits of that good working relationship between GRAIL and the FDA***."

447. The statements identified in ¶446 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state that GRAIL was "making good progress," had "been talking to the FDA about submitting data from the NHS trial as part of the FDA submission" a "powerful" trial that would "add to the bolus of evidence" supporting GRAIL's FDA submission, and Illumina was "starting to see the benefits of that good working relationship between GRAIL and the FDA." As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33); and (iii) the FDA told GRAIL that there was "no way" that GRAIL could get approval for the Galleri test based on the NHS-Galleri trial. ¶132.

448. On March 28, 2023, Defendant Ofman discussed Galleri on a video presentation that was featured on GRAIL's website. In that presentation, Defendant Ofman represented that "Our Galleri multi-detection test can ***identify 50 different cancers with a single blood draw.*** And we can do that with a very low false positive rate, and a very high accuracy to predict in the body any cancer signal is found, and that ***allows physicians to make an efficient and rapid diagnosis***."

449. The statement identified in ¶448 above was materially false and misleading. It was materially false and misleading for Defendant Ofman to state that Galleri could "identify 50 different cancers with a single blood draw" and that

enable physicians to make "an efficient and rapid diagnosis." As set forth in Section V.C.1, these statements were materially false and misleading because there was no evidence that Galleri could detect 50+ cancers in an asymptomatic population, or that Galleri would result in an "efficient" or "rapid" diagnosis of 50 cancers. ¶¶117-26.

### E.    In Response to Icahn's Inquiries, Defendants Continue to Misrepresent GRAIL's Value, the Reasons for the Acquisition, and Illumina's Accounting

450.    After the closing of the deal, analysts increasingly raised questions about GRAIL's value, Defendants' reasons for closing the acquisition in light of ongoing antitrust challenges, and Illumina's accounting.  In addition, on March 24, 2023, activist investor Carl Icahn issued an open letter to Illumina's shareholders calling attention to and questioning the D&O policy Illumina obtained for its Board immediately prior to the GRAIL acquisition.

451.    In response to these inquiries, on March 24, 2023, Illumina issued a press release, which was also filed with the SEC on Form DEFA14A.  In the press release, in response to Icahn's questions concerning the D&O insurance policy, Illumina stated that "***D&O insurance and corporate indemnification are standard for Delaware companies***," "***[a]ll major U.S. public companies, including Illumina, regularly review their D&O insurance to reflect appropriate coverage***," and that "***it is not uncommon for a company buying another business to increase insurance limits during the acquisition process***."

452.    The statements identified in ¶451 above were materially misleading and omitted material facts.  It was materially misleading to state that "D&O insurance and corporate indemnification are standard for Delaware companies," "[a]ll major U.S. public companies, including Illumina, regularly review their D&O insurance to reflect appropriate coverage," and that "it is not uncommon for a company buying another business to increase insurance limits during the acquisition process."  It was also materially false and misleading to state that Illumina's purchase of additional

insurance should be considered "[]common" and similar to other instances where coverage is increased during the acquisition process. As set forth in Sections V.G and V.H, these statements were materially false and misleading because the insurance policy was not "standard" or "[]common," but instead involved an unprecedented premium of over $72 million on $300 million of coverage, doubled the Company's D&O insurance from the year before at nearly 20 times the cost, eliminated the entity coverage that Illumina previously had, and covered any shareholder claims that would result from closing the transaction.  ¶¶174-77, 182.

453.  In the press release, Illumina also stated: "***The Board takes its fiduciary duties seriously and exercises considered and deliberate judgement [sic] with independent advice. Illumina steadfastly follows appropriate risk management and disclosure practices. Illumina's disclosures are full, transparent and timely, consistent with SEC and other disclosure requirements***."

