**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3481

*Counsel for Lead Plaintiffs
Universal and ACATIS, and
Lead Counsel for the Class*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re Illumina, Inc. Securities Litigation* | Case No. 3:23-cv-02082-LL-BJW <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Courtroom: 5D <br> Judge:  Hon. Linda Lopez |

# **TABLE OF CONTENTS**

**Page**

GLOSSARY ........................................................................................................ xii

I.     INTRODUCTION ........................................................................................1

II.    STATEMENT OF FACTS ...........................................................................7

    A.     Illumina Forms GRAIL, Spins It Off, And Reduces Stake To 20%.....7

    B.     Illumina Reacquires GRAIL And Antitrust Regulators Intervene .......8

    C.     Illumina Closes The GRAIL Deal In Defiance Of Regulators And Defendants Continue To Misrepresent GRAIL And Galleri .............11

    D.     Loss Causation—Defendants' Fraud Injures Investors ......................14

III.   ARGUMENT.............................................................................................14

    A.     Defendants Made False And Misleading Statements ........................15

        1.     GRAIL's False Financial Valuations Are Actionable And Illumina Had A Duty to Disclose Its Own Contrary Forecasts..................................................................................15

        2.     Defendants' Statements About Illumina's Ability To "Accelerate" Galleri Are Actionable .......................................18

        3.     Defendants Misrepresented Galleri's Ability To Detect 50 Cancers, The Clinical Evidence Of Galleri's Effectiveness, And Prospects For FDA Approval Based On The Data.................................................................................23

        4.     Defendants Misrepresented That The Acquisition And Closing The Deal Would "Save Lives" ...................................26

        5.     Illumina Misrepresented The Sources Of GRAIL Revenue, GRAIL Revenue Guidance, And Progress To Achieving It...........................................................................27

        6.     Defendants Falsely Asserted The Deal Was Conflict-Free, Issued False Responses To Scrutiny About The Deal, And Falsely Defended Aravanis's Role And Illumina's Insurance .................................................................................30

        7.     Illumina Made False And Misleading Statements Concerning Its Accounting For GRAIL ...................................32

    B.     Defendants Acted With Scienter.......................................................34

        1.     The Complaint Pleads A Strong Inference Of Scienter...........34

        2.     Defendants' Remaining Scienter Arguments Are Meritless..................................................................................49

3. A Holistic Analysis Supports A Strong Inference Of Scienter.................................................................................55

C. The Complaint Adequately Pleads Loss Causation ............................56

1. Closure Of The GRAIL Acquisition On August 12, 2021 .......57

2. The November 23, 2021 *Diagnostics* Article And June 10, 2022 *New York Times* Article .......................................................59

3. GRAIL's Negative Financial Performance And True Value ....................................................................................................60

4. Disclosures Concerning Conflicts And Accounting.................62

D. The Complaint Adequately Pleads Scheme Liability .........................64

IV. CONCLUSION.................................................................................................65

# **TABLE OF AUTHORITIES**

**Cases**                                                                        **Page(s)**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)...............................................................................39

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................*passim*

*In re Apollo Grp., Inc. Sec. Litig.*,
2011 WL 5101787 (D. Ariz. Oct. 27, 2011)......................................................54

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020)......................................................28

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .....................................................34

*Arnold v. Pfizer, Inc.*,
970 F. Supp. 2d 1106 (D. Ore. 2013) ................................................................54

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .............................................................................21

*Azar v. Blount Int'l, Inc.*,
2017 WL 1055966 (D. Or. Mar. 20, 2017).........................................................16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......................................................................*passim*

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022)...........................................24, 26, 39

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .....................................................................57, 63

*Bond v. Clover Health Invs. Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ...........................................................58

*In re Cadence Design Sys., Inc. Sec. Litig.*,
692 F. Supp. 2d 1181 (N.D. Cal. 2010).............................................................54

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...............................................................43

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...................................................................................4, 21, 36

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018)..........................................................................42

*In re Cobalt Int'l Energy, Inc.*,
    2016 WL 215476 (S.D. Tex. Jan. 19, 2016)....................................................................64

*In re Coinstar Inc. Sec. Litig.*,
    2011 WL 4712206 (W.D. Wash. Oct. 6, 2011)................................................................53

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..........................................................................53

*In re Daou Sys.*,
    411 F.3d 1020 (9th Cir. 2005) ...................................................................................*passim*

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................................................57

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 938 (9th Cir. 2023) ....................................................................32, 35, 46, 47

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) ............................................................................................59

*In re Evolus Inc. Sec. Litig.*,
    2021 WL 4251957 (S.D.N.Y. Sept. 17, 2021) .................................................................57

*In re Fastly, Inc. Sec. Litig.*,
    2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) .................................................................36

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ......................................................................................20, 21

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
    902 F. Supp. 2d 476 (S.D.N.Y. 2012) .............................................................................65

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ...........................................................................42, 65

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ..........................................................................................60

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................................................................*passim*

*Glazer v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................48

*Golub v. Gigamon Inc.*,
   372 F. Supp. 3d 1033 (N.D. Cal. 2019).........................................................29, 30

*Hedick v. Kraft Heinz Co.*,
   2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .....................................................61

*Herron v. Best Buy Stores, LP*,
   2013 WL 4432019 (E.D. Cal. Aug. 16, 2013)....................................................43

*Homyk v. ChemoCentryx, Inc.*,
   2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ....................................................23

*In re Hot Topic, Inc. Sec. Litig.*,
   2014 WL 7499375 (C.D. Cal. May 2, 2014) ......................................................16

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ...........................................................................18

*In re Illumina, Inc. Sec. Litig.*,
   2025 WL 2739655 (S.D. Cal. Sept. 26, 2025)....................................................57

*Illumina, Inc. v. FTC*,
   88 F.4th 1036 (5th Cir. 2023) ..................................................................4, 33, 34

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ..........................................................................51

*In re Intuitive Surgical Sec. Lit.*,
   65 F. Supp. 3d 834 (N.D. Cal. 2014)............................................................20, 26

*In re Iso Ray, Inc. Sec. Litig.*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016)......................................................55, 59

*Jaeger v. Zillow Grp., Inc.*,
   2025 WL 2741642 (9th Cir. Sept. 26, 2025) ................................................56, 57

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)....................................................................................*passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................15, 37, 39, 44

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F. Supp. 3d 350 (E.D.N.Y. 2022) ...........................................................20

*In re Leapfrog Enter., Inc. Sec. Litig.*,
  200 F. Supp. 3d 987 (N.D. Cal. 2016)............................................................62

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d (9th Cir. 2016) .................................................................................63

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .........................................................................63

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024).........................................................................15, 17, 18

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2012) .....................................................41, 47

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)....................................................................................34, 49

*In re Mattel, Inc. Sec. Litig.*,
  2021 WL 1259405 (C.D. Cal. Jan. 26, 2021).................................................63

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) .................................................63

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
  2018 WL 6181241 (D. Ariz. Nov. 27, 2018) .................................54, 56, 61, 62

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000)....................................................45, 46

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003) .....................................................54

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .............................................................6, 7, 61, 62

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015).......................................................33, 46

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020)................................................................17

*In re Mullen Auto. Sec. Litig.*,
    2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ..................................................19

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d (N.D. Cal. 2014)........................................................19, 20, 25

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017).......................................................37

*In re Myriad Genetics, Inc.*,
    2021 WL 977770 (D. Utah Mar. 16, 2021).......................................................48

*In re Nature's Sunshine Prods. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007)...............................................................42

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
    2017 WL 4453561 (D. Or. Oct. 3, 2017).....................................................16, 36

*In re Nevsun Res. Ltd.*,
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) .............................................50, 52

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v.*
    *Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .......................................................35, 46, 47, 50

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001)...............................................................53

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ....................................................................35, 62

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
    2024 WL 5182634 (9th Cir. Dec. 20, 2024)........................................40, 44, 46

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................4, 21, 34

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v.*
    *First Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023) ....................................................58

*Pampena v. Musk*,
    705 F. Supp. 3d 1018 (N.D. Cal. 2023).............................................................58

*Patel v. Edwards Lifesciences Corp.*,
2025 WL 2724388 (C.D. Cal. Sept. 19, 2025) ..............................................45, 47

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2024 WL 5399664 (N.D. Cal. Sept. 18, 2024)...............................................57, 63

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2025 WL 556283 (N.D. Cal. Feb. 18, 2025) .................................................48, 64

*Pujo v. EHang Holdings Ltd.*,
2025 WL 1242324 (C.D. Cal. Mar. 26, 2025).....................................................59

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019).....................................................47

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 732 (N.D. Cal. 2022)................................................................24

*In re Regulus Ther. Inc. Sec. Litg.*
406 F. Supp. 3d 845 (S.D. Cal. 2019)................................................................49

*Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)...........................................................42, 47

*Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020) ...........................................................65

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) ............................................................................52

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020).....................................................54

*Rudolph v. UTSTarcom*,
2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ...................................................63

*Ryan v. FIGS, Inc.*,
2024 WL 187001 (C.D. Cal. Jan. 17, 2024).......................................................50

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .....................................................48

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024) ........................................................................48, 51

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................*passim*

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   56 F. Supp. 3d 1121 (C.D. Cal. 2014) .............................................................40

*SEC v. Daifotis*,
   2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ...................................................18

*SEC v. Richman*,
   2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ...................................................64

*Seeks v. Boeing Co.*,
   2024 WL 4367846 (N.D. Ill. Sept. 30, 2024) ...................................................20

*In re Semtech Corp.*,
   2025 WL 2884810 (C.D. Cal. Oct. 7, 2025)....................................................22

*In re Siebel Sys., Inc. Sec. Litig.*,
   2005 WL 3555718 (N.D. Cal. Dec. 28, 2005)....................................................53

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) .........................................................49, 52

*Smilovits v. First Solar Inc.*,
   119 F. Supp. 3d 978 (D. Ariz. 2015) ................................................................63

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ............................................................18

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000)...................................................44

*Stocke v. Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009)................................................................51

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005)...........................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...........................................................................*passim*

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  2017 WL 3097184 (N.D. Cal. June 22, 2017)..................................................................45

*United States v. Chang*,
  2024 WL 2817494 (E.D.N.Y. Mar. 31, 2024)..................................................................18

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)............................................................................48

*In re Vaxart, Inc. Sec. Litig.*,
  2023 WL 3637093 (N.D. Cal. May 25, 2023)............................................................*passim*

*Vazquez v. Masimo Corp.*,
  2024 WL 6080498 (S.D. Cal. Nov. 5, 2024)....................................................................36

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ..........................................................................................64

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992)................................................................................36

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic*,
  845 F.3d 384 (8th Cir. 2016) ..........................................................................................65

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ..............................................................................20, 26, 39

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
  2012 WL 3835078 (N.D. Cal. Sept. 4, 2012)..................................................................17

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d (N.D. Cal. 2023)........................................................................37, 45, 61

*Wietschner v. Monterey Pasta Co.*,
  294 F. Supp. 2d 1102 (N.D. Cal. 2003)...........................................................................53

*Zak v. Chelsea Theraps. Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ..........................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..............................................................................49, 53, 54

**Other Authorities**

Jay W. Eisenhofer, *Toward A Corporate Finance-Based Theory of
  Loss Causation*, 59 Bus. Law. 1419 (2004) ....................................................................62

**GLOSSARY**

| Term | Definition |
|---|---|
| ALJ | Chief Administrative Law Judge D. Michael Chappell, who presided over *In the Matter of Illumina Inc., and GRAIL, Inc.*, Docket No. 9401. |
| Appendix A | Plaintiffs' Response to Defendants' Chart of Challenged Statements (ECF No. 62-4), filed herewith. |
| Aravanis | Defendant Alexander M. Aravanis, M.D., Ph.D. ¶37. |
| Bishop | Defendant Hans Bishop. ¶42. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class Period | September 21, 2020 to November 9, 2023, inclusive. |
| CMO | Chief Medical Officer. |
| Complaint or ¶ | Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 81. |
| CTO | Chief Technology Officer. |
| deSouza | Defendant Francis A. deSouza, Illumina's former Chief Executive (2016-June 11, 2023), ¶36. |
| EC | European Commission. |
| ELT | Illumina's Executive Leadership Team. |
| Ex. | Exhibits to the Declaration of John Rizio-Hamilton in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Third Amended Consolidated Class Action Complaint ("Rizio-Hamilton Declaration"), filed herewith. |
| Executive Defendants | deSouza, Aravanis, Febbo, Samad, Thompson, Bishop, Ofman, and Klausner. ¶¶36-44. |
| FE | Illumina and GRAIL former employees whose reports are discussed in the Complaint. |
| Febbo | Defendant Phillip G. Febbo, M.D. Illumina's former CMO (2018-2023). ¶38. |
| FTC | Federal Trade Commission. |
| Galleri | GRAIL's MCED test. ¶35. |
| Gr.Br. | Memorandum of Points and Authorities in Support of GRAIL Defendants' Motion to Dismiss Third Amended Complaint, ECF No. 87-1. |
| GRAIL | GRAIL, LLC (n/k/a GRAIL, Inc.). ¶35. |
| GRAIL Defendants | GRAIL, Bishop, Ofman, and Klausner. |
| Ill.Br. | Memorandum of Points and Authorities in Support of |

| Term | Definition |
| --- | --- |
| | Illumina Defendants' Motion to Dismiss the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 84-1. |
| Ill.RJN | Request for Judicial Notice and Incorporation by Reference in Support of Illumina Defendants' Motion to Dismiss the Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 85. |
| Illumina | Defendant Illumina, Inc. ¶34. |
| Illumina Defendants | Illumina, deSouza, Aravanis, Febbo, Samad, and Thompson. |
| *Illumina* Order | Order on Illumina's Defendants' Demurrer to Plaintiffs' Consolidated Complaint, *In re Illumina, Inc. Shareholder Litigation*, No. 24-CIV-00585 (Cal. Sup. Ct. Cnty of San Mateo Sept. 16, 2025), filed herewith as Exhibit A to the Rizio-Hamilton Declaration. |
| Klausner | Defendant Richard D. Klausner, M.D. ¶44. |
| MCED | Multi-cancer early detection. ¶48. |
| Ofman | Defendant Joshua J. Ofman. Ofman serves as President at GRAIL. He previously served as its CMO and Head of External Affairs from January 2020 to June 2022 and as its Chief of Corporate Strategy and Head of External Affairs from June 2019 to January 2020. ¶43. |
| Plaintiffs | Universal-Investment-Gesellschaft mbH, UI BVK Kapitalverwaltungsgesellschaft mbH, and ACATIS Investment Kapitalverwaltungsgesellschaft mbH. ¶¶32-33. |
| RJN Opp. | Plaintiffs' Omnibus Response to Defendants' Requests for Judicial Notice, filed herewith. |
| Samad | Sam A. Samad. Samad was Illumina's CFO and Senior Vice President from January 2017 to July 8, 2022. ¶39. |
| Thompson | Defendant John W. Thompson. Thompson was a member of Illumina's Board of Directors starting in May 2017, and served as Board Chairman from May 2021 to May 25, 2023, when he was voted out at the 2023 annual stockholder meeting. ¶40. |

Plaintiffs respectfully submit this memorandum in opposition to Defendants' Motions to Dismiss the Third Amended Consolidated Class Action Complaint.

## I.       INTRODUCTION

This case arises from Defendants' false and misleading statements concerning Illumina's $8 billion acquisition of GRAIL, one of the "most disastrous attempted mergers in biotech history." Defendants told investors that, by acquiring GRAIL, Illumina would "accelerate" adoption of GRAIL's Galleri cancer test—supposedly a "proven technology" nearing FDA approval and broad commercialization— thereby "saving tens of thousands of lives" and quickly generating billions in revenue. Illumina's stock price soared as a result. Defendants then closed the deal despite ongoing antitrust reviews by the FTC and the EC, and the Executive Defendants realized *hundreds of millions of dollars* in profits. Unfortunately for investors, Defendants' statements were false: Galleri was unproven and clinically useless, the FDA had rejected Galleri's planned clinical trials, and Illumina had no plan or ability to accelerate its adoption. Illumina ultimately divested GRAIL at a *95% discount*, ending a saga that destroyed billions in shareholder value.

The Complaint provides uniquely detailed facts supporting Plaintiffs' claims, including: (i) the firsthand observations of a former senior Illumina executive, who attended meetings with Defendant deSouza and the rest of Illumina's ELT and recounted specific discussions with them about the very subjects of Defendants' statements, and of another ELT member who worked directly with deSouza on Illumina's messaging about the deal; (ii) cites to internal Illumina documents that contradict Defendants' statements; and (iii) Defendants' testimony and admissions at trial, as well as judicial decisions, that confirm the falsity of several statements.

It is extraordinary to have such facts at the pleading stage. Defendants demand more, effectively asking the Court to require irrefutable proof now, but the Ninth Circuit has warned against "transform[ing] the PSLRA's formidable pleading requirement into an impossible one." *Glazer Cap. Mgmt., L.P. v. Forescout Techs.,*

*Inc.*, 63 F.4th 747, 769 (9th Cir. 2023). "The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance" like this one. *Id.*

The Ninth Circuit has well-established standards for pleading an actionable misrepresentation. A statement is actionably misleading if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Thus, once a defendant touts positive information about a topic to the market, he must disclose any "adverse information that cuts against the positive information" needed to make the statement materially accurate. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

The Complaint pleads in detail how Defendants made false and misleading statements to investors. ***First***, after agreeing to buy GRAIL, Defendants published false financial projections for GRAIL that valued the company at up to $44 billion, based on purportedly "reasonable" assumptions, making GRAIL's $8 billion price seem like a steal. They buttressed these valuations by asserting that the deal was negotiated at arm's length and talks began only after GRAIL had taken steps to go public. But in reality, Defendants' true, internal valuations were just a fraction what Illumina paid; they knew that the assumptions underlying the public valuations were false; the deal's negotiation began through insider backchannels months earlier than represented; and the deal process was heavily conflicted and secretly led by an Illumina executive, Defendant Aravanis, who reaped a fortune when the deal closed.