454.  The statements identified in ¶453 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to state that Illumina's Board "[took] its fiduciary duties seriously," Illumina "steadfastly follow[ed] appropriate risk management and disclosure practices," and Illumina's "disclosures were full, transparent and timely."  As set forth in Sections V.G and V.H, these statements were materially false and misleading because: (i) rather than provide "timely" and "transparent" disclosures, Illumina concealed the fact that it determined to close the GRAIL acquisition while falsely telling investors it would provide regulators with any needed "assurances" (¶¶172-73); (ii) senior management and the Board approved the purchase of D&O insurance with an unprecedented premium of over $72 million on $300 million of coverage and doubled the Company's D&O insurance from the year before at nearly 20 times the cost because Illumina did not follow appropriate risk management practices (¶¶174-77, 182); and (iii) Illumina closed the deal despite the mandatory

standstill while knowing that doing so invited litigation, fines and reputational harm (¶¶172-73).

455.    Illumina continued to defend the acquisition and the purchase of the $300 million D&O policy in the press.  On March 24, 2023, in an article published by the *Financial Times*, Illumina stated:

> ***Illumina operates transparently with strong corporate governance.***  Nothing was hidden, and unsurprisingly, Carl Icahn is deliberately mischaracterizing appropriate risk management and normal SEC disclosure practices.  ***In line with strong corporate governance, Illumina reviews its [directors and officers] insurance annually, and obtained appropriate coverage to reflect the Grail acquisition.  All disclosures, including insurance and tax liabilities, were made in an appropriate, full, transparent, and timely manner consistent with SEC disclosure regulations.***

456.    The statements identified in ¶455 above were materially false and misleading and omitted material facts.  It was materially false and misleading for Illumina to state that Illumina "operates transparently with strong corporate governance," and that in line with that strong corporate governance, Illumina "obtained appropriate coverage to reflect the Grail acquisition" and that "[a]ll disclosures" were "made in an appropriate, full, transparent, and timely manner."  As set forth in Sections V.G and V.H, these statements were materially false and misleading because they omitted the highly material facts that Illumina's senior management and Board approved the purchase of D&O insurance with an unprecedented premium of over $72 million on $300 million of coverage to cover their acquisition-related misconduct—extraordinary levels of insurance coverage that demonstrated Defendants knew their conduct gave rise to liability, that were not timely or ever properly disclosed to investors. ¶¶174-77, 182.

457.    In the face of analyst questions and the proxy contest, Defendant deSouza continued to publicly defend the acquisition and its rationale.  For example, on April 26, 2023, Defendant deSouza gave an interview on CNBC to defend the deal.  During the interview, in response to the interviewer remarking, "This one [the Galleri test] ***really works***," Defendant deSouza stated:

This one does and so, you know, the first 12-month revenue ramp for GRAIL has been the first test of any cancer screening test in history. . . . The reason why we think it makes sense at Illumina is that *we can accelerate bringing this test to more people, more quickly, more affordably than GRAIL can do on their own*. . . . we have teams that are experts in bringing reimbursements for tests. *And so what we can do is make this test more available to people who can't afford the $950 test and roll it out more quickly*."

458. On the same day, Defendant deSouza also gave an interview on Bloomberg TV. During the interview, Defendant deSouza stated: "[The Galleri test] is a *proven technology*. *There are large studies that show the efficacy of GRAIL as well as the performance metrics around GRAIL*."

459. On the same day, Defendant deSouza also gave an interview on FOX Business. During the interview, deSouza stated:

*We also have the opportunity at Illumina to significantly accelerate the ramp of GRAIL*. . . . We at Illumina can accelerate that ramp because GRAIL has only plans to roll it out, the test out in the U.S. and the U.K. until 2030. We operate in 150 countries. I have talked personally to ministers of health that have expressed interest in rolling this test out in Europe, in Asia, in the Middle East, *so we can accelerate this test and create significant shareholder value in doing this*.