***Second***, Defendants made false and misleading statements to justify the deal. Defendants repeatedly stated that Illumina would "accelerate" Galleri's adoption and that it had the specific capabilities to do so. They repeatedly touted Galleri's efficacy, trumpeting purported evidence of its effectiveness and stating it could detect over 50 cancers in asymptomatic patients. They also assured investors that the evidence supported imminent FDA approval and commercialization, and thus told investors the acquisition would "save lives." But this was false: as Defendants

admitted internally and in the FTC trial, Illumina lacked the expertise, experience, and ability to accelerate Galleri, and had no plan to do so; there was no evidence that Galleri was effective, could detect 50 cancers in asymptomatic patients, or save lives (and real world experience showed the opposite); and the FDA privately told GRAIL its trials were insufficient for approval. In fact, GRAIL *prohibited* its employees from saying Galleri could "save lives" because no evidence supported that claim.

*Third*, when the EC announced in the summer of 2021 that it was investigating the deal, ostensibly triggering a "standstill" requirement that Illumina and GRAIL abstain from closing, Defendants falsely said they would "work with the [EC] to ensure that it has the information and assurances necessary to approve this transaction." In reality, they had *already* decided to close without EC approval and obtained *highly unusual* insurance to pay for their personal liability for doing so.

*Fourth*, after Illumina closed the deal despite the EC standstill, investors began asking whether conflicts of interest drove its decisions. In response, Defendants stated that Aravanis had been "recused" from those decisions and their insurance policy was "common" and "standard." But in truth, Aravanis "sponsored" the deal, even though he held GRAIL shares that would be worth millions when the deal closed, and Defendants' insurance policy was so unusual—its $72 million premium was nearly *20 times* what Illumina paid the year before—that the Delaware Court of Chancery would later find it provided a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law."

*Fifth*, after closing, Defendants issued revenue guidance for GRAIL and later reaffirmed it, saying GRAIL was "on track" to meet it based on Galleri's "gaining traction" with key customers. But GRAIL's senior sales leaders told Defendants the guidance was unachievable before they issued it and, when Defendants claimed GRAIL's guidance was "on track," the opposite was true because GRAIL was not generating *any* revenues from those key customers and things were getting worse.

Notwithstanding the Complaint's extraordinary detail, Defendants seek

dismissal as a matter of law based on a host of technical arguments. But these arguments fail on their own terms and contravene common sense.

**Falsity.** Defendants wrongly assert that the Complaint pleads no misleading statements whatsoever. In some cases, they ignore the challenged statements' context. For example, Defendants defend statements that Illumina would "accelerate" Galleri and the acquisition would "save lives" as mere "puffery"— vague statements of corporate optimism no investor takes seriously. But they made these statements to explain *why* they paid $8 billion for GRAIL and closed the deal without waiting for regulators to complete their review—so the statements were clearly meaningful to investors in context. *See Glazer*, 63 F.4th at 770 (even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Defendants also brush past the fact that numerous other courts have reached conclusions that *show* that their statements were false and misleading. For example, the FTC Commission and the Fifth Circuit Court of Appeals found that, after a full merits trial before the FTC, Illumina had failed to show that *any* "acceleration [of Galleri] would actually occur, much less … how it would be achieved." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1061 (5th Cir. 2023). Similarly, the very same accounting allegations at issue here have already been sustained in a parallel state court case.

In addition, Defendants ignore the Complaint's well-pleaded facts. For example, they argue that Defendant Samad's statement touting expected "synergies" from the deal was an inactionable opinion. But the Supreme Court has held that an opinion that "omits material facts … [that] conflict with what a reasonable investor would take from the statement itself" is actionable, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015), and the Ninth Circuit has held that opinions that do not "fairly align[]" with the information a defendant possesses are too. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Here, the complaint alleges that

CASE NO. 3:23-CV-02082-LL-BJW
PLAINTIFFS' OMNIBUS OPP. TO DEFS.' MTD

Samad personally reviewed a document (which Defendants attach to their Motion) stating: "We do not expect material synergies to the transaction." Samad's public statement in no way "fairly aligns" with that, and is therefore actionable.

Defendants also try to rewrite their statements. For example, they argue that it was not misleading to state that Aravanis was "recused from any decisions to sign and close" the deal—even though he "sponsored" the deal at Illumina, presented it to the Board, and led deal negotiations—because he was not a Board member and thus did not actually vote on the deal. But interpreting the statement that way is absurd: Aravanis could not have been "recused" from voting because he never had the authority to do so. The only reasonable interpretation of Defendants' statement— that Aravanis was "recused" from a meaningful role in the decision-making—was clearly false because it gave an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson*, 527 F.3d at 985.

Defendants similarly err in claiming that certain statements are protected by the PSLRA's safe harbor. For example, Defendants argue that, as a matter of law, they cannot be held liable for providing investors with GRAIL valuations that were (i) *up to 4 times higher* than those Illumina actually used and (ii) based on regulatory timelines they knew could not be met. But as the Ninth Circuit has explained, the safe harbor does *not* protect issuers "when they knowingly make a materially false or misleading statement about current or past facts," *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)—exactly what happened here.

**Scienter.** Defendants also wrongly contend that the Complaint fails to plead a strong inference of scienter—that they misled investors "knowingly, intentionally, or with deliberate recklessness." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021). As the Supreme Court has explained, to assess scienter, a court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-

24 (2007). Critically, the inference of scienter need not be of the "'smoking-gun' genre," nor even the "most plausible," and any "tie" goes to the plaintiff. *Id.*

The Complaint pleads numerous facts supporting the inference that Defendants knew their statements were misleading or at least deliberately reckless. For example, it pleads: (i) Defendants knew their actual GRAIL projections were radically worse than the ones they published and they did not ever actually "assume" what they told investors they did; (ii) Defendants admitted, and internal documents and former employee accounts confirm, that Illumina had no plan to accelerate Galleri and lacked the capabilities Defendants said Illumina had; (iii) Defendants admitted Galleri's commercialization required FDA approval and any FDA filing was "years away"; and (iv) the FDA informed GRAIL that its Galleri studies were insufficient. It also pleads several statements that were clearly deliberately misleading, including that Aravanis was "recused" and Illumina's insurance was "standard." And it pleads a litany of other facts supporting scienter, including Aravanis's insider trading, the Executive Defendants' hundreds of millions of dollars in profits, that Illumina's lead "cosponsors" "resign[ed]" the day before Illumina disclosed an SEC investigation, and the departure of every other senior executive responsible for the deal. These and the rest of the scienter allegations, considered together (as they must be), far exceed applicable pleading standards.

**Loss Causation.** In response to the Court's prior order (ECF No. 78), the Complaint details each of the alleged loss-causing events and "link[s]" them to specific misstatements. ¶¶184-244. Defendants nevertheless argue that the Complaint fails to plead loss causation because, according to them, the disclosures must reveal the fraud and "correct" specific misstatements. But Defendants' argument was squarely rejected by the Ninth Circuit in *Mineworkers' Pension Scheme v. First Solar Inc.*, which held that loss causation requires only some "causal connection" between the alleged fraud and the stock price decline in question, that there are an "'infinite variety' of causation theories," and that loss causation is pled

even if the "market was unaware at the time that fraud" caused the stock decline. 881 F.3d 750, 753-54 (9th Cir. 2018). The "causal connection" is amply alleged here: the loss-causing events—the surprise closing of the deal (¶¶188-95); worsening news about GRAIL's FDA approval and clinical effectiveness (¶¶196-200, 209-17); an earnings miss and disappointing financial results (¶¶201-08, 218-23); announcement of an SEC investigation and the surprise resignation of key executives (¶¶224-29); revelation that Defendants had a "personal stake" in the transaction (¶¶230-36); and a $1 billion GRAIL impairment (¶¶237-43)—are connected to facts concealed by the alleged misrepresentations and are substantively identical to loss causation disclosures that the Ninth Circuit has upheld.

**Scheme Liability**. The Complaint also alleges that Defendants' conduct gives rise to a scheme liability claim under Rules 10b-5(a) and (c), which prohibits a wide variety of deceptive conduct—including a scheme to take "advantage of misleading statements," as is alleged here. *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023). The Illumina Defendants effectively concede they have no argument, addressing it only in a footnote on the last page of their brief, while the GRAIL Defendants simply ignore the Complaint.

The motions should be denied.

## II.   STATEMENT OF FACTS

### A.    Illumina Forms GRAIL, Spins It Off, And Reduces Stake To 20%

Illumina makes and sells DNA sequencing platforms and controls approximately 80% of this "gene sequencing" market. ¶¶46-48. In September 2015, Illumina formed GRAIL to develop a multi-cancer-early-detection ("MCED") test, "Galleri," that sought to identify multiple types of cancer from a single blood draw. ¶¶48-50. In January 2016, Illumina spun out GRAIL and, with outside funding, reduced its ownership stake to 52%. ¶¶51-52, 331. In 2017, GRAIL raised additional funds—but used them to buy down Illumina's ownership stake, reducing it to below a 20% threshold that is critical under accounting rules, instead of for clinical efforts.

7

Case No. 3:23-cv-02082-LL-BJW
Plaintiffs' Omnibus Opp. to Defs.' MTD

¶¶304, 330-33. Following additional fundraising rounds that brought it to a rumored market value of $4 billion, GRAIL began pursuing an IPO. ¶52.

**B.      Illumina Reacquires GRAIL And Antitrust Regulators Intervene**

GRAIL never went public. Instead, on September 21, 2020, the first day of the Class Period, Illumina announced that it would reacquire GRAIL for over $8 billion. ¶53. Analysts immediately questioned the deal and valuation. ¶¶54-55.

In response, Defendants made a series of false and misleading statements to convince investors GRAIL was a good investment and would deliver billions of dollars in revenue for Illumina. To start, Defendants misrepresented GRAIL's value. In November 2020, Illumina filed a Form S-4 containing two forecasts "prepared by GRAIL management"—a more "conservative" one assuming "broad reimbursement for Galleri" in "calendar 2025," and a more aggressive one assuming even wider adoption by then. ¶75. *Id*. Using these forecasts, Morgan Stanley publicly valued GRAIL at $11-44 billion—easily justifying GRAIL's $8 billion price. ¶¶77, 368. But Defendants concealed that GRAIL's own internal projections, discussed in its Long Range Plan ("LRP"), showed it never expected broad reimbursement by 2025—the key "assumption" in the S-4 driving GRAIL's valuation—but instead thought it would take until at least 2026 or 2027, if not longer. ¶79. In addition, Illumina's ***actual*** forecasts ascribed a much lower value to GRAIL than Morgan Stanley did, with internal forecasts showing that GRAIL would generate roughly ***half*** the revenues in the S-4's more conservative forecast—a result consistent with the conclusion Illumina's outside auditor would later reach. ¶¶81-84.

In the S-4, Illumina also asserted that the deal was "negotiated through an arm's length process" and that talks about Illumina acquiring GRAIL began on July 31, 2020, after GRAIL began considering an IPO. But both of these statements were false and misleading: in reality, the decision to acquire GRAIL and related negotiations began much earlier, and the closing was made possible only through unauthorized back-channel communications between deSouza and a GRAIL Board

member (Klausner or Bishop) that culminated in a series of personnel changes and investments designed to ensure that the GRAIL acquisition would close and enrich Defendants. ¶¶156-157. Specifically, "unauthorized" communications took place months before July 2020, around the same time GRAIL Board member Klausner purchased $125 million in GRAIL stock. ¶¶156, 166. This stock would approximately double in value when the deal was announced. ¶167. Around this same time, Defendant Ronaghi became a GRAIL director, while Defendant Aravanis, who held more than $10 million in GRAIL equity, left GRAIL and became an Illumina executive. ¶¶157-59. Once at Illumina, Aravanis—an interested party in in the deal by virtue of his GRAIL equity holdings—became a "sponsor" responsible for overseeing all the activities related to the acquisition, including evaluating the "business case" for the deal and advising the ELT and the Board. ¶159.

Defendants also falsely stated that Illumina would "accelerate" Galleri's commercialization. ¶¶95-99. For example, when the deal was announced, deSouza told investors that Illumina acquired GRAIL because Illumina had "a clinical sales team," and "manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities needed to "accelerate" Galleri, while Defendant Bishop told investors that the "merger with Illumina will get the Galleri test to people far faster." ¶¶95-96. And in the S-4 Defendants represented that Illumina "expect[ed]" that the deal "would result in [] synergies." ¶97. While analysts credited these representations, in truth, Defendants had no ability or plan to accelerate Galleri: as FE5 reported, deSouza, Aravanis, Samad, and Febbo internally discussed that Illumina would have to fundamentally change its business and acquire and build new capabilities and expertise, which the Company did not have, to operate GRAIL; the individual at Illumina responsible for Galleri's regulatory and reimbursement strategy testified before the FTC that Illumina did not have the infrastructure and expertise in relevant areas to accelerate Galleri's adoption, and that it would be virtually impossible to get Galleri reimbursed by any major payor in the foreseeable

future; internal documents showed Illumina did not expect any material synergies from the transaction; and, consistent with the foregoing, there was never any plan to accelerate Galleri. ¶¶98-110.

Defendants also misrepresented the quality of Galleri's clinical data. ¶¶127-133. Defendants pointed to Galleri's studies in glowing terms as supporting an FDA submission timeline as early as 2023, with broad reimbursement and extraordinary revenues to be achieved shortly thereafter. For example, deSouza stated on March 2, 2021 that "*we don't believe additional studies are necessary for Galleri to be successful*" and GRAIL's intent was "to do an FDA submission in 2023," with "broader reimbursement from CMS and private payers" to follow. But in truth, unknown to investors, the FDA had informed Defendants in 2019 and 2020 that GRAIL's studies were insufficient to demonstrate "effectiveness" or to obtain FDA approval, including because they did not "assess how the test results impacted patient treatment decisions" or test the right patient population. ¶¶113, 129-31. Indeed, Defendant Bishop admitted in May 2021 testimony that GRAIL was "*still years away from seeking FDA approval* for its multi-cancer screening test," while Defendants' own expert concluded that it would take "*seven to ten years at minimum*" to conduct the kind of study needed. ¶130. Along similar lines, GRAIL senior management knew and had been informed that Galleri was not going to receive FDA approval based on its NHS or SUMMIT studies. ¶130. As former Illumina and GRAIL employees reported, it was "impossible to design or afford a trial" necessary to demonstrate Galleri's ability to detect 50 cancers, and none of the clinical trials at the time would assess that outcome—and it was common knowledge inside GRAIL that the FDA had informed GRAIL that its data was insufficient for FDA approval and that Galleri would never be approved for 50 cancers. ¶¶118-26.

Nevertheless, almost as soon as the deal was announced, U.S. and E.U. competition authorities grew concerned about the deal given Illumina's near-monopoly on the sequencing technology relied on by the MCED industry. ¶¶58-60.

In March 2021, the FTC sued to block the merger, while in April 2021, the EC began to review it—ostensibly bringing the deal to a "standstill" under E.U. rules and prohibiting it from closing. ¶¶58, 61. Throughout this time, to address investor concerns, Defendants continued to misrepresent GRAIL's valuation and Galleri's clinical efficacy. These false statements reassured investors and caused Illumina's share price to nearly *double* from September 2020 to August 2021. ¶67.

### C.    Illumina Closes The GRAIL Deal In Defiance Of Regulators And Defendants Continue To Misrepresent GRAIL And Galleri

As a high-ranking former executive ("FE5") recounted, at a July 12, 2021 Illumina Executive Leadership Team ("ELT") meeting, after the EC had demanded certain concessions by Illumina in connection with its review, deSouza and the ELT decided to defy the standstill and close the acquisition rather than cooperate further with the EC. ¶173. Days later, Defendants told investors the opposite: that Illumina would "continue to work with the European Commission (EC) to ensure it has the information and assurance necessary to approve this transaction." ¶65. Then, on August 18, 2021, contrary to those assurances (¶¶169-70), Illumina shocked investors by announcing they were closing the deal. ¶68.

The market was stunned by the closing, and Illumina's stock price declined precipitously. ¶192. Defendants immediately issued strong statements justifying the extreme step. The day Illumina announced the closing, deSouza claimed there was a "moral obligation" to close because "[w]ith Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S," and that the deal would save "tens of thousands of lives that would not be saved if we didn't buy GRAIL." ¶¶71, 134-42. That same day, Defendant Bishop stated that "with Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives in the U.S. and additional lives in the E.U. over the next nine years." ¶134. Analysts credited these statements. For example, SVB noted in an April 7, 2021 report that "CTO Aravanis and CMO Febbo emphasized the importance of bringing early cancer detection technology to the market as soon as possible to save lives." ¶135.