460. The statements identified in ¶¶458-59 above were materially false and misleading and omitted material facts. It was materially false and misleading for Defendant deSouza to state that Illumina acquired GRAIL to "accelerate bringing this test to more people, more quickly, more affordably than GRAIL could do on their own," "make this test more available to people who can't afford the $950 test and roll it out more quickly," "significantly accelerate the ramp of GRAIL," and "create significant shareholder value." As set forth in Section V.B.1-2, these statements were materially false and misleading because: (i) as the Illumina Executive Defendants discussed in August 2020, Illumina lacked the capability to accelerate Galleri, including because Illumina lacked the critical manufacturing, commercial, regulatory, reimbursement, clinical sales, and marketing capabilities necessary to develop and sell Galleri and would instead have to acquire or build them

(¶¶100-06); and (ii) Illumina never had any plan to accelerate Galleri's commercialization, regulatory approval, or payor reimbursement (¶¶107-09).

461.    It was also materially false and misleading for Defendant deSouza to state that Galleri "really works" and that it is a "proven technology." As set forth in Section V.C, these statements were materially false and misleading because: (i) there was no evidence that Galleri was "effective" in improving patient outcomes and treatment decisions in Galleri's intended test population (¶¶117-26); and (ii) none of the planned studies for GRAIL did so in a sufficiently powered manner to support FDA approval, and there was a total absence of the kind of clinical evidence necessary to support FDA approval, commercialization, and payor reimbursement (¶¶127-33).

462.    On April 27, 2023, Illumina issued an investor presentation in connection with Illumina's 2023 Annual Meeting of Stockholders. The presentation was filed the same day on Schedule 14A. In the presentation, Defendants stated that it was a "***Myth***" that "***Illumina's Board acted inappropriately and expanded its D&O insurance prior to completing the GRAIL acquisition***," and that, instead, it was a "***Fact***" that "***[a]s a general matter, companies regularly resize and rescope their D&O coverage in connection with M&A events. There's nothing inappropriate or unusual about a growing business enhancing its D&O coverage***."

463.    The statements identified in ¶462 above were materially false and misleading and omitted material facts. Defendants' statement that it was a "Myth" that "Illumina's Board acted inappropriately and expanded its D&O insurance prior to completing the GRAIL acquisition" was materially false and misleading. As set forth in Sections V.G and V.H, these statements were materially false and misleading because they omitted the highly material facts that Illumina's Board approved the purchase of D&O insurance with an unprecedented premium of over $72 million on $300 million of coverage, doubled the Company's D&O insurance from the year before at nearly 20 times the cost, and eliminated the entity coverage

that Illumina previously had—highly unusual and inappropriate measures that evidenced Illumina's senior leadership knowledge that their conduct gave rise to liability. ¶¶174-77, 182.

464.   It was also materially false and misleading to state that "companies regularly resize and rescope their D&O coverage in connection with M&A events," and that "There's nothing inappropriate or unusual about a growing business enhancing its D&O coverage." As set forth in Section V.H, these statements were materially false and misleading because they omitted the highly material facts that Illumina's Board approved the purchase of D&O insurance with an unprecedented premium of over $72 million on $300 million of coverage, doubled the Company's D&O insurance from the year before at nearly 20 times the cost, eliminated the entity coverage that Illumina previously had, and covered any shareholder claims that would result from closing the transaction. ¶¶174-77, 182.

465.   On April 28, 2023, activist investor Carl Icahn published an open letter to Illumina shareholders questioning the GRAIL acquisition and requesting that the Board "bring in an outside – and demonstrably independent – law firm and forensic accounting team to investigate and address these questions publicly."  In response, just before the market closed on May 1, 2023, Illumina issued a press release, which was also filed with the SEC on Form DEFA14A, stating:

> None of Illumina's directors involved in either the decision to sign or the decision to close the GRAIL acquisition – including our former CEO and Executive Chairman Jay Flatley, our current CEO Francis deSouza and each of Illumina's current directors – has ever held any equity interest in GRAIL. At the time of Illumina's various investment rounds in GRAIL, no individuals at Illumina were investors in GRAIL. Illumina's employees, executive officers and Board members were not permitted to participate in GRAIL investment rounds and did not otherwise receive any GRAIL equity. Illumina, Inc. was the founder of GRAIL and individuals employed by Illumina moved to GRAIL as part of the spin-out in 2016. Those who moved to GRAIL terminated their relationship with Illumina at the time of transition and directors and employees who remained at Illumina could not receive any GRAIL equity.
>
> No executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition, other than Alex Aravanis, who

Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's board in May 2020. *The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were recused from any decisions to sign and close the GRAIL acquisition*.