But these statements were misleading for two reasons. First, there was no evidence that Galleri improved patient outcomes or that it "saved lives," because the Galleri studies did not (and could not) measure Galleri's effectiveness for the relevant patient outcomes, including mortality. ¶137. And real-world evidence from the San Francisco firefighters and the City of Mesa that was obtained by GRAIL suggested that Galleri had no effect on saving lives, as did analyses by prominent clinicians. ¶¶137-39. Unknown to investors, the lack of support for these claims was so egregious that Illumina was unable to identify a single credible independent source willing to publicly state that the deal would "save lives." ¶139. Indeed, according to former employees who attended meetings of GRAIL's Product Market/Regulatory Communications ("PMRC") committee, GRAIL prohibited its own employees from publicly stating that Galleri could "save lives" because there was no evidence to support that claim—a fact well known and supported by Defendants Bishop and Ofman. ¶¶140-41. And second, Defendants' statements that closing the deal would "save lives" were false for the independent reason that Illumina could not accelerate Galleri anyways. ¶142.

Defendants also made false claims about Galleri's "efficacy" and its ability to detect 50+ cancers when they closed the deal. ¶¶111-33. For example, in the August 2021 press release announcing the closing, Illumina stated: "GRAIL's Galleri blood test detects 50 different cancers before they are symptomatic." ¶111. But in reality, as the FTC's trial record confirmed, there was "simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population." ¶117. In fact, Ofman admitted that the clinical trial necessary to prove the claim would "require hundreds of thousands of people" and take years, and GRAIL's own expert conceded that Galleri "has been clinically shown to detect only *seven* types of Stage I through Stage III cancer in an asymptomatic population." *Id.*

In the months that followed, Defendants sought to portray GRAIL as meaningfully contributing to Illumina's revenues. ¶143. At a January 10, 2022

investor conference, deSouza stated that "GRAIL expects strong revenue in the range of $70 million to $90 million as their Galleri test gains traction," and Defendant Ofman pointed to the "positive reception" to Galleri by payers, including "commercial payers and large self-insured employers." ¶143. Defendants reaffirmed this guidance, and gave more detail on GRAIL's current sales experience to justify it, in the coming months. For example, deSouza told investors on Illumina's May 5, 2022 earnings call that GRAIL continued to be "on track to meet the revenue outlook that we laid out at the beginning of the year, the $70 to $90 million." ¶¶145-46. Analysts reassessed their valuations of Illumina stock upward in direct response. ¶147. But in truth, the GRAIL guidance had no basis in reality: prior to its issuance, GRAIL's SVP of Sales told GRAIL senior management that the guidance was unachievable and objected to stating it. ¶¶149-50. FEs 2 and 3 confirmed that GRAIL's senior leadership, including Ofman, knew the guidance was unachievable, including because he was involved in presenting to large healthcare systems who laughed at GRAIL's commercial team. ¶150. Indeed, by no later than March 2022, GRAIL's actual sales experience confirmed GRAIL would not achieve anything close to its $70 to $90 million revenue guidance—and it was nowhere near "on track" to achieve it because, in truth, sales were on a downward trajectory. ¶153.

In the wake of the unprecedented decision to close the deal in contravention of the EU's standstill obligation, which caused massive investor losses, concerned investors began to ask questions about why Illumina took that step—and whether the decision was driven by conflicts of interest. In response, Defendants issued false statements defending the deal. For example, when asked whether any insiders had personal motives for pursuing the deal, Defendants falsely stated that Aravanis had been "recused" from any decisions to sign and close the acquisition—when, in truth he personally engineered it as a deal "sponsor." ¶¶159-63. And when questions were raised about the insurance Defendants took out prior to the closing, Defendants represented it was "standard" and commonplace. ¶¶180-81. In truth, the insurance

arrangements were so unusual—doubling coverage at a premium nearly 20 times that of the prior year, all while Illumina was dropped as an insured and agreed to indemnify the GRAIL Defendants—that a Delaware court later held it indicated the Board committed "a knowing violation of positive law." ¶¶176-79, 183. Indeed, after gaining access to Illumina's privileged and confidential documents, a newly elected director quickly uncovered that Defendants' pursuit of GRAIL deal was so conflicted and disloyal that deSouza and the Board breached their fiduciary duties and were "poisoned by their personal stake in the deal." ¶¶230-35.

### D.    Loss Causation—Defendants' Fraud Injures Investors

While Illumina and GRAIL insiders reaped hundreds of millions of dollars in profit through their misconduct, investors suffered devastating losses when the price of Illumina shares declined in response to disclosures causally connected to Defendants' fraud. Beginning in August 2021, investors were barraged by a series of loss causing events, including when: Defendants closed the deal in defiance of the EC (¶¶188-95); new reports suggested Galleri's FDA approval timeline was longer and Galleri evidence much weaker than previously represented (¶¶196-208); GRAIL revenues and guidance missed forecasts because of poor adoption amid growing criticism of the test (¶¶218-23); Illumina disclosed an SEC investigation into the GRAIL deal and Defendants Febbo and Aravanis, the deal's "cosponsors," abruptly left the Company (¶¶224-29); a lawsuit backed by an Illumina Board member revealed that deSouza and Illumina's Board had been "poisoned by their personal stake" in the deal (¶¶230-36); and Illumina was forced to write down GRAIL by approximately $1 billion. ¶¶237-43. In total, Illumina shares lost more than 80% of their value because of these fraud-related disclosures, causing catastrophic losses for which this lawsuit seeks to recover. *See* Section III.C.

## III.    ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5(b) here, Plaintiffs must adequately allege "(1) a material misrepresentation or omission by the defendant;

(2) scienter; … and (6) loss causation." *Alphabet*, 1 F.4th at 699. While the PSLRA imposes a heightened pleading standard, the Ninth Circuit has stressed that it is not intended to eliminate "actions of substance," but is satisfied "by stating with particularity the facts supporting each of their beliefs as to why the challenged statements were false or misleading." *Glazer*, 63 F.4th at 769.

## A.    Defendants Made False And Misleading Statements

The Supreme Court recently reaffirmed that Rule 10b-5 "prohibits omitting a material fact necessary to make the statements made not misleading" and thus bars "half-truths." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). This is consistent with longstanding Ninth Circuit law holding that even literally accurate statements are actionable if they give "the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985. Thus, when a company touts positive information, it must "disclos[e] adverse information that cuts against [it]." *Arena*, 840 F.3d at 706. Whether a statement is misleading cannot be resolved on the pleadings unless "the adequacy of the disclosure … is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 at 1014 (9th Cir. 2018).

Defendants made seven categories of misrepresentations, as set forth below.

### 1.    GRAIL's False Financial Valuations Are Actionable And Illumina Had A Duty to Disclose Its Own Contrary Forecasts

Defendants misrepresented GRAIL's valuation when presenting investors with projections showing, based on purportedly "reasonable" or "conservative" assumptions, that GRAIL would make up to $24 billion a year by 2030 and was worth up to $44 billion. *See* ¶¶360-62, 367-72. In truth, the projections Defendants actually relied on—including Illumina's "Deal Model" that was ***actually used*** internally to value GRAIL—had figures that were approximately ***one-quarter to one-half*** of those Illumina publicly reported. ¶¶80-85.

Defendants' projections also falsely represented GRAIL management's "assumptions." Specifically, Defendants represented that the projections were based

---

15                                    CASE NO. 3:23-CV-02082-LL-BJW
                                   PLAINTIFFS' OMNIBUS OPP. TO DEFS.' MTD

on GRAIL management's "best currently available estimates and judgments" and "reasonable assumptions," including a purportedly conservative "assumption" that "broad reimbursement would be *achieved in calendar 2025*" and a less conservative one that assumed even broader acceptance by then. ¶¶87-88. In reality, as FE5, who worked closely with the Executive Defendants, explained, the 2025 date was "pulled out of thin air." ¶90. Instead, GRAIL's most aggressive internal projections anticipated FDA approval—a *precursor* to "broad reimbursement"—only by 2026 or 2027 at the *very* earliest, and *only then if Congress changed the law*. ¶¶90-92. That is, the publicly reported assumptions were neither "reasonable" nor were they GRAIL's actual "assumptions" at all. And even Defendants' internal projections—which were much lower than the public ones—were inflated: as FE5 explained, Illumina assumed Galleri re-take rates of 70-75%, even though evidence showed that re-take rates were actually 2-4% and never reached beyond 8-10%. ¶¶93-94.

Defendants' public projections were materially misleading and their stated assumptions were false. The public projections, which relied on impossible-to-meet assumptions GRAIL did not actually make and contained revenue and valuation numbers *two to four* times greater than Illumina's internal ones, gave a "reasonable investor the impression of a state of affairs that differs in a material way" from reality. *Berson*, 527 F.3d at 985. Once Defendants touted the rosy projections, they were required to disclose the "adverse information that cut[] against" them, including their own internal assumptions and projections. *Arena*, 840 F.3d at 706. Statements just like these are routinely sustained. *See Azar v. Blount Int'l, Inc.*, 2017 WL 1055966, at *5 (D. Or. Mar. 20, 2017) (use of less accurate projection materially misleading); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, 2017 WL 4453561, at *6-7 (D. Or. Oct. 3, 2017) (statements as to accuracy of forecasts used for fairness opinion misleading when internal forecasts more accurate); *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *7 (C.D. Cal. May 2, 2014) (same).

Defendants' arguments fail. *First*, Defendants contend that the projections

and assumptions are inactionable forward-looking statements. Ill.Br. 12-13. But the safe harbor protects issuers only "when optimistic projections of growth in revenues and earnings are not borne out by events"—not "when they knowingly make a materially false or misleading statement about current or past facts" or "combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1130, 1142; *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1020-21 (N.D. Cal. 2020) (no safe harbor when statements "misrepresented or omitted material past or present facts"). Here, Defendants published projections purporting to employ GRAIL's "best currently available estimates and judgments" and "reasonable assumptions"—but the projections actually utilized regulatory timelines they knew could not be achieved, that GRAIL did not itself use, while omitting the true, far more sober projections and assumptions Defendants employed internally *at the time*. ¶¶80-94.

Defendants' assertion that the projections were accompanied by "meaningful" cautionary language (Ill.Br. 12-13) is also wrong. The safe harbor "does not [provide] carte blanche to lie." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005). Nor do "risk warnings" insulate Defendants when they *knew* their projections and assumptions were unachievable when issued, *i.e.*, that "the potential perils identified ha[d] in fact been realized." *Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012); ¶¶148-49; *infra* Section III.B. Indeed, because these statements included false assertions of present fact (namely, that the reimbursement schedule assumptions were GRAIL's "best" or "reasonable" assumptions, when they were not GRAIL's true assumptions at all), "no cautionary language [] short of an outright admission" of falsity "would be sufficiently meaningful." *Quality Sys.*, 865 F.3d at 1130, 1146-47.

***Second***, Defendants contend they had no duty to disclose other projections because they supposedly amount to "pure omissions," which are foreclosed by *Macquarie*. 601 U.S. at 266; *see* Ill.Br. 14. The opposite is true. Defendants published the projections, affirmative misstatements they chose to make; no one is

arguing that Defendants had an independent duty to disclose the internal projections absent a statement on the subject. *See United States v. Chang*, 2024 WL 2817494, at \*11 (E.D.N.Y. Mar. 31, 2024). The public projections are a classic, actionable "half-truth" under *Macquarie*: as the Supreme Court explained, a child saying "he had dessert" is a half-truth when "the dessert was ... a whole cake." 601 U.S. at 263.

*Third*, Illumina tries to distance itself from its misstatements by suggesting that they were only GRAIL's—not Illumina's. Ill.Br. 14. But it is black-letter law that an issuer is responsible for the contents of its SEC filings, as are any signatories—for the S-4 in question, deSouza, Thompson, and Samad. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) (courts hold "signatories of misleading documents 'made' the statements in those documents"). For its part, GRAIL also disclaims responsibility for the projections, contending that it did not "make" the statements in the S-4 under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)—despite ***extensive*** disclosures of GRAIL's joint responsibility for these statements that Illumina identifies. *Cf.* Gr.Br. 13 *with* Ill.Br. 14. Illumina and GRAIL cannot evade liability at this stage by simply pointing the finger at one another. *See, e.g.*, *SEC v. Daifotis*, 2011 WL 3295139, at \*4 (N.D. Cal. Aug. 1, 2011) (fact issues under *Janus* to be resolved at summary judgment, not on pleadings).

### 2. Defendants' Statements About Illumina's Ability To "Accelerate" Galleri Are Actionable

Defendants told investors that, by buying GRAIL, Illumina would "accelerate" Galleri's regulatory approval and widespread adoption—and they detailed the specific capabilities Illumina would bring to bear to do that. *See* ¶¶346-352, 354-55, 357-59, 373-76, 380-82, 384, 387-88, 392-93, 395-99, 403-04, 407-10, 413-17, 419-21, 438-39, 444-45, 458-60. For example, in announcing the acquisition, DeSouza claimed that Illumina had a "very clear line of sight into how we can accelerate" Galleri because of Illumina's "clinical sales team" and

"manufacturing, regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities. ¶346-51. Similarly, to justify the acquisition in August 2021, he claimed that Illumina would "dramatically accelerate getting this test into the hands of people whose lives it could save," "by years," because it had "the teams that can work on reimbursement and regulatory approval." ¶¶407-14. And in February 2022, Febbo stated that the acquisition would "speed the test to market and make it more accessible more broadly, more quickly" because Illumina had "incredible … commercial capability, support capability, regulatory capability and reimbursement experience to help bring this test globally." ¶¶95-96.

But Illumina actually lacked any capability, plan, or expectation to accelerate Galleri. For example, FE5 recounted that Illumina's ELT and Board explicitly discussed how Illumina would have to "***fundamentally***" alter its business if it acquired GRAIL, including by acquiring clinical testing and sales functions—two ***specific*** functions Defendants told Illumina investors the Company ***already*** had. *See* ¶¶95. Similarly, during the FTC trial, Ammar Qadan—the Illumina executive most knowledgeable about GRAIL's reimbursement strategy—admitted that Illumina lacked the necessary regulatory and reimbursement expertise and the team's budget was roughly ***2%*** of the $500 million needed. ¶¶102-03. FE5 similarly reported Qadan saying that it would be virtually impossible to get Galleri reimbursed by any major payor without FDA approval and clinical studies that would take years. ¶103. Consistent with these admissions and internal discussions, the FTC and the Fifth Circuit determined that Illumina failed to show "acceleration would actually occur, much less … how it would be achieved." ¶¶106-10.[1] Defendants' statements are actionable. *See In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) (statements concerning ability to timely deliver products actionable when company could not do so); *see also Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp.

---

[1] The Fifth Circuit's finding was not merely that there was a failure to quantify efficiencies, as the GRAIL Defendants wrongly argue. Gr.Br. 6.

3d at 956-62 (N.D. Cal. 2014) (statements attesting to ability to respond to FDA warning letter actionable where deficiencies could not be remedied).

Defendants' arguments are without merit. *First*, unbelievably, Defendants contend that these statements were mere "puffery." Ill.Br. 14-15; Gr.Br. 12. Determining whether a statement is puffery, *i.e.*, immaterial, "entail[s] fact-intensive assessments," including of "the entire statement and its circumstances," to determine whether it was so obviously immaterial that no investor would rely on it—assessments "more properly left to the jury." *Impax*, 36 F. Supp. 3d at 966. And almost by definition, statements that are objectively verifiable cannot be "puffery."

Here, the "acceleration" statements are not remotely "puffery." The ability to "accelerate" a product's delivery to market is not puffery because it is critical to a company's business. *See Fecht v. Price* Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "anticipates a continuation of its accelerated expansion schedule" not puffery); *Xoma*, 74 F.3d at 959 (statements about progress to FDA approval not puffery). And Defendants made the statements specifically to explain to investors why Illumina paid $8 billion for GRAIL and closed in defiance of the standstill; they were not "mere expressions of [immaterial] corporate optimism." *In re Intuitive Surgical Sec. Lit.*, 65 F. Supp. 3d 834 (N.D. Cal. 2014); *Glazer*, 63 F.4th at 770-71 (statements responding to analysts are not puffery); *Xoma*, 74 F.3d at 959 (statement "everything [was] going fine" actionable when made to quell fears); *see, e.g.*, ¶71 (deSouza stating there was a "moral obligation" to close as, with "Illumina's acceleration, the Galleri test can conservatively save 10,000 additional lives"); ¶98 (analysts crediting statements). Defendants also repeated these statements with increasing intensity. *See, e.g.*, ¶¶380, 385, 392, 395; *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374-75 (E.D.N.Y. 2022) ("repeated emphasis" supports materiality); *Seeks v. Boeing Co.*, 2024 WL 4367846, at *15 (N.D. Ill. Sept. 30, 2024) (similar). And even if Defendants' statements could be seen as "general statements of optimism" (they were not), "in context," they are

actionable because they "contravened" the true facts. *Glazer*, 63 F.4th at 770-71.

***Second***, Defendants contend that the statements were mere inactionable opinions, Ill.Br. 15-19, Gr.Br. 10, but that is wrong. Defendants' "acceleration" statements are not protected "opinions," but factual false statements about the existence of a corporate capability and the attendant infrastructure it required. *See Fecht*, 70 F.3d at 1083 ("positive statements about the expansion program" verifiably false based on allegations that "the new stores were losing money").