466. On May 18, 2023, in response to activist investor Carl Icahn's questions about Illumina insiders' financial interests in the GRAIL transaction, Defendant Thompson stated:

On conflicts of interest, there is an important question I would like to put to bed: "Did any Illumina directors have a financial interest in GRAIL at the time of the acquisition?" This question is not a matter of interpretation or explanation. The answer is simply no. As we have said before, no director who oversaw any part of the GRAIL transaction has ever owned any equity interest in GRAIL – that includes Jay Flatley, Francis deSouza, myself, and any member of the Board now or at the time of acquisition. In addition, no executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition (including indirect ownership interests such as through trusts, LP or GP stakes in investment vehicles, or through derivative securities), *other than Alex Aravanis, who Illumina had hired from GRAIL*, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's Board in May 2020. *The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices*, *both were recused from any decisions to sign and close the GRAIL acquisition.*

No executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition, other than Alex Aravanis, who Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's board in May 2020. *The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were recused from any decisions to sign and close the GRAIL acquisition*.

467. The statements identified in ¶¶465-66 above were materially false and misleading and omitted material facts. Thompson's statement that Aravanis and Ronaghi were "recused from any decisions to sign and close the GRAIL acquisition" was materially false and misleading. As set forth in Section V.F, these statements were materially false and misleading because: (i) Defendant Aravanis—who left GRAIL to re-join Illumina as CTO—played a prominent role in the GRAIL

acquisition by presenting the deal to Illumina's Board of Directors (¶¶157-63); (ii) Aravanis served as Defendant deSouza's critical resource for answering any substantive question deSouza had about GRAIL and Galleri (¶162); and (iii) contrary to Defendants' statements that Aravanis's "economic interests" were "fully disclosed to, and known by, Illumina and its Board," Aravanis's ownership of over 1.3 million shares of GRAIL was not properly disclosed to the Board at the time he was leading the effort to acquire GRAIL. ¶160.

## F. Defendants Violated GAAP by Failing to Disclose GRAIL as a Related Party

468. In each of Illumina's quarterly and annual filings during the Class Period prior to the close of the GRAIL acquisition (namely, its Form 10-Qs filed on October 30, 2020, April 28, 2021, and August 6, 2021, and its Form 10-K filed on February 17, 2021), Illumina failed to disclose GRAIL as a related party or the GRAIL acquisition as a related party transaction under GAAP, and also accounted for its shares of GRAIL under the cost method, rather than the equity method. These filings provided in substantially similar form:

> *The consolidated financial statements have been prepared in conformity with U.S. generally accepted accounting principle*s….
> . . .
> We evaluate our ownership, contractual and other interests in entities that are not wholly-owned to determine if these entities are VIEs, and, if so, whether we are the primary beneficiary of the VIE. In determining whether we are the primary beneficiary of a VIE and therefore required to consolidate the VIE, *we apply a qualitative approach that determines whether we have both (1) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and (2) the obligation to absorb losses of, or the rights to receive benefits from, the VIE that could potentially be significant to that VIE*. We continuously perform this assessment, as changes to existing relationships or future transactions may result in the consolidation or deconsolidation of a VIE.
> . . .

> One of our investments, GRAIL, is a VIE for which **_we have concluded that we are not the primary beneficiary_**, and therefore, we do not consolidate GRAIL in our consolidated financial statements."