Even if they were deemed "opinions," they would be actionable because they did not "fairly align[]" with the information in Defendants' possession. *Align*, 856 F.3d at 605, 615-16; *Omnicare*, 575 U.S. at 175, 189 (opinion that "omits material facts" is actionable). Under *Omnicare*, an opinion statement can be actionable if it: (i) omits a material fact; (ii) contains a false embedded factual statement; or (iii) is objectively false and not believed. *Id.*; *see also In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). The statements are actionable under these prongs.

To start, to the extent any "acceleration" statements were opinions, they were misleading for omitting that Illumina never had any capability or plans to accelerate Galleri. Illumina's senior-most leadership internally admitted that Illumina lacked the necessary infrastructure and would have to undertake ***fundamental*** changes to operate GRAIL, including building and buying capabilities Defendants claimed Illumina had already. ¶100. Senior executives also admitted that Illumina's teams had nowhere near the budget needed for Galleri's clinical trials and that meaningful acceleration could not occur before FDA approval, which was years away. ¶¶102-04, 117-18, 130. And the FTC and Fifth Circuit found that Illumina was utterly unable to show that there would be any acceleration, "much less … how it would be achieved." ¶106. These facts are ***irreconcilable*** with Defendants' "acceleration" statements and certainly did not "fairly align" with them. *Align*, 856 F.3d at 615-16.

Several of the statements also contained false factual assertions. For example, to justify their acceleration claims, Defendants touted Illumina's "clinical sales

CASE NO. 3:23-CV-02082-LL-BJW
PLAINTIFFS' OMNIBUS OPP. TO DEFS.' MTD

team," its "regulatory, reimbursement, clinical labs, clinical sales and marketing" capabilities, its "reimbursement and regulatory approval" teams, and Illumina's supposedly "incredible … commercial capability, support capability, regulatory capability and reimbursement experience." ¶¶95-96. But these factual assertions were false: Illumina *lacked* relevant clinical testing and sales capabilities, the "team" responsible for regulatory and reimbursement strategy was tiny and missing *98%* of the necessary budget, and Illumina's "regulatory expertise" was in no demonstrable way "superior" to what GRAIL already possessed. ¶¶100, 102, 106. Defendants try to cite certain of Illumina's supposed capabilities by mischaracterizing snippets of Qadan's testimony but ignore the crystal-clear allegations above.[2]

Finally, any statements asserting that Illumina would "accelerate" Galleri are actionable because Defendants "knew of or recklessly disregarded" those opinions' objective falsity. *In re Semtech Corp.*, 2025 WL 2884810, at *11 n.4 (C.D. Cal. Oct. 7, 2025); *see infra* Section III.B. Defendants cite to a document they concede states that there would be no "material" synergies to the transaction to argue that some vague benefits could arise from acquiring GRAIL—many of which are unrelated entirely to accelerating Galleri. Ill.Br. 16-17. But the document says what it says— that there would be *no* material synergies from the transaction. RJN Opp. 9.

*Third,* Defendants contend that the acceleration statements are inactionable forward-looking statements (Ill.Br. 19), but they are not. Defendants' supposed cautionary language—which spoke about potential failures to recognize "anticipated synergies"—was not meaningful at all: it was misleading when Illumina *actually* anticipated "dis-synergies." ¶110. In addition, many of the statements contained false present factual assertions about Illumina's existing capabilities, bringing them

[2] Qadan's testimony that he "[didn't] know how [some of Illumina's capabilities] would be different for Galleri" and Illumina's Market Access team and budget was "continuing to expand" (Ill.Br. 16-18) cannot be considered (RJN Opp. 5-6); regardless, it does not support Defendants' concrete assertions about Illumina's then-present capabilities or undermine the detailed allegations about their absence.

outside of the safe harbor. *See, e.g.,* ¶¶347-48 (touting "regulatory capabilities").

### 3. Defendants Misrepresented Galleri's Ability To Detect 50 Cancers, The Clinical Evidence Of Galleri's Effectiveness, And Prospects For FDA Approval Based On The Data

Defendants also falsely touted Galleri's effectiveness over and over again. *See* ¶¶352-53, 355-56, 377-78, 389-90, 407-11, 436-37, 440-43, 446-49, 457-58, 461. For example, in August 18, 2021, Illumina stated that Galleri "detects 50 different cancers before they are symptomatic." Similarly, on March 28, 2023, Ofman stated that Galleri "can identify 50 different cancers with a single blood draw." ¶111. Defendants also touted Galleri's supposedly "proven technology" and supporting clinical evidence— on September 21, 2020, deSouza stated that Galleri's "value has been demonstrated" through the "clinical data required to launch" Galleri that GRAIL had developed, and, on April 26, 2023, he described GRAIL as a "proven technology" supported by "large studies that show the efficacy of GRAIL." ¶112. Defendants further pointed to the slate of Galleri studies as supporting a 2023 FDA submission timeline—for example, deSouza stated on March 2, 2021 that "we don't believe additional studies are necessary for Galleri to be successful" and therefore GRAIL's intent was "to do an FDA submission in 2023 and then pursue broader reimbursement," and on a May 5, 2022 analyst call that the studies were "sufficiently powered" and Defendants were having "constructive" dialogue with the FDA. ¶113.

These statements were false and misleading. To start, as Ofman effectively admitted and the FTC concluded, there was "simply no clinical evidence that Galleri can provide early detection of 50+ cancers in an asymptomatic population." ¶117. Rather, the trials required to provide such evidence would take decades and were "impossible to design or afford." ¶118. And as confirmed by several FEs, the FDA informed GRAIL that none of the Galleri studies sufficed to approve Galleri as a 50-cancer test and it was widely understood that there was no realistic path to obtaining such approval. ¶¶119-20. *See Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *16 (N.D. Cal. Feb. 23, 2023) (statement about drug safety misleading when

defendants knew FDA had expressed study design could not support it).

In addition, Defendants' statements that Galleri's effectiveness was "proven" and demonstrated by clinical data were false: clinical data actually showed that Galleri was highly ineffective. ¶¶121-26. Defendants' assertions that the existing slate of Galleri studies were sufficient were false because the FDA had told GRAIL they were not, including because they were not sufficiently powered and failed to measure the right outcomes. ¶¶128-29. Before the FTC, Bishop testified in May 2021 that GRAIL was "still years away from seeking FDA approval" and Defendants' experts concluded the necessary studies would take "seven to ten years minimum"—several years *after* the date Defendants represented to investors. ¶¶127-133. Once Defendants touted "large studies" supporting Galleri's efficacy, they were required to disclose "adverse" facts they knew, including the FDA's report that they were insufficient. *See, e.g.*, *Arena*, 840 F.3d at 708 (touting studies misleading when omitting FDA concerns); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *4, 12 (N.D. Cal. Jan. 6, 2022) ("clinical benefit" statements misleading due to FDA concerns); *see also In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 732, 733-35 (N.D. Cal. 2022) (similar); *Zak v. Chelsea Theraps. Int'l, Ltd.*, 780 F.3d 597, 609 (4th Cir. 2015) ("strength" of data misleading due to FDA concerns).

Defendants' arguments fail. *First*, Defendants argue that Illumina's statement that Galleri "detects 50 different cancers before they are symptomatic," and Ofman's similar statement based on the CCGA study, are inactionable opinions that interpreted that study's results. *See* Gr.Br. 8, 10; Ill.Br. 19 n.5 (adopting GRAIL's arguments). But the CCGA study did *not* evaluate whether Galleri could detect 50+ cancers in asymptomatic patients at all—it only found *six* positive tests among the 1,254 study participants who were not already diagnosed with cancer. *See* D.Ex. 46 at p. 566. And Ofman testified before the FTC that the study required to show Galleri could detect 50+ cancers in an asymptomatic population would "require hundreds of thousands of people" and take years. ¶117. The statement that Galleri detected 50

cancers in asymptomatic populations was thus not an opinion on a matter of scientific debate; it was a false statement of fact made without any basis at all.

*Second*, Defendants contend that several of their other statements were inactionable opinions. *See* Ill.Br. 20-21 (statements about not needing "additional studies," and that existing studies were "sufficiently powered," for FDA submission). But these statements are alleged to be both subjectively and objectively false: the FDA *told* Illumina that the existing studies were insufficient before the statements were made. *See* ¶¶128-29; *infra* Section III.B. They were also misleading for omitting the FDA's communication, which did not "fairly align" with the stated "opinion." And the assertion that the Galleri studies were "sufficiently powered" was an embedded false statement of fact: Ofman *admitted* that the existing studies were *not* sufficiently powered. *See* ¶117.

*Third*, Defendants argue—based on cherry-picked snippets—that certain statements were "puffery." Ill.Br. 21-22 (citing ¶¶352, 355, 389, 436, 440, 442, 446). But materiality determinations should be "left to the jury," and the Court may not assess the statements "in a vacuum, plucking the statements out of their context to determine whether the words, taken per se, are sufficiently vague so as to constitute puffery." *Impax*, 36 F. Supp. 3d at 966. Rather, the Court must assess the entire statement and context—an assessment that confirms they were highly material here.

It strains credulity to think that statements about the efficacy of a test Illumina paid *$8 billion* for could be found immaterial as a matter of law—particularly where, as here, they were made repeatedly, in direct response to analyst questions and concerns about the most monumental transaction in Illumina's history, and were connected to concrete and verifiable outcomes. These facts show the statements were not puffery. *See, e.g.*, ¶355 (Illumina acquired GRAIL because "[t]heir technology works"); ¶389 (analyst reporting on statement that LDT launch data could support FDA submission); ¶436 (touting "size" and "sufficiently" "powered" nature of GRAIL studies in response to question about "timeline for FDA approval"); ¶440

(in response to question about NHS-Galleri trial, calling it an "exciting piece of clinical evidence for GRAIL" in connection with "discussions with regulators about approval"); ¶442 ("making progress towards reimbursement" meant "an expected GRAIL revenue CAGR of 60% to 90%"); *Xoma*, 74 F.3d at 959 (even "general statements of optimism" about FDA approval made "in response to market fears" can be actionable); *BioMarin*, 2022 WL 164299, at \*12 (statements "undergirded by factual assertions such as timelines for [FDA] approval" were not "empty opinions similar to puffery"); *Intuitive*, 65 F. Supp. 3d at 834 ("repeated statements" about "efficacy could be objectively assessed" and were not puffery).

*Fourth*, the FDA timelines were not protected forward-looking statements. Ill.Br. 22. The Complaint pleads facts showing that the statements contradicted Defendants' then-current plans, and Defendants' cautionary language was not meaningful because the warned-of risks—that submission could be delayed past 2023 and GRAIL's clinical studies might be insufficient—had already come to pass when the FDA told Defendants the clinical studies were insufficient. *See* ¶¶128-29.

### 4. Defendants Misrepresented That The Acquisition And Closing The Deal Would "Save Lives"

Defendants also repeatedly misrepresented that the acquisition would "save lives." *See* ¶¶380, 383, 385-86, 389, 391-92, 394-95, 397-98, 400, 403, 405, 407-10, 412, 416, 418, 425-26. For example, in August 2021, Defendant deSouza stated that the merger would save "tens of thousands of lives that would not be saved if we didn't buy GRAIL." ¶134. These statements were false and misleading for two separate, independent reasons. *First*, the statements were false and misleading because there was no evidence Galleri could detect previously unidentified cancer in asymptomatic patients early enough to make a difference. And, as the FDA informed Defendants, none of the Galleri studies tested for mortality or other relevant outcomes. ¶137. In fact, real-world evidence showed Galleri would not save lives, ¶¶121-26, and despite looking extensively, Defendants could not find a credible independent source willing to represent that Galleri could do so. ¶¶138-39.

Indeed, because showing that Galleri could save lives is not trivial, and there was no data to support that conclusion, GRAIL's PMRC committee *prohibited* GRAIL employees from making such claims. ¶¶140-41. *Second*, the statements were independently false and misleading because Illumina had no ability or plan to *accelerate* Galleri—so the *acquisition* could not save any lives regardless of whether Galleri itself did anything. ¶¶100-10; *supra* Section II.A.2. At minimum, once Defendants asserted that the acquisition would "save lives," they were obligated to disclose all these adverse facts, which they failed to do. *See Arena,* 840 F.3d at 706.

Defendants' arguments fail. *First*, Defendants incorrectly contend that these statements were mere "puffery." Mot. 14-15. But the statements were verifiable, made in response to questions from analysts, and issued to justify critical corporate decisions, including acquiring GRAIL for $8 billion and closing the acquisition in defiance of the EC standstill, which shows their materiality. *See supra* 20-21.

*Second*, these statements are not inactionable opinions. Ill.Br. 15-19. Defendants point to no language in the statements themselves suggesting they were opinions. But even if they were, they would be actionable, at minimum, for failing to disclose the information that did not "fairly align" with them, *i.e.*, that: there was no clinical evidence showing that Galleri would save lives; real-world evidence suggested Galleri could *not* save lives; GRAIL's own PMRC prohibited employees from making that statement because it was unsupportable; and Illumina could not and did not plan to actually accelerate Galleri's adoption. *See* ¶¶137-42.[3]

### 5. Illumina Misrepresented The Sources Of GRAIL Revenue, GRAIL Revenue Guidance, And Progress To Achieving It

After closing the acquisition, Defendants repeatedly issued false guidance for GRAIL, misrepresented the sources of GRAIL's revenues, and falsely stated that GRAIL was "on track" to meet its revenue targets. *See* ¶¶422-24, 427-35. In the first

---

[3] The GRAIL Defendants wrongly argue that the PMRC merely took a "conservative approach to regulatory communications" (Gr.Br. 7)—the Complaint alleges that the PMRC prohibited *any public statements* that Galleri "saved lives." ¶283.

quarter of 2022, Defendants repeatedly guided for $70-90 million in revenue for GRAIL, explaining that such guidance was driven by eight health systems GRAIL had signed up. ¶145. And on May 5, 2022, Defendants reassured investors that GRAIL was "on track" to meet that guidance, despite underperformance announced that day, based on an increased "number of partners across health systems, employers and insurers." ¶146. These statements were false and misleading because GRAIL senior sales executives told senior management that the guidance was unsupportable, Defendants lied about the number of partners GRAIL had, and, by March 30, 2022, GRAIL was far behind any revenue expectations—with revenue from key channels coming in at 0% and 7% of forecasts. ¶¶150-53.

Defendants' arguments fail. *First*, Defendants claim that certain of these statements were mere "puffery" (Ill.Br. 23 (citing ¶¶422, 427, 432, 434), Gr.Br. 12), but ignore that "even general statements of optimism, when taken in context" are actionable "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.,* 865 F.3d at 1130. In *Quality Systems*, the Ninth Circuit held that statements "repeatedly reassur[ing] investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing" and "that the pipeline was full and growing" were not puffery when they "affirmatively created an impression" that was materially misleading. 865 F.3d at 1144; *see also In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *15 (N.D. Cal. June 2, 2020) ("a party cannot affirmatively create a positive impression of an area it knows to be doing poorly"). That is precisely what Defendants did here: they reassured investors that Galleri was "gaining traction" with relevant customers and "on track" to meet guidance when none of that was true.

*Second*, Defendants contend that any projections of revenue and the assumptions underlying them are inactionable forward-looking statements. Ill.Br. 23. Not so. To start, Defendants' statements contained misleading statements of present fact. For example, during the May 5, 2022 first-quarter earnings call, in

response to a question about maintaining guidance despite GRAIL's low reported first-quarter revenues, deSouza specifically cited how GRAIL's number of partners was "up to 34." ¶146. But touting this number was misleading because Illumina had been told that their guidance was unachievable before issuing it; they only signed up 11 total partners in the first quarter; and the revenues and uptake rates for those sign-ups was a mere fraction of the amounts forecasted (in some cases, 0% outright)—all current facts that Defendants misrepresented or concealed. ¶¶151-52. Moreover, the safe harbor does not protect statements that were knowingly false when made, and Defendants' cautionary language cannot be meaningful if it warns of hypothetical risks that have already come to pass. *See supra* 17. That is precisely what is alleged here: Defendants were told that the guidance was unachievable prior to issuing it, and the issues Defendants "warned" about were already happening. *See* ¶¶149-53; *Quality Sys.*, 865 F.3d at 1142 (safe harbor does not insulate a "knowing" "materially false or misleading statement about current or past facts" or the ability to "combine" such a false statement "with a forward-looking statement").

***Third***, Defendants wrongly contend that the alleged facts do not support the falsity of certain statements about the numbers of health systems, employers, and insurers that had signed up for Galleri. Ill.Br. 23-24. But this misreads the Complaint, which alleges that the statements in question were misleading for failing to disclose several facts, including that GRAIL was struggling to "gain traction" with groups of customers they called out as supporting the guidance numbers, and revenues for those groups were running ***50-100%*** below projections. *See* ¶¶434-35. Defendants' case—in which projections were made ***before*** a "surprisingly poor" quarter, after which they were revised—is entirely inapposite, as here the Complaint alleges that Defendants were warned that their guidance was unachievable before it was made and disastrous results occurred ***prior*** to Defendants' reaffirmance of it. *See Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1051 (N.D. Cal. 2019). For the same reasons, this is not fraud by hindsight. *See* Gr.Br. 8.