469.   In addition, each of these filings attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendant deSouza and Defendant Samad attesting to the filing's accuracy and the disclosure of all fraud.  Each of the SOX Certifications made positive representations to investors that each quarterly or annual report "fairly presents, in all material respects, the financial condition and results of operations of the Company.

470.   The statements referenced in ¶¶468-69 above were materially false and misleading and omitted material facts.  It was materially false and misleading to state that Illumina's financial statements "have been prepared in conformity with [GAAP]," that each of the financial statements that were the subject of the SOX Certifications "fairly presents, in all material respects, the financial condition and results of operations of the Company," and that Illumina was "not the primary beneficiary" of GRAIL as a VIE.  As set forth in Section IX, these statements were materially false and misleading because Illumina: (i) improperly accounted for GRAIL under the cost method rather than the equity method despite exerting "significant influence" over GRAIL in violation of GAAP (¶¶334-38); and (ii) failed to disclose GRAIL as a related party or the GRAIL acquisition as a related party transaction in violation of GAAP.  ¶¶339-44.

## XI.   THE PRESUMPTION OF RELIANCE

471.   Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and half-truths, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

    (i)    The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (ii)    The misrepresentations and half-truths were material;

(iii)   Illumina's common stock was actively traded in an efficient market on the NASDAQ;

(iv)   Illumina's common stock traded at high weekly volumes;

(v)   As a regulated issuer, Illumina filed periodic public reports with the SEC;

(vi)   Illumina was eligible to file registration statements with the SEC on Form S-3, its equivalent;

(vii)   Illumina regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(viii)   The market reacted promptly to public information disseminated by Illumina;

(ix)   Illumina common stock was covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(x)   The material misrepresentations and half-truths alleged herein would tend to induce a reasonable investor to misjudge the value of Illumina common stock; and

(xi)   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Illumina common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

472.   Additionally, Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because certain of the claims asserted herein against Defendants are predicated upon a scheme to defraud and omissions of material fact which there was a duty to disclose.

473.   Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Illumina's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and half-truths, deceptive devices, and fraudulent scheme during the Class Period.

## XII.   CLASS ACTION ALLEGATIONS

474.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Illumina common stock between September 21, 2020, and November 9, 2023, inclusive, and who were damaged thereby (the "Class Period").

475.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the class members.  During the Class Period, Illumina had more than 150 million shares of common stock outstanding, owned by many thousands of investors.

476.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Illumina common stock was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

477.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

478.   Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

479.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

480.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

481.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

482.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

483.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or

misleading, did not actually believe the statements, had no reasonable basis for the statements, and were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XIV. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST DEFENDANTS ILLUMINA, GRAIL, DESOUZA, SAMAD, FEBBO, ARAVANIS, THOMPSON, BISHOP, AND OFMAN)

484. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

485. This count is asserted on behalf of Lead Plaintiffs and all members of the Class against Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

486. During the Class Period, Defendants Illumina, GRAIL, deSouza, Aravanis, Samad, Febbo, Thompson, Bishop, and Ofman made the false statements specified above, all of which were about Illumina and its common stock, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

487. Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading.

488. Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails

made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the above statements and half-truths intentionally or with severe recklessness.

489.   Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman are liable for all materially false or misleading statements made during the Class Period, as alleged above.

490.   As described above, Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Illumina common stock, were either known to Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman or were so obvious that they should have been aware of them.

491.   Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of market prices, they paid artificially inflated prices for Illumina common stock, which inflation was removed from its price in response to the disclosures detailed herein.

492.   Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman's wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members.  Had Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired Illumina common stock or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also foreseeable to Defendants

Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman that misrepresenting and concealing these material facts from the public would artificially inflate the price of Illumina's securities and that the disclosures detailed herein would cause the price of Illumina common stock to decline.

493.   Accordingly, as a result of their purchases of Illumina common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

494.   By virtue of the foregoing, Defendants Illumina, GRAIL, deSouza, Samad, Febbo, Aravanis, Thompson, Bishop, and Ofman violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder.