**6.    Defendants Falsely Asserted The Deal Was Conflict-Free, Issued False Responses To Scrutiny About The Deal, And Falsely Defended Aravanis's Role And Illumina's Insurance**

Defendants misrepresented the conflicted nature of the negotiations, told investors deal talks began months after they actually did, and lied about Illumina's "cooperation" with the EC, Aravanis's role in the deal, and the extraordinary insurance they took out to cover their personal liability. *See* ¶¶154-83, 293, 363-66, 401-06, 453-56, 465-67. For example, in a November 2020 S-4, Defendants stated that the deal was "negotiated through an arm's length process" and deal talks started only on July 31, 2020, after GRAIL began considering an IPO. In truth, the deal was heavily conflicted—it was sponsored at Illumina by Aravanis, who had a stake in GRAIL—and talks began in January 2020, leading to a host of personnel changes in anticipation of the deal that all occurred months before July 31, 2020. ¶¶156-68.

Then, on July 22, 2021, after the EC's investigation triggered the mandatory standstill, Illumina told investors that it was working to "ensure that [the EC] has the information and assurance necessary to approve this transaction." deSouza made similar assurances during Illumina's August 5, 2021 call. ¶403. But in truth, prior to either statement, on July 12, 2021, the ELT (including deSouza, Aravanis, Samad, and Febbo) determined to close the transaction in violation of the standstill and to not offer any further assurances or remedies to allay the EC's concerns. ¶¶171-73.

And when investors asked questions about Illumina's decision to close despite the EC standstill, and about the insurance Illumina took out in advance, Defendants doubled down. They responded that the insurance was "standard," "appropriate coverage," and that it was "not uncommon" for a company in Illumina's situation to increase its policy limits. ¶180. They also said that, while Aravanis held GRAIL shares, he was "recused from any decisions to sign and close the GRAIL acquisition." *Id.* These statements were false and misleading: Illumina's new policy was highly unusual—multiples of prior coverage at an exorbitant premium while dropping entity coverage—and Aravanis was brought on to co-sponsor the

acquisition and negotiated it. ¶¶182-83; *See Berson*, 527 F.3d at 985.

*First*, Defendants contend that it was accurate to say that Aravanis was "recused" from the Board's decision to sign and close the acquisition because Aravanis was not a Board member and thus could not approve the merger. Ill.Br. 25. Even if the statement were interpreted that way, it would still be misleading—even though literally true—for failing to omit Aravanis's central role. But interpreting the statement that way makes no sense anyway because Aravanis could not be "recused" from a role he never had in the first place. For the statement to be meaningful, Aravanis's "recus[al] from any decisions to sign and close the GRAIL acquisition" *has* to refer to participating in the decision-making process in some manner besides formal voting—and it was misleading because Aravanis was centrally involved in the process that lead to the approval of the transaction, including by being a co-sponsor and negotiator. ¶¶157-63. At best, Defendant's argument presents a question of fact requiring discovery.

*Second*, Defendants cite their Insurance Matters Agreement to suggest that their insurance arrangements were common, Ill.Br. 24, but that misses the point. The Complaint challenges characterizations of the insurance as "appropriate" and "standard" not because increasing insurance in connection with a merger is unusual, but because the terms of the particular insurance Illumina obtained were, in fact, *highly* unusual: the coverage was many multiples higher than before, the premium cost *almost 25%* of the policy limits, and the policy covered not just Illumina's Board and executives, but GRAIL's executives, too. ¶¶178, 182. Indeed, the policy was so unusual that the Delaware Court of Chancery found it provided a "credible basis to infer the board engaged in conduct constituting a knowing violation of positive law." ¶182. Defendants cannot just wave away these highly atypical facts.

*Third*, Defendants argue that their statements asserting that they would "continue to work with the European Commission" were not false because allegations that the ELT decided to close the acquisition prior to this statement are

supposedly unreliable, and because closing the acquisition is supposedly still "consistent with" working with the EU. Ill.Br. 24-25. Neither argument makes any sense. To start, FE5 meets all relevant standards for reliability, and his account must be credited on a pleading motion. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 938, 940 (9th Cir. 2023) (FEs credited when allegations support the "probability that a person in the position occupied by the source would possess the information alleged"). Defendants suggest that the ELT could not have decided to close the acquisition because the Board had that responsibility. *See id.* at 940-41. But the statement is still misleading, at minimum, because that is exactly what *deSouza* (who was on the Board) and the ELT had decided to do, and Illumina in fact had, by that time, *stopped* providing the "assurances" the EC requested. ¶¶171-73, 293-94. In addition, even if Illumina could *technically* continue working with the EC after closing, Illumina's statement would still be misleading for omitting that Defendants had already decided to take the unprecedented decision to simply flout the EC standstill. Indeed, when the closing was announced, numerous analysts commented on being surprised by the move and Illumina's stock price declined significantly. ¶¶69, 191-92; *see Alphabet*, 1 F.4th at 699-700.

**Fourth**, Defendants argue that no well-pled facts contradict their assertion that Illumina's and GRAIL's CEOs met on July 31, 2020 (Ill.Br. 25 n.21), but that is a misdirection: the Complaint does not dispute that a meeting took place that day. Rather, Plaintiffs allege that the statement was misleading because any such meeting was not the beginning of the process: meetings and other steps related to the deal— including conversations between deSouza and GRAIL Board members, bringing Aravanis to Illumina from GRAIL, and sending Ronaghi in the opposite direction— happened well before any July 2020 meeting. *See* ¶¶156-59, 366.

### 7. Illumina Made False And Misleading Statements Concerning Its Accounting For GRAIL

Defendants also misrepresented the accounting treatment for GRAIL. After Illumina reduced its GRAIL stake to under 20% in 2017, Illumina reported its

interests in GRAIL using the "cost method." ¶¶308-09. This was improper and violated GAAP. It also significantly reduced transparency by enabling Illumina to avoid reporting GRAIL as a related party, to (falsely) assert its acquisition of GRAIL was "arm's length," and to conceal Aravanis's GRAIL ownership and role. ¶¶318-22. But the actual facts—including from FE accounts, internal documents, and numerous other sources—show Illumina exerted "significant influence" over GRAIL, rendering the "cost method" treatment improper under GAAP. Accounting allegations like these are routinely sustained, as were *identical allegations* against Defendants here. *See In re Illumina, Inc. S'holder Litig.*, No. 24-CIV-00585 (Super. Ct. San Mateo Cnty. Sept. 16, 2025) ("*Illumina*"); *see also In re Daou Sys.*, 411 F.3d 1020 (9th Cir. 2005) (sustaining GAAP violations); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) (failure to disclose related party status rendered "SEC filings misleading"); *see also* App'x A.

As in *Illumina*, Defendants' arguments fail. To start, Defendants' contention that their accounting statements are inactionable opinions is incorrect. As Defendants argued in state court, the plaintiffs in that case "copied" their accounting allegations "directly" from the complaint here. The copied allegations stated a claim because plaintiffs sufficiently alleged "each factor of… (ASC) 323 to state a claim that Illumina had significant influence (as defined in that statute) over GRAIL such that the equity method" should have been applied. Ex. A ("*Illumina* Order") at 10. The *Illumina* court further held that whether the accounting statements were actionable opinion, as Defendants contend here, was a "factual dispute" inappropriate for resolution on the pleadings. Contrary to Defendant's argument, nothing in *Hunt* disturbs the state court's well-reasoned holding that, under Ninth Circuit law, just because the use of a specific GAAP method "may qualify as an opinion," that does not mean it is one in "all situations." *Illumina* Order at 11.[4]

---

[4] *Hunt* confirms that whether a statement is an opinion depends on its nature—there,

Even if opinions, they are actionable under *Omnicare* because they omitted key facts that one would take from the statement that the cost method was appropriate—including, in particular, the facts alleged (including as sustained by the state court) establishing that Illumina was "required" to (but did not) use the equity accounting method. 575 U.S. at 175, 189; *Cf.* Order at 12 *with* ¶¶335-44.

## B.  Defendants Acted With Scienter

Scienter refers to misleading investors "knowingly, intentionally, or with deliberate recklessness." *Alphabet*, 1 F.4th at 705. In evaluating scienter, a court must "constantly assum[e] … plaintiff's allegations to be true" and assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation" does. *Tellabs*, 551 U.S. at 322-23, 326-27. Plaintiffs need not plead a "smoking gun," and the inference "need not be irrefutable" or even the "most plausible"—a "tie" goes to the plaintiff. *Id.* at 324. No "specific theory of defendants' motives" is required. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *12-13 (N.D. Cal. Nov. 4, 2020); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (no motive needed).

### 1.  The Complaint Pleads A Strong Inference Of Scienter

The strength of the scienter allegations here is rare in securities fraud cases, where discovery is stayed pending resolution of a motion to dismiss: the allegations here include the accounts of senior Illumina and GRAIL executives who reported on Defendants' actual knowledge that their statements were at least misleading, as well as the contents of internal documents and the record in the FTC proceeding, which squarely contradict Defendants' misstatements.

**GRAIL Valuations (III.A.1)**. When issuing the S-4, Defendants knew its

---

a complex accounting judgment about the "useful life" of a fuel-cell server for a sale-leaseback. As *Illumina* confirmed based on copied allegations, the Complaint here details how "Defendants were 'required' to use the equity method of accounting" which is "sufficient to allege misrepresentation." *Illumina* Order at 13.

rosy projections were far better than the ones Illumina and its Board considered when buying GRAIL or those GRAIL management believed possible. ¶¶258-63. The internal numbers—projecting roughly half the revenues that the "conservative" public projections did (¶260)—were prepared by Febbo, Goswami, and other senior Illumina executives and provided to Illumina's Board, including deSouza and Thompson. This shows scienter. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("data, available to the party, which contradict the statement" was "most direct way to show [scienter]").

Defendants also actually knew that the S-4's "conservative" assumption "that broad reimbursement would be achieved in calendar 2025" was untrue, given their admissions about the FDA timeline and how FDA approval was a prerequisite to reimbursement. As FE5 confirmed, Illumina and GRAIL's leadership never assumed "broad reimbursement by 2025 because there were no facts or plan to support that assumption." ¶262. GRAIL management, including Bishop and Ofman, had actual knowledge of GRAIL's LRP, which provided an "aggressive" FDA approval assumption of 2026 to 2027—*years before* the 2025 date the S-4 said was GRAIL management's "reasonable" assumption of "broad reimbursement." ¶¶75, 87, 369-70. deSouza, Aravanis, Samad and Febbo had access to the LRP too. ¶261. Further, Illumina's "Deal Model" assumed a 70-75% re-test rate, even though only 2-4% of first-time Galleri users repeated the test in the first part of 2022; FE5 confirmed that Illumina had no data to support that assumed re-test rate at acquisition. ¶¶259, 263. This alleges scienter. *See E. Ohman J:or Fonder*, 81 F.4th at 940 ("[A]ccess and review of contemporaneous reports are the most direct way to prove scienter."); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941-43 (9th Cir. 2003) (similar).

The Illumina Defendants argue that the fact there were "different" projections does not mean that they knew their "projections would turn out right and GRAIL's would turn out wrong." Ill.Br. 30. But the Complaint alleges that both sets of

projections were false and were based on "assumptions" no one actually had. ¶¶258-63; *Precision Castparts Corp.*, 2017 WL 4453561, at *15 (scienter where defendants knew that publicly-reported forecasts were misleading).[5] The Illumina Defendants further argue that allegations of "access" to GRAIL's LRP are insufficient, ignoring that allegations that "defendants had actual access," including from FE5, "raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145.[6]

The GRAIL Defendants argue that Plaintiffs merely "challenge GRAIL's assumptions." Gr.Br. 16. But Plaintiffs allege that the GRAIL Defendants knew the publicly-reported projections were false: Bishop and Ofman admitted before the FTC that broad reimbursement could not happen without FDA approval, which GRAIL'S LRP said would not come until 2026 ***at best***. ¶¶261-63. The GRAIL Defendants' argument that they did not "make" these statements is wrong: the statements are explicitly attributed to GRAIL (¶75) and the Illumina Defendants assert they were made by "GRAIL management." *See supra* 18.

**Acceleration Misstatements (III.A.2)**. Several facts confirm that Defendants knew their statements that Illumina would "accelerate" Galleri's adoption were untrue. ¶¶264-72. deSouza, Aravanis, Samad, Febbo, and the ELT knew that Illumina lacked the specific infrastructure, expertise, funding, and resources to launch Galleri they touted to investors. *Id*. Before the FTC, (i) the Illumina executive responsible for Galleri's regulatory and reimbursement strategy testified that Illumina did not have the funding, experience, or resources to "accelerate" Galleri's

---

[5] Defendants' cases are inapposite. *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1487 (N.D. Cal. 1992) (plaintiffs made only "conclusory assertion" the projections "lacked a reasonable basis"); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *15 (N.D. Cal. Nov. 23, 2021) (the "allegedly concealed facts had not yet transpired").

[6] Defendants' cases are inapposite. Plaintiffs allege far more than "access to the undisclosed information," *Vazquez v. Masimo Corp.*, 2024 WL 6080498, at *11 (S.D. Cal. Nov. 5, 2024), and that Defendants actually knew the true projections, ¶¶259-61, not merely that they had "direct access" to them. *Align*, 856 F.3d at 610.

FDA approval or its widespread adoption; (ii) Febbo and Illumina's expert each confirmed Illumina did not have any "acceleration" in its deal model; (iii) GRAIL's CFO testified that there was no estimate of acceleration because neither Illumina nor GRAIL performed that analysis; (iv) Bishop admitted he could not quantify how much sooner Galleri would obtain FDA approval as a result of the deal; and Defendants were completely "unable to substantiate" any acceleration claim. ¶¶105, 267-71. And an internal Illumina FAQ document provided to deSouza and Samad stated: "We do not expect material synergies to the transaction." ¶272. These facts show scienter. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *14 (D. Or. June 27, 2017) (scienter where company "did not have any actual forecasts").

In response, Defendants contend the scienter allegations merely "repackage[]" deficient falsity allegations, but those allegations are sufficient (*see supra* Section III.A.2) and many other facts—such as the FTC admissions—show scienter as well. *Daou*, 411 F.3d at 1015 (falsity and scienter are "generally strongly inferred from the same set of facts"). Defendants also try to spin a counterfactual narrative about what their admissions mean, but their attempt to "present their own version of the facts at the pleading stage" is improper, *Khoja*, 889 F.3d at 999—and the FTC record is clear and corroborated by FE5 and the Fifth Circuit's findings. *See supra* Section III.A.2. Defendants further argue that the more "compelling" inference is that Defendants "believed" Illumina would accelerate Galleri. Ill.Br. 31. But that "belief"—even if genuinely held—would not excuse Defendants' material omissions, including that there was *no plan* to accelerate Galleri and Illumina lacked the capability to do so. ¶¶107-09; *see, e.g.*, *Glazer*, 63 F.4th at 780 (subjective belief that merger would happen irrelevant where defendants knew acquirer was reconsidering). And Defendants' supposed "belief" is implausible given their admissions that neither Illumina nor GRAIL had even analyzed whether Illumina could "accelerate" Galleri. ¶¶265-72; *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d at 886 (N.D. Cal. 2023) ("good faith in unprecedented circumstances" was not more

compelling).

The same is true of Bishop's statement that the deal would "get the Galleri test to people *far faster*": he has no real defense, so he accuses Plaintiffs of misconstruing his FTC testimony (Gr.Br. 15), even though he has withheld most it, which remains under seal. But his testimony—which he gave just two weeks before his statement—is clear: he swore there was no discussion between Illumina and GRAIL of any plans to accelerate FDA approval. ¶270; *see also* RJN Opp. 6-9.

**Clinical Efficacy Statements (III.A.3)**. Defendants claimed that Galleri could "detect[] 50 different cancers before they are symptomatic" as would support an FDA submission in the near-term. ¶¶111-13. But Defendants' admissions show that these statements were false or misleading. Ofman conceded at trial that the PATHFINDER study, which he described as "more powerful" than the STRIVE and SUMMIT studies, did not provide clinical evidence of Galleri's ability to detect 50 types of cancer in an asymptomatic population. ¶275; *see also* ¶274 (GRAIL's expert conceded that Galleri could only detect seven cancers in an asymptomatic population). Multiple Illumina and GRAIL FEs confirmed that GRAIL's senior leadership knew that Galleri would never obtain FDA approval for 50 cancers. ¶276.

Defendants further admitted before the FTC that GRAIL's clinical studies could not support the 2023 FDA submission they touted to investors. Bishop testified that GRAIL was "still years away from seeking FDA approval for its multi-cancer screening test" and its completed trials were not "sufficient" for FDA approval; Illumina's expert testified it would take "seven to ten years at minimum" to conduct the clinical study needed (at least five years longer than in Defendants' public timeline); and Ofman admitted that the CCGA study did not involve the intended use population for Galleri, that GRAIL had not analyzed the SUMMIT or STRIVE data as of the 2021 FTC trial, and that PATHFINDER was too small to show effectiveness. ¶¶130, 277, 280. Such contemporaneous admissions cannot be squared with Defendants' public statements and are strong evidence of scienter. *See,*

*e.g., Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82-83 (1st Cir. 2002).

The Complaint also alleges in detail that: Defendants were privately informed by the FDA, in meetings and in writing starting in 2019, that the Galleri studies were insufficient for FDA approval; FE2, FE4, and FE5 confirmed that the fact that the FDA had informed Defendants Galleri's clinical program was insufficient and Galleri would never be approved to test 50 cancers was "widely known" by GRAIL senior leadership; Illumina's senior executives had unrestricted access to GRAIL's FDA file and knew these facts too; according to FE5, deSouza admitted at a September 18, 2020 internal meeting that data showed Galleri's detection of Stage 1 cancers was low and said Illumina needed to hide this fact from investors; and Galleri's real-world performance showed that it was a disaster. ¶¶121-26, 276, 278, 281. Facts like these plead scienter under controlling law. *See, e.g., Arena*, 840 F.3d at 707-08 (scienter where defendants touted FDA progress but failed to disclose FDA concerns); *Xoma*, 74 F.3d at 959 (scienter where defendants made "optimistic" statements "FDA-approval process was progressing positively" when it was not); *BioMarin*, 2022 WL 164299, at *13 (scienter for FDA timeline statements when "approval was riskier than they let on publicly" given "warning signs").