495.   This claim is timely within the applicable statute of limitations and repose.

## COUNT II – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5(A) AND (C) PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

496.   Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

497.   This count is asserted on behalf of all members of the Class against Defendants Illumina, GRAIL, deSouza, Thompson, Samad, Febbo, Aravanis, Bishop, Ofman, and Klausner for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

498.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of Illumina common stock during the Class Period in an effort to maintain artificially high market prices for Illumina common stock.

499.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class in connection with the purchase and sale of Illumina common stock; which did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the Galleri test's capabilities and readiness for commercialization and Defendants' personal financial motives for acquiring GRAIL; (ii) artificially inflate and maintain the market price of Illumina common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Illumina common stock at artificially inflated prices and suffer losses when the stock price declined in response to the disclosures detailed herein.

500.   As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Defendants engaged in the following course of business conduct, as described by, among things, pleadings and evidence filed in connection with related litigation involving Illumina and GRAIL, including *In re Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Docket No. 9401, *Icahn*, *Omaha*, *Roseville*, *Pavers,* and *New York State*; and the accounts of former employees described above.  For example, Defendants engaged in the following deceptive activities:

    i.    Concealing evidence of insiders' personal stakes in GRAIL by applying the cost method of accounting rather than the equity method of accounting in violation of GAAP and disseminating false statements to do so;

    ii.    Garnering illicit profits by using Defendants' knowledge of Illumina's acquisition of GRAIL while "investing" tens of millions in GRAIL and concealing evidence of Defendant Klausner and Milky Way's purchase of GRAIL equity;

    iii.    Purchasing $300 million in D&O insurance—which had been made a condition to closing the GRAIL acquisition—at an over $72 million premium specifically to provide against personal liability for completing the GRAIL acquisition, and eliminating "Side C" entity coverage for Illumina, while knowing that completion of the deal was illegal and then misrepresenting and concealing the nature of the policy and its import when questioned by investors;

iv.    Entering into a secret letter agreement in which Illumina and GRAIL agreed to sidestep certain conditions in Illumina and GRAIL's merger agreement requiring that all necessary regulatory approvals be obtained before closing the GRAIL acquisition;

v.    Disseminating false statements about the timeline of the GRAIL acquisition to conceal the heavily conflicted nature of the deal, including concealing Defendant deSouza's January 2020 discussions with Defendant Bishop or Defendant Klausner about the potential acquisition;

vi.    Disseminating false statements over-valuing GRAIL with knowledge that Galleri's commercial prospects and FDA approval were unsubstantiated; and

vii.    Disseminating numerous false, unsubstantiated and unsupported claims about Galleri's effectiveness in violation of FDA regulations, attempting to avoid scrutiny into those device claims by launching and publicizing the launch of Galleri as an LDT, misrepresenting the status of GRAIL's discussions with the FDA and the rigor and sufficiency of Galleri's clinical effectiveness to payors, and concealing these facts from investors.

501.    These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of Illumina common stock during the Class Period in an effort to maintain artificially high market prices for Illumina common stock.

502.    As described above, Defendants Illumina, GRAIL, deSouza, Aravanis, Samad, Febbo, Thompson, Bishop, Ofman, and Klausner acted with scienter throughout the Class Period, in that they either acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.

503.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of market prices, they paid artificially inflated prices for Illumina common stock, which artificial inflation was removed from the stock in response to the disclosures detailed herein. Plaintiffs and the Class would not have purchased Illumina common stock at the prices they paid, or at all, had they been aware that the market prices for Illumina common stock had been artificially inflated by Defendants' fraudulent course of conduct.

504.    As a direct and proximate result of Defendants' wrongful conduct,

Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock during the Class Period.

505. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

506. This claim is timely within the applicable statute of limitations and repose.

**COUNT III – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE ILLUMINA EXECUTIVE DEFENDANTS AND THE GRAIL EXECUTIVE DEFENDANTS)**

507. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

508. This count is asserted on behalf of all members of the Class against Illumina, the Illumina Executive Defendants, and the GRAIL Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

509. *Illumina*. The Illumina Executive Defendants acted as controlling persons of Illumina within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

510. By reason of their high-level positions of control and authority as Illumina's most senior officers, the Illumina Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and activities of Illumina and its employees, and to cause Illumina to engage in the wrongful conduct complained of herein. The Illumina Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Illumina during the Class Period, thereby causing the dissemination of the materially false and misleading statements of material facts as alleged herein.

511. The Illumina Executive Defendants communicated with investors or the public on behalf of Illumina during the Class Period. The Illumina Executive

Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, the Illumina Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Illumina during the Class Period, thereby causing the dissemination of the materially false and misleading statements of material facts as alleged herein.

512. Illumina violated Section 10(b) of the Exchange Act by virtue of the acts and omissions of its top executives, including the Illumina Executive Defendants, as alleged in this Complaint.

513. By virtue of their positions as controlling persons of Illumina and as a result of their own aforementioned conduct, the Illumina Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Illumina common stock during the Class Period. As detailed above, during the respective times, these Defendants served as officers, directors, and/or senior personnel of Illumina.

514. ***GRAIL.*** The GRAIL Executive Defendants and Illumina acted as controlling persons of GRAIL within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

515. By reason of their high-level positions of control and authority as GRAIL's most senior officers, the GRAIL Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and activities of GRAIL and its employees, and to cause GRAIL to engage in the wrongful conduct complained of herein. The GRAIL Executive Defendants and Illumina were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by

1    GRAIL during the Class Period, thereby causing the dissemination of the materially

2    false and misleading statements of material facts as alleged herein.

3        516.    The GRAIL Executive Defendants communicated with investors or the

4    public on behalf of GRAIL during the Class Period.    The GRAIL Executive

5    Defendants were provided with, or had unlimited access to, copies of GRAIL's press

6    releases, public filings, and other statements alleged by Lead Plaintiffs to be

7    misleading prior to and/or shortly after these statements were made and had the

8    ability to prevent the issuance of the statements or to cause the statements to be

9    corrected.    Therefore, the GRAIL Executive Defendants and Illumina were able to

10   influence and control, and did influence and control, directly and indirectly, the

11   content and dissemination of the public statements made by GRAIL during the Class

12   Period, thereby causing the dissemination of the materially false and misleading

13   statements of material facts as alleged herein.

14       517.    GRAIL violated Section 10(b) of the Exchange Act by virtue of the acts

15   and omissions of its top executives, including the GRAIL Executive Defendants, as

16   alleged in this Complaint.

17       518.    By virtue of their positions as controlling persons of GRAIL and as a

18   result of their own aforementioned conduct, the GRAIL Executive Defendants and

19   Illumina are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiffs

20   and the other members of the Class who purchased or otherwise acquired Illumina

21   common stock during the Class Period.    As detailed above, during the respective

22   times, these Defendants served as officers, directors, and/or senior personnel of

23   GRAIL.

24       519.    As a direct and proximate result of Illumina's, the Illumina Executive

25   Defendants, and GRAIL Executive Defendants' conduct, Lead Plaintiffs and the

26   other members of the Class suffered damages in connection with their purchases or

27   acquisitions of Illumina common stock.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    177
CASE NO. 3:23-cv-02082-LL-MMP

520.   This claim is timely within the applicable statutes of limitations and repose.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XVI.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated: October 27, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

*/s/ Michael D. Blatchley*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

John Rizio-Hamilton
(johnr@blbglaw.com)
Michael D. Blatchley
(michaelb@blbglaw.com)
Alec Coquin
(alec.coquin@blbglaw.com)
Michael Mathai

(michael.mathai@blbglaw.com)
Emily A. Tu
(emily.tu@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiffs Universal and ACATIS and Lead Counsel for the Class*