In response, Defendants raise improper factual disputes which fail for that reason alone. *See Khoja*, 899 F.3d at 999; RJN Opp. 1-2. First, Defendants again argue that the "strongest inference" is that Defendants "believed Galleri could detect 'cancers' because the CCGA studies said it could." Ill.Br. 32. But Ofman admitted CCGA did not involve the intended use population and GRAIL was told by the FDA that CCGA was insufficient. ¶280. Even if Defendants somehow "believed" CCGA supported them, they knowingly misled by omitting the FDA's contrary view.

Second, Defendants argue that the S-4's disclosures about the risks inherent in all clinical trials somehow "negates" scienter. Ill.Br. 33. But these generic disclosures did not inform investors about what Defendants actually knew. *See supra*

Section III.A.3.[7] Here, only an "outright admission" of the FDA's disapproval would be a "sufficiently meaningful" risk warning. *Quality Sys.*, 865 F.3d at 1146-48.

The GRAIL Defendants knew all of this but now argue otherwise—ignoring Bishop and Ofman's admissions that GRAIL's studies were insufficiently powered for FDA approval and that they received FDA feedback reporting this fact. They instead argue that Ofman "did not speak about FDA approval." Gr.Br. 15. But Ofman stated that Galleri "can identify 50 cancers with a single blood draw," which he knew was at best misleading, including based on his admission that GRAIL's studies could not support FDA approval for Galleri's intended use. *See supra* 38-39.

**"Save Lives" Misstatements (III.A.4)**. Defendants knew that their statements that the GRAIL acquisition and Galleri's adoption would "save lives" were false and misleading. Bishop knew that GRAIL's PMRC prohibited GRAIL employees from publicly claiming that Galleri could "save lives" because it was not supported—but he told investors that anyways. ¶¶283-84, 409. As an ELT member reported, deSouza knew his "save lives" statements were not supported by any actual facts, prompting him to direct a desperate and failed effort to identify an independent backer to support such statements. ¶¶285, 287. And Bishop and deSouza worked together on deSouza's op-ed claiming that the FTC was "jeopardizing our chance to save more lives from cancer"—even though Bishop knew the PMRC's prohibition on publicly making this representation. ¶286. This shows scienter. *Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *2 (9th Cir. Dec. 20, 2024) ("actual access" to contrary facts sufficient for scienter).

Defendants' only response to these allegations is to argue, counterfactually, that "[m]ultiple studies confirmed Galleri's ability to detect cancers early." Ill.Br.

---

[7] *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, is wholly inapposite. There, the plaintiff's conclusory allegations that defendant's sales of shares were made pursuant to a "scheme to defraud and manipulate" were undercut by the defendants' ability "to sell the shares however it pleased" "[u]nder the plain terms of the [parties'] agreement." 56 F. Supp. 3d 1121, 1165 (C.D. Cal. 2014).

32; Gr.Br. 15. This factual challenge is improper at the pleading stage. *Tellabs*, 551 U.S. at 326-27 (courts are required to "constantly" assume Plaintiffs' allegations are true). Regardless, Defendants' claim of "early detection" is meaningless and unsupported because Defendants admitted that GRAIL's studies were insufficient to support FDA approval for its intended use, the FDA informed Defendants of this, and none of GRAIL's studies measured Galleri's effect on mortality. *See supra* 38-40. Given these allegations, what the studies actually showed or what Defendants could reasonably take from them is a fact dispute for trial—not a basis for dismissal. *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 808-09 (C.D. Cal. 2012) (scienter and falsity inferred when a defendant makes confident statements after the FDA informs it of problems). And even if Defendants believed the deal would "save lives," they never disclosed that there was no clinical evidence supporting that claim and the PMRC prohibited it. *See supra* Section III.A.4; *Glazer*, 63 F.4th at 780.

**Conflict of Interest Misstatements (III.A.6)**. The undisclosed conflicts of interest that drove the acquisition, which were obviously known by Defendants, also demonstrate scienter. Defendants knowingly misled investors when they claimed that Aravanis was "recused from any decisions to sign and close the GRAIL acquisition"—they knew that Aravanis was one of two primary "cosponsors" who *led* the Board's decision-making. ¶¶290-91. This is particularly true for deSouza, who personally installed Aravanis as Illumina's CTO to orchestrate the deal and, as FE5 explained, relied heavily on Aravanis for all deal-related questions. ¶162.

Further, contrary to Defendants' representations that the GRAIL acquisition was "negotiated through an arm's length process" and that acquisition talks began on July 31, 2020, deSouza had multiple conversations with GRAIL Board members—including Ronaghi (previously Illumina's CTO), Klausner, and Aravanis—as early as January 2020. ¶¶289, 292. This is confirmed by internal documents from Delaware Chancery Court litigation revealing "multiple streams of unauthorized communications between an Illumina board member and GRAIL

board members and bankers." ¶292. deSouza obviously knew that the S-4's statement that negotiations began in July 2021 omitted these facts and were untrue.

These facts provide overwhelming evidence of scienter: Defendants not only had access to information contradicting their misstatements, but actually participated in the conduct at issue in the misstatements. *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043 (N.D. Cal. 2018) (scienter where defendants were "highly involved"). Defendants' assurance that Aravanis was "recused"—when he was actually the co-sponsor—was a deliberate attempt to cover up wrongdoing. These facts would never have come to light had they not been uncovered by a former director—elected to the Board after Defendants said Aravanis had been "recused" and the transaction was conflict-free—who immediately recognized, based on internal documents, that the deal and closing were conflicted. This alleges scienter. *See, e.g., Quality Sys.*, 865 F.3d at 1145 (allegations in director's lawsuit showing defendants' "actual access" supported scienter); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) ("attempts to hide" and "cover up" scienter); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310-11 (D. Utah 2007) (similar).

Defendants argue that these allegations merely repeat falsity allegations (Ill.Br. 34), but the Ninth Circuit has held that falsity and scienter are "generally strongly inferred from the same set of facts." *Daou*, 411 F.3d at 1015. Further, the statements—including that Aravanis was "recused" from a decision-making process he led—could not have been innocently made. ¶291; *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 229 (E.D. Pa. 2021) (scienter where "it is extremely unlikely [defendant] did not know" about topic of statement).

**Illumina's Plans for GRAIL Misstatements (III.A.6)**. Defendants knew that their July 22, 2021 statement that Illumina would "ensure that [the EC] has the information and assurance necessary to approve this transaction" were false because, at a July 12, 2021 meeting ten days prior, the ELT (including deSouza, Aravanis,

Samad, and Febbo) chose to close the transaction in violation of the standstill, to not offer any further assurances or "remedies" to allay the EC's concerns, and to obtain $300 million in insurance to cover deal-related claims. ¶¶293-95. Defendants ignore these allegations entirely and thus waive any arguments as to them. *See Herron v. Best Buy Stores, LP*, 2013 WL 4432019, at *4 (E.D. Cal. Aug. 16, 2013). Instead, Defendants swipe at FE5 in passing, arguing his "claimed meeting attendance and emails receipt lack detail." Ill.Br. 29. But FE5 provides a play-by-play of the July 12 meeting, identifying the attendees and their words—far more than is required at the this stage, before discovery. *Infra* Section III.B.2; *see Quality Sys.*, 865 F.3d a 1145 (crediting FE allegations describing interactions with defendant at meetings).

**D&O Insurance Misstatements (III.A.6)**. Defendants' scienter is also supported by the insurance policy they secured to indemnify Illumina's and GRAIL's boards and management for deal-related conduct, as well as the secret indemnification letter agreement. ¶¶295-97. Months **after** the deal closed, Defendants disclosed the existence of the policy—but continued to hide its cost and terms, which they never voluntarily disclosed. ¶298. When later questioned about it by activist Carl Icahn, Defendants lied, calling it "standard," "appropriate," "common," and consistent with the Board's fiduciary duty. ¶¶298, 453.

Defendants dismiss these allegations as "frivolous," arguing that Illumina's revenues somehow make the $300 million policy, and Defendants' lies downplaying it, irrelevant. Not so. When a new Illumina director uncovered the policy, he grew so concerned that he and Icahn filed suit, accusing Illumina of misrepresenting the transaction and the reasons for closing. This is powerful evidence of scienter. *See Quality Sys.*, 865 F.3d at 1145. Defendants again wrongly contend that Plaintiffs attempt to "co-mingle" falsity and scienter (Ill.Br. 34), but that argument is baseless. *Daou*, 411 F.3d at 1015. Here, the policy was clearly out of line with Illumina's prior policies and industry standards (¶¶176, 182, 295-98), and the fact that Defendants called it "standard" when questioned about it confirms their scienter. *See In re*

*Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237-38 (S.D.N.Y. 2010) ("incongruity between word and deed establishes a strong inference of scienter").

Defendants discount the Delaware Chancery Court's finding that the policy provided a "credible basis to infer" that Illumina's Board committed "a knowing violation of positive law" based on the pleading standards, claims asserted, and the EU's later jurisdictional ruling. But the Delaware court did not find a colorable fiduciary breach simply for "buying car insurance," as Defendants argue. Ill.Br. 34.[8] Defendants' knowing breach is relevant to their purchase of the policy and later statements that it was "standard" and "appropriate." *See Tellabs*, 551 U.S. at 326 (allegations accepted as true and taken collectively); *Snap*, 2024 WL 5182634, at *2 (scienter where there are "reasonable grounds to believe" statement was false).

Last, Defendants try to downplay the insurance by calling its $72 million cost a "rounding error." Ill.Br. 34. But the bespoke policy was extraordinary, the focus of extensive discussion by the ELT, a required condition for closing, and triggered a lawsuit by a newly elected director. ¶¶175-76. The cost was not a "rounding error"; it was ***1.3 times more*** than GRAIL's revenues that year. *See* ¶221. Defendants' counterfactual argument should be rejected. *See Khoja*, 899 F.3d at 1014.

**GRAIL's Revenue Guidance Misstatements (III.A.5)**. Defendants also knew that their statements concerning GRAIL's 2022 revenue guidance were false and misleading. GRAIL's internal documents, available to Ofman and the Illumina Defendants, showed that GRAIL was not meeting and could not meet its target volumes in each channel, with revenues reaching only 58.5% of forecast for the first quarter of 2022; deSouza and GRAIL leadership determined the revenue guidance over the objections of GRAIL's SVP of Sales, who said it was unsupportable and unachievable; and, as FE5 reported, GRAIL and Illumina's communication and legal

---

[8] The jurisdictional ruling is irrelevant; fiduciary and securities laws take an *ex ante* approach to the facts as they were at the time. *See, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *14 n.10 (N.D. Cal. Sept. 29, 2000).

departments discussed revenue figures in monthly meetings, after which Illumina's VP, Finance & Treasurer prepared "readouts" for the Illumina Executive Defendants based on Galleri's sales data. ¶¶300-02. This alleges scienter. *DocuSign*, 669 F. Supp. 3d at 880 (actual knowledge where former employees recounted "waning demand in DocuSign products" reflected by data accessible to defendants); *Patel v. Edwards Lifesciences Corp.*, 2025 WL 2724388, at \*10 (C.D. Cal. Sept. 19, 2025) (actual knowledge where employees recounted that "executives knew … projections would not be met" and sales decline was discussed). This inference is bolstered by Samad's admissions that Illumina "work[ed] closely" with GRAIL on the guidance and budget and that Illumina management got "details on the assumptions." ¶¶301-02; *Quality Sys.*, 865 F.3d at 1145 (scienter when "executives themselves told investors they had real-time access to, and knowledge of, sales information").

Ignoring these allegations, Defendants argue that Plaintiffs do not plead facts demonstrating that Defendants knew GRAIL would not meet its revenue guidance at year-end. Ill.Br. 33. But when deSouza said in May 2022 that GRAIL was "on track" to meet its guidance, internal documents showed total revenues were **half** internal forecasts, health systems revenues were **7%** of forecasts, and payer and insurer channels had **zero** revenues—facts that Samad said would have been reported to Illumina management. ¶153; *see also Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at \*1-2 (N.D. Cal. June 22, 2017) (finding scienter based on similar internal forecast misses).

**Illumina's Accounting of GRAIL Misstatements (III.A.7)**. Scienter is also supported by Defendants' accounting violations. ¶¶303-06. The alleged accounting violations were sophisticated maneuvers designed to conceal highly material facts about insiders' conflicts in the GRAIL transaction and could only have been carried out with the approval and knowledge of senior management, showing scienter. *Id.*; s*ee, e.g., In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[S]ignificant GAAP violations … described with particularity … may

provide powerful indirect evidence of scienter. After all, books do not cook themselves."); *see also Montage Tech.*, 78 F. Supp. 3d at 1226-27 (scienter where company failed to disclose that largest distributor was related party under GAAP).

Defendants argue that Plaintiffs' accounting allegations fail since Plaintiffs removed certain allegations concerning insiders' secret stake in GRAIL. Ill.Br. 30. But Defendants' focus on an inoperative pleading is a distraction—they ignore that the accounting allegations here were sustained by a California court in a parallel proceeding. Ex. A. Moreover, the operative Complaint, the only pleading that matters, alleges numerous facts showing deliberate misconduct, including that Illumina's sale of GRAIL equity in 2017, which brought its stake in GRAIL down from over 50% to under 20%, had no purpose besides giving Illumina cover for failing to report GRAIL as a related-party and hiding transactions with GRAIL or its insiders, such as Aravanis's GRAIL ownership and personal involvement in the deal. ¶305. This supports scienter. *See McKesson*, 126 F. Supp. 2d at 1273.[9]

**GRAIL's Importance and Defendants' Credibility.** The Ninth Circuit has explained at least four times that some facts are so prominent it would be "absurd to suggest" that top management lacks scienter. *Snap*, 2024 WL 5182634, at *3 ("absurdity" test independently shows scienter); *NVIDIA*, 81 F.4th at 946 ("obvious" CEO would know about source of $1 billion in revenue); *Berson*, 527 F.3d at 988 ("hard to believe" senior executives would not have known about $1 million of stop-work orders); *Am. W.*, 320 F.3d 943 n.21 ("patently incredible" board did not know of millions in stock purchases and FAA investigation.). This case is no different.

Defendants' misstatements concerned the $8 billion GRAIL acquisition, the

---

[9] Defendants argue Plaintiffs overstate the significance of the 20% threshold, but ignore that, to relinquish control of GRAIL, Illumina had to convert its super-voting Class B shares, which gave it significant influence over director elections and veto power over certain corporate actions, to Class A. This conversion created a divergence between Illumina's equity and voting power and confirms Defendants' intent to eliminate obvious indicators of significant influence.

most important transaction in either company's history. The deal was the subject of a proxy contest that led to the ouster of Illumina's Board chair, a derivative lawsuit, an FTC trial, and appeals to the FTC and Fifth Circuit. And GRAIL lost 95% of its value soon after being acquired. These facts bolster scienter. *See NVIDIA*, 81 F.4th at 946; *Berson*, 527 F.3d at 988; *Am. W.*, 320 F.3d at 943; *MannKind*, 835 F. Supp. 2d at 808-09 (core product, coupled with access to FDA interactions, made it "absurd to suggest" lack of knowledge). It would be "patently incredible" and "absurd" to suggest Defendants did not know the truth about the facts they misrepresented, including whether Illumina actually had plans or capabilities to accelerate Galleri and whether Defendants' public projections conflicted with the undisclosed ones. *Am. W.*, 320 F.3d at 943 n.21.

Defendants' scienter is also supported by their professed and demonstrated knowledge of GRAIL and Galleri—a central topic of every investor call and numerous media appearances during the Class Period. *See, e.g.*, ¶¶308, 348, 375, 377, 403, 416, 427-28, 436); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (scienter supported by fact that statements were made in response to analyst questions); *Energy Transfer*, 532 F. Supp. 3d at 228-29 (self-professed knowledge created strong inference of scienter). According to FE5, deSouza admitted that GRAIL was one of only two things during the Class Period that investors cared about (¶187), and a former ELT member confirmed that deSouza personally oversaw an effort to find a credible mouthpiece to back Defendants' false claims about Galleri—but was unable to do so (¶139).

Defendants argue that this is not the "exceedingly rare" case where the "core operations" doctrine applies (Ill.Br. 36; Gr.Br. 16-17), but Plaintiffs utilize the doctrine to *supplement* the scienter inference. *Edwards*, 2025 WL 2724388, at *10.[10] As to Defendant deSouza's divorce proceedings, Defendants merely assert they are

---

[10] The facts here stand in sharp contrast to Defendants' cases, which concerned vague accusations and conjecture or declined to find scienter based *solely* on the doctrine.

irrelevant, but, as set forth above, his conduct there supports his scienter.

**Executive Resignations.** Numerous suspicious executive departures also support scienter. Most notably, Illumina disclosed that Aravanis and Febbo, the deal's two "cosponsors," were leaving one day before it revealed an SEC investigation into its representations about the GRAIL deal. ¶¶224-31; *see In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (resignations in the midst of "investigations" support scienter). Similarly, Samad joined Illumina in 2016, immediately before the accounting fraud is alleged to have begun, yet resigned unexpectedly in the middle of several other alleged fraud-related disclosures, and four separate analysts connected the departure to GRAIL. ¶325. And deSouza left abruptly, without a permanent successor, after a failed proxy contest triggered by his misrepresentations about GRAIL. *See In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021) (resignation that is effective immediately without a successor in place may be considered "unusual"). Indeed, seven of Illumina's senior-most executives at the time deSouza became CEO have now departed, including the architects of the GRAIL deal, Thompson, Aravanis, Febbo, and the CFOs responsible for GRAIL's accounting. ¶¶324-26. This supports scienter. *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, at *322 (S.D.N.Y. 2024) ("too many departures to say that they were coincidental with a straight face"); *Glazer v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (resignations are "circumstantial evidence of fraud," particularly where "independent facts indicate that the resignation was somehow tied to the fraud"). Defendants ignore these allegations, which detail why the departures are unusual.

Further, Illumina's Chief Accounting Officer unexpectedly resigned three months after Samad, and Samad's replacement resigned just after the final alleged disclosure. *See id.* Contrary to Defendants' argument, the departures of these non-defendants "add[] one more piece to the scienter puzzle." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *see, e.g.*, *Plumbers & Pipefitters*

*Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 556283, at *15 (N.D. Cal. Feb. 18, 2025) ("*CareDX II*") (resignations of "other employees [] over … alleged improper conduct" support scienter). Defendants' cases are inapposite as the resignations had innocent explanations. *See In re Regulus Ther. Inc. Sec. Litg.* 406 F. Supp. 3d 845, 861-62 (S.D. Cal. 2019) (single resignation explained); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,1002 (9th Cir. 2009) (similar).

### 2.     Defendants' Remaining Scienter Arguments Are Meritless

Defendants' remaining arguments against scienter are unavailing.

***First***, Defendants argue that scienter is not alleged because they had no motive to commit fraud. This is doubly wrong. Plaintiffs are ***not*** required to plead motive (*see Matrixx*, 563 U.S. at 48; *Arena*, 840 F.3d at 709 n.8), but they do so here.

Aravanis—who became Illumina's CTO specifically to "cosponsor" the GRAIL acquisition—liquidated all of the stock he received through that deal as quickly as possible, reaping $5 million in proceeds. ¶311. Bishop netted over $100 million from the deal, while Ofman pocketed over $55 million. ¶312. Klausner used an opaque vehicle, Milky Way, to invest $125 million in GRAIL while knowing Illumina was taking steps to reacquire it—doubling that investment in months. ¶¶313-15. And after deSouza orchestrated the deal, Illumina's Board rewarded him with roughly $67 million over the next three years—a huge increase from the $1.9 million he earned in 2019. ¶¶316-19. In addition, deSouza, Aravanis, Febbo, and Samad were each personally motivated to misrepresent the value of GRAIL and Galleri based on the stock options whose value depended on Illumina's stock price and other compensation based on vesting and earnings-per-share targets. ¶317.

These extraordinary financial incentives weigh heavily in favor of scienter, particularly given the many allegations corroborating Defendants' knowledge of the truth. *See, e.g.*, *Tellabs*, 551 U.S. at 310 ("personal financial gain may weigh heavily in favor of a scienter inference"); *In re SLM Corp. Sec. Litig*., 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("possibility of reaping a windfall payout" through acquisition

supports scienter); *Am. W.*, 320 F.3d at 944 (executives were "motivated to inflate [] financial results … because their eligibility for stock options and executive bonuses were based principally on the company's financial performance").

Ignoring these allegations, the Illumina Defendants contend that the Complaint only pleads motive as to Aravanis and deSouza (Ill.Br. 26-27). While this is enough to plead Illumina's scienter, the Complaint goes far beyond that. It alleges that a then-current Illumina Director and others with access to confidential Board materials independently determined that the Board had been "poisoned by their personal stake" in the GRAIL deal. ¶¶318-19.

With respect to Aravanis, Defendants concede that sales that are "'dramatically out of line with prior trading" and "calculated to maximize the personal benefit from *undisclosed* inside information'" are "'suspicious'" (Ill.Br. 27). But they have no answer for the fact that Aravanis's Class Period sales were highly suspicious and timed to maximize his profits while he had inside information. Instead, Defendants defend the sales on the ground that he supposedly "finally receive[d] freely tradable shares" when the deal closed and that he sold pursuant to a 10b5-1 plan. Ill.Br. 27. But Aravanis received at least $5 million in cash through the acquisition on top of his approximately $5 million in Illumina shares—he did not need the liquidity. ¶163. Moreover, Defendants repeatedly stated that GRAIL was worth more—even as a standalone company—than the price Illumina paid. ¶¶75-77. If Aravanis believed that (as he told investors), it is not plausible that he would have sold every Illumina share he received through the merger at the first moment he could when he was already sitting on $5 million in cash. ¶163; *see, e.g., In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013). Defendants' case, *Ryan v. FIGS, Inc.*, confirms Aravanis's sales are suspicious. 2024 WL 187001, at *12 (C.D. Cal. Jan. 17, 2024) ("percentage of holdings sold" and "selling stocks within months of corrective disclosures" indicative of scienter).

Defendants' next argument, that Aravanis's sales cannot be suspicious

because they were made pursuant to a 10b5-1 trading plan (Ill.Br. 27), also fails. Aravanis entered into the plan while he and the other Defendants were misrepresenting the value of GRAIL and Galleri's ability to "save lives," which negates any protection the plan might otherwise provide. *See, e.g.*, *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022) ("fact that a trade was made under a 10b5-1 plan does not per se rebut the inference of scienter"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 & n.5 (D. Nev. 2009) (defense pursuant to 10b5-1 plan requires factual finding of "good faith" inappropriate on a motion to dismiss). Defendants also do not disclose the details of his 10b5-1 plan, so it only raises fact questions as to what it says and why it supposedly establishes innocence; the Court cannot hold the sales are innocent without such facts.[11] Third, even if Defendants provided the plan, it provides no defense given that it enabled Aravanis to dispose of every single share he received at the earliest possible moment.

As to deSouza, Defendants argue that his incentive-based compensation was "common" and does not support scienter. But not every executive's compensation increases 30-fold during a period of unprecedented investor value destruction, ¶316, does not take into account the underperformance of an $8 billion acquisition, ¶317, and is targeted by an activist campaign and SEC investigation. The Complaint alleges how deSouza, Aravanis, Febbo, and Samad were personally motivated to misrepresent GRAIL based on compensation that depended on Illumina's stock price and on vesting and earnings-per-share targets that excluded the performance of GRAIL entirely. ¶317. This is highly unusual, and supports scienter. *See, e.g.*, *Dentsply*, 732 F. Supp. 3d at 318 (compensation supports motive where there is link to misstatements and an incentive to "sweep problems under the rug").

---

[11] Exhibit 39 merely shows that Aravanis's sales were conducted pursuant to a 10b5-1 plan, not the details of that plan. Aravanis necessarily entered into any such plan during the Class Period or just prior, when he became Illumina's CTO to help close the acquisition. But even Rule 10b5-1 plans "set up before the class period" cannot "per se rebut an inference of scienter." *Pluralsight*, 45 F.4th at 1265-66.

Remarkably, the GRAIL Defendants disclaim having any motive, even though they do not dispute that they "owned GRAIL shares [and] profited when Illumina acquired GRAIL." Gr.Br. 14. But Bishop and Ofman together netted over ***$155 million*** as a result of GRAIL's inflated valuation, giving them an extraordinary motive to mislead. ¶168; *see also SLM*, 740 F. Supp. 2d at 558. The GRAIL Defendants further repackage the Complaint's allegations concerning Klausner's personal financial motives and argue that "negotiating on behalf of GRAIL shareholders and investing in a startup company are 'routine corporate objectives.'" Gr.Br. 15. In addition to injecting yet another counterfactual narrative, Defendants are wrong. That Klausner invested $125 million in GRAIL when he knew non-public information that Illumina would acquire GRAIL provides him with an obvious motive to mislead investors. *See Nevsun*, 2013 WL 6017402, at *13.[12]

***Second***, Defendants baselessly attempt to discredit FE5. Those attacks fail. Courts credit FE allegations where the FE is identified with "sufficient particularity" to support "the probability that a person in the position occupied by the source would possess the information alleged." *Daou*, 411 F.3d at 1015; App'x B. The Complaint far exceeds that. It details FE5's role, responsibilities for "Illumina business reviews, strategic initiatives, and corporate reporting," tenure, and contact with deSouza and other members of Illumina's ELT. ¶90. It also details the basis of FE5's knowledge, including that he "attended meetings with Defendant deSouza and others from Illumina's [ELT], was included on emails with them, and participated in presentations concerning the GRAIL acquisition with them." ¶90. Such allegations go far beyond what is required. *Daou*, 411 F.3d at 1016 (crediting FE allegations where "[p]laintiffs number[ed] each witness," "describe[d] his or her job description and responsibilities," and listed "to which … executive the witness reported").

---

[12] *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 884 (9th Cir. 2012) is thus inapposite because Plaintiffs allege far more than a mere desire to obtain compensation "based partly on [] success in achieving key corporate goals."

Moreover, FE5's account provides extraordinary detail and specificity, including that the ELT decided at a July 12, 2021 meeting that Illumina would close the acquisition despite the standstill, that Illumina's Global Market Access head stated it would be virtually impossible to get Galleri reimbursed by any major payor because they required FDA approval and clinical data, that the S-4's assumption of a "broad reimbursement" date of 2025 was "pulled out of thin air," and that the re-take rates used were wrong. Importantly, his account is corroborated by internal Illumina documents and witness testimony, including documents and testimony showing that the projections presented to Illumina's Board were far lower than publicly-reported ones, and Defendants' admissions that Illumina and GRAIL had never determined whether Illumina could "accelerate" Galleri's adoption. FE5's account should be afforded more weight. *See, e.g., In re Countrywide Fin. Corp. Deriv. Litig.,* 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (scienter established when witness accounts tell "the same story … from markedly different angles").

Defendants further argue that the allegations concerning FE5's attendance at two meetings in July 2021 and September 2021 are insufficient. ¶¶173, 281. But these detailed allegations—including dates, attendees, and what was said—strongly support scienter. *See Quality Sys.*, 865 F.3d at 1145 (crediting FE allegations describing interactions with defendant at meetings). Courts credit far less detailed reports at the pleading stage. *See, e.g.*, *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *9 (W.D. Wash. Oct. 6, 2011) (rejecting argument that FE, who did not attend meetings, "was not in a position to know the Defendants' personal awareness" because witness was "alleged to be in a position to report on these facts").[13]

_____

[13] The FEs had personal knowledge, including as ELT members and from interacting with Defendants; in Defendants' cases, FEs were not in a position to know or relied on "only secondhand information." *Zucco*, 552 F.3d at 996-97; *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1112 (N.D. Cal. 2003); *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *9 (N.D. Cal. Dec. 28, 2005); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001).

Defendants also resort to attacking the FE allegations as "hearsay." These are *not* hearsay statements. *See Arnold v. Pfizer, Inc.,* 970 F.Supp.2d 1106, 1123-24 (D. Ore. 2013) (statements by employees to affiant not hearsay). Regardless, as Defendants' own authorities caution, hearsay is "*not* automatically precluded from consideration" to support scienter. *Zucco*, 552 F.3d at 998 n.4.[14] Rather, hearsay—an evidentiary issue for trial, not pleadings—may be credited at this stage where a witness's "role … could plausibly give him access to" the reported information. *In re Cadence Design Sys., Inc. Sec. Litig.,* 692 F.Supp.2d 1181, 1188 (N.D. Cal. 2010).

Tellingly, Defendants do *not* contend that FE5 or any other FE lacked a basis to know the information attributed to them. Instead, they argue that FE5's statements are not "indicative of scienter" because the allegations do not "speak to any Defendant's mental state." But FEs are not required to have contact with a defendant or be a mind-reader. *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (scienter despite lack of "direct contact" with defendants); *see also Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11-12 (D. Ariz. Nov. 27, 2018) (no personal knowledge of defendants' state of mind required). In all events, the FE allegations *do* speak to Defendants' knowledge. *E.g.*, ¶90 (FE5 attended meetings with ELT), ¶118 (FE3 worked with Aravanis and joined Ofman on calls and presentations), ¶139 (FE1 was member of ELT).[15]

---

[14] *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) is inapposite; there, the plaintiffs failed to "adequately plead the bases of most of the witnesses' personal knowledge" or the "dates" or "substance" of the meetings—which stands in stark contrast to FE5's accounts. *E.g.*, ¶¶173, 282.

[15] Defendants argue that only FE 5 supports widespread internal knowledge that FDA approval for 50 cancers was unachievable, but FE2, FE3, and FE5 do too—each was responsible for Galleri's clinical and commercial strategy. ¶120. Defendants' cases are thus inapposite. *Cf. In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *15 (D. Ariz. Oct. 27, 2011) (witness statements supported inference of scienter). Defendants further argue that the ELT's decision to close in defiance of the EU standstill "does not sound in fraud." That makes no sense, as evidenced by the EC and FTC proceedings and the deal-related D&O insurance taken out by the Board.

***Third***, the GRAIL Defendants argue that Plaintiffs "mix[] and match[] allegations" to establish scienter. Gr.Br. 15. The Complaint alleges a host of detailed allegations related to each GRAIL Defendant's scienter, including based on GRAIL Defendants' sworn testimony in the FTC proceeding, internal GRAIL documents, and the detailed accounts of well-placed FEs. *See supra* Section III.A.1.

### 3.    A Holistic Analysis Supports A Strong Inference Of Scienter

Finally, Defendants argue that Plaintiffs' theory of fraud makes no sense. Ill.Br. 36; *see also* Gr.Br. 17. This is wrong. It is obvious that Defendants Aravanis, Bishop, Ofman, and Klausner—who together made hundreds of millions of dollars as direct result of the GRAIL transaction—were incentivized to inflate GRAIL's value and close the deal. *See supra* Section III.A.1. And even if no Defendants profited from the fraud, that would not negate scienter because courts cannot "infer innocence by hindsight because the alleged misdeeds did not pay off." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1076 (E.D. Wash. 2016).

In reality, a holistic analysis of the Complaint's scienter allegations shows that nothing about Defendants' proffered innocent inference makes any sense. Defendants could have simply extended the acquisition closing to accommodate the EC review and FTC proceeding. Instead, they closed the deal despite an explicit regulatory prohibition—securing an extraordinary insurance policy and entering into a secret agreement in which Illumina indemnified GRAIL directors and officers. They did this to pay GRAIL's investors $8 billion—with hundreds of millions going to Aravanis, Bishop, Ofman, and Klausner—even though their internal valuations showed it was worth a fraction of that amount, while agreeing to hold the companies separate and exposing Illumina to hundreds of millions in fines. They tried to justify the closing based on their ability to "accelerate" Galleri and "save lives," but had no plan or ability to do the former, and no evidence supporting the latter—and when questioned about their motives, issued a series of misleading denials. Ultimately, Illumina sold GRAIL at a 95% loss—for ***less than its cash on hand***. Taken together,

as they must be (*see Tellabs*, 551 U.S. at 322-23), these allegations show no innocent inference is remotely plausible, let alone *more* plausible than the one alleged.

### C.     The Complaint Adequately Pleads Loss Causation

The Complaint pleads a theory of loss causation under the Ninth Circuit's decision in *First Solar*. 881 F.3d at 753. Importantly, this loss causation theory does *not* require that any fraud or false statement be revealed. As the Ninth Circuit explained, ultimately, loss causation is just the "familiar test for proximate cause": a "context-dependent inquiry" where "there are an infinite variety of ways for a tort to cause a loss." *Id.* at 753. To plead loss causation, "plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Id*. While a "corrective disclosure[]" or revelation of fraud in the marketplace is one of the "infinite" ways to show proximate cause, a disclosure need not actually "correct" a prior misstatement or reveal an alleged fraud to cause a loss. As the Ninth Circuit explained most recently:

> Even if a later disclosure does not refer directly to an alleged misrepresentation, it may reveal "true facts concealed" by such misrepresentation. If so, the "truth becomes known," and a changed market price may indicate how the market would have reacted had the defendant told the truth from the start.

*Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sept. 26, 2025) (cleaned up). Thus, a plaintiff can "prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, *even if the market was unaware at the time that fraud had concealed the miss*." *First Solar*, 881 F.3d at 754.

In this case, Defendants misled investors and inflated the price of Illumina shares by making a series of misrepresentations concerning GRAIL's valuation and Galleri's prospects, Illumina's ability to accelerate Galleri's commercialization, Galleri's efficacy and FDA approval timeline, and Defendants' justifications for pursuing GRAIL. Investors suffered losses when adverse facts concealed by these misrepresentations came to light and, in each case, caused statistically significant

stock price declines. These disclosures include when investors learned that GRAIL was worth a fraction of what Defendants' portrayed; its Galleri test was ineffective and problematic; Galleri's public FDA approval and "broad reimbursement" timeline failed to materialize; and the deal was not "arms' length negotiation" but instead driven by self-interest and undisclosed conflicts of interest. Analyzing these allegations holistically, as required, shows loss causation is amply alleged here. *See, e.g., Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *25 (N.D. Cal. Sept. 18, 2024) ("*CareDX I*") ("When considering all the disclosures together, Plaintiffs have sufficiently alleged loss causation.").

The Complaint's now amended loss causation allegations clearly plead the "link" between each loss causing event and "each Defendant's prior misstatement on that topic," *In re Illumina, Inc. Sec. Litig.*, 2025 WL 2739655, at *3 (S.D. Cal. Sept. 26, 2025), and provide enough factual content to give the "defendant some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). To be clear, however, the Court is not required to lay the alleged misstatements and loss-causing disclosures "side-by-side" in order to assess loss causation, as Defendants wrongly urge (Ill.Br. 37), and doing so invites error. *See Zillow*, 2025 WL 2741642, at *1.

Defendants' other loss causation challenges are flawed because they impermissibly presume that their statements were truthful, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020), ignore Ninth Circuit law, and ask the Court to make premature and incorrect factual findings about whether certain loss-causing events were "sufficiently" corrective by mischaracterizing the Complaint. *See, e.g.*, Ill.Br. 37. Defendants also incorrectly contend, contrary to Ninth Circuit law, that partial loss causing events cannot correct the same misstatements. *See, e.g., BofI*, 977 F.3d at 790 ("a corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop"); *see also In re Evolus Inc. Sec. Litig.*, 2021 WL 4251957, at *4 (S.D.N.Y. Sept. 17, 2021) (similar). None have merit.

### 1.    Closure Of The GRAIL Acquisition On August 12, 2021

On July 22, 2021, Illumina misleadingly represented that it would "continue to work with the EC to assure it has the information and assurances necessary" to approve the GRAIL acquisition, while deSouza noted that the "deal contract lasts till December 20" 2021 and that Defendants were "committed to working through this period." ¶189. Analysts credited and repeated these misstatements. ¶190.

On August 18, 2021, Illumina surprised investors by announcing the exact opposite: it had closed the GRAIL acquisition without EC approval. Analysts were "surprised," noting the closing was "premature," unexpected, and revised their ratings downward. ¶191. In response, the price of Illumina common stock declined nearly 7.9% on extremely high trading volume. ¶192. This is a *classic* example of a loss-causing event. *See, e.g., Pampena v. Musk*, 705 F. Supp. 3d 1018, 1052-54 (N.D. Cal. 2023) (loss causation where "Defendant announced that he would move forward with the deal" after previously mispresenting reasons merger was held up).

Based on an implausible and incorrect reading of their false statements, Defendants argue that these disclosures neither corrected any prior misstatement nor reveal new information. Ill.Br. 37, Gr.Br. 18. To the contrary, the announcement of closing the deal despite the standstill revealed that Defendants would ***not*** continue to work through the expiration of the deal contract to obtain regulatory approval, which is "just what a corrective disclosure *is*—correcting a misstatement by disclosing the truth." *Bond v. Clover Health Invs.*, Corp., 587 F. Supp. 3d 641, 680 (M.D. Tenn. 2022) (emphasis in original). Defendants' reliance on *Palm Harbor* for the contrary proposition is misplaced, as the disclosure there concerned only "confirmatory information," unlike the new, contradictory information here. *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023).[16]

---

[16] The GRAIL Defendants also argue Plaintiffs do not allege this particular corrective disclosure (and one other) "corrected any GRAIL statements." Gr.Br. 18. But this is irrelevant as to the Illumina Defendants, and ignores that these disclosures corrected

## 2. The November 23, 2021 *Diagnostics* Article And June 10, 2022 *New York Times* Article

On November 23, 2021, three leading pathology, pathobiology, and biochemistry clinicians published an article in the peer-reviewed journal analyzing "the latest experimental data" from GRAIL. The analysis "confirmed the [test's] low sensitivity for early cancer detection," "cast[] doubt" on whether Galleri was "a viable pan-cancer clinical screening tool," and rebutted GRAIL's new analysis of its own clinical data. ¶¶196-97. The article directly questioned the veracity of Defendants' prior representations concerning Galleri's (i) ability to effectively "detect[] 50 different cancers," (ii) the purportedly "peer-reviewed" clinical evidence supporting Galleri's effectiveness, including that the test's "value has been demonstrated" and that the "technology works" (iii) Galleri's prospects for FDA approval, and (iv) the test's ability to "save lives." Disclosures such as these are more than sufficient to allege loss causation. *See, e.g.*, *Iso Ray*, 189 F. Supp. 3d at 1079-80 (loss causation where article that "did not disclose anything new" communicated study findings with "much greater intensity and credibility").

Defendants argue that because the article "merely commented on data the market already had, it was not a corrective disclosure." Ill. Br. 38. But Defendants' cited authority ***confirms*** that a disclosure contradicting published data can be corrective where "expertise or specialized skills" are needed to analyze the data. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024). And the new, rigorous scientific analysis presented in *Diagnostics* that contradicted Defendants' own claims about Galleri fits comfortably within the Ninth Circuit's description of a loss causing event. ¶¶196-98; *see, e.g.*, *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *11 (C.D. Cal. Mar. 26, 2025) (factors used to evaluate whether information was new include the "complexity of the data" analyzed and the "effort needed to locate and analyze [it]"); *see also Iso Ray*, 189 F. Supp. 3d at 1079-80.

---

inflation caused by GRAIL's scheme conduct. *See* ¶¶187, 472, 496-500; *infra* at 65.

Next, on June 10, 2022, before market open, *The New York Times* published an article highlighting the dangers posed by Galleri.  The article relayed previously unpublished warnings from thought leaders, a former member of GRAIL's advisory board, researchers, clinicians, and a former Director with National Cancer Institute—all of whom expressed concern with the test's unproven efficacy and the harms it invited, noting that "finding cancers earlier could mean just as many deaths, with the same timing as without early diagnosis." ¶211. The article's conclusions concerning Galleri directly undermined Defendants' prior false and misleading statements concerning the test's (i) ability to "detect[] 50 different cancers before they are symptomatic" and "very low false positive rate," (ii) the purportedly "peer-reviewed" clinical evidence supporting Galleri's effectiveness, including that the test's "value has been demonstrated" and that the "technology works" (iii) Galleri's prospects for FDA approval, and (iv) the test's ability to "save lives."

Defendants contend that the June 10, 2022 disclosure did not reveal anything new related to criticisms of Galleri or its evidence base (Ill.Br. 39), but they ignore the Complaint's allegations that this was new. *E.g.*, ¶210 (new information from expert *who had worked at GRAIL* about insufficiency of the studies).  Indeed, that's exactly how the market and analysts perceived it—as the new information triggered a nearly 10% stock decline and forced Defendants to put out their own formal response to *The New York Times* in order to stem the stock price decline. ¶214. Particularly in light of the inherent difficulty of interpreting of scientific data, the article's synthesis of insider accounts and views of the leading scientists in this area clearly alleges loss causation. *See, e.g.*, *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1187 (9th Cir. 2024) (loss causation alleged because information previously in market was not "readily digestible" until synthesized in report).

### 3.    GRAIL's Negative Financial Performance And True Value

Starting in January 2022, Defendants issued and reaffirmed GRAIL revenue guidance of $70-90 million, stated that Galleri was "gaining traction," that specific

customers were driving these revenues, and that GRAIL was "on track" to meet it. ¶¶143-47. In truth, GRAIL's guidance lacked a reasonable basis, and Galleri was not gaining traction with payors and not "on track" to meet the unsupportable guidance. ¶148. The relevant "truth" concealed by these misstatements was revealed on May 5 and August 11, 2022, when Illumina reported an earning miss, slashed guidance, and stalled "commercial progress" from health centers. ¶¶218-19.

As the Ninth Circuit held in *First Solar* and has repeatedly affirmed, a stock price decline following an earning miss pleads loss causation "even if the market was unaware at the time that fraud had concealed the miss"—*i.e.*, exactly what happened here. 881 F.3d at 754; *see, e.g.*, *Berson*, 527 F.3d at 989-90 (disclosure revealing revenue declines but not underlying causes); *see also DocuSign*, 669 F. Supp. 3d at 849, 887 ("plaintiffs may show loss causation by showing that DocuSign's stock price fell upon the revelation of an earnings miss.").

Separately, on November 9, 2023, Illumina announced that it would be taking an $821 million impairment due to GRAIL and that GRAIL revenues would come in "at the low end" of the guidance range, missing analyst already revised expectations. ¶237. Analysts immediately reacted to the news of the new impairment. ¶239. Defendants' disclosures concerning GRAIL's write down and disappointing guidance directly related to Defendants' prior misleading statements concerning GRAIL's valuation in the S-4 (¶240), and directly undermined Defendants' prior misstatements concerning Galleri's clinical effectiveness, "value," "proven technology," and ability to "save lives"—as it communicated the reality of Galleri's lackluster sales and true financial prospects arising from the growing scientific and customer consensus concerning Galleri. As a result, analysts understood that GRAIL was worthless, with UBS reporting that it had assigned it a "~$0 valuation." Announcements of impairments and write downs like the one here are similar to earnings misses, and regularly found to be loss causing events. *See, e.g.*, *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *17 (N.D. Ill. Aug. 11, 2021).

Defendants argue that disclosure of Illumina's poor financial health does not "correct" any misstatement, and thus, fails to plead loss causation. Ill.Br. 38-40; Gr.Br. 19. Not so. *First Solar* rejected this argument, and held that Defendants' restrictive test requiring a market revelation of fraud is not the law. 881 F.3d at 753-54 ("restrictive" test from prior precedent "should be understood as fact-specific variants of the basic proximate cause test").[17] The same is true here: the Complaint expressly alleges a *First Solar* causation theory (¶¶184-87), the earnings misses and GRAIL impairment revealed the truth about Galleri's problems that were concealed by Defendants' misstatements, and are more than sufficient. 881 F.3d at 750.

### 4.   Disclosures Concerning Conflicts And Accounting

The disclosures of the CFO's surprise departure (¶¶209, 215) (June 9, 2022), the "resignations" of deal "co-sponsors" Aravanis and Febbo, together with the simultaneous disclosure of an SEC investigation into the acquisition (¶¶224-26) (August 9-10, 2023), and the revelations of Illumina insiders' "personal stake" and fiduciary breaches (¶¶234-36) (October 20, 2023) were each causally related to Defendants' misrepresentations concerning Defendants' undisclosed conflicts of interest and Illumina's fraudulent accounting. ¶¶228, 244. At the time of the disclosures, analysts immediately connected them to Defendants' statements about GRAIL, which "remained highly controversial in the investment community." ¶215.

The "combination of partial disclosures" here—including executive resignations, together with disclosures of an SEC investigation, and corroborating

---

[17] *See also* Jay W. Eisenhofer, *Toward A Corporate Finance-Based Theory of Loss Causation*, 59 Bus. Law. 1419, 1444 (2004) ("the disclosure that drives down the stock price need not be a disclosure that fraud has taken place….[i]*t may simply be that future performance will be less than previously expected*."). Defendants' citation to *Oracle*, Ill.Br. 38-39, and cases where plaintiffs specifically plead a "market revelation of the fraud" theory are irrelevant, as the courts there "naturally evaluate[d] whether" that standard had been met. *First Solar*, 881 F.3d at 752-54. *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1006 (N.D. Cal. 2016) (Ill.Br. 39) is inapposite given that the opinion addressed falsity, not loss causation.

allegations from a then-current director, each followed by statistically significant stock declines—is sufficient. *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at \*12 (S.D. Cal. July 12, 2016) (finding similar disclosures sufficient); *see, e.g.*, *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at \*12 (C.D. Cal. Jan. 26, 2021) (disclosure revealing "fact" (but not contents) of whistleblower letter); *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 997 (D. Ariz. 2015) (departure of CEO); *Rudolph v. UTSTarcom*, 2008 WL 4002855, at \*4 (N.D. Cal. Aug. 21, 2008) (disclosures putting market "on notice" more "might be forthcoming" sufficient).

Defendants' arguments are unavailing. Defendants first contend that all of the information contained in Icahn's verified complaint was already public. Ill.Br. 41-42. This is clearly wrong—Icahn nor any other director or executive had *ever* filed suit, and the complaint here was based on inside information from a director who alleged the blockbuster fact (among others) that Illumina Board members had a "personal stake" in the deal. ¶¶230-36. This alleges loss causation. *See BofI*, 977 F.3d at 788, 791 (loss causation pleaded by insider's whistleblower suit).

Defendants next contend that the announcement of an SEC investigation, standing alone, is insufficient to establish loss causation. Ill.Br. 39, Gr.Br. 8. In doing so, Defendants rely on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) and its progeny, ***all of which pre-date the Ninth Circuit's clarification of the law on loss causation in First Solar***. To be clear: the Ninth Circuit has held that the announcement of an investigation ***does plead*** loss causation where there is a subsequent event that constitutes something "more." *Lloyd v. CVB Fin. Corp.*, 811 F.3d at 1210-11 (9th Cir. 2016); *Mattel*, 2021 WL 1259405, at \*11-13. Here, the announcement of an investigation was combined with a significant stock price declines ***and*** subsequent confirming events—including the suspicious simultaneous resignations of the deal's "co-sponsors," a verified complaint by an Illumina director that accused Defendants of lying, and the subsequent revelation that GRAIL was worth a fraction of what Illumina paid. This is sufficient. ¶¶238-42; *CareDX I*, 2024

WL 5399664, at *25 (sustaining loss causation event based on government investigation even though the investigation was later dropped); *see also CareDX II*.[18]

### D.     The Complaint Adequately Pleads Scheme Liability

Defendants are liable for their scheme to defraud investors.  The Ninth Circuit has rejected Defendants' argument that Rule 10b-5(a) and (c) "are violated only when conduct other than misstatements is involved." *Alphabet*, 1 F.4th at 709 & n.10; Ill.Br. 42; Gr.Br. 18. Rather, liability extends to "a scheme to take advantage of misleading statements." *See, e.g.*, *Vaxart*, 2023 WL 3637093, at *3.

Here, Defendants engaged in a scheme to defraud investors so that insiders could profit by, among other things: (i) using non-public knowledge of the acquisition to "invest" tens of millions in GRAIL; (ii) concealing evidence of insiders' personal stakes in GRAIL by violating GAAP; (iii) purchasing $300 million in D&O insurance at an exorbitant $72 million premium, lying about it, and closing the deal to enrich insiders; (iv) disseminating false statements that over-valued GRAIL; and, (v) making false and unsubstantiated claims about Galleri's effectiveness. ¶500. Courts have repeatedly upheld scheme liability claims like those here. *See, e.g.*, *SEC v. Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021) (scheme where defendants "made actionable misrepresentations" and "created false appearances of fact by misleading" investors about sustainability of business).

The Illumina Defendants do not contest this, except to argue in a footnote that the scheme claims fail because (they argue) they are not liable under 10b5-(b). Ill.Br.

---

[18] Defendants argue that the SEC's decision here militates against loss causation. Ill.Br. 39, Gr.Br. 18. But the SEC's enforcement priority shift (¶255) is irrelevant. SEC policy and courts are clear that a non-prosecution decision cannot be considered because it can be based on things (like workloads) that are "***clearly irrelevant***" to the merits. *See, e.g.*, Exchange Act Release No. 9796, at 3 (Sept. 27, 1972); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012) ("We draw no inference from the SEC's decision"); *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016) (announcement related to SEC investigation was loss causing event despite SEC's "no recommendation for enforcement").

40 n.27. Defendants are wrong three times. ***First***, Defendants' footnote argument operates as waiver. *See, e.g.*, *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 610, n.7 (M.D. Tenn. 2020) (scheme liability challenge "relegated to a mere footnote" waived); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 499 (S.D.N.Y. 2012) (similar). ***Second***, the Complaint adequately alleges misstatement claims under 10b-5(b). *See supra* Sections III.A-B. ***Last***, the Illumina Defendants' scheme conduct includes *both* the dissemination of false statements *and* conduct by each Illumina Defendant beyond dissemination. *Alphabet*, 1 F.4th at 709 ("disseminating false statements r[uns] afoul of subsections (a) and (c).").

For their part, the GRAIL Defendants argue Bishop and Ofman's scheme misconduct is not adequately alleged. Gr.Br. 19-20. But the Complaint pleads their scheme conduct, including Bishop and Ofman's reaping $155 million in illicit profits by assisting in drafting false media reports and other misstatements about Galleri and GRAIL. *See* ¶¶283-84, 286; *In re Galena Biophama, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. Aug. 5, 2015) (editing and approving articles were "actions" beyond misstatements supporting scheme); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic*, 845 F.3d 384, 393 (8th Cir. 2016) (scheme where company induced edits to medical journal articles). And Klausner covertly secretly orchestrated the deal with deSouza for personal gain. *See* ¶¶156-168; *Vaxart*, 2023 WL 3637093, at *2 (upholding similar allegations).

## IV.  CONCLUSION

Defendants' motions should be denied. If the motions are granted in any part, Plaintiffs respectfully request leave to amend. *See Daou*, 411 F.3d at 1013.

Dated: February 4, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton (*pro hac vice*)
(johnr@blbglaw.com)
Michael D. Blatchley (*pro hac vice*)
(michaelb@blbglaw.com)
Alec Coquin (*pro hac vice*)
(alec.coquin@blbglaw.com)
Michael M. Mathai (*pro hac vice*)
(michael.mathai@blbglaw.com
Emily A. Tu (*pro hac vice*)
(emily.tu@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiffs Universal and ACATIS, and Lead Counsel for the Class*